

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |
|---|---|
| )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **FILED**<br><br>**JAN 16 2009**<br><br>**Clerk, U.S. District and<br>Bankruptcy Courts** |

NATIONAL PARKS CONSERVATION )
ASSOCIATION )
1300 19th Street, NW Suite 300 )
Washington, DC 20036 )
)
          Plaintiff, )
)
                                          Civil Action No.
v. )
)
DIRK KEMPTHORNE, in his official )
capacity as Secretary of the United States )
Department of the Interior, )
1849 C Street, NW, Washington, D.C. )
20240, )
)
BRENT WAHLQUIST, in his official )
capacity as Director of the United States )
Office of Surface Mining Reclamation )
and Enforcement, )
1951 Constitution Ave., NW, )
Washington, D.C.  20240, and )
)
STEPHEN L. JOHNSON, in his official )
capacity as Administrator of the United )
States Environmental Protection Agency, )
Ariel Rios Bldg., 1200 Pennsylvania )
Ave., NW, Washington, D.C. 20460, )
)
          Defendants )
)
)
)
)
)

Civil Action No.

Case: 1:09-cv-00115
Assigned To : Kennedy, Henry H.
Assign. Date : 1/16/2009
Description: Admin. Agency Review

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

# COMPLAINT

## NATURE OF ACTION

1.  This action challenges the promulgation on 12 December 2008 by the United States Office of Surface Mining Reclamation and Enforcement ("OSM") of the Final Rule for "Excess Spoil, Coal Mine Waste, and Buffers for Perennial and Intermittent Streams," 73 Fed. Reg. 75,814 (12 Dec. 2008) ("stream buffer zone" or "SBZ" "Final Rule"). This action also challenges the written determination of the United States Environmental Protection Agency ("EPA"), issued on 2 December 2008, concurring in OSM's promulgation of the SBZ Final Rule. The rule took effect on 12 January 2009.

2.  OSM's action reverses the agency's long-standing policy and stream buffer zone rule, in effect since 1983 ("1983 SBZ rule"). The 1983 SBZ rule prohibited disturbances in or within 100 feet of a perennial or intermittent stream by surface mining activities ("100-foot buffer" or "buffer" "requirement") unless the regulatory authority specifically authorized surface mining activities closer to, or through, such a stream, and only upon finding that the surface mining activities would not cause or contribute to the violation of state or federal water quality standards, and would not adversely affect the water quantity and quality or other environmental resources of the stream. 30 C.F.R. §§816.57(a)(1), 817.57(a)(1).

3.  The SBZ Final Rule significantly alters the 1983 SBZ rule by, inter alia, exempting from the 100-foot buffer requirement valley fills and other mining activities in or adjacent to streams merely upon a showing by the operator that avoidance is not reasonably possible. See SBZ Final Rule §§780.25(d) and 784.16(d)(coal mine waste

impoundments and refuse piles); §§780.35(a)(3) and 784.19(a)(3)(disposal of excess

spoil); §§780.28(a)-(e), 784.28(a)-(e), 816.57(a),(b), and 817.57(a),(b)(mining activities

in or adjacent to perennial or intermittent streams); see also 73 Fed. Reg. 75,876-85.  The

Rule further eliminates the requirement that the regulatory authority must find that such

activities do not cause or contribute to violations of water quality standards and do not

adversely impact water quantity and quality and the environmental values of the stream.

§§816.57(a),(b); 817.57(a),(b); 73 Fed. Reg. 75,818, 75,883-85.

    4.  The SBZ rule change will have significant negative effects on water quality and

stream health by condoning mining operations that have already devastated Appalachian

streams in part through lack of enforcement of the 1983 SBZ rule.  Mountaintop mining

operations that occurred between 1992 and 2002, including valley fills and other

permitted activities, directly impacted 1,208 miles of streams in the coal fields of central

Appalachia.  See OSM, Excess Spoil Minimization Stream Buffer Zones, Final

Environmental Impact Statement at IV-145 (Sept. 2008) [hereinafter SBZ FEIS]; U.S.

EPA, Mountaintop Mining/Valley Fills in Appalachia Draft Programmatic

Environmental Impact Statement, at IV B-I (2003) [hereinafter MTM/VF DEIS].

Between 1985 and 2001, valley fills, in particular, annihilated an estimated 724 stream

miles.  SBZ FEIS at IV-145; see also MTM/VF DEIS at B-II.  EPA predicted in 2003

that if mining operations continue at these rates, an additional 4.1% of the streams in

central Appalachia would suffer direct impacts over the course of ten years, and that an

additional 724 miles of headwater streams would be lost by 2013.  SBZ FEIS at IV-145;

73 Fed. Reg. 75,875.

5.  The changes to the 1983 stream buffer zone rule will only exacerbate these conditions, in violation of the environmental protection provisions set forth in the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §1201 et seq., and the Clean Water Act, 33 U.S.C. §1251 et seq. ("CWA").

6.  The change in the SBZ rule also constitutes agency "action" that "may affect" threatened and endangered species and critical habitat of aquatic species, within the meaning of the Endangered Species Act ("ESA"), 16 U.S.C. §§1531-1544, triggering the requirement to initiate formal consultation with the United States Fish and Wildlife Service ("FWS") before promulgating the rule. See 50 C.F.R. §402.14(a)(requirement for formal consultation); id. §402.02(b)(defining agency action expressly to include the promulgation of rules). Additionally, under SMCRA regulations, no surface mining activity shall be conducted which is likely to jeopardize the continued existence of endangered or threatened species or which is likely to result in the destruction or adverse modification of designated critical habitats of such species in violation of the ESA. 30 C.F.R. §816.97(b).

7.  OSM unlawfully refused to initiate formal consultation, relying on an invalid biological opinion issued by the FWS in September 1996 to evade its legal obligations. FWS, Formal Section 7 Biological Opinion and Conference Report on Surface Coal Mining and Reclamation Operations Under the Surface Mining Control and Reclamation Act of 1977 (24 Sept. 1996) [hereinafter 1996 BiOp], *available at* http://www.osmre.gov/guidance/docs/biologicalopinion.pdf.

8.  In the 1996 BiOp, the FWS summarily concluded that SMCRA and its regulations provided a sufficient level of protection such that their "requirements will avoid

jeopardizing any listed species or adversely modifying any designated critical habitat in violation of the [ESA]." 1996 BiOp at 10.   The 1996 BiOp has been wholly inadequate to prevent jeopardy to threatened and endangered species, as evidenced by the new listings of species and designation of critical habitat and the numerous scientific studies since the issuance of the 1996 BiOp showing the adverse impacts on listed species from surface mining.   Moreover, the conclusion in the 1996 BiOp was premised on the Act and regulations in place at the time, including the 1983 SBZ rule.   Because the SBZ Final Rule changes these assumptions, OSM's reliance on the BiOp to evade its formal consultation requirements under 50 C.F.R. §§402.14(a) and 402.02 is unlawful. Likewise, EPA was obligated to initiate formal consultation with the FWS before concurring in OSM's promulgation of the rule, which it failed to do.

9.   OSM and EPA's failure to initiate formal consultation before promulgating and concurring in, respectively, the SBZ Final Rule violates the agencies' procedural and substantive duties under section 7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2), and under the SMCRA regulations, 30 C.F.R. §816.97(b).   Their actions are therefore arbitrary, capricious, an abuse of discretion, and otherwise inconsistent or not in accordance with law in violation of SMCRA, 30 U.S.C. §1276, and the Administrative Procedure Act ("APA"), 5 U.S.C. §706.

10.   Plaintiff asks the Court to:   (1) declare that the SBZ Final Rule is arbitrary and capricious, an abuse of discretion, and otherwise inconsistent or not in accordance with law in violation of the APA, 5 U.S.C. §706, and SMCRA, 30 U.S.C. §1276; (2) declare that OSM violated SMCRA, 30 U.S.C. §§1202(a), (d), 1265(b)(10), (b)(22), (b)(24), (c)(4), and 1266(b)(11); (3) declare that OSM violated §7(a)(2) of the ESA, 16 U.S.C.

5

§1536(a)(2), by failing to initiate consultation with the FWS to insure that the SBZ rule

change would not jeopardize listed species; (4) declare that EPA's written concurrence

under SMCRA §501, 30 U.S.C. §1251, violated §§101, 303 of the CWA, 33 U.S.C.

§§1251, 1313 and implementing regulations, 40 C.F.R. §§131.5, 131.12, 230.10(b)-(c);

and §7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2); (5) declare that the 1996 BiOp is

invalid; (6) vacate the SBZ Final Rule; (7) vacate EPA's concurrence in the SBZ Final

Rule; (8) vacate the 1996 BiOp; (9) award to the Plaintiff its costs and expenses of this

action, including reasonable attorneys' fees; and (10) grant such other relief as the Court

deems just and proper.

## JURISDICTION AND VENUE

11.   This action arises under SMCRA, 30 U.S.C. § 1201 et seq., the CWA, 33 U.S.C.

§1251 et seq., the ESA, 16 U.S.C. §1531 et seq., and the APA, 5 U.S.C. §700 et seq.

This Court has jurisdiction over the action pursuant to 28 U.S.C. §1331 (federal question

jurisdiction), 28 U.S.C. §2201 and §2202 (declaratory and injunctive relief), and 30

U.S.C. §1276(a) (1) (SMCRA judicial review).  Venue is proper in this Court pursuant to

30 U.S.C. §1276(a)(1), 5 U.S.C. §703, and 28 U.S.C. §1391(e).

## PARTIES AND STANDING

12.   Plaintiff National Parks Conservation Association ("NPCA") is an independent,

nonprofit, membership organization that was founded in 1919.  It is the only such

organization specifically dedicated to the protection of the country's national park

system.  NPCA's Southeast Regional office in Knoxville works to protect National Park

Service ("NPS") managed lands throughout the southeast, including the Big South Fork

National River and Recreation Area ("NRRA") in Tennessee.

13.  Because of its biodiversity, the Big South Fork NRRA provides habitat for world-class freshwater mussel assemblage and is an important refuge for many endangered mussel species. The Big South Fork NRRA has more extant federally endangered fish and imperiled mussel species than any other park service unit in the country, and these species are at risk from destructive coal mining practices in the headwaters of the Big South Fork NRRA. NPCA is working to protect the park's aquatic diversity from threats from active coal mining.

14.  Over 5,400 of the NPCA's 337,000 members live in Tennessee; more than 11,000 members live in Virginia; and approximately 3,000 and 1,300 members live in Kentucky and West Virginia, respectively. NPCA's Southeast Regional office serves Tennessee and Kentucky, and its Mid-Atlantic Regional Office, located in Arlington, Virginia, serves Virginia and West Virginia. Plaintiff's Mid-Atlantic Regional Office works to protect the Gauley River National Recreation Area and the New River Gorge National River in West Virginia that are also threatened by surface mining, including mountaintop removal mining.

15.  Plaintiff's members live, recreate, use, and/or enjoy the National Park Service managed lands near mining areas. Their use and enjoyment of these areas is reduced by mining activities. NPCA's members will suffer injuries to their aesthetic, recreational, environmental and/or economic interests by stream filling and disturbances related to mining activities that are authorized pursuant to the SBZ Final Rule. These activities devastate the landscape, bury miles of streams, obliterating all life within the stream, and result in downstream pollution and harm to aquatic species, including federally listed

mussel and fish species in the Big South Fork NRRA and other Appalachian river systems.

16. Plaintiff NPCA participated in the administrative proceedings by submitting oral and written comments to OSM and EPA on the proposed SBZ rule change. See Letter to OSM from Southern Environmental Law Center ("SELC") (23 Nov. 2007); Letter to EPA from SELC (21 Nov. 2008). On 15 January 2008, Plaintiff, along with other petitioners represented by SELC, also submitted a petition to OSM and FWS requesting that OSM carry out its duty to reinitiate consultation based on triggers set forth in the ESA regulations, which OSM declined to do. See Petition Before the U.S. Fish & Wildlife Service and the Office of Surface Mining Reclamation and Enforcement to Reinitiate Formal Consultation on All Surface Mining Activities Conducted Under the Authority of the Surface Mining Control and Reclamation Act of 1977 [hereinafter Petition to Reinitiate](Exhibit 1).

17. Defendant Dirk Kempthorne is the Secretary of the Interior and is sued in his official capacity. OSM is part of the Department of the Interior. The Secretary has the ultimate authority under §501(b) of SMCRA, 30 U.S.C. §1251(b), to issue rules for surface coal mining activities.

18. Defendant Brent Wahlquist is the Director of OSM and is sued in his official capacity. In enacting SMCRA, Congress created OSM "to administer the programs for controlling surface coal mining operations which are required by this Act." 30 U.S.C. §1211. OSM has the authority to "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions" of SMCRA. 30 U.S.C.

§1211(c).  Defendant Wahlquist caused the SBZ Final Rule to be promulgated on 12

December 2008, with an effective date of 12 January 2009.

19.    Defendant Stephen Johnson is the Administrator of EPA and is sued in his

official capacity.  He is charged by §501(b) of SMCRA, 30 U.S.C.

§1251(b)[incorporating §501(a)(B)], with making a concurrence determination before the

Secretary of the Interior or OSM may promulgate any regulation that relates to air and

water quality standards.  He is also charged with administering and carrying out the

purposes and provisions of the CWA, 33 U.S.C. §1251 et seq.  On 2 December 2008 he

concurred in the promulgation of the SBZ Final Rule.

## FACTUAL AND STATUTORY BACKGROUND

### The Surface Mining Control and Reclamation Act of 1977

20.   Under SMCRA, OSM has responsibility for "the establishment of appropriate

standards to minimize damage to the environment . . . and to protect the health and safety

of the public." 30 U.S.C. §§ 1201(d), 1211(c).   SMCRA establishes various requirements

intended to minimize impacts on the environment from mining operations.  These

include, among others, requirements that mining operations will "minimize disturbances

and adverse impacts . . . on fish, wildlife, and related environmental values," 30 U.S.C.

§1265(b)(24); will "minimize the disturbances to the prevailing hydrologic balance at the

mine-site and in associated offsite areas" and minimize disturbances "to the quality and

quantity of water in surface and ground water," 30 U.S.C. §1265(b)(10); and that "no

damage will be done to natural watercourses," 30 U.S.C. §1265(c)(4)(D).  These and

other requirements apply to the disposal of excess rock that is created from surface

mining operations, typically referred to as "excess spoil," and to coal mine waste.

21.   Additionally, under SMCRA regulations, "[n]o surface mining activity shall be

conducted which is likely to jeopardize the continued existence of endangered or

threatened species . . . or which is likely to result in the destruction or adverse

modification of designated critical habitats of such species in violation of the [ESA]." 30

C.F.R. §816.97(b).

## The Endangered Species Act

22.   The ESA was enacted in 1973, in order to "provide a means whereby the

ecosystems upon which endangered species and threatened species depend may be

conserved [and] to provide a program for the conservation of such endangered species

and threatened species . . . ." 16 U.S.C. §1531(b).   Section 7(a)(2) of the ESA requires

administering agencies to seek consultation to "insure that any action authorized, funded,

or carried out by such agency . . . is not likely to jeopardize the continued existence of

any endangered species or threatened species or result in the destruction or adverse

modification" of designated critical habitat for the species. 16 U.S.C. §1536(a)(2).   In

making this determination, agencies must "use the best scientific and commercial data

available." Id.

23.   Formal consultation must take place for agency "actions" that "*may* affect listed

species or critical habitat." 50 C.F.R. §402.14(a)(emphasis added).   Under the ESA

regulations, "[a]ction means all activities or programs of any kind authorized, funded, or

carried out, in whole or in part, by Federal agencies" including "the promulgation of

regulations," 50 C.F.R. §402.02(b), and actions "directly or indirectly causing

modifications to the land, water, or air," 50 C.F.R. §402.02(d).

24.  During formal consultation the FWS must formulate and provide the federal agency with its biological opinion regarding whether the action, along with cumulative effects, is likely to "jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. §§402.14(h), 402.14(g)(4).  The biological opinion is required to include "[a] summary of the information" that it is based upon, "[a] detailed discussion of the effects of the action on listed species or critical habitat," and any "reasonable and prudent alternatives" to the action.  50 C.F.R. §402.14(h).  If the FWS finds that it is likely to jeopardize a species or its habitat, the opinion is referred to as a "jeopardy biological opinion"; if the FWS determines that the action will not likely jeopardize a species or its habitat, then the opinion is a "no jeopardy opinion." Id. §402.14(h)(3).

25.  Additionally, a federal agency must reinitiate formal consultation with the FWS "where discretionary Federal involvement or control over the action has been retained or is authorized by law" and at least one of the following four criteria is met:

(a)     If the amount or extent of taking specified in the incidental take statement is exceeded;

(b)     If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c)     If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d)     If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. §402.16.

## The Clean Water Act

26.  The purpose of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA §101(a), 33 U.S.C. §1251(a).  To that

end, the Act establishes water quality standards in order to protect public health and

water supplies, the propagation of fish, shellfish, and wildlife, and to provide for

recreation in and on the waters.  Id. §1251(a)(2); see generally CWA §303, 33 U.S.C.

§1313.  The Act charges EPA with the duty to approve state standards or disapprove and

promulgate federal standards, which must ensure, at a minimum, that existing instream

water uses and the level of water quality necessary to protect those uses shall be

maintained and protected.  Id.; 40 C.F.R. §§131.5, 131.12.  The Act also sets as a

national goal the elimination of the discharge of pollutants into waters of the United

States, CWA §101(a)(1), 33 U.S.C. §1251(a)(1), and prohibits discharges that will

jeopardize the continued existence of threatened or endangered species.  See, e.g., 40

C.F.R. § 230.10(b)-(c)(restrictions on discharge of dredged or fill material).

### The Stream Buffer Zone Rule

27.  The 1983 SBZ rule provides: "No land within 100 feet of a perennial stream or an

intermittent stream shall be disturbed" by underground or surface mining activities,

"unless the regulatory authority specifically authorizes . . . mining activities closer to, or

through, such a stream.  The regulatory authority may authorize such activities only upon

finding that . . . mining activities will not cause or contribute to the violation of

applicable State or Federal water quality standards and will not adversely affect the water

quantity and quality or other environmental resources of the stream."  30 C.F.R.

§§816.57(a)(1), 817.57(a)(1).

28.  The rule was adopted to carry out the environmental protection requirements set

forth in SMCRA.  Under the 1983 SBZ rule, filling or mining through streams by means

such as valley fills and heads-of-hollow fills, and placement of mine waste disposal

facilities, could only be permitted upon the required finding that they would not violate

water quality standards or adversely affect the water quantity and quality or other

environmental resources of the stream.  30 C.F.R. §§ 816.57(a)(1), 817.57(a)(1).  The

SBZ Final Rule expressly excludes excess spoil fills and coal mine waste disposal

facilities in a perennial or intermittent stream from the buffer requirement if avoidance

"is not reasonably possible," §§780.25(d); 780.35(a)(3), 784.16(d); 784.19(a)(3); and it

requires no finding that such activities will not adversely affect the water quantity and

quality and related environmental resources of the stream.  See 73 Fed. Reg. 75,818,

75,853.

    29.  The SBZ Final Rule significantly changes the 1983 rule and will result in

significant harm to streams and aquatic life.  As Judge Haden, Chief Judge of the District

Court for the Southern District of West Virginia, stated:

> When valley fills are permitted in intermittent and
> perennial streams, they destroy those stream segments. The
> normal flow and gradient of the stream is now buried under
> millions of cubic yards of excess spoil waste material, an
> extremely adverse effect. If there are fish, they cannot
> migrate. If there is any life form that cannot acclimate to
> life deep in a rubble pile, it is eliminated. No effect on
> related environmental values is more adverse than
> obliteration. Under a valley fill, the water quantity of the
> stream becomes zero. Because there is no stream, there is
> no water quality.

Bragg v. Robertson, 72 F. Supp. 2d 642, 661-62 (S.D. W. Va. 1999).  Judge Haden found

that the 1983 SBZ rule prohibited the burial of intermittent and perennial streams under

valley fills of excess mining spoil.  Id.  Judge Haden's decision was overturned on

jurisdictional grounds, but the substance of his ruling was not addressed by the Court of

Appeals.  See Bragg v. W. Va. Coal Ass'n, 248 F.3d 275 (4th Cir. 2001).

**The 1996 Biological Opinion**

30.  On 21 March 1995, the OSM made a request to the FWS for formal ESA §7 consultation regarding "the approval and conduct of surface coal mining and reclamation operations under State and Federal regulatory programs adopted pursuant to SMCRA where such operations may adversely affect threatened or endangered species." 1996 BiOp at 3.

31.  "Surface mining" under SMCRA includes all above-ground mining activity, including above-ground impacts of underground mines, as well as coal processing facilities located on site of mining operations.  See generally 30 U.S.C. §1201 et seq.

32.  On 24 September 1996, after consulting with the OSM, the FWS issued a "no jeopardy" biological opinion, the 1996 BiOp, as well as an Incidental Take Statement ("ITS").  See 1996 BiOp.  In the mere 15-page BiOp and ITS, the FWS summarily concluded that SMCRA and its regulations provided a sufficient level of protection such that their "requirements will avoid jeopardizing any listed species or adversely modifying any designated critical habitat in violation of the [ESA]." Id. at 10. The FWS specifically found that "surface coal mining and reclamation operations conducted in accordance with properly implemented Federal and State regulatory programs under SMCRA are not likely to jeopardize the continued existence of listed or proposed species, and are not likely to result in the destruction or adverse modification of designated or proposed critical habitats." Id.

33.  The 1996 BiOp applies to all coal mining throughout the country and to all threatened and endangered species and critical habitat, whether listed or designated at the time or in the future.  Id. at 6.  FWS's sweeping conclusions were made with very little

reference to studies or data, with no reference to individual species that may be impacted,

and with no discussion of any difference of methods of mining and impacts across the

country.

34.   The 1996 BiOp has been wholly inadequate to prevent jeopardy to threatened and

endangered species as evidenced by the new listings of species and designation of critical

habitat and the numerous scientific studies since the issuance of the 1996 BiOp showing

the adverse impacts on listed species from surface mining.  See infra ¶¶ 35-45.

### The Impacts from Surface Mining Activities on Appalachian Streams and Aquatic Life

35.   It is undisputed that the direct impacts of valley fills and heads-of-hollow fills are

the obliteration of those streams buried under the excess spoil.  As OSM admits, filling or

mining through streams results in the complete destruction of "all biota living in the

footprint of the fill or in the mined area."  SBZ FEIS at IV-152.  Valley fills and head-of-

hollow fills also adversely impact downstream water quality and fish and mussel

populations, as well as other aquatic organisms.  See, e.g., Letter to Brent Wahlquist and

David Hartos, OSM, from Frank McCormick, American Society of Ichthyologists and

Herpetologists (2007), reprinted in SBZ FEIS at B-163.

36.   EPA's own studies show that mountaintop removal mining has devastated aquatic

life and water quality in the Appalachian region, resulting in the obliteration of 724

stream miles between 1985 and 2001.  SBZ FEIS at IV-145; see also MTM/VF DEIS at

B-II; SBZ FEIS at B-32 to B-33 (citing EPA, Wadeable Streams Assessment: A

Collaborative Survey of the Nation's Streams (2006)); Letter to David Hortos, OSM,

from Virginia Department of Environmental Quality at 5-6 (16 Nov. 2007)(sediment load

from mineral extraction one of "Top Ten" sources of stress on aquatic species in

Virginia, including threatened and endangered species), reprinted in SBZ FEIS at B-32 to

B-33. A 2008 monitoring study of West Virginia watersheds by EPA staff shows that

coal mining operations are "strongly related to downstream biological impairment,"

resulting in numerous adverse impacts downstream. Gregory J. Pond et al., Downstream

Effects of Mountaintop Coal Mining: Comparing Biological Conditions Using Family-

and Genus-Level Macroinvertebrate Bioassessment Tools, 27 J. N. Am. Benthol. Soc'y,

717-37 (8 July 2008)[hereinafter Pond 2008].

37.   Aquatic communities downstream of mine sites are less diverse and more

pollution-tolerant because of increased sedimentation and increased water contamination

and toxicity. See MTM/VF DEIS at IV B-4 to B-5. In addition, sites below valley fills

have substantially higher conductivity levels than sites below unmined areas. Id. at IV B-

4. High conductivity, and other water quality characteristics found downstream from

mined sites, adversely affect biological integrity. See id. at IV B-4 to B-5; SBZ FEIS at

IV-156.

**The Clinch, Powell, New River and Big South Fork of the Cumberland Rivers, and
Impacts on Threatened and Endangered Species From Surface Mining Activities**

38.   Although numerous watersheds in Appalachia contain at risk aquatic species

that are adversely affected by surface mining operations, Plaintiff focuses specifically on

the Clinch and Powell watersheds in Virginia and Tennessee and the New River and Big

South Fork of the Cumberland River in Tennessee as examples.

39.   The Clinch and Powell Rivers are part of the Tennessee River system and flow

from the coalfields of southwest Virginia into eastern Tennessee. The Big South Fork of

the Cumberland River is formed by the confluence of the New River, which begins in the

coal mining region of northeast Tennessee, and Clear Fork in Tennessee. The Big South

Fork in Tennessee forms the Big South Fork NRRA in Tennessee, administered by the

NPS. These rivers are among the most diverse temperate rivers in North America. They

are also in peril from coal mining operations. See, e.g., S.A. Ahlstedt et al., *Long-Term

Trend Information for Freshwater Mussel Populations at Twelve Fixed-Station

Monitoring Sites in the Clinch and Powell Rivers,* Final Report, U.S. Fish & Wildlife

Service, Cookeville, TN, at 2 (2005)[hereinafter Ahlstedt 2005 Report] (Petition to

Reinitiate, Exhibit 1, Att. 7)("[L]ong-term trend monitoring of mussel populations since

1979 are showing that mussel population densities and species composition are rapidly

declining in the Clinch especially in Virginia and the Powell River."); S.A. Ahlstedt et

al., *Current Status of Freshwater Mussels in the Big South Fork National River and

Recreation Area,* 14 Walkerana 33, 42, 74 (2003-04)[hereinafter Ahlstedt 2003-04

Mussel Status](Petition to Reinitiate, Exhibit 1, Att. 16)(2003 survey of the Big South

Fork identified continued deposition of silt and coal fines from mining outside of the park

as a significant negative factor for imperiled species).

40.   According to a 2000 report on biodiversity in the United States, the "upper Clinch

River on the Virginia-Tennessee border surpasses all other watersheds in the country."

S.J. Chaplin et al., *The Geography of Imperilment, in* Precious Heritage: The Status of

Biodiversity in the United States 159, 181 (B.A. Stein et al., eds. 2000)(Petition to

Reinitiate, Exhibit 1, Att. 5). The Clinch River is home to over 44 species of mussels,

Ahlstedt 2005 Report at 8, and 126 extant native fish species, U.S. Geological Survey,

P.S. Hampson et al., Water Quality in the Upper Tennessee River Basin, Circ. 1205, at 6

(2000)[hereinafter USGS 2000 Report], *available at*

http://pubs.usgs.gov/circ/circ1205/introduction.htm (Petition to Reinitiate, Exhibit 1, Att. 6).

41.   The Clinch River is also considered one of the most biologically threatened rivers in the country, because more than one-fourth of its native fish and mussel species are at-risk.  USGS 2000 Report at 6.   Of the river's vulnerable species, two fish are federally listed as endangered, two fish as threatened, fourteen mussels as endangered, and four mussels as candidates for listing.  Letter to Paul Davis, Tennessee Department of Environment and Conservation ("TDEC"), from Lee Barclay, FWS at 1 (17 Apr. 2007) [hereinafter Barclay 2007 Letter](Petition to Reinitiate, Exhibit 1, Att. 9); see also 71 Fed. Reg. 53,756, 53,788-89 (12 Sept. 2006) and 69 Fed. Reg. 24,876, 24,878 (4 May 2004)(identifying candidate species).  Studies of the Clinch River have found that mussel distribution and abundance are negatively affected by proximity to mining activity and that the toxicity of coal mining-related effluents is one of the causal factors for mussel population declines.  Ahlstedt 2005 Report at 8 (resurgence of coal mining in Clinch and Powell drainages "has set a course for major catastrophic damage that may be irreversible").

42.   The Powell River was once home to over 41 species of mussels and numerous species of fish.  Barclay 2007 Letter at 1.  It is now home to two threatened fish species, seven endangered mussel species, and two candidate species of mussels.  Barclay 2007 Letter at 1.  As is the case in the Clinch, impacts to downstream water quality from mining activities is one of the reasons for the significant population declines and is a factor preventing species recovery.  See 2005 Ahlstedt Report at 2, 10; FWS, *Recovery Plan for Cumberland Elktoe, Oyster Mussel, Cumberland Combshell, Purple Bean, and*

*Rough Rabbitsfoot*, 35-39 (7 July 2004)(describing coal mining impacts on mussel

species)[hereinafter 2004 Recovery Plan], *available at*

http://ecos.fws.gov/docs/recovery_plans/2004/040524.pdf; S.A. Ahlstedt & J.M.

Tuberville, *Quantitative Reassessment of the Freshwater Mussel Fauna in the Clinch and

Powell Rivers, Tennessee and Virginia*, *in* Conservation and Management of Freshwater

Mussels II (K.S. Cummings et al. eds. 1997)(determining that 15-year decline in certain

mussel species in the Powell River primarily attributable to coal mining in the area)(cited

in 2004 Recovery Plan at 35); USGS 2000 Report at 20 (finding that polycyclic aromatic

compounds, which are indicative of coal fines and toxic to aquatic life including mussels,

were high in the upper portions of the Clinch and Powell Rivers)(cited in 2004 Recovery

Plan at 35); see also Memorandum of Understanding Among EPA Regions III and IV,

TDEC, Virginia Department of Environmental Quality, and the Virginia Department of

Mines, Minerals, and Energy, Concerning the Clinch and Powell Rivers (signatures from

11 Dec. 2007 to 7 Jan. 2008)(acknowledging decline in mussel and fish species in the

rivers).

43. The Big South Fork of the Cumberland is also known for its aquatic diversity. It

is home to at least 68 fish species and 23 species of mussels. NPS, *The Big South Fork

General Management Plan and Environmental Impact Statement* 209 (2005) [hereinafter

BSF GMP], *available at* http://www.nps.gov/biso/parkmgmt/upload/chapter4.pdf

(Petition to Reinitiate, Exhibit 1, Att. 14). As the NPS stated, "[f]ew other river systems

support this level of mussel diversity." BSF GMP at 19. It provides "habitat for a world-

class freshwater mussel assemblage" and is "an important refuge for many endangered

mussel species." Id. Six of its mussel species are federally listed as endangered, and in

the spring of 2008, two additional endangered mussel species and two candidate species

were re-introduced, for a total of ten protected mussel species.  Interview with Steve

Bakaletz, Wildlife Biologist, Big South Fork NRRA (14 Jan. 2009).  The Big South Fork

River also supports at least three species of federally protected fish: the duskytail darter

(endangered), Palezone shiner (endangered), and blackside dace (threatened).  See BSF

GMP at 210; see also D.A. Etnier, *Fish Faunas of the Big South Fork of the Cumberland*

*River and the Upper Cumberland River Drainage, Tennes*see *and Kentucky*, 1, 2, 4

University of Tennessee, Knoxville (10 Oct. 2005) [hereinafter Etnier 2005](Petition to

Reinitiate, Exhibit 1, Att. 15).  Deposition of silt and coal fines from mining outside of

the park significantly affects imperiled species in the Big South Fork NRRA.  Ahlstedt

2003-04 Mussel Status at 33, 42, 74; 2004 Recovery Plan at 35-39; NPS and Department

of Interior, 1997 Water Resources Management Plan for the Big South Fork of the

Cumberland River at 15 (Sept. 1997)("main cause of impacts to the mussel community

are pollutants and sediment associated with coal mining"), *available at*

http://www.nature.nps.gov/water/management_plans/big_south_fork_screen.pdf;

Tennessee Wildlife Resources Agency ("TWRA"), Tennessee's Comprehensive Wildlife

Conservation Strategy at 134-36 (Sept. 2005)(identifying coal mining as having one of

the worst water quality impacts for the Cumberland River drainage), *available at*

http://www.state.tn.us/twra/cwcs/tncwcs2005.pdf; Etnier 2005 at 1, 2, 4 (concluding that

increased coal mining could adversely affect federally protected fish species in the Big

South Fork and upper Cumberland system)(Petition to Reinitiate, Exhibit 1, Att. 15); see

also R.B. Evans, Distribution of Fishes and Changes in Biotic Integrity in the New River,

Tennessee (1998)(unpublished M.S. Thesis, University of Tennessee, Knoxville)(finding New River significantly affected by acid mine drainage and siltation).

44. On 10 January 1997, the FWS listed five new mussel species as endangered. 62 Fed. Reg. 1,647 (10 Jan. 1997). These are the Cumberland elktoe (*Alasmidonta atropurpurea*); Oyster mussel (*Epioblasma capsaeformis*); purple bean (*Villosa perpurpurea*); rough rabbitsfoot (*Quadrula cylindrical stigillata*); and Cumberlandian combshell (*Epioblasma brevidens*). In 2004, the FWS formally designated portions of the Clinch, the Powell, and the Big South Fork of the Cumberland Rivers as critical habitat for these five species. 69 Fed. Reg. 53,136 (31 Aug. 2004). In the Recovery Plan for these species, the FWS stated that adverse impacts from upstream coal mining (such as increased sedimentation, heavy metal pollution, and low pH) threaten the populations of these species living in the critical habitat designated areas. 2004 Recovery Plan at 35-39.

45. In sum, numerous recent studies since 1996 show that water quality degradation from active mining will jeopardize populations of threatened and endangered species in the Clinch, Powell, New, and Big South Fork of the Cumberland Rivers. Because the SBZ Final Rule legalizes the devastating in-stream mining activities that have already caused significant degradation to water quality and adversely affected listed fish and mussel species in these and other Appalachian rivers, the SBZ Final Rule constitutes an agency action that "may affect" listed species.

## Failure to Initiate Formal Consultation with the FWS

46. Although the SBZ rule change "may affect" federally listed species and critical habitat within the meaning of the ESA and implementing regulations, OSM and EPA

failed to initiate formal consultation with the FWS before promulgating and concurring

in, respectively, the SBZ Final Rule, as required by the ESA.  OSM maintained in the

FEIS that the rule change does not implicate its formal §7 duties under the ESA on two

grounds: that the rule change would have no "net effect" on threatened and endangered

species, see SBZ FEIS at IV-162 to -163, and that its §7 ESA duties have been fulfilled

by its past consultation with the FWS under the 1996 BiOp.  See id. at IV-162 ("[t]he

regulatory protections identified in the 1996 [BiOp] continue to ensure the protection of

listed endangered and threatened species, proposed species, and their critical habitats.")

Neither assertion is correct.

47.   First, OSM asserts that the changes would result in slight positive effects because

it incorporates changes to reduce the adverse impacts of coal mine waste disposal

facilities (refuse piles and slurry impoundments) on fish, wildlife, and related

environmental values, and because of the combination of the excess spoil and coal mine

waste provisions.  73 Fed. Reg. 75,875.  These latter two provisions require permittees to

avoid placement of excess spoil or coal mine waste in or within 100 feet of a perennial or

intermittent stream to the extent possible and, if avoidance is not possible, to select the

alternative with the least overall adverse impact on fish, wildlife, and related

environmental values.  30 C.F.R §§780.25(d), 780.35(a)(3).  SMCRA already requires

that impacts be minimized; see SMCRA §§ 515 (b)(10)(B)(i), and (b)(24).  Thus, adding

this requirement to the SBZ Final Rule does not afford additional protection nor

constitute a change that would result in "slight positive" effects.  Additionally, OSM's

assertion that the rule changes would have positive impacts is belied by its own

admissions regarding the adverse impacts from mining activities in or through streams on

aquatic species, see, e.g., SBZ FEIS at IV-152, MTM/VF DEIS at IV B-4 to B-5, and the

large body of scientific evidence to the contrary, see, e.g., Pond 2008; supra ¶¶ 35-45.

48.   Notably, as OSM admitted, the FWS stated that OSM was adopting a less

protective standard by changing the 1983 required finding that activity "will not

adversely affect the water quantity and quality and related environmental resources of the

stream" to a requirement that the activity use the best technology currently available to

minimize adverse impacts to fish, wildlife, and related environmental values to the extent

possible.  OSM stated: "We do not dispute this characterization." 73 Fed. Reg. 75,853.

49.   Second, OSM may not lawfully rely on the 1996 BiOp to evade its formal

consultation duty.  The ESA regulations expressly include the promulgation of rules as an

agency "action" that triggers the formal consultation requirement if the rule "may affect"

threatened or endangered species or critical habitat.  The "no jeopardy" conclusion in the

1996 BiOp was premised on the Act and regulations in place at the time, including the

1983 SBZ rule.  Because the rule change necessarily undermines this premise, OSM's

reliance on the BiOp to evade its formal consultation requirements under 50 C.F.R.

§§402.14(a) and 402.02 is unlawful.

50.   In addition, the listing of new species and designation of critical habitat, and new

information, since the BiOp was issued obligated OSM to reinitiate consultation on the

BiOp itself under 50 C.F.R. §§402.16(d) and 402.16(b), which OSM has failed to do.  As

Plaintiff's January 2008 Petition to Reinitiate set forth, OSM has a duty to reinitiate

consultation based on these and other triggers set forth in the ESA regulations.  See

Petition to Reinitiate (Exhibit 1).

51.   Moreover, OSM's reliance on the 1996 BiOp is unlawful because the 1996 BiOp fails to satisfy the fundamental requirements for a biological opinion and is therefore legally invalid.

## CLAIMS FOR RELIEF

### Count I

### (OSM's Violation of SMCRA Environmental Protection Standards)

52.   Paragraphs 1 through 51 are incorporated herein by reference.

53.   The SBZ Final Rule violates the environmental protection standards OSM is charged with enforcing under SMCRA, including 30 U.S.C. §§1202(a),(d), 1265(b)(10), (b)(22), (b)(24), (c)(4), and 1266(b)(11), and implementing regulations set forth at  30 C.F.R. Parts 700-800.  OSM's rationale for overturning the 1983 SBZ rule is arbitrary and capricious and contrary to the evidence before the agency.

54.   The SBZ Final Rule is therefore arbitrary, capricious, or otherwise not in accordance or inconsistent with law in violation of the APA, 5 U.S.C. §706, and SMCRA, 30 U.S.C. §1276.

### Count II

### (OSM's Violation of its Duty to Initiate Formal Consultation Under the ESA)

55.   Paragraphs 1 through 54 are incorporated herein by reference.

56.   The SBZ Final Rule is agency "action" under 50 C.F.R. §402.02(b) that "may affect" threatened and endangered aquatic species in the Appalachian coal mining region, including in the watersheds of the Big South Fork of the Cumberland, the New River, and the Powell and Clinch Rivers.  OSM's lack of enforcement of the 1983 SBZ rule has already resulted in substantial and irreversible losses of aquatic and terrestrial habitats.

Memorandum from Regional Director, FWS Region 5 to Director, at 7. Studies have shown that water quality degradation from active mining is jeopardizing populations of threatened and endangered mussels in the Clinch, Powell, and Big South Fork of the Cumberland Rivers. See supra ¶¶ 35-45.

57. Under the changed rule, mining activities in and adjacent to streams will be permitted merely upon a showing by the operator that avoidance is not reasonably possible. Additionally, regulatory authorities are no longer required to ensure that mining activities through or within 100 feet of streams do not adversely impact water quantity and quality and the environmental values of the stream. Effectively, these changes eviscerate the stream buffer zone rule. The SBZ Final Rule will therefore cause further negative impacts to water quality and "may affect" the listed fish and mussel species in these rivers and other Appalachian streams.

58. OSM's failure to initiate formal consultation under 50 C.F.R §402.14 violates its duty under §7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2), to consult with the FWS to assure that its promulgation of regulations under SMCRA is not likely to jeopardize the existence of threatened or endangered species or result in the destruction or adverse modification of habitat.

59. Additionally, OSM's failure to initiate formal consultation violates the SMCRA requirement that no surface mining activity shall be conducted which is likely to jeopardize the continued existence of endangered or threatened species or which is likely to result in the destruction or adverse modification of designated critical habitats of such species in violation of the ESA. 30 C.F.R. §816.97(b).

60.  OSM's promulgation of the SBZ Final Rule without initiating formal consultation with FWS is therefore arbitrary, capricious, or otherwise not in accordance or inconsistent with law in violation of the APA, 5 U.S.C. § 706, and SMCRA, 30 U.S.C. §1276.

## Count III

### (OSM's Reliance on the 1996 Biological Opinion to Avoid Formal Consultation is Unlawful Under the ESA)

61.  Paragraphs 1 through 60 are incorporated herein by reference.

62.  The 1996 BiOp's no jeopardy conclusion is based on the SMCRA regulations in effect at the time, including the 1983 SBZ rule.  The SBZ Final Rule significantly alters the 1983 rule.  Therefore OSM's reliance on the 1996 BiOp to evade its formal consultation duties is unlawful.

63.  In the alternative, the SBZ Final Rule constitutes a subsequent modification of the identified action "in a manner that causes an effect to the listed species or critical habitat that was not considered in the [1996 BiOp]," triggering OSM's legal requirement to reinitiate consultation under 50 C.F.R. §402.16(c), which it failed to do.

64.  OSM's reliance on the 1996 BiOp is also unlawful because other events since the 1996 BiOp was issued have occurred that triggered OSM's duty to reinitiate consultation, rendering the 1996 BiOp invalid.  See Count IV.  Moreover, the 1996 BiOp itself was never valid in any event because it is insufficient under the ESA and implementing regulations.  See Count V.

65.  OSM's reliance on the 1996 BiOp to avoid formal consultation on the SBZ Final Rule is therefore arbitrary, capricious, or otherwise not in accordance or inconsistent with law in violation of the APA, 5 U.S.C. § 706, and SMCRA, 30 U.S.C. §1276.

## Count IV

### (OSM's Failure to Reinitiate Formal Consultation Renders the 1996 Biological Opinion Invalid Under the ESA)

66.  Paragraphs 1 through 65 are incorporated herein by reference

67.  OSM was obligated to reinitiate formal consultation on the 1996 BiOp under 50 C.F.R. §402.16(d) to consider the impacts from mining on newly listed species and critical habitats, including the five mussel species listed as endangered in 1997 and the designation in 2004 of critical habitat for these species noted above. See 62 Fed. Reg. 1,647; 69 Fed. Reg. 53,136. OSM's failure to do so renders the 1996 BiOp invalid.

68.  The listing of new species since the 1996 BiOp also renders the ITS in the 1996 BiOp invalid.

69.  The many studies published since the 1996 BiOp that reveal mining's effects on listed species and critical habitat in a manner or to an extent not considered in the BiOp likewise obligated OSM to reinitiate consultation under 50 C.F.R. §402.16(b), rendering the 1996 BiOp invalid.

70.  OSM's failure to reinitiate consultation on the 1996 BiOp to fulfill its ESA §7 obligations is arbitrary, capricious, or otherwise inconsistent with law in violation of the APA, 5 U.S.C. § 706, rendering the 1996 BiOp invalid.

## Count V

### (The 1996 Biological Opinion is Insufficient under the ESA and Implementing Regulations)

71.  Paragraphs 1 through 70 are incorporated herein by reference.

72.  The 1996 BiOp is insufficient under ESA §7(a)(2), 16 U.S.C. §1536(a)(2), and implementing regulations. The evidence overwhelmingly shows that FWS's conclusion

that SMCRA "requirements will avoid jeopardizing any listed species or adversely

modifying any designated critical habitat in violation of the [ESA]," 1996 BiOp at 10, is

false. As OSM has admitted, the direct effect of filling or mining through streams is the

complete destruction of "all biota living in the footprint of the fill or in the mined area."

SBZ FEIS at IV-152. OSM has also recognized that coal mining activities have

significant impacts on downstream water quality. See id. at IV-156. Further, scientific

studies show dramatic declines in fish and mussel species in areas closest to active

mining during the past decade, making recovery of federally protected species doubtful if

current mining practices continue. See, e.g. Ahlstedt Report 2005 at 2, 8, 10; Etnier 2005

at 3-4.

73.   The 1996 BiOp as adopted is also fundamentally flawed because, among other

failings: (1) it is impermissibly broad; (2) its "no jeopardy" conclusion is inconsistent

with its recitation of facts regarding the harm that mining causes to species and habitats;

(3) it fails to include any discussion regarding recovery of listed species or habitat; and

(4) it fails to meet the requirements for ITS. See 50 C.F.R. §402.14(g)-(i). In addition,

FWS explicitly conditioned its "no jeopardy" conclusion and ITS on the development of

species-specific measures to minimize anticipated take. 1996 BiOp at 13. No such

measures have been adopted for most of the federally endangered and threatened aquatic

species that are being harmed by mining in the watersheds of the Clinch, Powell, New,

and Big South Fork of the Cumberland Rivers.

74.   The 1996 BiOp is therefore unlawful under §7 of the ESA, and OSM's reliance

on it is arbitrary, capricious, or otherwise not in accordance with law in violation of the

APA, 5 U.S.C. § 706.

## Count VI

### (EPA Violation of Clean Water Act)

75.   Paragraphs 1 through 74 are incorporated herein by reference.

76.   Section 501 of SMCRA provides that OSM cannot promulgate regulations on environmental protection standards unless it has "obtained the written concurrence" of EPA "with respect to those aspects" of federal regulations "which relate to air or water quality standards promulgated under the" Clean Water Act and the Clean Air Act. 30 U.S.C. §§1251(a)(B), 1251(b).

77.   EPA provided its written concurrence in the SBZ Final Rule on 2 December 2008.

78.   Because the SBZ Final Rule will cause permanent and irreversible damage to streams and aquatic life, EPA's concurrence in the rule is plainly inconsistent with the CWA and the Administrator's responsibilities under the CWA and implementing regulations, CWA §101(a), (d), 33 U.S.C. §1251(a), (d)(setting CWA goals and EPA duty to administer); CWA §303, 33 U.S.C. §1313 (governing water quality standards); 40 C.F.R. §§131.5 and 131.12 (governing antidegradation requirements and EPA duty to review); and id. § 230.10(b)-(c)(restricting discharges that jeopardize protected species).

79.   EPA's written concurrence is therefore arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA, 5 U.S.C. §706.

## COUNT VII

### (EPA's Written Concurrence in the SBZ Final Rule Violates Duty to Consult under the ESA)

80.   Paragraphs 1 through 79 are incorporated herein by reference.

81.   EPA's determination under SMCRA §501, 30 U.S.C. §1251, meets the definition of agency "action" under the ESA.  Agency action encompasses "all activities or programs of any kind authorized . . ., in whole or in part, by Federal agencies," including "the promulgation of regulations . . . [and] actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. §402.02 (b), (d).

82.   EPA's written concurrence is a necessary pre-condition to OSM's adoption of the regulation, and is therefore agency action that "authorize[s]" the "promulgation of regulation" under 50 C.F.R. §402.02(b).  In addition, because the SBZ Final Rule will categorically allow the burying of Appalachian streams, EPA's concurrence is agency action that "directly or indirectly caus[es] modifications to the land, water, or air" under 50 C.F.R. §402.02(d).

83.   Because the SBZ rule change "may affect" threatened and endangered species and critical habitat in Appalachian river systems, EPA violated its duties to consult with FWS under §7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), before making its concurrence determination.

84.   EPA's written concurrence is therefore arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA, 5 U.S.C. §706.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court grant the following relief:

(1)   Declare that the SBZ Final Rule is arbitrary and capricious, an abuse of discretion, and otherwise inconsistent or not in accordance with law in violation of the APA, 5 U.S.C. §706, and SMCRA, 30 U.S.C. §1276;

(2)   Declare that OSM violated SMCRA, 30 U.S.C. §§1202(a), (d), 1265(b)(10), (b)(22), (b)(24), (c)(4), and 1266(b)(11);

(3)   Declare that OSM violated §7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2), by failing to initiate consultation with the FWS to insure that the SBZ rule change would not jeopardize listed species;

(4)   Declare that EPA's written concurrence under SMCRA §501, 30 U.S.C. §1251, violated CWA §§101, 303, 33 U.S.C. §§1251, 1313 and implementing regulations, 40 C.F.R. §§131.5, 131.12, 230.10(b)-(c); and §7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2);

(5)   Declare that the 1996 BiOp is invalid;

(6)   Vacate the SBZ Final Rule;

(7)   Vacate EPA's concurrence in the SBZ Final Rule;

(8)   Vacate the 1996 BiOp;

(9)   Award to the Plaintiff its costs and expenses of this action, including reasonable attorneys' fees; and

(10)   Grant such other relief as the Court deems just and proper.

Respectfully submitted this 16th day of January 2009.

Deborah M. Murray (D.C. Bar No. 362563)
Senior Attorney
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA   22902
(434) 977-4090 Telephone
(434) 977-1483 Fax

Counsel for Plaintiff
National Parks Conservation Association

**Exhibit 1**


# Petition Before the U.S. Fish & Wildlife Service and the Office of Surface Mining Reclamation and Enforcement to Reinitiate Formal Consultation on All Surface Mining Activities Conducted Under the Authority of the Surface Mining Control and Reclamation Act of 1977


Submitted on behalf of:

Center for Biological Diversity            Tennessee Wildlife Resources Agency
National Parks Conservation Association
World Wildlife Fund, Inc.

By Counsel:                                By Counsel:
Deborah M. Murray                          Sheryl D. Holtam
Mary Varson Cromer                         General Counsel
Southern Environmental Law Center          Tennessee Wildlife Resources Agency
201 West Main Street, Suite 14             PO Box 40747
Charlottesville, Virginia 22902            Nashville, TN  37204
434- 977-4090                              615-781-6606

15 January 2008

## Petition Before the U.S. Fish & Wildlife Service and the Office of Surface Mining Reclamation and Enforcement

### Introduction

The undersigned petitioners hereby respectfully petition the United States Fish &

Wildlife Service ("FWS") and the Office of Surface Mining Reclamation and Enforcement

("OSM") to reinitiate formal consultation under §7 of the Endangered Species Act ("ESA"), 16

U.S.C. §1536(a)(2), on all coal mining activities conducted under the authority of the Surface

Mining Control and Reclamation Act of 1977, 30 U.S.C. §1201 et seq. ("SMCRA").   The

petitioners include the Center for Biological Diversity ("CBD"), National Parks Conservation

Association ("NPCA"), and World Wildlife Fund, Inc.("WWF"),  represented by counsel

Southern Environmental Law Center; and the Tennessee Wildlife Resources Agency ("TWRA").

Such activities are currently the subject of a 1996 biological opinion that purports to have

assessed the impact of SMCRA-regulated coal mining on "all present and future Federally listed

and proposed species and designated or proposed critical habitats."[1]  Rather than initiate §7

consultation on each surface mine permit[2] that could jeopardize listed species or critical habitats,

on 21 March 1995 OSM requested consultation on the "continuation and approval of surface coal

mining and reclamation operations under State and Federal regulatory programs adopted

pursuant to [SMCRA] and its implementing regulations."[3]  After consulting with OSM, on 24

September 1996 FWS issued a 15-page biological opinion ("1996 BiOp") and accompanying

Incidental Take Statement ("ITS"), in which  FWS summarily concluded that SMCRA and its

---

[1] United States Fish & Wildlife Service, Formal Section 7 Biological Opinion and Conference Report on Surface Coal Mining and Reclamation Operations Under the Surface Mining Control and Reclamation Act of 1977, at 6 (24 Sept. 1996), *available at* http://www.osmre.gov/pdf/biologicalopinion.pdf [hereinafter 1996 BiOp] (Att. 1).
[2] "Surface mining" under SMCRA includes all above-ground mining activity, including above-ground impacts of underground mines, as well as coal processing facilities located on site of mining operations. *See generally* 30 U.S.C. §§1201 et seq.
[3] 1996 BiOp, at 1 (Att. 1).

2

regulations provided a sufficient level of protection such that their "requirements will avoid jeopardizing any listed species or adversely modifying any designated critical habitat in violation of the Endangered Species Act [ESA]."[4]

The 1996 BiOp applies to all coal mining throughout the country and to all threatened and endangered species, and critical habitat, whether listed or designated at the time or in the future. FWS's sweeping conclusions were made with very little reference to studies or data, with no reference to individual species that may be impacted, and with no discussion of any difference of methods of mining and impacts across the country.

As set forth below in Part I, from the outset, the 1996 BiOp has been inadequate to prevent jeopardy to threatened and endangered species. Currently, OSM is attempting to use the 1996 BiOp to avoid formal consultation on its proposed rule changes to the SMCRA regulations that would categorically allow fill and waste to be disposed of in waters of the United States.[5] OSM's continued reliance on the BiOp in lieu of formal consultation on this proposed rule change would violate its substantive duties under the ESA.

Reinitiation of consultation is legally required under 50 C.F.R. §402.16:

> (a) If the amount or extent of taking specified in the incidental take statement is exceeded;
>
> (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
>
> (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

---

[4] *Id.* at 10 (Att. 1). The biological opinion and the ITS are collectively referred to herein as the 1996 BiOp.
[5] *See* Proposed Rule, 72 Fed. Reg. 48,890 (24 Aug. 2007); OSM, *Draft Environmental Impact Statement: Excess Spoil Minimization, Stream Buffer Zones,* Apr. 2007, 72 Fed. Reg. 48,678 (24 Aug. 2007) [hereinafter SBZ DEIS].

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

Here, as set forth in Part II below, each of these "triggers" mandates that OSM and FWS reinitiate consultation on the impacts of coal mining on listed species and critical habitats. Therefore, petitioners request that FWS and OSM revoke the 1996 BiOp and reinitiate formal consultation as required under 50 C.F.R. §402.16. Petitioners note that the Tennessee Department of Environment and Conservation ("TDEC"), by letter dated 11 January 2008, has also requested the FWS to reinitiate formal consultation in regard to coal mining activities. Further, TDEC states in the letter that they "are in agreement with the aim of [this] petition as well." [6]

## Rivers at Risk

As set forth above, the 1996 BiOp applies nationwide. Petitioners have especial interests and concerns about the Clinch and Powell Rivers, and the New River and Big South Fork of the Cumberland Rivers. The Clinch and Powell Rivers are part of the Tennessee River system and flow from the coalfields of southwest Virginia into eastern Tennessee. The Big South Fork of the Cumberland River is formed by the confluence of the New River, which begins in the coal mining region of northeast Tennessee, and Clear Fork, just upstream of the Big South Fork National River and Recreation Area ("BSF NRRA") in Tennessee. *See* Map, Exhibit 2. These rivers are among the most diverse temperate rivers in North America.[7] Because of their biodiversity, these rivers are globally important and are gems of the Southeast.

---

[6] Letter to H. Dale Hall, FWS, from Paul L. Sloan, TDEC, at 1 (11 Jan. 2008) (Exhibit 1).

[7] The diversity of this region is not confined to its waters. The mixed mesophytic and temperate broadleaf forests of the Appalachian and Cumberland Plateaus are second only to eastern China's temperate forests in species richness and diversity. *See* T.H. RICKETTS ET AL., TERRESTRIAL ECOREGIONS OF NORTH AMERICA 183 (1999) (Att. 2).

According to recent studies by The Nature Conservancy and WWF, the Tennessee and

Cumberland River systems have the highest number of fish, crayfish, and mussel species on the

continent.[8] Many of these species are at risk of extinction. In fact, the Tennessee and

Cumberland River basins have more vulnerable and imperiled freshwater fish and mussel species

than any other freshwater region in the United States, with 57 at-risk fish species and 47 at-risk

mussel species.[9] A 2000 report on biodiversity in the United States stated that the "[t]he upper

Clinch River on the Virginia-Tennessee border surpasses all other watersheds in the country."[10]

The Clinch River alone is home to an astonishing number of aquatic species, including

126 extant native fish species[11] and over 44 species of mussels.[12] The Clinch River is also

considered one of the most biologically threatened rivers in the country, because more than one-

fourth of its native fish and mussel species are at-risk.[13] In fact, according to The Nature

Conservancy, the Clinch River has the "highest number of globally imperiled and vulnerable

freshwater species in the United States."[14] Of the river's vulnerable species, four fish and

fourteen mussels are federally listed,[15] and four mussels are candidates for listing.[16]

---

[8] SOUTHEAST WATERSHED FORUM, RETURN OF THE NATIVES 2 (2004) (Att. 3).

[9] THE NATURE CONSERVANCY, RIVERS OF LIFE 55 (1998) [hereinafter RIVERS OF LIFE] (Att. 4).

[10] S.J. Chaplin et al., *The Geography of Imperilment*, *in* PRECIOUS HERITAGE: THE STATUS OF BIODIVERSITY IN THE UNITED STATES 159, 181 (B.A. Stein et al., eds. 2000) (Att. 5). The report also noted that two hydrologic regions comprise 35% of all vulnerable and imperiled fish and mussel species in the United States and that 70% of those species occur no where else in the world. The Tennessee-Cumberland River basin is one of those two regions. *Id.*

[11] P.S. HAMPSON ET AL., WATER QUALITY IN THE UPPER TENNESSEE RIVER BASIN, Circ. 1205, at 6 (2000), *available at* http://pubs.usgs.gov/circ/circ1205/introduction.htm (Att. 6) .

[12] S.A. Ahlstedt et al., *Long Term Trend Information for Freshwater Mussel Populations at Twelve Fixed-Station Monitoring Sites in the Clinch and Powell Rivers...*, Final Report, U.S. Fish & Wildlife Service, Cookeville, TN, at 8 (2005) (Att. 7).

[13] P.S. HAMPSON ET AL., WATER QUALITY IN THE UPPER TENNESSEE RIVER BASIN, Circ. 1205, at 6 (2000), *available at* http://pubs.usgs.gov/circ/circ1205/introduction.htm (Att. 6) .

[14] RIVERS OF LIFE, at 25 (Att. 4). Likewise, the U.S. Army Corps of Engineers has recognized that "the Clinch River is an aquatic resource of world wide and national significance that is in urgent need of protection to stabilize and help restore rare and endangered species populations, some of which [sic] occur no where else in the world." U.S. Army Corps of Engineers, Nashville District, *Reconnaissance Study: Clinch River Basin Virginia: Section 905(b) (WRDA 1986) Analysis*, at 14 (Nov. 2004) (Att. 8).

[15] Letter to Paul Davis, TDEC, from Lee Barclay, FWS (17 Apr. 2007) (Att. 9).

[16] The four candidate species of mussels that are reported as extant in the Clinch and Powell Rivers are the sheepnose mussel (*plethobasus cyphyus*), spectaclecase (*Cumberlandia monodonta*), fluted kidneyshell

The Powell River was once home to over 41 species of mussels[17] and 90 species of fish.[18] The river is currently home to two federally listed fish species, seven listed mussel species, and two candidate species of mussels.[19] A 2005 survey of mussel populations determined that mussel fauna in the Clinch and Powell River are in peril.[20] These mussels play the role of the canary in the coal mine for these river systems because mussels are indicator species whose fate precedes the fate of other aquatic biota in the river system.[21]

Like the Clinch and Powell Rivers, the Big South Fork of the Cumberland is known for its aquatic diversity. Recent surveys of the BSF NRRA show that the Big South Fork River is home to 68 fish species and 23 species of mussels.[22] Of these, 22 species are classified as at-risk of extinction,[23] and two fish species[24] and five mussel species are federally listed.[25] Because of

(*Ptychobranchus subtentum*), and slabside pearlymussel (*Lexingtonia dolabelloides*). *Id. See also* 71 Fed. Reg. 53,756, 53,788-89 (12 Sept. 2006); 69 Fed. Reg. 24,876, 24,878 (4 May 2004).

[17] *Id.*

[18] R.E. JENKINS & N.M. BURKHEAD, FRESHWATER FISHES OF VIRGINIA 39-42 (1994) (Att. 10).

[19] Letter to Paul Davis, TDEC, from Lee Barclay, FWS (17 Apr. 2007) (Att. 9).

[20] S.A. Ahlstedt et al., *Long Term Trend Information for Freshwater Mussel Populations at Twelve Fixed-Station Monitoring Sites in the Clinch and Powell Rivers…*, Final Report, U.S. Fish and Wildlife Service, Cookeville, TN, at 2 (2005) ("[L]ong-term trend monitoring of mussel populations since 1979 are showing that mussel population densities and species composition are rapidly declining in the Clinch especially in Virginia and the Powell River.") (Att. 7).

[21] Mussels allow the retention of carbon and nutrients in a stream or river. Mussels can comprise the majority of a river's invertebrate biomass. Nutrients assimilated by mussels are retained until the mussel dies or until the nutrients are released through metabolism. Live mussels also promote the growth of periphyton, beneficial algae that grow on the stream bed. Periphyton, in turn, promotes the growth of numerous macroinvertebrates, which, in turn, leads to more robust fish populations. The most important functional value of mussels is their role in water filtration and pollution sequestration. As filter feeders, mussels remove a large amount of particulate matter from the water column. In fact, each mussel can effectively clean as much as one liter of water per hour. *See* B.B. Beaty, *What Good Is a Mussel? The Ecological Roles of Mussels in Stream Systems* (Abstract), *in* CONSERVATION MANAGEMENT OF THE CLINCH AND CUMBERLAND RIVER SYSTEMS: A COLLABORATIVE DISCUSSION ON COAL MINING AND THE AQUATIC ENVIRONMENT, Abingdon, Virginia (5-7 Sept. 2007) (Att. 11); C.C. Vaughn et al., *Ecosystem Processes Performed by Unionid Mussels in Stream Mesocosms: Species Roles and Effects of Abundance,* 527 HYDROBIOLOGIA 35 (2004) (Att. 12); C.C. Vaughn, C.C. Hakenkamp, *The Functional Role of Burrowing Bivalves in Freshwater Ecosystems*, 46 FRESHWATER BIOLOGY 1431 (2001) (Att. 13).

[22] National Park Service, *The Big South Fork General Management Plan and Environmental Impact Statement*, at 209 (2005), *available at* http://www.nps.gov/biso/parkmgmt/upload/chapter4.pdf [hereinafter BSF GMP] (Att. 14).

[23] RIVERS OF LIFE, at 57 (Att. 4).

[24] D.A. Etnier, *Fish Faunas of the Big South Fork of the Cumberland River and the Upper Cumberland River Drainage, Tennessee and Kentucky*, at 2, 4 University of Tennessee, Knoxville (10 Oct. 2005) (Att. 15).

[25] S.A. Ahlstedt et al., *Current Status of Freshwater Mussels in the Big South Fork National River and Recreation Area…*, 14 WALKERANA 33, 71 (2003-04) (Att. 16).

this diversity, the National Park Service ("NPS") found that the BSF NRRA provides "habitat for a world-class freshwater mussel assemblage and are an important refuge for many endangered mussel species."[26]  The NPS concludes that "[f]ew other river systems support this level of mussel diversity."[27]

Since the issuance of the 1996 BiOp, the factors requiring reinitiation of consultation under 50 C.F.R. §402.16 have been met regarding the Clinch, Powell, and Big South Fork of the Cumberland watersheds.  Several new species have been listed as threatened or endangered, and new critical habitat designated in these rivers that are directly impacted by active SMCRA-regulated mining in these watersheds, thus requiring reinitiation of consultation under 50 C.F.R. §402.16(d).  New scientific studies have also been published regarding the impacts of regulated mining on these federally protected species and critical habitat, triggering the requirement for reinitiation of formal consultation under §402.16(b).  Data published since 1996 document significant declines in the diversity and aquatic populations in the portions of these rivers that are closest to active mining.  Further, numerous recent scientific publications explicitly link these declines to the mining occurring in the rivers' headwaters.  Currently, there are 38 active mine operations in the upper reaches of the Clinch River in Virginia, 48 active mine operations in the upper reaches of the Powell River in Virginia, and 15 active mine operations in Tennessee's New River.[28]  To ensure that regulated mining is not likely to jeopardize the continued existence of federally listed species or result in the destruction or adverse modification of their habitat, OSM and FWS must reinitiate consultation immediately.

---

[26] BSF GMP, at 19 (Att. 14).

[27] *Id.*

[28] Communication with Virginia's Department of Mined Land Reclamation (2 Jan. 2008); Communication with OSM in Knoxville, TN (2 Jan. 2008).  Active mine operations include mine sites actively producing coal and auxiliary sites used in coal production.  In Tennessee, when a haulroad is permitted separate from the mine operation it serves, it has not been counted as a separate mine operation.  The Clinch River's coal resources are located solely in the northwestern one-third of the river basin.  U.S. Army Corps of Engineers, Nashville District, *Reconnaissance Study: Clinch River Basin Virginia: Section 905(b) (WRDA 1986) Analysis*, at 9 (Nov. 2004) (Att. 8).

7

**Petitioners' Interests**

Petitioners' specific interests are implicated by current mining in the New River tributary of the Big South Fork of the Cumberland River and in the Clinch and Powell Rivers.

1.    Petitioner CBD is a non-profit corporation dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center has more than 35,000 members worldwide, including approximately 396 members in Tennessee and 985 members in Virginia. A great deal of the Center's work is focused on protecting endangered and threatened species and their critical habitat under the Endangered Species Act. There are numerous federally-listed species that inhabit the Clinch and Powell River ecosystems that are being adversely impacted by coal mining. The Center is working to reduce and eliminate these impacts and to ensure the conservation of these ecosystems and the species that depend upon them for their survival.

2.    Petitioner NPCA is America's only private, nonprofit citizens' organization dedicated solely to protecting, preserving, and enhancing the U.S. National Park System. NPCA's Southeast Regional office in Knoxville specifically works to protect the BSF NRRA. Founded in 1919, NPCA has over 337,000 members nationwide, including almost 5,000 who reside in Tennessee. Many of these members use and enjoy the BSF NRRA. Current SMCRA-regulated mining operations in the New River, which is a tributary to the Big South Fork, are impacting the aquatic biota and health of the New River and the BSF NRRA. NPCA's and its members' recreational uses of the NRRA are likewise adversely impacted by damage to the health of the New River and the Big South Fork.

3.    Petitioner WWF is a non-profit 501(c)(3) conservation organization dedicated to protecting endangered species and their habitats and to conserving the diversity of life on Earth.

WWF maintains its primary office in Washington, D.C., and has a regional office in Nashville, TN. The mission of the Nashville office is to ensure the protection, preservation and enhancement of aquatic life in the rivers and streams of the southeastern United States. WWF has over 1.2 million members in the United States and over 45,000 members in Tennessee and Virginia. WWF is concerned that the ongoing coal mining activities in the Clinch and Powell Rivers are having an adverse impact on aquatic wildlife and habitat. Accordingly, WWF is working to ensure that any activities in these river systems have sufficient protection measures so that wildlife and wildlife habitat will not be adversely impacted.

4.      The mission of the Tennessee Wildlife Resources Agency is to preserve, conserve, protect, and enhance the fish and wildlife of the state and their habitats for the use, benefit, and enjoyment of the citizens of Tennessee and its visitors.

I.      **REINITIATION OF CONSULTATION IS REQUIRED TO ENSURE THAT CURRENT MINING DOES NOT JEOPARDIZE THE CONTINUED EXISTENCE OF LISTED AQUATIC SPECIES OR ADVERSELY MODIFY CRITICAL HABITAT.**

A.      **The 1996 BiOp Is Inadequate to Protect Listed Species and Critical Habitat.**

OSM's reliance on the 1996 BiOp cannot ensure the protection of listed species and critical habitats as is required under the ESA,[29] because the BiOp itself is insufficient for a number of reasons. First, as an overarching matter, it is obvious that a 15-page document that purports to cover all coal mining throughout the country and the impacts on all current or future

---

[29]  Surface mining under SMCRA is an action authorized by OSM through the permit process. OSM is therefore the "action agency" and has the duty to ensure that its action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species...." 16 U.S.C. §1536(a)(2).

listed species or habitats is impermissibly broad.  The scope of the biological opinion must be

tailored so that all impacts of the agency action can be adequately analyzed.[30]

Second, the 1996 BiOp fails to meet the minimum regulatory requirements for biological

opinions.  The regulations require that the biological opinion include a summary of all

information on which the decision is based and a detailed discussion of the effects of the

operation under consideration.[31]  The 1996 BiOp summarily discusses the effects of mining in

only three paragraphs and cites only three studies.  In addition, the 1996 BiOp entirely fails to

establish baseline conditions before predicting the effects of the action as is required by the

regulations.[32]  The BiOp also fails to adequately analyze the direct, indirect, and cumulative

impacts of surface coal mining, as is required by 50 C.F.R. §§402.02, 402.14(g)(3).  The BiOp's

three-paragraph discussion includes only general statements regarding the impacts of mining.  It

is clear that the 1996 BiOp in no way approaches the level of analysis that the regulations

require.

A third major failing of the 1996 BiOp is that it finds that compliance with SMCRA is

sufficient to ensure compliance with the ESA.  Substituting the requirements of SMCRA for

ESA's mandate is impermissible.[33]  While SMCRA purports to require full compliance with the

ESA, its consultation provision falls short of that required by the ESA.  SMCRA requires only

that a mine operator notify OSM of the need for consultation or reinitiation if an endangered

---

[30] See, e.g., Conner v. Burford, 848 F.2d 1441, 1453 (9th Cir. 1988) ("[T]he scope of the agency action is crucial because the ESA requires the biological opinion to analyze the effects of the *entire* agency action.") (emphasis in original); Center for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139, 1156 (D. Ariz. 2002) ("[T]he breadth and scope of the analysis must be adequate to consider all the impacts that are likely to jeopardize the species or adversely modify the critical habitat....").
[31] 50 C.F.R. §402.14(h).
[32] See 50 C.F.R. §402.14(g).
[33] Wash. Toxics Coalition v. EPA, 413 F.3d 1024, 1032 (9th Cir. 2005) ("[A]n agency cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives."), cert. denied sub nom. CropLife Am. v. Wash. Toxics Coalition, 546 U.S. 1090 (2006).

species is discovered.[34]  Section 7 of the ESA, on the other hand, sets more stringent

requirements, requiring a federal agency to ensure that the actions it permits do not jeopardize

listed species or habitat.  In addition, recent evidence discussed below regarding the harm that

SMCRA-regulated mining is having on endangered aquatic species in these rivers demonstrates

that SMCRA is not protective.  Reliance on SMCRA is therefore invalid to meet the substantive

requirements of the ESA.

Fourth, the 1996 BiOp is invalid because its "no jeopardy" conclusion is inconsistent

with its recitation of facts regarding the harm that mining causes to species and habitats.[35]  In the

mere three paragraphs in which the impact of mining on species and habitats is discussed, the

BiOp acknowledges that mining can result in a number of detrimental effects to water bodies,

including the deposition of metals and other pollutants, increased siltation, alteration of pH, and

changes in stream flow and temperature, all of which can harm aquatic species, especially those

with little motility, like mussels.  Given this recitation of the known harms to aquatic species

from permitted mining, OSM cannot rely on the 1996 BiOp to ensure that its permitting will not

cause substantive ESA violations.

Fifth, the 1996 BiOp includes no discussion of recovery of listed species or habitat.

Recovery is as important as survival and must be addressed in a biological opinion.[36]  The failure

of the 1996 BiOp even to address the recovery of listed species renders OSM's continued

reliance on the 1996 BiOp invalid.  In addition, stream surveys and new toxicology information

demonstrate that mining affects streams in ways that not only harm current biota but that also

impair the survival of future generations.  (*See* Part II. B. 1 through 3 below).

---

[34] 30 C.F.R. §816.97(b).

[35] *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (citation omitted).

[36] *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071-72 (9th Cir. 2004).

Sixth, the Incidental Take Statement ("ITS") of the BiOp, which concludes that take is "unquantifiable," cannot pass muster.[37] To be valid under the ESA and ensure protection of the species or habitat, an ITS must be specific enough to trigger reinitiation of consultation if the allowed activity presents too great a danger to the species or habitat.[38] The only specified trigger for reinitiation in the ITS of the 1996 BiOp is if an operator discovers a take and brings it to the attention of the federal agencies. Entrusting the survival of a species to the voluntary action of a mine operator is not sufficient under the ESA, particularly here where the ITS is impermissibly vague.

Finally, on its face the 1996 BiOp refers to only two of the triggers set forth in the ESA regulations as permissible bases for reinitiation of consultation.[39] The BiOp makes no mention of the other bases requiring reinitiation of formal consultation if (1) the amount or extent of taking specified in the ITS is exceeded,[40] or if (2) a new species or critical habitat is designated.[41] The failure to refer to these triggers reflects the underlying inadequacy of the BiOp—the ITS is so vague as to be meaningless, and the inclusion of all current or future listed species anywhere in the country reflects the impermissibly broad scope of the BiOp. Thus the agencies cannot rely on the 1996 BiOp to excuse their legal obligations under the ESA.

---

[37] See Oregon Natural Res. Council v. Allen, 476 F.3d 1031, 1039 (9th Cir. 2007) (determining that FWS's ITS was insufficient because it failed to "set forth a trigger that would invalidate the safe harbor provision and reinitiate the consultation process.").

[38] Id. at 1040-41 (9th Cir. 2007) (ITS must be sufficiently specific to trigger reinitiation if necessary).

[39] The 1996 BiOp specifically addresses reinitiation in its last paragraph, which reads:

> This concludes formal consultation and conference on OSM's proposed action. As provided in 50 C.F.R. 402.16, reinitiation of formal consultation is required when discretionary Federal agency involvement or control over the action has been maintained (or is authorized by law) and if (1) new information reveals that the agency action may affect listed species or critical habitats in a manner or to an extent not considered in this opinion, or (2) the agency action is modified in a manner that causes an adverse effect to listed species or critical habitat that was not considered in this opinion. This biological opinion and conference report does not absolve the action agency from complying with statutory procedures.

BiOp, at 14 (Att. 1). FWS may not unilaterally determine to exclude the other factors for reinitiation of consultation specifically set forth in subsections (a) and (d) of the regulation.

[40] 50 C.F.R. §402.16(a).

[41] 50 C.F.R. §402.16(d).

**B.      OSM's Reliance on the 1996 BiOp to Avoid Consultation on the
Current Proposed Rule Change to the SMCRA Regulations Is
Contrary to the ESA.**

As set forth above in the introduction, in August 2007 OSM proposed to change its

existing SMCRA stream buffer zone regulations to categorically allow fill and waste to be

disposed of in waters of the United States.[42]  OSM is attempting to use the 1996 BiOp to avoid

undertaking formal consultation on this significant relaxation of SMCRA permitting standards,

by asserting that its §7 duties have been fulfilled by its past consultation.[43]  As a legal matter,

OSM cannot rely on the 1996 BiOp to comply with the ESA.  First, OSM's §7 duties are

triggered by any "agency action" that "may affect" listed species or critical habitat.  Rulemaking

is specifically listed in the ESA regulations as the type of "agency action" giving rise to §7

duties.[44]  Moreover, the legal inadequacies of the 1996 BiOp itself preclude OSM's reliance on

the BiOp to avoid its clear legal obligations to consult.

Second, the preamble to the §7 regulations specifies that the "may affect" trigger includes

"*any possible effect*, whether beneficial, benign, adverse, or of an undetermined character."[45]

Thus, even though OSM argues that the proposed rule change will have no net effect,[46] that is

not the standard.  Even if one were to take at face value OSM's assertion that the proposed

excess spoil rule change will "slightly decrease the risks to threatened and endangered species in

---

[42] 72 Fed. Reg. 48,890, 48,892 (24 Aug. 2007).  The rule change proposes that four categories of mining activities
that "inherently involve placement of fill material in waters of the United States" be excluded from the requirements
of the stream buffer zone rule.  Those four categories are mining through streams, constructing sediment ponds in
streams, filling streams with coal refuse and spoil, and in-stream road-building activities.  *Id.* at 48,924, 48,925.  The
rule also proposes to relax the standard for determining whether to issue other permits for mining activities within
100 feet of a stream from requiring a finding that the operation "will not adversely affect" fish, wildlife, and related
environmental values to a finding that the operation will minimize impacts on fish, wildlife, and related
environmental values "to the extent possible" using the "best technology currently available."  *Id.* at 48,892
[43] SBZ DEIS, at IV-135–139.  *See id.* at IV-138 ("The regulatory protections identified in the 1996 [BiOp] continue
to ensure the protection of listed endangered and threatened species, proposed species, and their critical habitats.").
[44] 50 C.F.R. §402.02.
[45] 51 Fed. Reg. 19,926, 19,949 (3 Jun. 1986)(emphasis added).
[46] SBZ DEIS, at IV-139.

the steep-slope terrain of the central Appalachian coalfields,"[47] any such purported benefit to

listed species and critical habitat would still trigger OSM's consultation duties.

More to the point, however, OSM's assertion that its proposed rule would have no effect

on threatened and endangered species or critical habitat is untenable and belied by its own

analysis in the Draft Environmental Impact Statement ("DEIS") for the proposed rule. This

discrepancy is most obvious in OSM's discussion of the direct and indirect impacts that have

occurred and are likely to continue as a result of the destruction of headwaters streams in Central

Appalachia.[48] OSM admits that the direct effect of in-stream mining operations is complete

obliteration: "When streams are filled or mined through all biota living in the footprint of the fill

or in the mined area are lost."[49] The indirect effects are equally certain: aquatic communities

downstream of mine sites are less diverse and more pollution-tolerant because of increased

sedimentation and increased water contamination and toxicity.[50] OSM notes that these changes

to stream quality are particularly problematic for the sixteen threatened and endangered species

of mussels in the DEIS study area.[51] In its discussion of the area's mussels, OSM admits that

"[m]ussel habitat and populations are being hindered by impoundments."[52] OSM points out that

the Clinch and Powell Rivers are of particular importance because of their diverse populations of

mussels, and further states that coal fines in the rivers are increasing.[53] The agency's admission

that SMCRA-regulated mining activities are harming listed species is proof that it must reinitiate

consultation now to avoid further violations of the ESA. OSM's reliance on the 1996 BiOp

---

[47] *Id.*

[48] *Id.* at III-117.

[49] *Id* at IV-129.

[50] *Id.* at IV-132.

[51] *Id* at IV-133.

[52] *Id.* at III-35.

[53] *Id.* at IV-133 ("The amount of coal fines in both the Clinch and Powell Rivers has increased and is now a major component of sediment at sites where some of the best populations of federally listed mussels occur on the Tennessee side of the Clinch River.") (citation omitted).

constitutes an impermissible avoidance of its consultation duty as well as its substantive duty to

ensure that its actions are not likely to jeopardize listed species or protected habitat.

**II.  SECTION 402.16 OF THE ENDANGERED SPECIES ACT REGULATIONS REQUIRES REINITIATION OF CONSULTATION GENERALLY AND SPECIFICALLY WITH RESPECT TO THE WATERSHEDS OF THE CLINCH AND POWELL RIVERS AND THE NEW RIVER AND BIG SOUTH FORK OF THE CUMBERLAND RIVER.**

With regard to mining's impacts on the specific watersheds of concern to the petitioners,

circumstances since FWS released the 1996 BiOp have triggered the regulatory requirement that

FWS and OSM reinitiate consultation. Specifically, 50 C.F.R. §402.16 requires that FWS and

OSM reinitiate consultation when new species are listed, new critical habitats are designated,

new information is published revealing impacts on listed species or critical habitats that were not

considered in the 1996 BiOp, or the original ITS is exceeded. Any of these circumstances would

require reinitiation of consultation; in this case, all have occurred in these watersheds since the

1996 BiOp was released. Therefore, OSM and FWS must reinitiate consultation without further

delay.

**A.  Reinitiation Is Required Under 50 C.F.R. §402.16(d) to Consider Mining's Impact on Five Newly Listed Mussel Species and Their Critical Habitats in the Clinch and Powell Rivers and the New River and Big South Fork of the Cumberland River.**

Since the issuance of the 1996 BiOp, the FWS has listed five mussel species as

endangered and has designated critical habitat for these species in the watersheds of concern.

The five new mussel species that the FWS listed as endangered in January 1997 are the

Cumberland elktoe (*Alasmidonta atropurpurea*), Oyster mussel (*Epioblasma capsaeformis*),

Cumberlandian combshell (*Epioblasma brevidens*), purple bean (*Villosa perpurpurea*), and

rough rabbitsfoot (*Quadrula cylindrical stigillata*).[54] FWS found that the range and numbers of

---

[54] 62 Fed. Reg. 1647 (10 Jan. 1997) [hereinafter Listing].

all five species had declined dramatically, such that the remaining mussels existed only in small,

isolated populations.[55]  With regard to the impact of mining on the newly listed species, FWS

stated, "[i]f a mining activity comes under the jurisdiction of a state or Federal agency and one of

these five mussels or any other listed species may be in the project area, the project's impacts to

the species must be considered.  However, it has been the Service's experience, after dealing

with hundreds of mining projects, that in nearly all cases where there is a conflict between

endangered species and a mining project, the project is permitted with only minor

modifications." [56]

In August 2004, FWS formally designated parts of the Big South Fork of the Cumberland

River and the New River, most of the mainstems of the Clinch and Powell Rivers, and two

tributaries of the Clinch River as critical habitats for these five mussels ("Critical Habitat

Designation").[57]  In July 2004, FWS published a Recovery Plan for these mussels.[58]  The listings

and designation of critical habitat by FWS trigger the requirement under 50 C.F.R. §402.16(d)

that OSM and FWS reinitiate consultation on the impacts of coal mining on these mussels.

The Critical Habitat Designation makes clear that the Clinch, Powell, and Big South Fork

of the Cumberland River are crucial to the survival of these species.  FWS found that the Clinch

and Powell Rivers "represent some of the best remaining habitat for four of the five mussels in

question."[59]  According to the Critical Habitat Designation, the fifth mussel, the Cumberland

---

[55] *Id.* at 1654.
[56] *Id.* at 1651.
[57] FWS, *Designation of Critical Habitat for Five Endangered Mussels*, 69 Fed. Reg. 53,136 (31 Aug. 2004) [hereinafter Critical Habitat Designation].
[58] FWS, *Recovery Plan for Cumberland Elktoe, Oyster Mussel, Cumberland Combshell, Purple Bean, and Rough Rabbitsfoot*, 35-39 (7 July 2004). *available at* http://ecos.fws.gov/docs/recovery_plans/2004/040524.pdf [hereinafter Recovery Plan] (Att. 17).
[59] Critical Habitat Designation, at 53,141.

elktoe, is extant only in Cumberland River tributaries in Tennessee and Kentucky, which include the Big South Fork and New Rivers.[60]

In both the listing and the Recovery Plan, FWS found that active and past pollution from upstream coal mining threatens the designated portions of all of these rivers and the survival of all five of these mussel species.[61]  FWS found that mining's effects, including increased sedimentation and turbidity, low pH, and heavy metal pollution, have altered the habitat of many streams such that mussels are unable to survive.[62]  FWS noted particularly the impacts from acid mine runoff on recruitment of the Cumberland elktoe because most of the range of this species is within watersheds where coal mining is currently occurring.[63]  Likewise, the Recovery Plan noted that historic and active coal mining in the upper reaches of the Powell and Clinch Rivers in Virginia poses a significant threat to the four mussels found in those rivers.[64]

### B.  Reinitiation Is Required Under 50 C.F. R. §402.16 (b) to Consider New Information Revealing Mining's Impact on Listed Species and Habitat in the Clinch and Powell Rivers and the New River and Big South Fork of the Cumberland River.

FWS's findings developed in relation to the listing of new species, Critical Habitat Designation, and the Recovery Plan also constitute new information under 50 C.F.R. §402.16(b) that necessarily was not considered in the 1996 BiOp and that trigger reinitiation of formal consultation.[65]  In addition to its findings, FWS also cites studies in these documents that postdate the 1996 BiOp.  In particular, the Recovery Plan cites a 1997 study that attributes the

---

[60] *Id.* at 53,137.
[61] *See* Listing, at 1647-50; Recovery Plan, at 35-39 (Att. 17).
[62] Recovery Plan, at 35 (Att. 17).
[63] *Id.*
[64] *Id.*
[65] 50 C.F.R. §402.16(b) specifically requires reinitiation of consultation if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."

17

significant long-term decline in mussel populations in the Powell River to general stream degradation caused by mining in the river's headwaters.[66]

The Recovery Plan also cites a 2000 study conducted by the United States Geological Survey analyzing levels of polycyclic aromatic compounds ("PAHs") in the Clinch and Powell Rivers.[67] PAHs are pollutants, commonly found in coal fines, that are known to be toxic to fish, mussels, and aquatic insects.[68] The presence of these pollutants in the rivers' substrates reflects the presence of coal fines in the rivers from upstream mining activity. According to the study, PAHs are found at varying levels throughout the Clinch and Powell Rivers, and the highest levels of these toxic pollutants occur in areas closest to upstream mining activities.[69]

In addition to the information reported in the FWS 2004 listing and critical habitat documents for endangered mussels in these rivers, many other studies have been published since 1996 regarding the impacts of SMCRA-regulated mining on vulnerable aquatic species in the New, Big South Fork, Powell, and Clinch Rivers in Tennessee and Virginia, and in Central Appalachia more widely. Such new information likewise requires reinitiation of consultation under 50 C.F.R. §402.16(b). Furthermore, these documents, highlighted below, also refute the central premise of the 1996 BiOp that compliance with SMCRA will prevent degradation of listed species or habitat.

In addition, most recently, the federal and state agencies charged with implementing the federal Clean Water Act and the state law counterparts in Tennessee and Virginia entered into a Memorandum of Understanding dated December 2007/January 2008 ("MOU") to coordinate

---

[66] Recovery Plan, at 35 (Att. 17) (citing S.A. Ahlstedt & J.M. Tuberville, *Quantitative Reassessment of the Freshwater Mussel Fauna in the Clinch and Powell Rivers, Tennessee and Virginia, in* CONSERVATION AND MANAGEMENT OF FRESHWATER MUSSELS II (K.S. Cummings et al. eds. 1997) (Att. 18)).

[67] Recovery Plan, at 36 (citing P.S. HAMPSON ET AL., WATER QUALITY IN THE UPPER TENNESSEE RIVER BASIN, Circ. 1205, at 20 (2000) (Att. 6)).

[68] P.S. HAMPSON ET AL., WATER QUALITY IN THE UPPER TENNESSEE RIVER BASIN, Circ. 1205, at 20 (2000), *available at* http://pubs.usgs.gov/circ/circ1205/introduction.htm (Att. 6).

[69] *Id.*

efforts to protect and restore the Clinch and Powell Rivers.[70]   The MOU broadly acknowledges

the studies documenting the decline in mussel and fish species in the Clinch and Powell Rivers,

which decline stems in part from coal mining operations.[71]   Significantly, the timing of the

MOU coincides with that of the letter from the TDEC Deputy Commissioner, a signatory to the

MOU, to FWS requesting that FWS reinitiate formal consultation on the impacts of coal mining

and noting the legal obligation for FWS and OSM to do so.[72]   Reinitiation of formal consultation

is not only required under the ESA regulations, but it is also essential to the success of any

efforts undertaken pursuant to the MOU.  Thus the MOU is additional new information requiring

OSM and FWS to reinitiate consultation.

### 1.   *New Studies of Mining's Impact on Aquatic Species in the Clinch and Powell Rivers Require Reinitiation of Consultation.*

Because of the unique global aquatic resources in the Clinch and Powell Rivers, scientists

have devoted a great deal of attention to studying these watersheds.  Many studies have been

conducted since 1996 with findings that directly refute the 1996 BiOp's contention that SMCRA

is sufficiently protective of threatened and endangered species and critical habitats.

Two population trend studies conducted since 1996 show declines in mussel diversity and

densities in areas closest to active mining.  These studies reveal that mussel population declines

have occurred since SMCRA was passed in 1977.  First, a 1997 survey by Ahlstedt and

Tuberville determined that much of the decline in mussel populations of both rivers has occurred

since 1979, with significant declines in rare and sensitive species.[73]   Second, a 2005 study shows

---

[70] MOU Among Regions III and IV of the U.S. Environmental Protection Agency, TDEC, the Virginia Department of Environmental Quality, and the Virginia Department of Mines, Minerals, and Energy Concerning the Clinch and Powell Rivers (signatures ranging from 11 Dec. 2007 to 7 Jan. 2008)(Exhibit 3).
[71] MOU at 1.
[72] Letter to H. Dale Hall, FWS, from Paul L. Sloan, TDEC, at 2 (11 Jan. 2008)(Exhibit 1).
[73] S.A. Ahlstedt & J.M. Tuberville, *Quantitative Reassessment of the Freshwater Mussel Fauna in the Clinch and Powell Rivers, Tennessee and Virginia, in* CONSERVATION AND MANAGEMENT OF FRESHWATER MUSSELS II (K.S. Cummings et al. eds. 1997) (Att. 18).

that, historically, the decline has been most dramatic in the upper reaches of the Powell River

where intensive surface mining continues to occur: the mussel populations closest to current

mining have been almost completely eliminated.[74] This study also shows dramatic declines in

mussel populations in the Virginia portion of the Clinch River.[75] According to Steve Ahlstedt,

the USGS malacologist who has spent 30 years studying the mussel populations in these two

rivers, that coal fines from mining operations in Virginia now occur in the Clinch River all the

way downstream to Norris Lake, TN, where they are prominent in the river's best remaining

mussel shoals, is further cause for alarm.[76]

　　　　Other studies undertaken since 1996 have focused on the causes for the decline in

mussels.[77] In 2002, EPA published its Clinch and Powell Valley Watershed Ecological Risk

Assessment.[78] In its assessment, EPA determined that mining activities had the greatest adverse

effect on the rivers' fish and mussel species.[79] Among different types of mining operations, EPA

singled out coal processing plants, which operate on site at most active mines, as having the most

detrimental impact on aquatic fauna because of water contamination.[80] This finding regarding

the harm caused by coal processing plants demonstrates the invalidity of the 1996 BiOp's

---

[74] S.A. Ahlstedt et al., *Long Term Trend Information for Freshwater Mussel Populations at Twelve Fixed-Station Monitoring Sites in the Clinch and Powell Rivers...*, Final Report, U.S. Fish & Wildlife Service, Cookeville, TN, at 10 (2005) (Att. 7).

[75] *Id.*

[76] Personal communication with S.A. Ahlstedt (24 Oct. 2007).

[77] A 2006 study used an ecotoxicological rating system to compare stream quality in proximity to different land-use categories at the confluence of several tributaries and the Clinch River. B.A. Locke et al., *Land Use Influences and Ecotoxicological Ratings for Upper Clinch River Tributaries in Virginia*, 51 ARCH. ENVIRON. CONTAM. TOXCOL. 197 (2006) (Att.19). The data showed that tributaries draining watersheds influenced by mining activity had the greatest negative impact on the mainstem of the river because of the poor benthic macroinvertebrate health scores in those tributaries. *Id.* at 203.

[78] EPA, *Clinch and Powell Watershed: Ecological Risk Assessment* (Sept. 2002), *available at* http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=15219 [hereinafter Risk Assessment] (Att. 20). These two rivers were chosen for this assessment because "the watershed contains valued and threatened ecological resources; it had previously collected stressor and effects data; it is subjected to multiple physical, chemical, and biological stressors; and a number of organizations are working to protect the ecological resources." *Id.* at xiv. *See also* J.M. Diamond et al., *Assessing Relationships Between Human Land Uses and the Declines of Native Mussels, Fish, and Macroinvertebrates...*, 21 ENVIRON. TOXICOL. CHEM. 1147 (2002) (discussing EPA's risk assessment) (Att. 21).

[79] Risk Assessment, at I-6 (Att. 20).

[80] *Id.*

conclusion that SMCRA is sufficiently protective of these endangered fish and mussel species.

One important proof is that the chemicals used in these plants are not regulated under SMCRA;

therefore SMCRA cannot protect listed species downstream from these types of facilities.[81]

In the 2002 risk assessment, EPA also found that episodic coal slurry spills greatly

impacted aquatic populations:

> Episodic chemical or coal slurry spills, although low in frequency and duration in
> this watershed, have undoubtedly had a significant impact on mussel and native
> fish species abundance and distribution. Many of these spills have also occurred
> in headwater areas of the watershed. Therefore, tributary and headwater
> populations, which were historically some of the richest faunal locations in the
> watershed, are most at risk from extirpation because native species migration and
> recruitment could be more difficult.[82]

Moreover, the FWS noted in the Recovery Plan for the five newly-listed mussel species that,

between 1995 and 1999, five slurry spills occurred in the upper reaches of the Clinch and Powell

Rivers.[83]

The risk from episodic spills is particularly acute in headwater streams with rich

biodiversity like the Clinch River's Indian Creek tributary. Indian Creek, in Tazewell County,

Virginia, supports three federally endangered mussels, including the last known reproducing

population of a subspecies of the riffleshell complex (*Epioblasma florentina* spp).[84] It also is

home to several active mining operations.[85] In 2004, blackwater slurry spilled from an active

---

[81] *See, e.g.,* U.S. Army Corps of Engineers, Nashville District, Reconnaissance Study: Clinch River Basin Virginia: Section 905(b) (WRDA 1986) Analysis, at 12 (Nov. 2004) ("Presently, there are 287 active point-source discharges from coal processing plants and mine sites. Of the 287 sites, only a few potentially toxic chemical contaminants are regulated. . . .") (Att. 8).
[82] Risk Assessment, at I-6 (Att. 20).
[83] Recovery Plan, at 35 (Att. 17).
[84] Jess Jones, Richard Neves, *Survey of Freshwater Mussel Populations in Indian Creek, Tazewell County, Virginia,* at 1-2 (Nov. 2004) (Att. 22); J.W.Jones et al., *A Holistic Approach to Taxonomic Evaluation of Two Closely Related Endangered Freshwater Mussel Species...*, 72 J. MOLLUSCAN STUD. 267 (2006) (proposing the federally endangered tan riffleshell population in Indian Creek as a distinct subspecies from the federally endangered tan riffleshell in the Big South Fork) (Att. 23).
[85] Jess Jones, Richard Neves, *Survey of Freshwater Mussel Populations in Indian Creek, Tazewell County, Virginia,* at 2 (Nov. 2004) (Att. 22).

mine into Indian Creek and flowed for almost three miles.  After the spill, FWS officials

observed coal fines in the sediment of habitat for the three mussels for a period of four months.[86]

It is likely that this spill significantly impacted Indian Creek's tan riffleshell population.

Comparisons of surveys conducted in 1999-2000 and in 2006 show a 63% decline in the tan

riffleshell population in Indian Creek.[87]  Again, contrary to the mistaken premise of the 1996

BiOp, adherence to SMCRA regulations is not sufficient to protect endangered species from

devastating episodic spills. For these reasons, the 1996 BiOp's conclusion that the SMCRA

regulations are sufficient to protect listed aquatic species is contradicted by more recent

evidence, and reinitiation of consultation is required pursuant to 50 C.F.R. §402.16(b).

> ### 2. *New Studies on Mining's Impact on Aquatic Species in the New River and Big South Fork of the Cumberland River Require Reinitiation of Consultation.*

New information since 1996 has also been published on the impacts from intensive

mountaintop mining in the headwaters of the New River on federally listed aquatic species in the

Big South Fork of the Cumberland River and the New River.  This new information triggers the

§402.16(b) requirement that OSM and FWS reinitiate consultation on mining's impact on

threatened and endangered species.  Such new information includes, *inter alia*, the 1997 Water

Resources Management Plan for the BSF NRRA, a 2003 survey of mussels in the BSF NRRA, a

2005 fish fauna survey of the Cumberland River, and the Tennessee Wildlife Resource Agency's

2005 Comprehensive Wildlife Conservation Strategy.

In 1997, the National Park Service ("NPS") and the Department of the Interior

("DOI") adopted a Water Resources Management Plan ("WRMP") for the BSF NRRA to

---

[86] *Id.*

[87] Rachel Mair et al., *Indian Creek Water Quality Data and Juvenile Mussel Toxicity Tests* (2006), *at* http://www.fws.gov/cookeville/presentations/mussel_meeting_2k6/rmair_cook_2006.ppt (Att. 24).

govern the NRRA's water resources.[88]   According to the WRMP,  "[t]he mussel

community has approximately one half of the historic species diversity, and mussels are

completely absent from the New River in which historic populations existed.  The main

cause of impacts to the mussel community are pollutants and sediment associated with

coal mining."[89]   The WRMP also noted the "recent resurgence in regional coal mining

activity, particularly in the New River headwaters."[90]

   More recent information on endangered fish and mussel species in the Big South Fork

also attests to the threats to these species from mining in the New River watershed.  Ahlstedt's

2003 survey of mussels in the Big South Fork NRRA found five listed mussel species in the BSF

NRRA.[91]  According to this study, the Big South Fork "has more extant federally endangered

fish and imperiled mussel species than any other [National Park Service] unit in the country and

represents one of the richest remaining mussel faunas in the Cumberland River system...."[92]

The study identified "the continued deposition of silt and coal fines washing out of the New

River drainage into the [Big South Fork] from outside the boundaries of the NRRA" as one

major problem.[93]  The study noted that a large coal processing facility in the New River had been

reactivated and concluded that "[i]ncreased demands for coal and oil and gas

---

[88] NPS, *BSF NRAA Water Resources Management Plan* (Sept. 1997), *available at*
http://www.nature.nps.gov/water/management_plans/big_south_fork_screen.pdf [hereinafter BSF NRRA WRMP]
(Att. 25). The 1997 WRMP was prepared pursuant to 16 U.S.C. §460ee(h), the legislation that created the BSF
NRRA.  Subsection (h) requires that federal agencies, along with "the State of Tennessee and its political
subdivisions" periodically prepare a comprehensive plan to improve water quality in the New River watershed.
Because of the acknowledged harm to this watershed from coal mining, Congress required that the plan specifically
address "programs to enhance the environment and conserve and develop natural resources, and to minimize
siltation and acid mine drainage."  16 U.S.C. §460ee.
[89] BSF NRRA WRMP, at 15 (citation omitted)(Att. 25).
[90] *Id.*  at 58. The WRMP refers to permitted coal operations, making clear that impacts stem from current SMCRA-
regulated mining and not simply pre-SMCRA mining.  *Id.*
[91] Stephen A. Ahlstedt et al., *Current Status of Freshwater Mussels...*, 14 WALKERANA 33, 42 (2003-04) (Att. 16).
[92] *Id.* at 74
[93] *Id.*

exploration/extraction could reverse positive gains observed for mussels and other imperiled species in the [Big South Fork]."[94]

In a 2005 fish fauna survey in the Cumberland River system, Dr. David Etnier noted that fish populations in the Big South Fork River had been severely degraded by coal mining in the region before 1970 but had subsequently improved as a result of decreased mining activity. He opined that: "It is certain that this short-term improvement of the Big South Fork system could be nullified by an increase in mining activity in the New River watershed."[95] Dr. Etnier noted the presence of two listed fish species in the Big South Fork area, the endangered duskytail darter (*Etheostoma percnurum*) and the threatened blackside dace (*Phoxinus cumberlandensis*).[96] He stated that the blackside dace is at particular risk because it "occurs in tiny streams in several localities in the coal mining area."[97]

Finally, in September 2005, TWRA published its Comprehensive Wildlife Conservation Strategy [98] that likewise identifies mining activity conducted under SMCRA as a significant concern for sensitive species. The purpose of the congressionally required study is to prevent wildlife from declining to the point of endangerment. The Tennessee study ranked the stressors to aquatic resources in each watershed in the state, and it ranked coal mining practices as a major stressor of water quality in the Cumberland River drainage.[99] Within the Cumberland River watershed, TWRA categorized sub-watersheds according to the number of species representing the greatest conservation need. The Big South Fork was categorized as a priority one watershed

---

[94] *Id.*

[95] D.A. Etnier, *Fish Faunas of the Big South Fork of the Cumberland River and the Upper Cumberland River Drainage, Tennessee and Kentucky*, University of Tennessee, Knoxville, at 1 (10 Oct. 2005) (Att. 15).

[96] *Id.* at 2, 4.

[97] *Id.* at 4.

[98] TWRA, *Tennessee's Comprehensive Wildlife Conservation Strategy* (Sept. 2005), *available at* http://www.state.tn.us/twra/cwcs/tncwcs2005.pdf (Att. 26).

[99] *Id.* at 134-36. The study rated mining as the third worst watershed impact for the Cumberland River drainage. *Id.* at 135.

because of the number of species of concern.[100]  While noting that much of the damage to the

region has come from historic mining and from abandoned mines, the report also found that

"[a]nother problem from mining comes from the improper disposal of overburden during strip

mining."[101]

The new information described above highlights not only the importance of the aquatic

biota of the Big South Fork of the Cumberland River and the New River, but also the threat that

SMCRA-related mining poses to these species despite the existence of the BiOp and SMCRA

requirements.  This new information triggers the requirements for reinitiation of consultation

under 50 C.F.R. §402.16(b).

> **3.   New Information on Mining's Impacts Set Forth in the 2005
> Environmental Impact Statement on Mountaintop Mining in
> Central Appalachia Requires Reinitiation of Consultation.**
>
> > **a.   The Environmental Impact Statement Reveals the
> > Magnitude of Devastation of Central Appalachia's
> > Headwater Streams.**

While petitioners' particular interests focus on the Clinch, Powell, New, and Big South

Fork of the Cumberland Rivers, the impacts of mining on aquatic species are not confined to

these rivers, necessitating a complete repudiation of the 1996 BiOp.  Indeed, recent data from the

2005 Final Environmental Impact Statement on Mountaintop Mining ("FEIS") has revealed the

devastation of Central Appalachia's aquatic resources from coal mining to an extent that was not

known in 1996 and that certainly was not considered in the 1996 BiOp.

According to the FEIS, between 1992 and 2002, approximately 1200 miles of headwater

streams in Central Appalachia were directly impacted by mountaintop mining and valley fills;

while an estimated 724 miles of streams were completely buried by valley fills from 1985 to

---

[100] *Id.* at 135.
[101] *Id.* at 136.

2001.[102]  The FEIS recommended nothing that would curtail this harmful practice, however.  As

such, the environmental situation is continuing to deteriorate, as OSM has had to acknowledge in

the DEIS for the proposed changes to the stream buffer zone rule.  In that DEIS, OSM admits

that mining permits from October 2001 to June 2005 would directly impact 367 more miles of

streams in Central Appalachia, with approximately two-thirds of those streams being

permanently buried.[103]  OSM further predicts that, at the current rate of fill construction, an

additional 724 miles of streams will be buried in 17 years or by 2018."[104]

The detrimental impacts caused by mountaintop mining and valley fills are irrevocable.

Studies conducted in preparation for the mountaintop FEIS show that waters downstream of

valley fills are also severely impacted.  These studies also acknowledge the unique functional

values of headwaters streams and that those values are lost forever when a stream is filled by

mine waste.  The Draft Mountaintop Mining EIS succinctly admits, "[w]hen streams are filled or

mined all biota living in the footprint of the fill or in the mined area are lost."[105]  Similarly, Judge

Haden from the Southern District of West Virginia stated:

> When valley fills are permitted in intermittent and perennial streams, they destroy
> those stream segments.  The normal flow and gradient of the stream is now buried
> under millions of cubic yards of excess spoil waste material, an extremely adverse
> effect....If there is any life form that cannot acclimate to life deep in a rubble pile,
> it is eliminated.  No effect on related environmental values is more adverse than
> obliteration.[106]

---

[102] EPA Region 3, *Mountaintop Mining / Valley Fills in Appalachia Final Programmatic Environmental Impact Statement*, at 4 (Oct. 2005), *available at* http://www.epa.gov/region3/mtntop/pdf/mtm-vf_fpeis_full-document.pdf [hereinafter MTM FEIS] (Att. 27).
[103] SBZ DEIS, at III-117; *see also* 72 FR 48,890, 48,891 (24 Aug. 2007).
[104] SBZ DEIS, at III-117.
[105] EPA Region 3, *Mountaintop Mining / Valley Fills in Appalachia Draft Programmatic Environmental Impact Statement*, at Chapter III-D.2, *available at* http://www.epa.gov/region3/mtntop/pdf/III_%20Affected%20Environment%20and%20Consequences%20of%20MTM%20VF.pdf (Att. 28)
[106] *Bragg v. Robertson*, 72 F. Supp. 2d 642, 661-62 (D. W. Va. 1999), *vacated in part on jurisdictional grounds*, 248 F. 3d 275 (4th Cir. 2001), *cert denied*, 534 U.S. 1113 (2002).

Section 402.16(b) compels reinitiation to assess this new information and

consider the impacts from mining on all listed species in and downstream of the more

than one-thousand miles of Central Appalachian streams that have already been buried

from coal mining and the further anticipated decimation of streams under current

regulations, as acknowledged in the proposed stream buffer zone rule change.[107]

**b.    New Information on Selenium Pollution Below Valley Fills Requires Reinitiation of Consultation.**

As part of the mountaintop FEIS, EPA surveyed water quality of those streams located in

the primary region of mountaintop mining in Central Appalachia, covering the period from

October 1999 to January 2001.  The survey, published in 2002, found high concentrations of

selenium downstream from valley fills, including 66 violations of water quality standards for

selenium below the valley fills.[108]  These violations are particularly significant because, while

small amounts of selenium are needed to support life, according to the study, even slightly

greater amounts are highly toxic to aquatic life.[109]  Moreover, selenium bioaccumulates in the

food chain.[110]  According to the study, coal mining is one of the highest sources of selenium

mobilization in the United States.[111]  Moreover, the study acknowledged that "[d]isturbing coal

and soils during [mountaintop mining and valley fills] could be expected to result in violations of

the stream limit for selenium."[112]  This new information triggers the 50 C.F.R. §402.16(b)

---

[107] The mountaintop FEIS completely skirts the issue of impacts on threatened and endangered species, stating that because the specifics for the various actions have not been developed, evaluation of such impacts "is not yet feasible," and that, until development of any action would occur, there would be no effects.  MTM FEIS, at 54 (Att. 27).  Such circularity of reasoning does not satisfy the ESA requirements.

[108] G. Bryant et al., *A Survey of Water Quality of Streams in the Primary Region of Mountaintop / Valley Fill Coal Mining, October 1999 to January 2001*, at 75 (8 Apr. 2002)[hereinafter Bryant], *available at* http://www.epa.gov/Region3/mtntop/pdf/Appendices/Appendix%20D%20Aquatic/Stream%20Chemistry/MTMVFCh emistry.pdf (Att. 29).

[109] *Id.* at 73.

[110] *Id.*

[111] *Id.* at 73-74 (citation omitted).

[112] *Id.* at 74.

27

requirement that FWS and OSM reinitiate consultation to assess the impact of selenium

mobilized from SMCRA-regulated mining on threatened and endangered aquatic species.

> **c.   New Information on High Conductivity and Total Dissolved Solids From Mining Requires Reinitiation of Consultation.**

EPA conducted two stream surveys for the mountaintop FEIS, both of which reported

that streams below mountaintop mining sites had extremely high conductivity levels in

comparison to streams below unmined sites.[113]  EPA's 2000 study determined that high

conductivity levels correlated strongly with poor stream health.[114] Conductivity is the measure of

an aqueous solution's ability to carry a current.[115]  The median conductivity of streams below

valley fills as determined by EPA was 585 µs/cm, as compared with 66.4 µs/cm for unmined

sites.[116]  EPA determined that conductivity at sites below mountaintop mining and valley fills

can often be 100 times greater than unmined sites, with sites below reclaimed sediment control

structures having the highest conductivity measures.[117]   Overall, EPA found a very strong

correlation between low benthic health scores and high levels of conductivity below mountaintop

mines and valley fills.[118]

A waterway's total dissolved solids ("TDS") value is closely linked to its conductivity.

Like conductivity, high levels of TDS are harmful for aquatic life and human health.[119]  A 2006

study of land use and tributary health in the Clinch River determined that levels of TDS in the

---

[113] *Id.* at 45; J. Green et al., *A Survey of the Condition of Streams in the Primary Region of Mountaintop Mining/Valley Fill Coal Mining*, at 52 (Nov. 2000)[hereinafter Green], *available at* http://www.epa.gov/region3/mtntop/pdf/III_%20Affected%20Environment%20and%20Consequences%20of%20MTM%20VF.pdf (Att. 30).

[114] *Id.* at 52 (Att. 30).

[115] Bryant, at 44 (citation omitted) (Att. 29).

[116] *Id.* at 25. EPA determined that conductivity should be less than 426 micromhos/cm (µs/cm) to support good or very good stream condition index scores. Green, at 54 (Att. 30).

[117] Bryant, at 45 (Att. 29).

[118] Green, at 50–54 (Att. 30).

[119] *See* Bryant, at 37 (referencing California's aquatic water quality criteria, which notes an inverse relationship between fish health and TDS) (Att. 29).

tributaries impacted by mining were significantly greater than in other Clinch River

tributaries.[120] The study determined that the high TDS levels combined with high levels of

aluminum in tributaries impacted by mining were the two most significant factors in explaining

the overall low benthic macroinvertebrate health of these tributaries.[121]

The scientific studies conducted as part of the 2005 FEIS were not available when FWS

reviewed the impacts from SMCRA-regulated mining on listed species and critical habitat.

Because of the revelations in the FEIS regarding the extent and type of harm caused by

mountaintop mining, and the likelihood that such harm will negatively impact threatened and

endangered species, 50 C.F.R. §402.16(b) requires that FWS and OSM revoke the 1996 BiOp

and reinitiate consultation.

**C.      Reinitiation of Consultation Is Required Because the Take That Has
Occurred Exceeds That Contemplated by the Incidental Take
Statement in the 1996 BiOp.**

50 C.F.R. §402.16(a) requires reinitiation of consultation when the amount or extent of

take exceeds that specified in the ITS.  In this case, the ITS of the 1996 BiOp determined that

take was "unquantifiable."[122] That determination, however, did not (and could not) license

unlimited take.[123] Moreover, FWS's  determination that the precise number of individual "takes"

could not be counted with numerical precision, but was low enough that it would not likely result

in jeopardy to any listed species or adverse modification of critical habitat, is contradicted by the

evidence and information published since 1996.  As discussed above, that evidence shows

---

[120] B.A. Locke et al., *Land Use Influences and Ecotoxicological Ratings for Upper Clinch River Tributaries in Virginia*, 51 ARCH. ENVIRON. CONTAM. TOXCOL. 197, 202 (2006) (Att. 19).
[121] *Id.* at 200-03.
[122] BiOp, at 11 (Att. 1).
[123] *See Oregon Natural Res. Council v. Allen*, 476 F.3d 1031, 1039 (9th Cir. 2007) (determining that FWS's ITS was insufficient because it failed to "set forth a trigger that would invalidate the safe harbor provision and reinitiate the consultation process.").

dramatic declines in mussel species in areas closest to active mining during the past decade; thus mining is potentially jeopardizing listed species in contradiction to the BiOp's conclusion.

In addition, FWS explicitly conditioned its "no jeopardy" conclusion and ITS on the development of species-specific measures to minimize anticipated take.[124]  No such measures have been adopted for most of the federally endangered and threatened aquatic species that are being harmed by mining in the watersheds of the Clinch, Powell, New, and Big South Fork Rivers.[125]  Because the conditions of FWS's 1996 ITS have not been fulfilled, any take that occurs is beyond that considered by FWS in 1996 and cannot be excused by OSM's adherence to the terms of the BiOp.

## Conclusion

It is obvious that the poorly conceived 1996 BiOp is insufficient to ensure that active mining is regulated sufficiently to protect listed species and critical habitats as is required by Section 7 of the ESA.  OSM cannot continue to rely on the 1996 BiOp to ensure that it does not violate its substantive duty under §7(a)(2) of the ESA to ensure that the action it authorizes, funds, or carries out is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat."  Petitioners have demonstrated with respect to their specific watersheds of concern that reinitiation of consultation is required and that the BiOp is untenable.  Because the 1996 BiOp applies nationwide to all species, reinitiation of consultation is also necessary on a national level.

For the foregoing reasons, the petitioners request that OSM and FWS revoke the 1996 BiOp and undertake new consultation on all SMCRA-regulated mining.

---

[124] BiOp, at 13 (Att. 1).
[125] As of December 2007, no species-specific guidance measures are yet in place for coal mining in Virginia; nor are species-specific guidance measures in place for aquatic species in Tennessee.  Communication with Roberta Hylton, FWS, Abingdon, Virginia Field Office (3 Dec. 2007); Communication with Lee Barclay, FWS, Cookeville, Tennessee Field Office (6 Dec. 2007).

Respectfully submitted,

*Deborah M Murray*

Deborah M. Murray
Mary Varson Cromer
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA  22902
434- 977-4090


Counsel for Petitioners
Center for Biological Diversity
National Parks Conservation Association
World Wildlife Fund, Inc.

Gary T. Myers
Executive Director
Tennessee Wildlife Resources Agency

By Counsel:

*Sheryl D Holtam (by permission)*

Sheryl D. Holtam
General Counsel
Tennessee Wildlife Resources Agency
PO Box 40747
Nashville, TN  37204
615-781-6606

31

# PRECIOUS HERITAGE

## The Status of Biodiversity in the United States

*Editors*

Bruce A. Stein

Lynn S. Kutner

Jonathan S. Adams

THE NATURE CONSERVANCY

ASSOCIATION FOR BIODIVERSITY INFORMATION

# 6

## THE GEOGRAPHY
## OF IMPERILMENT

*Targeting Conservation toward*
*Critical Biodiversity Areas*

The Lake Wales Ridge stretches out along Florida's central spine, point-
ing southward like an arrow toward Lake Okeechobee and the Ever-
glades beyond. The "river of grass," as the Everglades are known, attracts
visitors from around the world to experience this unique ecosystem and
view its immense wildlife concentrations. Compared to its famous neigh-
bor to the south, the Lake Wales Ridge is virtually unknown to the pub-
lic. From a biological perspective, though, these low, scrub-covered sand
hills are of perhaps greater interest than the immense wetlands of the
Everglades, because the ancient sand dunes that form this ridge are home
to some of the most distinctive and highly localized species in the world.
Yet most of the scrub vegetation that supports these species has been de-
stroyed, replaced by agriculture and housing developments: Only about
15% of this unique habitat remains (Menges 1997).

Among the rarest of the ridge's inhabitants is the Lake Placid scrub
mint (*Dicerandra frutescens*), known from just a handful of localities. This
mint produces chemicals that have a powerful deterrent effect on insects
and that could provide the key to developing new forms of insect repel-
lents useful to people (Eisner et al. 1990). Although these chemicals pro-
tect the mint from being devoured by insects, the plant has little protec-
tion against the development pressures that threaten it. Another resident
of the ridge is the yellow scrub balm (*Dicerandra christmanii*), a closely
related mint that has an even more restricted distribution. Both of these
plants are regarded as critically imperiled (G1), and both are listed by the
federal government as endangered.

Sharing the Lake Wales Ridge with these rare plants is the Florida
scrub jay (*Aphelocoma coerulescens*), a bird that is mostly restricted to the
scrub along Florida's central ridge but occurs in scattered locations along
Florida's Gulf and Atlantic Coasts as well. Florida scrub jays have the

*Stephen J. Chaplin*

*Ross A. Gerrard*

*Hal M. Watson*

*Lawrence L. Master*

*Stephanie R. Flack*



Number of
Species by Region

☐ 1–9
▨ 10–24     ☐ 50–99
☐ 25–49     ■ 100–104

Figure 6.13. Regional concentrations of
aquatic biodiversity.

*Based on the number of at-risk fish and
mussel species, the Tennessee-Cumberland
and Mobile River basins in the Southeast
have extraordinarily diverse assemblages of
freshwater animal species.*

of a size more amenable to conservation planning and action.[6] Using a geographic information system we assigned each species both to freshwater regions and to small watersheds. Experts in all states then reviewed the data to refine the small-watershed distributions for these species.

Although at-risk freshwater species are distributed throughout the United States, two particular hydrologic regions dominate, containing 35% of all vulnerable and imperiled fish and mussel species (figure 6.13): the Tennessee–Cumberland River basins (including Tennessee and parts of six other states) and the Mobile River basin (including Alabama, parts of Georgia and Mississippi, and a bit of Tennessee). Of these at-risk species, 70% (113) occur nowhere else in the world; they are endemic to one of these two regions. These basins are also rich in other freshwater species, including snails and turtles (Lydeard and Mayden 1995). The Interior Highlands region—located in Arkansas, southern Missouri, southwestern Oklahoma, and northeastern Texas—is another regional center of diversity, and with 54 species, it has the next-highest count of fish and mussel species at risk.

Of the more than 2,000 small-watershed areas found across the continental United States, about 1,300 (61%) support one or more fish or mussel species at risk. In turn, 87 of these stand out as hot spots, harboring 10 or more vulnerable or imperiled species (figure 6.14). These hot spots of aquatic diversity are largely concentrated in the Southeast. Four river basins alone—the Tennessee, Ohio, Cumberland, and Mobile—contain 18 of the top 20 watersheds. The upper Clinch River on the Virginia-Tennessee border surpasses all other watersheds in the country, with 48 imperiled and vulnerable fish and mussel species, including 21 that are federally listed as endangered or threatened. In the analysis of all imperiled species presented earlier (figure 6.6), this is the same area that emerged as the single most diverse hexagon in the continental United States.

The extraordinary diversity of southeastern rivers results from the coincidence of a diverse physical geography, a favorable climate, and a long but dynamic history. The numerous streams of the southeastern

---

6. These small watersheds are the equivalent of the U.S. Geological Survey's eight-digit Hydrologic Cataloguing Unit, which is roughly the equivalent of the U.S. Forest Service's "subbasin."

Attachment 6

# Water Quality in the Upper Tennessee River Basin, Tennessee, North Carolina, Virginia, and Georgia 1994–98

*By* Paul S. Hampson, M.W. Treece, Jr., Gregory C. Johnson, Steven A. Ahlstedt,
   *and* Joseph F. Connell

U.S. GEOLOGICAL SURVEY CIRCULAR   1205

## Biological Diversity

The Upper Tennessee River Basin is noted nationally for its diversity of freshwater fishes and mussels. The basin provides habitat for 174 species of fish, including 25 species that are non-native.

Of the 149 fish species native to the Upper Tennessee River, 29 are found only in the Tennessee and adjacent Cumberland River Basins, and 15 are found only in the Upper Tennessee River. Fifteen fish species in the basin are federally listed as endangered or threatened and 50 species are listed under management categories used by the four States.

Most of the fish diversity in the basin is concentrated in the Valley and Ridge physiographic province, which includes 141 of the 149 native Upper Tennessee species, most notably in the Upper Clinch and lower Holston River Basins (fig. 7). The Clinch River alone is home to 126 Upper Tennessee River native species, 12 of which are federally protected and 41 of which are State listed. Four previously recorded fish species are no longer found in the Clinch River, the largest number of eliminated fish species for any Upper Tennessee drainage.

The Upper Tennessee River also includes one of the most diverse freshwater mussel fauna in the world with 85 different species having historically been recorded. Twenty-five of these species are no longer found in the basin, mostly because of habitat destruction associated with reservoir



The Upper Tennessee River Basin includes one of the world's most diverse freshwater mussel faunas. (Photograph courtesy of Richard Neves, Virginia Polytechnic and State University.)



**Figure 7.** Fish diversity is highest in the Lower Holston and Upper Clinch River systems.

impoundment, and 11 are now believed to be extinct. Of the 60 freshwater mussel species now found in the Upper Tennessee River Basin, 30 species are under Federal protection and 52 species are listed by the States.

As with fishes, most of the freshwater mussel diversity is associated with the Valley and Ridge physiographic province, especially the Clinch River system (fig. 8). The Clinch River is now home to about 52 species of a previously recorded total of 79. Of the current total, 28 are federally listed and 38 are listed by the States.

Home to more than 300 globally rare species, the Upper Clinch River system, which includes the Powell River, has attracted attention from a number of environmental organizations including the designation as one of the "Last Great Places" by the Nature Conservancy. The Clinch River system also is considered to be one of the more biologically threatened river systems in the country (fig. 9). Of the 178 freshwater fish and mussel species presently inhabiting the Clinch River Basin, more than one-fourth are considered to be at-risk.[8]



The yellowfin madtom is one of the threatened fish species in the Upper Tennessee River Basin. (Photograph courtesy of the Tennessee Valley Authority.)



**Figure 8.** Freshwater mussel diversity is highest in the Valley and Ridge physiographic province.



**Figure 9.** The Upper Clinch and Powell Rivers have the highest numbers of freshwater fish and mussel species considered to be at risk.[8]

## Study Unit Design Focuses on Land Use.

Chemical and biological samples were collected from selected rivers and streams draining different land-use areas to assess overall quality as well as the effects of specific land uses. The study focused on agricultural land use and unregulated streams in the Valley and Ridge physiographic province. At Basic Fixed Sites, water samples were collected monthly and during storms to assess runoff conditions. Synoptic sites were sampled only once during periods of average flow.

Springs, domestic wells, and specifically installed agricultural monitoring wells were sampled to assess overall ground-water quality in the basin. Ground-water studies focused on the dolomite and limestone areas of the Valley and Ridge province, which provide the best aquifers and are the most susceptible areas in the basin to ground-water contamination. (See Study Unit Design, page 23, for details.)

curies of cesium-137 released from the ORR have also been retained by the lake sediments. The concentrations detected are not believed to pose an imminent human health risk, especially if the deep sediments are not disturbed.[25]

Mining of the massive sulfide deposits in the Copper Basin along the Ocoee River began in 1843. Copper was the primary metal extracted, but iron, sulfur, zinc, and small amounts of gold and silver also were produced. Before 1900, Copper Basin was the largest metal-mining district in the Southeast. The last mine was closed in 1987.[26]

High concentrations of sulfur dioxide produced by smelting operations devastated the surrounding environment, resulting in a "moonscape" of about 25 square miles. Erosion of the area resulted in high sediment and associated metal loads to area streams. Although thousands of acres have been revegetated and the landscape is being slowly transformed back to forest, relatively high metal concentrations remain in the upper reaches of Parksville Reservoir and the Ocoee River.

Discharge of essentially untreated paper-mill effluent to the Pigeon River began in early 1908 and continued until plant improvements were instituted in the 1990s. Dioxins were first detected in fish samples from the river in 1988 (dioxin detection methods were not available until 1985) and became an immediate priority with respect to human health effects.[27] Dioxins have not been detected in recent samples, including bed-sediment and tissue samples taken during the Upper Tennessee NAWQA study. The State of Tennessee, however, continues a precautionary fish-consumption advisory for the Tennessee portion of the river.

Even though discussions regarding the Pigeon River continue between the States of Tennessee and North Carolina, all parties agree that conditions have improved significantly. Once nearly devoid of aquatic life, benthic invertebrate and fish populations in the

Tennessee portion of the Pigeon River are showing signs of recovery. Waterville Lake, however, still retains tons of contaminated sediments deposited since the dam became operational in 1930, and these sediments remain a potential source of dioxin and other contaminants.

Polycyclic aromatic hydrocarbons (PAHs) commonly are detected as pollutants in soils and sediments, occur naturally in crude oil and coal, and also can result from the incomplete combustion of fossil fuels and forest fires.[28] In the upper Clinch River Basin, PAH concentrations reflect the presence of coal fines from upstream mining activities.

Twenty-nine PAHs were found in upper Clinch River bed-sediment samples and, with only a few exceptions, were not detected in the 12 samples taken from other parts of the Upper Tennessee Basin. Although PAHs are known to be toxic to fish, mussels, and aquatic insects, sediment-quality guidelines for the protection of aquatic life have been established for only 12 of the compounds detected. Of these, only two compounds – naphthalene and phenanthrene – exceeded their respec-

tive Canadian probable-effect levels of 391 µg/kg (micrograms per kilogram) and 515 µg/kg (fig. 30). The probable-effect levels define concentrations above which adverse effects are expected. A third compound, benzo(a)anthracene, occurred in concentrations very near its guideline of 385 µg/kg, and a number of compounds lacking guidelines were found at concentrations of 1,000 µg/kg or greater.

The highest concentrations generally follow the results for naphthalene and phenanthrene and occurred in the major river sites nearest, on a relative basis, to upstream mining activities. • For example, concentrations at the Powell River and Pendleton Island sites exceeded those found at the Clinch River near Tazewell, which is farther removed from active mining in terms of river miles. Higher gradients and water velocities in the tributaries to the major streams prevent the accumulation of fine-grained sediment and coal fines. The main river channels, however, contain large pools and backwater areas where fine-grained material and associated constituents are deposited.



Guest River at Millers Yard, Va.
Naphthalene 190 µg/kg
Phenanthrene 370 µg/kg

Clinch River at Pendleton Island, Va.
Naphthalene 400 µg/kg
Phenanthrene 570 µg/kg

Powell River near Arthur, Tenn.
Naphthalene 1600 µg/kg
Phenanthrene 1300 µg/kg

Emory River at Oakdale, Tenn.
Naphthalene 610 µg/kg
Phenanthrene 480 µg/kg

Copper Creek near Gate City, Va.
Naphthalene less than 50 µg/kg
Phenanthrene 33 µg/kg

Clinch River near Tazewell. Tenn.
Naphthalene 180 µg/kg
Phenanthrene 230 µg/kg

0 10 20 30 40 50 MILES
0 10  30  50 KILOMETERS

N

EXPLANATION
● Bed-sediment sampling site
● Abandoned mine      Bed-sediment concentration
○ Active mine      numbers in excess of aquatic-life protection
                        guidelines shown in red color.

**Figure 30.** Relatively high polycyclic aromatic hydrocarbon (PAH) concentrations, in micrograms per kilogram, are common in bed sediments in the upper Clinch River Basin.

Att... ...ment 7

2594

# Long-term Trend Information for Freshwater Mussel Populations At Twelve Fixed-Station Monitoring Sites in the Clinch and Powell Rivers of Eastern Tennessee and Southwestern Virginia 1979-2004

Steven A. Ahlstedt[1], Mark T. Fagg[2], Robert S. Butler[3], and Joseph F. Connell[1]

February 16, 2005

Prepared for:
U. S. Fish and Wildlife Service
Ecological Services
Cookeville, TN 38501

[1] U. S. Geological Survey, 1820 Midpark Dr., Knoxville, TN 37921
[2] Tennessee Wildlife Resources Agency, 3030 Wildlife Way, Morristown, TN 37814
[3] U. S. Fish and Wildlife Service, 160 Zillicoa St., Asheville, NC 28801

individuals for culture and propagation. The success of finding populations of gravid mussel species for culture and propagation are the result of continued long-term monitoring of mussel populations in the Clinch and Powell rivers over the last 25 years.

## Background

From 1979-1994, the upper reaches of the Clinch and Powell rivers in Tennessee and Virginia were quantitatively and qualitatively sampled for mussels at 11-19 fixed-station monitoring sites, respectively (Ahlstedt and Tuberville 1997). The Clinch and Powell rivers was sampled again in 1999 at all previous fixed sites and in 2004 sampling was reduced to six sites in both rivers. Basically, mussel monitoring was done every five years since 1979 and this information forms the basis for long-term trend monitoring.

Considerable changes had occurred to mussel populations in both rivers since Ortmann (1918) and more recently since monitoring began in 1979. Some of the changes include species that are currently rare, considered extinct, and/or extirpated and collecting sites where the fauna is currently reduced or no longer present. Mussels were relatively widespread and common for some species in the mid-1970s (Ahlstedt 1991ab) but long-term trend monitoring of mussel populations since 1979 are showing that mussel population densities and species composition are rapidly declining in the Clinch especially in Virginia and the Powell River. Many species that were more common and widespread throughout the Clinch and Powell rivers in the mid-1970s currently exist as old eroded individuals or are extirpated from former habitats. The fauna that remains in the Powell River is severely impaired and a portion of the Clinch River in Virginia that includes Simone's Island near Dungannon and Pendleton Island (The Nature Conservancy's mussel-preserve) near Ft. Blackmore, are suffering a similar fate. The resurgence of coal mining in southwestern Virginia is contributing unknown quantities of wastes in the form of coal fines and contaminants into both rivers since each river has a history of black-water events...discharges of coal fines from coal washing facilities. During the last 5-years, coal-fines were not as prevalent in the Clinch in Tennessee in comparison to what was observed in Virginia or the Powell River. Coal-fines have increased exponentially and currently cover substrate in some of the best mussel habitat that remains in the Clinch. Ahlstedt and Tuberville (1997) reported that patterns of mussel distribution and abundance are influenced by their proximity to mine lands and studies on sediment toxicity indicate that sediments from mining-related activities are one of the causal factors for mussel declines (McCann and Neves 1992). An Ecological Risk Assessment of the Clinch and Powell Valley watershed was completed by the Environmental Protection Agency (EPA) in 2002 (EPA 2002). The EPA reports that there are currently 287 active coal-mining point-source discharges in the Clinch and Powell watershed and point-source discharges from active mines and processing plants are potential threats to the rivers ecosystem. Hydraulic fluid releases associated with mining activities have caused known fish kills (Biological Monitoring, Inc. 1990). Discharges from coal processing plants and mine sites currently regulated by the U. S. Bureau of Mines are monitored for pH, total iron, total manganese, and total residue. However, a wide range of potentially toxic compounds such as hydraulic fluids, frothing agents, modifying reagents, pH regulators, dispersing agents, flocculants, and media separators used in mining and coal processing are currently unregulated, not monitored, and they may be discharged into rivers (Biological Monitoring, Inc. 1990; Cherry et al.

2

The Tennessee side of the Clinch contains some of the best and for some species the only reproducing populations of the following federally listed mussels in the Tennessee River system: *Cyprogenia stegaria, Dromus dromas, Epioblasma brevidens, E. capsaeformis, Fusconaia cor, F. cuneolus, Hemistena lata, Pleurobema plenum*, and *Quadrula c. strigillata*. It also contains the best reproducing populations of *Cumberlandia monodonta, Epioblasma triquetra, Medionidus conradicus, Plethobasus cyphyus, Pleurobema rubrum*, and *Ptychobranchus subtentum*, a candidate for federal listing. The illegal discharge of coal fines from coal washing facilities in Virginia now covers habitat in Tennessee where the best populations of federally listed and non-listed mussels occur. Twelve species not found in quantitative samples in 2004 but representative in qualitative samples or reported recently in previous sampling years are currently uncommon, rare or extirpated from monitoring sites in the Clinch. They include: *Fusconaia cuneolus, Leptodea fragilis, Lexingtonia dolabelloides, Ligumia recta, Plethobasus cyphyus, Pleurobema cordatum, Pleurobema rubrum, Potamilus alatus, Strophitus undulatus, Truncilla truncata, Villosa perpurpurea*, and *Villosa vanuxemensis*. Both *L. fragilis* and *T. truncata* are probably extirpated from the Clinch because neither has been found since 1979. A few other species found in 2004 also are considered rare in the Clinch. They include: *Alasmidonta marginata, Fusconaia barnesiana, F. cor, F. cuneolus, Pleurobema oviforme*, and *P. plenum*. Of note, *F. cuneolus* was once the most common federally listed mussel in the Clinch.

Of the 55 species reported from the upper mainstem Clinch River over the last 100 years, 11 are now considered extinct or extirpated. They include: *Epioblasma haysiana, E. lenior, E. stewardsoni, E. tortulosa gubernaculum, Leptodea fragilis, Pleurobema sintoxia, Toxolasma lividus, Truncilla truncata, Quadrula intermedia, Villosa fabalis*, and *V. trabalis*. Four species (*Alasmidonta viridis, Epioblasma walkeri, Lasmigona holstonia*, and *Villosa perpurpurea*) with the exception of *V. perpurpurea* no longer occur in the mainstem Clinch but are found in tributary streams Indian and Copper creeks. Both *E. walkeri* and *V. perpurpurea* populations were destroyed in the upper Clinch in 1998 by a chemical spill at Cedar Bluff, Virginia. Efforts are being made to restore both species back into the river at Cedar Bluff via culture and propagation techniques (Mike Pinder, pers. com). The last report of live *E. t. gubernaculum* occurred in 1983 at Pendleton Island (Ahlstedt 1991a). Another rare species not found during long-term trend monitoring is *P. fabula* but one live individual was reported in 1983 and 1999 downstream and upstream from Cedar Bluff (Jess Jones, pers. com.).

### Powell River

The diversity and abundance of freshwater mussels found both quantitatively and qualitatively in 2004 are summarized in table 9. Density of freshwater mussels per square meter by species and sampling year are presented in tables 10-15 and figure 3. Mussel densities remain the highest on the Tennessee side of the Powell at Buchanan Ford (8.0m², tables 9 and 10), followed by (decreasing in order of abundance) highway 833 Bridge crossing (2.60m², tables 9 and 14), Bales Ford (2.20m², tables 9 and 12), highway 70 Bridge crossing (1.80m², tables 9 and 15), McDowell Shoal (1.40m², tables 9 and 11), and Fletcher Ford (1.20m², tables 9 and 13). This is the first time highway 833 Bridge crossing was quantitatively sampled for mussels as a long-term monitoring site.

concentrations of metals at levels toxic to mollusks specifically zinc (Zn) and copper (Cu). Sediment tests on juvenile mussels from sediments collected downstream from a coal processing plant showed significantly lower survival (p=0.01) than in sediments tested upstream from the plant. Water samples analyzed from the Powell River during the course of their study contained concentrations of Cu exceeding U. S. EPA water quality criteria (and concentrations shown to have an adverse effect on mussel populations). If high metal concentrations continue it seems doubtful that the declining mussel populations in the Powell River will recover and more are endanger of extirpation (McCann and Neves 1992).

## Conclusions

The Clinch and Powell rivers contain more globally rare mussel and fish species than any river in North America. In terms of the Clinch Rivers biodiversity, The Nature Conservancy lists the Clinch as "One of its Last Great Places." Since long-term trend monitoring began in 1979, the mussel fauna in both rivers was more diverse and abundant throughout their reaches. The damage to the mussel resources in the Powell was obvious in 1979 since its drainage has a long history of chronic pollution from coal mining in southwest Virginia that has resulted in coal mine wastes blanketing the substrate. The mussel fauna in the upper Powell River closest to mining activities is almost totally eliminated and currently most species exist as old relict individuals along the state borders of Virginia and Tennessee.

This was not necessarily the situation on the Clinch River in 1979 since mussels were present throughout the river into the headwaters. Other than a 15-mile reach of the Clinch near Carbo, Virginia largely devoid of mussels from a 1967 fly ash and 1970 sulfuric acid spill, the river appeared in relatively good condition based on the presence of a diverse mussel fauna. Coal fines were evident in both the Clinch and Powell rivers in 1979 and may in part been responsible for declines noted in 1988 during a 5-year drought. Ahlstedt and Tuberville (1997) reported that patterns of mussel distribution and abundance are influenced by proximity of mined-lands and toxicity studies in the Clinch and Powell rivers indicate that sediments from mining-related activities is one of the causal factors for mussel declines. Drought conditions (1983-1988) may have concentrated toxics lethal to juvenile mussels and other aquatic organisms as a result of low flows during this time period.

The resurgence of coal mining in both drainages and illegal or accidental black-water releases, or permitted discharges has set a course for major catastrophic damage that may be irreversible. Many mussel species found here are endemics that occur nowhere else. They represent for some species the only seed stock available for recovering mussel faunas extirpated from other Tennessee and Cumberland River tributaries. The mussel fauna on the Tennessee side of the Clinch is now starting to decline and mirrors what has occurred in the Clinch in Virginia and the Powell River. Coal fines are now prominent in the Clinch at the best mussel sites and habitats in Tennessee. Coal fines also were prominent at two of the former best sites for mussels in Virginia (Pendleton and Simone's) but both sites are now largely destroyed.

Three major tasks were recommended in 1984 as a course of action for preserving the mussel fauna in the Clinch (Ahlstedt 1991a). They are verbatim as follows: 1) In

Attachment 9

## United States Department of the Interior

FISH AND WILDLIFE SERVICE
446 Neal Street
Cookeville, TN 38501

April 17, 2007

**RECEIVED**

APR 19 2007

TN Division Of Water
Pollution Control

Mr. Paul Davis
Tennessee Department of Environment
    and Conservation
7th Floor, L&C Annex
401 Church Street
Nashville, Tennessee  37243-1534

Dear Mr. Davis:

On February 28, 2007, a meeting was held at the U.S. Fish and Wildlife Service's Cookeville Field Office to discuss faunal declines observed by biologists in the Clinch River and Powell River in Tennessee. In response to the request you made at that meeting, biologists from my staff have compiled the following information.

The rivers of the upper Tennessee River Basin historically supported a diverse and abundant aquatic fauna, including freshwater mussels. In 1918, Arnold Ortmann, a prominent malacologist of the early 20th century, stated that this area is one of the major centers for mussel diversity and the most prolific region in the world for that faunal group. He also recognized a number of mussel species endemic to the upper Tennessee River Basin as a unique "Cumberlandian fauna."

The Powell River historically contained 41 species of freshwater mussels. Since passage of the Endangered Species Act (ESA) in 1973, 13 of the species have been listed as federally endangered species. Currently, 28 mussel species, including seven of the 13 listed species, still exist in the river; three species (leafshell, forkshell, and acornshell) were likely extinct prior to passage of the ESA. Two species, the sheepnose and fluted kidneyshell, are federal candidate species (i.e., species under consideration by the U.S. Fish and Wildlife Service for possible listing).

The Clinch River historically contained 55 species of mussels. Since passage of the ESA, 19 species have been listed as endangered. There are currently 41 species still occurring in the Clinch River, including 14 of the 19 listed species. Eight species (sugarspoon, angled riffleshell, leafshell, acornshell, narrow catspaw, forkshell, round combshell, and turgid-blossom pearlymussel) were likely extinct prior to passage of the ESA. Four species – the sheepnose, fluted kidneyshell, slabside pearlymussel, and spectaclecase – are federal candidate species.

In addition to mussels, the Clinch River and Powell River support populations of federally endangered and threatened fish species. The threatened slender chub and yellowfin madtom occur in the Powell River and Clinch River; the endangered pygmy madtom and duskytail darter

occur in the Clinch River. The Powell River, from the headwaters of Norris Lake to the Tennessee/Virginia state line, is designated as critical habitat for the slender chub and yellowfin madtom; the Clinch River from the headwaters of Norris Lake to the state line is designated critical habitat for the slender chub.

Biologists and university researchers have documented changes in densities of freshwater mussels over the past 28 years. In the Powell River, mussel density at McDowell Shoal in Tennessee dropped from 5.5 individuals per square meter in 1979 (16 species found) to 1.4 per square meter (7 species) in 2004. Thirty-seven mussel species were historically reported at this site. At Fletcher Ford in Virginia, mussel density dropped from 11.1 per square meter in 1979 (16 species) to 1.2 per square meter in 2004 (7 species). This site historically supported 35 mussel species.

The Clinch River at Kyles Ford in Tennessee historically supported 40 mussel species. In 1979, mussel density was reported to be 30.9 individuals per square meter (27 species). In 1999, density was found to be 95.8 per square meter (23 species), and in 2004 mussels were found at 74.1 per square meter (23 species). Forty-one species of mussels were historically found at Pendleton Island (a Nature Conservancy mussel preserve) in Virginia. In 1979, mussels occurred at a density of 24.6 individuals per square meter (21 species). By 2004, density had dropped to 4.6 per square meter (10 species).

In cooperation with the U.S. Geological Survey (USGS) and National Park Service (NPS), the U.S. Fish and Wildlife Service (USFWS) completed an investigation in 2006 that focused on the physicochemical properties of surface water, interstitial pore water, and sediment in the Clinch River, Powell River, and Big South Fork Cumberland River watersheds. We expect a final report to be published in 2007. In cooperation with Region V of the USFWS; USGS-Columbia Environmental Research Center, Virginia Department of Game and Inland Fisheries, Tennessee Wildlife Resources Agency (TWRA), Virginia Tech, and the Office of Surface Mining, in 2007 we initiated a three-year investigation of the toxicity of coal mining-related effluents to juvenile mussels. Samples will be collected from active coal mining areas and processing facilities in Virginia and Tennessee. We are also working cooperatively with TWRA, The Nature Conservancy, Tennessee Valley Authority, and the Tennessee Department of Environment and Conservation in investigating the suitability of translocating specific mussel species from the Clinch River in Tennessee to other suitable habitats in the State.

Should you have any questions or need additional information on the status of water quality and the mussel fauna in the Upper Tennessee River watershed in Tennessee, please contact Steve Alexander of my staff at 931/528-6481, ext. 210. If you require additional information related to water quality and the mussel fauna in Virginia, please contact Roberta Hylton, Field Supervisor of our Southwest Virginia Field Office at 276/623-1233, ext. 22.

Sincerely,

Lee A. Barclay, Ph.D.
Field Supervisor

Big South Fork National Rive & Recreation Area - General Management Plan (U.S. Nati...   Page 1 of 1

Attachment 14

**National Park Service**
**U.S. Department of the Interior**



## Big South Fork National River & Recreation Area
# General Management Plan

The Final General Management Plan analyzes the impacts associated with four alternative approaches to managing the park, including the agency preferred alternative. The final plan contains the alternatives and analyses published in the January 2003 Supplemental Draft General Management Plan, as well as responses to all sustentative public comments received during the public review period. These comments have been responded to by modifying the alternatives, clarifying or updating the analyses, making factual revisions, or explaining why a comment does not warrant further action.



The following links will allow you do download the various chapters and sections which make up the General Management Plan.

The Big South Fork General Management Plan was completed in early 2005.

- Please note that due to the size of some of these file they will not download efficiently if you have a dial-up connection.

If you experience difficulty downloading these files, printed copies or CD-ROMs may be obtained by writing: Superintendent, Big South Fork NRRA, 4564 Leatherwood Rd., Oneida TN 37841, by calling (423) 569-9778, or by email. Because the hard copies are substantially more costly to the taxpayer; we encourage you to request a CD-ROM if you have ready access to a computer.

sediment.  Some of the streams have been identified as impaired streams, pursuant to the Clean Water Act.  (Sources for this summary of water resource information: US Army Corps of Engineers, 1980; NPS, 1997a)

General Vegetation

The general forest type is mixed-oak with mixed-mesophytic pockets.  This type is divided into an upland community on the plateau and a ravine community.  The upland vegetation types range from red maple-dominated stands on poorly-drained flats to Virginia pine-dominated stands on dry ridges and cliff edges.  On the broad flats and gentle slopes are mixed oaks with hickory.  Ravine communities are generally dominated by more mesic species—beech, sugar maple, and yellow birch—with oaks on the middle and lower slopes.  Hemlock is prominent in the narrow gorges and along streams.  River birch and sycamore typify the floodplains.

A wide variety of specialized habitats exists on the floodplains, in protected coves and ravines, on moist north-facing slopes, and on the sandstone caprock with dry, shallow soils.  The rugged topography and moist, moderate climate combine to produce a great variety of microclimatic influences due to slope, orientation, and exposure.

Because of logging in the early-to-mid-20th century, most of the forest areas are 2nd or 3rd growth.  As a result, mature forests and groves of particular scenic interest are rare.  Due to inaccessibility, several small areas containing impressive examples of 2nd growth floodplain, mixed-mesic, and hemlock forests still exist, mostly in the more northern coves of the National Area.  (US Army Corps of Engineers, et. al., 1974; NPS, 1997a)

Of note is the widespread damage caused between 2000 and 2002 by pine beetles. Dead standing and fallen trees remain virtually everywhere in the National Area where Virginia pine stands existed prior to the infestation.  The safety hazard of falling limbs and trees is still significant although trees have been felled in all areas where visitors congregate.  Many trails and some back roads will remain hazardous until the dead trees are down.  The visual impact of so many dead trees is significant.

**General Terrestrial and Aquatic Animal Life**

The variety of natural conditions combine to provide a high diversity of habitat.  Sixty-eight species of fish, 215 taxa of macroinvertebrates, and 23 species of mussels have been documented in recent surveys within the National Area.  Game fish include resident native channel catfish, longear sunfish, muskellunge, rock bass, and smallmouth bass.  Walleye, striped bass, and white bass migrate upstream from Lake Cumberland; and brown and rainbow trout have been stocked in three streams by state agencies.  Mammals hunted in the National Area include white-tailed deer, raccoon, and gray squirrel.  Game birds hunted include ruffed grouse, mourning dove, and turkey.  Non-game species are plentiful and include a variety of salamanders, and various predators such as bobcat, gray fox, and the red-tailed hawk.  Black bear have been re-introduced on an experimental basis, with analysis still continuing.  Exotic wild boar exist in the area but data are lacking.

The diversity of habitat notwithstanding, water pollutants adversely affect aquatic diversity and populations.  The macroinvertebrate and fish community is still essentially non-existent in Bear Creek, and other streams are suspected to be in a similar condition.  Other effects of a lesser degree are generally known, but data are lacking to clearly identify pollution sources and direct and indirect impacts.

Mussel species are the most jeopardized and rapidly declining faunal group in the United States.  Twelve of the nation's 300 species are now extinct, and over sixty-seven percent are listed as endangered, threatened, special concern, or are being considered for listing.  The National Area currently has 27 documented species, five of which are federally listed as endangered.  In the southeast, only the Clinch and Green Rivers contain this level of diversity, and only two other NPS units in the country have greater diversity.  In the National Area, sedimentation and chemical pollutants are the primary threats to these species.  (US Army Corps of Engineers, 1980; NPS, 1997a; NPS, 1997b)

CHAPTER TWO

REQUIRED MANAGEMENT—THE INSTITUTIONAL FRAMEWORK

Many management requirements are placed on NPS in its administration of Big South Fork NRRA. These requirements come from two sources: the National Area's establishing legislation and the laws and policies that relate to all NPS-administered areas. It is important to understand what these requirements are because they affect the range of possibilities that may be considered in planning for the National Area.

## National Area Legislation

The purpose of the National Area is stated clearly in its establishing legislation and includes all of the following. (The full text of the legislation is included in the appendix.)

- To preserve and interpret the National Area's cultural, historic, archeological, geologic, fish and wildlife, scenic, and recreational values,
- To preserve the free-flowing Big South Fork and portions of its tributaries,
- To preserve the natural integrity of the gorge,
- To provide healthful outdoor recreation for the enjoyment of the public and for the benefit of the regional economy.

This legislation also includes specific reference to the NPS Organic Act, as amended, which states the purposes of all NPS-administered units. This act and related laws are discussed under "Other Laws" below.

The area's significance, which led to its establishment, is reflected in the following statements.

- Dramatic sandstone gorges, imposing bluff lines, some of the nation's largest water-crafted arches, and other notable geologic formations are found throughout the National Area.
- The Big South Fork is a free-flowing river system, flowing unhindered by water development projects except as it enters Lake Cumberland.
- The National Area contains a wide variety of habitats with associated flora and fauna of the Cumberland Plateau in a limited geographic area.
- Large numbers and varieties of archeological, historic, and ethnographic resources, illustrating a long continuum of use, are found in the National Area, including farmsteads eligible for the National Register of Historic Places.
- National Area waters provide habitat for a world-class freshwater mussel assemblage and are an important refuge for many endangered mussel species. Few other river systems support this level of mussel diversity.
- The National Area provides a broad range of natural and cultural resource-based outdoor recreation and education opportunities.

The purpose and significance have been translated into the following National Area mission statement:

> The Big South Fork NRRA provides healthful outdoor recreation while preserving the free-flowing condition of the Big South Fork and its tributaries, the scenic, natural, and cultural values of the area, and the essentially primitive condition of the gorge.

The National Area is a National River and Recreation Area. The National River designation denotes that it is centered on a free-flowing river. While it is not designated a National Wild and Scenic River, Congress included in the legislation some of the same protection from federal or federally assisted water development projects. Higher water quality and historical in-stream flows were clearly important values to be achieved and protected.

Attachment 15

# Fish faunas of the Big South Fork of the Cumberland River and the Upper Cumberland River Drainage, Tennessee and Kentucky

David A. Etnier, Emeritus Professor of Ecology and Evolutionary Biology
University of Tennessee, Knoxville, TN 37996-1610
10 October 2005

The upper Cumberland River system (above Cumberland Falls), and the Big South Fork of the Cumberland River ("Big South Fork"), especially the New River portion of the Big South Fork, drain huge areas of the Cumberland Plateau of Tennessee and Kentucky. These areas are rich in coal reserves, and most of their aquatic systems have been impacted by siltation, acid mine drainage, alkaline mine drainage, or a combination of these factors. R. Brian Evans (New River system, 1998) and J. T. Baxter, Jr. (Upper Cumberland River system, 1997) conducted extensive recent surveys of the fishes of these areas, with results represented by MS theses from the University of Tennessee. I was the research professor for both of these efforts.

I began studying fishes of the area in the late 1960s (Comiskey and Etnier, 1972, Fishes of the Big South Fork of the Cumberland River system) and have maintained an interest in the fishes and aquatic insects of the area to date. Following are annotations concerning the fishes of these systems and the potential impacts of increased mining in the area.

## Big South Fork of the Cumberland River system

The Big South Fork proper is formed by the junction of the New River and Clear Fork in Scott Co., TN, and flows north into the Cumberland River in Kentucky. Coal mining activity before 1970 had seriously degraded fish faunas of the New River system, to the extent that Comiskey and Etnier were unable to find many of the species that had been reported there in earlier years. The current presence of several species not found in the Big South Fork by Comiskey and Etnier, such as *Ichthyomyzon bdellium*, Ohio lamprey, and *Notropis photogenis*, silver shiner, strongly suggests that the impacts to New River extended downstream into the Big South Fork. These species apparently increased their range, from refugia farther downstream in Kentucky, in response to decreased mining activity and reclamation of abandoned mines during the past three decades or so. It is certain that this short-term improvement of the Big South Fork system could be nullified by an increase in mining activity in the New River watershed.

The palezone shiner (*Notropis albizonatus*) is a federally endangered species known only from the Little South Fork and the upper Paint Rock River system (Tennessee drainage, northern Alabama). It formerly occurred in Cove Creek, a Clinch River tributary (Tennessee River drainage) whose headwaters are adjacent to those of New River. There are no additional records for this species. Most biogeographers would conclude that this species moved via stream capture from the Cumberland drainage to the Tennessee drainage (or vice versa) across the headwaters of the New River rather than via the short Ohio River connection between the Cumberland and Tennessee rivers in western Kentucky. If so, palezone shiners once inhabited the New River system. Improving conditions there would very likely result in conservation

biologists attempting a transplant effort of Little South Fork progeny into the New River in the near future. There are no other reasonable areas to try to reestablish this species (Cove Creek has been impounded), so an improving New River system looms very large in the recovery effort for this species.

Anticipated negative impacts will affect the following species: Etnier and Boschung (in manuscript and abstracted on p 606, 2001 printing, Etnier and Starnes, The Fishes of Tennessee) restrict the range of the central stoneroller (*Campostoma anomalum*) to the Ohio River and its tributaries (but not the Barren/Green River system of Kentucky), some Blue Ridge tributaries of the upper Tennessee River system, and the Upper Cumberland River system (above Cumberland Falls). The New River of the Big South Fork system (below Cumberland Falls) also contains central stonerollers, while the stonerollers in Big South Fork represent the largescale stoneroller (*C. ologolepis*). At present these two species, neither of which is jeopardized, occur together in portions of the Big South Fork, and the results of their competitive interactions will be of considerable scientific interest to ichthyologists, ecologists, evolutionary biologists, and biogeographers. Will largescale stonerollers gradually replace central stonerollers, as they apparently did in most of the Tennessee River drainage? Will there be more or less hybridization than in the Tennessee River system? Might both species persist in Big South Fork (they have not in other contact areas)? These normal and natural interactions are likely to be impacted by greatly reduced numbers or even extirpation of stonerollers from the New River system, and reduced populations in Big South Fork, which could result from increased surface mining.

The two Tennessee native species of *Nocomis* in Tennessee, neither of which is jeopardized, both occur in the Big South Fork system–*Nocomis micropogon*, the river chub, in the Big South Fork and its tributaries; and the redtail chub (*N. effusus*) in the Little South Fork in Kentucky (Etnier and Starnes, 1993). Evans (1998) concluded that river chubs had greatly increased their range and abundance in the New River system. With improving conditions throughout the Big South Fork system, it would be only a matter of time before river chubs would extend their range downstream to the mouth of Little South Fork, and come in contact with the closely related redtail chub. These two species do not presently occur together anywhere. As is the case with the stoneroller species mentioned above, future co-occurrence under natural conditions in Big South Fork would be extremely interesting to scientists, but unlikely to occur unless current water quality in Big South Fork is maintained or improved.

Species that reach the eastern extent of their Cumberland River distribution in the Big South Fork (some, noted with an asterisk, also occur a few miles above the mouth of Big South Fork in the Rockcastle River, KY, see Burr and Warren, 1986) include rosyside dace (*Clinostomus funduloides*, unknown from the entire Cumberland except for the Caney Fork River system and a few localities farther downstream in the Western Highland Rim), *shorthead and *river redhorses (*Moxostoma breviceps* and *M. carinatum*), *stonecat (*Noturus flavus*), muskellunge (*Esox masquinongy*), crystal darter (*Crystallaria asprella*, extirpated from entire Cumberland River drainage), *ashy darter (*Etheostoma cinereum*), duskytail darter (*Etheostoma percnurum*, federally endangered, otherwise known only from the Tennessee River drainage, *bloodfin darter (*Etheostoma sanguifluum*), *Cumberland snubnose darter (*Etheostoma*

2

*atripinne*), *speckled darter (*Etheostoma stigmaeum* complex), Tippecanoe darter (*Etheostoma tippecanoe*), blotchside logperch (*Percina burtoni*, extirpated from entire Cumberland River drainage), channel darter (*Percina copelandi*, not known elsewhere from Cumberland River drainage except for two localities downstream in nearby Cumberland River proper, and these likely extirpated), gilt darter (*Percina evides*), longhead darter (*Percina macrocephala*, extirpated from entire Cumberland River drainage, with early records also from Obey River system, TN), and *olive darter (*Percina squamata*, known in Cumberland River drainage only from Big South Fork and Rockcastle river systems). An improving Big South Fork provides potential brood stock or reintroduction sites for many of the above species that already have been or should be considered (Etnier 1997) for state and federal protected status (crystal darter, ashy darter, duskytail darter, Tippecanoe darter, blotchside logperch, channel darter, longhead darter). In addition, when recognized species have distant outlying populations, these outliers are often, on closer investigation, found to represent undescribed species. Of the above, rosyside dace, stonecat, duskytail darter, channel darter, and olive darter are in that category, and I suspect that closer examination would result in at least one of these being recognized as a new species.

The slender madtom (*Noturus exilis*) ranges widely from the Ozark uplands north to southeastern Minnesota and east to the Highland Rim of Kentucky and Tennessee, with the most upstream Cumberland River drainage records from the Stones River system. Four Cornell University specimens were allegedly collected from Brimstone Creek, Scott Co., TN, 1953, 310 River Miles above the mouth of the Stones River. Comiskey and Etnier (1972) and Brazinski (1979) revisited that site and found no additional specimens. That this was not a mistaken locality record was confirmed when in 1996 Evans (1998) found an additional Brimstone Creek specimen very near the original collection locality. Madtoms are notoriously difficult to collect, and one must assume that slender madtoms persisted in Brimstone Creek in low numbers before recovering to the point where their presence was again detectable. Negative impacts from surface mining could reverse this recovery.

## Upper Cumberland River system

The Upper Cumberland system will be more immediately and directly impacted by an increase in coal mining activity. Species that are federally or state protected, or qualify for such protection (Etnier and Starnes, 1991; Etnier, 1997; Warren et al., 2000), and which could be adversely impacted by surface coal mining, follow:

- Silverjaw minnow (*Ericymba buccata*) should be on Tennessee's protected fauna list as endangered. It is known from only two recent collections (1974 and 1996) from Straight Fork and adjacent Clear Fork near Eagan, Claiborne Co., TN. It is likely to completely disappear from our fauna in the advent of significant new coal mining activity in that area.

- Rosyface shiner (*Notropis rubellus*) does not occur elsewhere in Tennessee. Populations in the Cumberland River system from Big South Fork downstream, and populations in the Tennessee River system and Barren/Green River system of the

3

Ohio River drainage, are now recognized as a separate species, the highland shiner (*Notropis micropteryx*). It is listed as of Special Concern in Tennessee.

- Mimic shiner (*Notropis volucellus*) is almost certainly a complex of two to several species. In the Tennessee portion of the Upper Cumberland system, they occur only in Clear Fork. It is more widespread in the Kentucky portion of the Upper Cumberland (Burr and Warren, 1986). None of these populations is currently protected, but the systematics of the group will eventually need to be addressed. Cryptic species or subspecies that are highly endemic and in need of protection are likley to be discovered.

- The blackside dace (*Phoxinus cumberlandensis*) is federally listed as a threatened species. It occurs in tiny streams in several localities in the coal mining area. The robust Lick Fork population of blackside dace is certainly threatened by mining activity already underway on Zeb Mountain.

- Brindled madtoms (*Noturus miurus*) are not known from Big South Fork or Rockcastle River systems, or from the Upper Cumberland system except for a single specimen from No Business Creek, Campbell Co., TN, 1977. Although there is some doubt concerning the validity of the locality information, it is currently accepted as the only record of this species from the Upper Cumberland drainage. The species does not warrant state or federal protected status, but a population this isolated from the contiguous range of the species could be genetically quite divergent.

- The arrow darter (*Etheostoma sagitta*) was not even known to occur in Tennessee until 1968. It is now known from numerous localities in the Upper Cumberland system, and from one eastern tributary to Big South Fork (Comiskey and Etnier, 1972; Baxter, 1997). It is on Tennessee's In Need of Management list.

- The Cumberland darter (*Etheostoma susanae*), formerly considered a subspecies of the johnny darter (*E. nigrum*), deserves federal protection as a threatened or endangered species. In Tennessee it is known from only three localities, and only from Jellico Creek in recent years (Baxter, 1997). It is slightly more abundant in the Upper Cumberland system of Kentucky (Burr and Warren, 1986).

Both the Big South Fork of the Cumberland River and the Cumberland River drainage above Cumberland Falls have rich and highly endemic fish faunas that have been well studied. The status of this rich fauna, with its numerous jeopardized species of fishes and other aquatic organisms, has responded to decreased coal mining by improving over the past three decades. Aquatic biologists are united in urging and hoping that this fauna can be protected from the siltation and chemical pollution that will result from increased coal mining.

4

Literature Cited

Baxter, J. T., Jr. 1997. Fish fauna of the Upper Cumberland River drainage in Tennessee. MS thesis, Univ. of Tenn., 90 p.

Brazinski, M. J., 1979. Fish populations of the New River: a system receiving acid coal mine drainage. MS thesis, Tenn. Tech. Univ., Cookeville, 68 p.

Burr, B. M., and M. L. Warren. 1986. A distributional atlas of Kentucky fishes. Kentucky Nature Preserves Commission Sci. & Tech. Series 4, 398 p.

Comiskey, C. E., and D. A. Etnier. Fishes of the Big South Fork of the Cumberland River. J. Tenn. Acad. Sci. 47:140-145.

Etnier, D. A. 1997. Jeopardized southeastern freshwater fishes: a search for causes. p 87-104 In G. W. Benz and D. E. Collins, eds., Aquatic fauna in peril: the southeastern perspective. Special Publ. No. 1, Southeast Aquatic Research Inst. Lenz Design & Communications, Decatur, GA, 554 p.

Etnier, D. A., and W. C. Starnes. 1991. An analysis of Tennessee's jeopardized fish taxa. J. Tenn. Acad. Sci. 66:129-133.

Etnier, D. A., and W. C. Starnes. 1993. The fishes of Tennessee. Univ. of Tenn. Press, Knoxville, 2001 printing, 689 p.

Warren, M. L., Jr., B. M. Burr, S. J. Walsh, H. L. Bart, Jr., R. C. Cashner, D. A. Etnier, B. J. Freeman, B. R. Kuhajda, R. L. Mayden, H. R. Robison, S. T. Ross, and W. C. Starnes. 2000. Diversity, distribution, and conservation status of the native freshwater fishes of the southeastern United States. Fisheries 25:7-29.

This statement was prepared by Dr. David A. Etnier, Emeritus Professor of Ecology and Evolutionary Biology at the University of Tennessee, and contains his professional opinion relevant to the petition to the Office of Surface Mining to declare lands in the New River watershed and Royal Blue and Sundquist Wildlife Management Areas as unsuitable for surface coal mining.

David A. Etnier

Attachment 16

ISSN 1053-637X

# WALKERANA

### Transactions of the POETS Society

Vol. 14                                                    No. 31

BALDIGO, Barry P., Karen RIVA-MURRAY and George
E. SCHULER.  Effects of environmental and spatial fea-
tures on mussel populations and communities in a North
American river ............................................................................ 1

AHLSTEDT, Steven A., Steve BAKALETZ, Mark T. FAGG,
Donald HUBBS, Maurice W. TREECE, and Robert S.
BUTLER.  Current status of freshwater mussels (Bivalva:
Unionidae) in the Big South Fork National River and Rec-
reation area of the Cumberland River and recreation area
of the Cumberland River, Tennessee and Kentucky (1999-
2002) ........................................................................................ 33

LAYZER, James B. and Jason R. KHYM.  Fish hosts
for glochidia of the pheasantshell, *Actinonaias
pectorosa* ................................................................................. 79

WATTERS, G. Thomas and Scott H. O'DEE.  A survey of
terrestrial gastropods in 1800+ hectares of reclaimed strip
mine land at The Wilds, Ohio, U.S.A.: implications for future
surveys ..................................................................................... 87

GOODRICH, Calvin. Bryant Walker 1856-1936
[Reprinted] ........................................................................... 107

Ann Arbor, Michigan
2003-2004

---

*Walkerana, 2003-2004, 14(31): 33-77*

CURRENT STATUS OF FRESHWATER MUSSELS (BIVALVIA:
UNIONIDAE) IN THE BIG SOUTH FORK NATIONAL RIVER
AND RECREATION AREA OF THE CUMBERLAND RIVER AND
RECREATION AREA OF THE CUMBERLAND RIVER, TENNESSEE
AND KENTUCKY (1999-2002). EVIDENCE OF FAUNAL RECOVER

Steven A. Ahlstedt[1], Steve Bakaletz[2], Mark T. Fagg[3], Donald Hubbs[4], Maurice
W. Treece[1], and Robert S. Butler[5]

## ABSTRACT

In 1974, the Big South Fork Cumberland River was designated a National River and
Recreation Area and managed by the National Park Service. The drainage basin suffered
extensively from coal mining, forestry and agricultural practices, domestic runoff, and
oil and gas exploration and extraction. Information concerning the mussel fauna in the
drainage is based upon a few sites sampled in Kentucky (1910-1911, 1947-1949) and
Tennessee (1938-1939). At least 55 species are reported from the Big South Fork but the
river at its confluence had access to the rich mussel fauna of the Cumberland River prior
to impoundment. The Big South Fork River has been affected by extensive pollution
in the drainage basin. Past pollution problems were recently thought severe enough
that the fauna was destroyed. However, in the mid-1970s and 1980s, 23 mussel species
were found live in the river and larger tributaries. The 23 mussel species were the
first indication that some mussels had survived. Recent surveys from 1999-2002 have
identified 26 species including five that are federally listed endangered (*Alasmidonta
atropurpurea, Epioblasma brevidens, E. florentina walkeri, Pegias fabula,* and *Villosa
trabalis*) and three thought extirpated (*Alasmidonta marginata, A. viridis,* and *Elliptio
crassidens*). The National River and Recreation Area of the Big South Fork contains
some of the best mussel populations that remain in the Cumberland River system and
the fauna appears to be recovering for some species. Restoration of extirpated mussels
is feasible via culture, propagation, and translocation of adults. The Big South Fork
could serve as a mussel refuge and seed source for other streams in the Cumberland
River system following pollution abatement.

Key Words: Big South Fork Cumberland River, National River and Recreation Area, Nati
Park Service, Unionidae, endangered mussels, recruitment

## INTRODUCTION

The freshwater mussel fauna in the Southeastern United States is glob

[1]U.S. Geological Survey, 1820 Midpark Drive, Suite A, Knoxville, Tennessee 37921.
[2]National Park Service, Big South Fork NRRA, 4564 Leatherwood Ford Road, Oneida, Tennessee 37841.
[3]Tennessee Wildlife Resources Agency, 3030 Wildlife Way, Morristown, Tennessee 37814.
[4]Tennessee Wildlife Resources Agency, P. O. Box 40747, Nashville, Tennessee 37204.
[5]US Fish and Wildlife Service, 160 Zillicoa Road, Asheville, North Carolina 28801.

(33)

TABLE 2. Sampling sites in the Big South Fork Cumberland River Basin.

[d in s, degrees, minutes, seconds; ml, miler, km, kilometer; BSF, Big South Fork Cumberland River.]

| Site number | Stream name | Site location description | County | State | Latitude (d m s) | Longitude (d m s) | River km/ml | Topo Quad |
|---|---|---|---|---|---|---|---|---|
| BSF1 | Big South Fork Cumberland River | confluence of Clear Fork and New River | Morgan | Tenn | 363238 | 844234 | 71.714 | Oneida South |
| BSF2 | Big South Fork Cumberland River | upstream of Leatherwood Ford | Scott | Tenn | 363583 | 844007 | 70.713 | Henry Creek |
| BSF3 | Big South Fork Cumberland River | Leatherwood Ford | Tenn | Tenn | 362844 | 844005 | 70.112 | Henry Creek |
| BSF4 | Big South Fork Cumberland River | upstream of Rough Shoals Branch | Scott | Tenn | 362756 | 843059 | 67.109 | Barthell SW |
| BSF5 | Big South Fork Cumberland River | mouth of Rough Shoals Branch | Scott | Tenn | 362093 | 843108 | 66.108 | Barthell SW |
| nsf6 | Big South Fork Cumberland River | downstream of Rough Shoals Branch | Scott | Tenn | 363203 | 844303 | 66.5707 | Barthell SW |
| BSF7 | Big South Fork Cumberland River | mouth of Station Branch | Tenn | Tenn | 363063 | 843059 | 65.706 | Barthell SW |
| BSF8 | Big South Fork Cumberland River | shoal downstream of Station Camp Creek | Scott | Tenn | 363231 | 844964 | 62.5707 | Barthell SW |
| BSF9 | Big South Fork Cumberland River | Fork Cave Creek | Scott | Tenn | 363532 | 844018 | 61.599 | Barthell SW |
| BSF10 | Big South Fork Cumberland River | island downstream of Perch Gum Creek | Tenn | Tenn | 363339 | 843039 | 61.799 | Barthell SW |
| BSF11 | Big South Fork Cumberland River | Big Island | Tenn | Tenn | 363457 | 843410 | 59.95 | Barthell SW |
| BSF13 | Big South Fork Cumberland River | mouth of Williams Creek | Tenn | Tenn | 363446 | 843633 | 57.92 | Oneida North |
| BSF13 | Big South Fork Cumberland River | shoal downstream of Oil Well Branch | McCreary | Ky | 363726 | 843256 | 52.78 | Oneida North |
| BSF14 | Big South Fork Cumberland River | mouth of Fishing Branch | McCreary | Ky | 363728 | 843556 | 52.84 | Oneida North |
| BSF15 | Big South Fork Cumberland River | shoal upstream of Clear Creek | McCreary | Ky | 361733 | 843160 | 50.781 | Burnhill |
| BSF16 | Big South Fork Cumberland River | below gage above Bell Branch | McCreary | Ky | 361514 | 843154 | 50.080 | Burnhill |
| BSF17 | Big South Fork Cumberland River | Big Shoal | Ky | Ky | 360094 | 843211 | 49.279 | Burnhill |
| BSF18 | Big South Fork Cumberland River | Blue Heron | McCreary | Ky | 364906 | 843429 | 43.773 | Burnhill |
| BSF19 | Big South Fork Cumberland River | Yamacraw | McCreary | Ky | 364331 | 843338 | 40.565 | Burnhill |

Ecological Specialists, Inc. (ESI) was contracted by the NPS in 1999 to assess the impacts of horses on mussel populations at two horse crossings in the BSF: Station Camp Creek and Big Island (Dunn, 2000). A total of 18 mussel species were found including five of the currently extant federally listed mussels (Table 1).

## STUDY METHODS

Mussel sampling consisted of snorkeling at sites accessible by road, foot and horse trail, and canoeing. SCUBA equipped divers searched the deeper pools. Mussels were located in the substrate by visual searching, moving slab boulders, and digging. The finding of juvenile mussels was an important component of the survey for documenting recent recruitment. Many live mussels were found under large slab boulders that are not imbedded in the substrate. This appears to be the most stable habitat and was where many of the juvenile mussels were located. It is assumed that juvenile mussels are deposited there by host fish and/or wash in during periods of high surface flows. Winter sampling using dry suits was effective for finding mussels that vertically migrate to the surface of the substrate for winter and spring spawning and attraction of host fish.

Stream banks were searched for shell feeding stations (middens) left by muskrats, Ondatra zibethica. No shell middens were found in the BSF and seldom were collected from tributary streams. Evidence of river otter predation on mussels was noted since otters break the shell to extract mussel flesh. River otters were reintroduced into the BSF in the mid-1980s and may have severely reduced muskrat populations. All live, fresh dead (shiny nacre and/or evidence of tissue left inside of shell), and relict (weathered nacre no longer lustrous) mussels were identified to species and recorded. Individual specimens of live and fresh dead mussels were measured for total length (in millimeters) by both size-class distribution using a digital dial caliper. The total person hours spent sampling mussels (timed search) was recorded by site for determining the Catch Per Unit of Effort (CPUE).

All sites sampled were identified by latitude and longitude using a hand-held Global Positioning System (GPS) unit. Sampling sites also were identified by river mile location, natural landmarks, creeks, and towns using USGS, 7.5-minute topographic maps (Tables 2 and 3). Individual specimens of federally listed and non-listed mussel species were collected under USFWS Federal Permit SA 00-14 and sent to the University of Alabama for genetic sequencing and phylogenetic studies. Federally listed and non-listed mussels taken for this purpose included the following: Alasmidonta atropurpurea, Epioblasma brevidens, E. florentina walkeri, P. fabula, and Villosa trabalis. Non-listed: Actinonaias pectorosa, Alasmidonta viridis, Lampsilis fasciola, Pleurobema sintoxia, Quadrula pustulosa, Villosa iris, and V. taenitata.

## RESULTS

In the combined 1999-2002 surveys, a total of 7,885 live mussels representing 26 species were collected at 19 BSF sampling sites and 20 sites in nine tributary streams (Tables 1-5). Mussel data from a few sites sampled in 1998 were included with the 1999-2002, study. Five species found are federally listed under the Endangered Species Act: Alasmidonta atropurpurea, Epioblasma brevidens, E. florentina walkeri, Pegias fabula, and Villosa trabalis. A single live specimen of another federally listed species, Pleurobema clava, was considered

70

it is now believed extirpated from the BSF. The little spectaclecase should be a candidate for restoration in the BSF. Williams et al. (1993) considered this species to be currently stable.

*Villosa taeniata* (Conrad 1834) (Painted Creekshell)

Wilson & Clark (1914) reported the painted creekshell as *L. punctata* that fits the description for this species. The mussel was not found by Neel & Allen (1964) but was reported in 1939 from the New River in Tennessee (Shoup & Peyton, 1940). The painted creekshell was rediscovered in the BSF in 1979 near the confluence of Troublesome Creek, Kentucky (Harker et al., 1979, 1981; Schuster 1988). The mussel has since been reported in the BSF in Tennessee (Bakaletz, 1991; Dunn, 2000). The painted creekshell was found live at 12 sites in the BSF and not found in any tributaries. Additional monitoring of mussel populations in Clear Fork, Crooked Creek, New River, White Oak Creek, and North White Oak Creek may identify live individuals. The painted creekshell should be a candidate for restoration at other locations in the BSF and tributary streams. Williams et al. (1993) considered this Cumberlandian species to be currently stable.

*Villosa trabalis* (Conrad 1834) (Cumberland Bean)

The Cumberland bean was collected in the BSF above Burnside (UMMZ 89248) and Parkers Lake Station, Kentucky (Wilson & Clark, 1914). The mussel was rediscovered in the BSF in 1979 near the confluence of Troublesome Creek, Kentucky (OSUM 45463) (Harker et al., 1979, 1981; Schuster, 1988). Bakaletz (1991) reported the Cumberland bean in Tennessee in the mid-1980s and is reported in recent studies (Shute et al., 1999; Dunn, 2000). The mussel is rare in the BSF and live individuals were found at seven sites. Historically it may have occurred in the New River and possibly Clear Fork. The Cumberland bean should be a candidate for restoration at other locations in the BSF including New River and Clear Fork. This Cumberlandian species is currently listed endangered under the Endangered Species Act.

*Villosa vanuxemensis* (Lea 1838) (Mountain Creekshell)

The mountain creekshell was reported rare in the BSF (Neel & Allen, 1964). However, the mussel may have actually been misidentified *Toxolasma lividus* that occurs in the Little South Fork Cumberland River (Harker et al., 1979, 1981; Starnes & Bogan, 1982; Schuster, 1988). The mountain creekshell does

---

71

not occur in the upper Cumberland River system and the record is spurious

DISCUSSION AND CONCLUSION

Several federally listed and candidate aquatic species are extant in the drainage. This includes one fish (duskytail darter, *Etheostoma percnurum*) and six mussel species: Cumberland elktoe, *Alasmidonta atropurpurea*; cumberlandian combshell, *Epioblasma brevidens*; tan riffleshell, *E. florentina walkeri*; little-wing pearlymussel, *Pegias fabula*; Cumberland bean, *Villosa trabalis*, and fluted kidneyshell, *Ptychobranchus subtentum*, a candidate for federal listing. All are currently found within the boundaries of the NRRA. Another potential federally listed mussel was found live and tentatively identified as the clubshell, *Pleurobema clava*. The identification of this species was not confirmed and permit constraints did not allow for the taking for verification purposes because of the possibility it could be federally listed. The clubshell was reported historically from the BSF (Wilson & Clark, 1914) and its confirmed identification would be of significant importance for the system. Four listed mussels are documented historically from the BSF, but since it is now believed extirpated from the Cumberland and Tennessee River systems. Four listed mussels are documented historically from the BSF and the Cumberland River system: drome pearlymussel, *Dromus dromas*; oyster mussel, *E. capsaeformis*; catspaw, *E. obliquata obliquata*; and cracking pearlymussel, *Hemistena lata*. Several species are possibly extinct according to Williams et al. (1993) and Turgeon et al. (1998): sugarspoon, *E. arcaeformis*; angled riffleshell, *E. biemarginata*; leafshell, *E. flexuosa*; yellow blossom, *E. florentina florentina* (federally listed acornshell, *E. haysiana*; forkshell, *E. lewisii*; and Cumberland leafshell, *E. stewardsonii*.

The best documentation as to the historical occurrence of mussels in the BSF is based on Wilson & Clark (1914), Shoup & Peyton (1940), and Neel & Allen (1964) surveys of the drainage and verification of museum records (Schuster, 1988). All three studies were for different purposes and limited access into the drainage. The purpose of the Wilson & Clark (1914) study of the Cumberland River and its tributaries was the appraisal of the mussel resources from a commercial standpoint for the button industry. They were more interested in the larger, thicker shelled, white nacre species used in manufacturing of buttons. The probability exists that some small, thin-shelled or rare species considered of no commercial value were either not found reported, or of interest.

Shoup & Peyton (1940) studied the biological and chemical characteristics the upper BSF drainage in Tennessee (1938-1939). They reported widespread

*Ahlstedt, Bakaletz, Fogg, Hubbs, Treece and Butler*

serve as a refuge and seed stock for mussels in the upper Cumberland system until recovery occurs in other damaged streams.

The BSF has more extant federally endangered fish and imperiled mussel species than any other NPS unit in the country and represents one of the richest remaining mussel faunas in the Cumberland River system. The NRRA is unique in that most mussels occur within the boundaries of the park and these lands and the fauna that occurs within them are protected federally as a national park. One major problem identified in this study is the continued deposition of silt and coal fines washing out of the New River drainage into the BSF from outside the boundaries of the NRRA. A large coal-washing facility and spoil pond exists in the New River that has currently been reactivated. Increased demands for coal and oil and gas exploration/extraction could reverse positive gains observed for mussels and other imperiled species in the BSF.

Long-term fixed station monitoring sites are needed at 10 locations in the NRRA: Leatherwood Ford (site BSF 2); Rough Shoals (site BSF 5); Station Camp Creek (site BSF 8); Big Island (site BSF 11); Bear Creek (site BSF 15); Blue Heron (site BSF 18); Clear Fork, Burnt Mill Bridge (site CF 4); Crooked Creek, ATV crossing (site CC 1); New River, Silcox Ford (site NR 2); and North White Oak Creek, ATV crossing (site NWO 2). Long-term sites, monitored every three years, are needed to document whether the mussel fauna is continuing to recover or decline. Additional long-term monitoring may find other species believed extirpated from the drainage. Other biological and chemical information are needed including fish and benthic macro-invertebrates, and water quality data. Studies related to sediment toxicity from coal-fines on juvenile mussels are needed for determining whether high sediment concentrations of polycyclic aromatic hydrocarbons (PAH's), may be a limiting factor affecting mussel recruitment and survival in the BSF. Researchers need to continue culturing and propagating mussels found within the NRRA and disseminate federally listed and non-listed species to other suitable sites away from horse-crossings. Where practical, all mussels documented historically in the BSF could be restored via culture and propagation and/or the translocation of adults from the Cumberland and Tennessee River systems.

## ACKNOWLEDGEMENTS

We wish to thank the following individuals who provided field assistance and other support for this study: Richard Biggins, Leroy Koch, David Pelren, and Timothy Merritt, U.S. Fish and Wildlife Service; David McKinney, Richard Kirk, Freddy Couch and David Sims, Tennessee Wildlife Resources Agency; Jess James, Rachel Muir, Nathan Johnson, Jason Meszaros and John McCloud, Virginia Cooperative Fish and Wildlife Research Unit; Guenter Schuster and Adam Shepard, Eastern Kentucky University; Steve Fraley, North Carolina Wildlife Resources

*Freshwater mussels in the Big South Fork Cumberland River*

Commission; Monte McGregor, Douglas Stephens, and William Moore, Kentucky Departm Fish and Wildlife Resources; Joseph Connell, Jeffrey Powell, Gregory Johnson, U.S. Geol Survey; and Paul Parmalee, McClung Museum, University of Tennessee. We also thank F Citarello, Kentucky State Nature Preserves Commission, for providing helpful comments critical review of the manuscript.

## LITERATURE CITED

BAKALETZ, S. 1991. *Mussel survey of the Big South Fork National River and Recre* Unpublished Master's Thesis, Tennessee Technological University, Cookeville, Te pp.

BAKALETZ, S. & R.G. BIGGINS. 2002. Draft Environmental Assessment, Recovery o freshwater mussels in the free-flowing reach of the Big South Fork of the Cumberland within Big South Fork National River and Recreation Area, Kentucky and Tennessee, Na Park Service, Big South Fork National River and Recreation Area, Oneida, Tennessee and Fish and Wildlife Service, Asheville, North Carolina. 24 pp.

BEATTY, J.S. 1982. Parts of two physiographic sections are in Area 17, and different types of mudslife Area 17: by M.W. Gaydos and others, in Hydrology of Area 17, Eastern Coal Prov Tennessee and Kentucky, U.S. Geological Survey Water Resources Investigations, Open Report. 81-1118: 4-8.

BIGGINS, R.G., S.A. AHLSTEDT & R.S. BUTLER. 2001. Draft for the augmentation reintroduction of freshwater mussel populations within the Big South Fork National River Recreation Area, Kentucky and Tennessee, U.S. Fish and Wildlife Service, Asheville, N Carolina and U.S. Geological Survey, Knoxville, Tennessee. 20 pp.

CALL, S.M. & P.W. PARMALEE. 1981. The discovery of extant populations of *Alasmido ampurpurea* (Rafinesque) (Bivalvia: Unionidae) in the Cumberland River basin. *Bulletin o American Malacological Union, Inc., for 1981:42-43.*

CICERELLO, R.R. & E.L. LAUDERMILK. 2001. Distribution and status of freshwater mu (Bivalvia: Unionoidea) in the Cumberland River basin upstream from Cumberland F Kentucky. *Journal of the Kentucky Academy of Science, 62(1): 26-34.*

CICERELLO, R.R., M.L. WARREN, Jr. & G.A. SCHUSTER. 1991. A distributional ch the freshwater mussels (Bivalvia: Unionoidea) of Kentucky. *American Malacological ç 8(2): 113-129.*

DUNN, H. 2000. Assessment of horse crossings on unionids in the Big South Fork River, South Fork NRRA, Tennessee, prepared for Big South Fork National River and Recreation A National Park Service, Oneida, Tennessee, ESI Project # 99-025. 28 pp.

EVALDI, R.D. & R. GARCIA. 1991. Quality of South Fork Cumberland River near Stea Kentucky, *in* Pages 417-434 Conference and Proceedings, Tome 3, Second Internatic Conference on the Abatement of Acidic Drainage, Montreal, Quebec, Canada.

GARNER, J.T. & S.W. McGREGOR. 2001. Current status of freshwater mussels (Unionid Margaritiferidae) in the Muscle Shoals area of the Tennessee River in Alabama (Muscle Sho revisited again). *American Malacological Bulletin,* 16(1/2): 155-170.

GORDON, M.E. 1991. *Alasmidonta atropurpurea.* Report submitted to The Nature Conservan Abingdon, Virginia.

GORDON, M. E. & J. B. LAYZER. 1989. Mussels (Bivalvia: Unionidae) of the Cumberla River. Review of life histories and ecological relationships, U. S. Fish and Wildlife Servi Contract Number 14-16-0009-1565. Biological Report, 89(15): 1-99

GORDON, M.E. & J.B. LAYZER. 1993. Glochidial host of *Alasmidonta atropurpurea* (Bivalv Unionoidea: Unionidae). *Transactions of the American Microscopical Society,* 112(2): 1(