**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> KEN SALAZAR, et al., <br><br> Defendants, <br><br> and <br><br> NATIONAL MINING ASSOCIATION, <br><br> Intervenor-Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     No. 1:09-cv-00115-HHK <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**OPPOSITION OF INTERVENOR-DEFENDANT NATIONAL MINING ASSOCIATION
TO DEFENDANTS' MOTION FOR VOLUNTARY REMAND AND VACATUR**

J. Michael Klise, No. 412420
jmklise@crowell.com
Kirsten L. Nathanson, No. 463992
knathanson@crowell.com
Jessica A. Hall, No. 977283
jhall@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

Attorneys for Intervenor-Defendant National
Mining Association

Dated:  May 11, 2009

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND..................................................................................................................2

ARGUMENT ......................................................................................................................5

I.  The Court Has An Independent Obligation to Decide Whether Vacatur is
Appropriate Following Judicial Review of the Rule and Cannot Rely on the
Secretary's Sua Sponte "Determination" of the Merits ...................................................5

II.  The Parties Actively Dispute the Secretary's Claim That the Rule is "Legally
Defective," and Thus it Would Be Inappropriate for the Court to Vacate....................11

III.  Vacating the Rule Would Violate the APA's Requirements Governing
Reconsideration and Repeal of Final Regulations.........................................................13

IV.  Defendants Mischaracterize the Effect of Vacatur ......................................................17

CONCLUSION .................................................................................................................18

## INTRODUCTION

Intervenor-Defendant National Mining Association ("NMA") hereby opposes the extraordinary request of Federal Defendants Ken Salazar, *et al.*, who ask this Court to vacate, without judicial review, the final rule at issue in this lawsuit. *See* Defendants' Motion for Voluntary Remand and Vacatur (Apr. 27, 2009) ("Def. Mot."). The rule is the culmination of a public rulemaking process that began over six years ago. It entailed two full notices of proposed rulemaking and rounds of public comment on the rule itself, a 2-volume 1,768 page Environmental Impact Statement ("EIS") that was also the subject of public comment, and a final rule whose preamble analyzing public comments spans 61 pages of the Federal Register.

This extensive process, carried out under the public participation requirements of the Administrative Procedure Act ("APA"), the Surface Mining Control and Reclamation Act ("SMCRA"), and the National Environmental Policy Act ("NEPA"), cannot be undone by administrative fiat, as Defendants seem to think. They ask this Court not only to remand the rule but also to vacate it, thereby lending the Court's endorsement to Secretary Salazar's unilateral "determination" late last month that his agency's rule is "legally defective" and is "bad public policy." While NMA recognizes that new federal agency officials such as Secretary Salazar have a degree of discretion to change policy, they must do so within the four corners of the law. NMA, which intervened in this case to *defend* the rule, cannot accede to vacating it as legally deficient when the Court has never reviewed it. NMA therefore opposes the motion to vacate and asks that the Federal Defendants be held to the standards of transparency and public participation the law demands.

As we explain below, Defendants' motion to vacate mischaracterizes the rule, misapprehends the vacatur remedy, conflicts with fundamental principles of separation of

powers, lacks a coherent rationale, and violates the requirements of the APA for repealing a rule.

Therefore, the motion should be denied.

## BACKGROUND

**Rulemaking History.**  The final rule at issue in this case concerns stream buffer zones

("SBZs"), stream-channel diversions, siltation structures, impoundments, excess spoil, and coal

mine waste, under SMCRA, 30 U.S.C. §§ 1201, *et seq.  See* 73 Fed. Reg. 75,814 (Dec. 12, 2008)

("SBZ Rule").  We summarize the rulemaking history of this SBZ Rule here, as the history

readily refutes one of the underpinnings of Federal Defendants' motion to vacate – that, solely by

reason of the date of the final rule's issuance, the rule somehow was an "11th Hour" rush job that

"doesn't pass the smell test."  Def. Mot. Ex. 1 at 4 (remarks of Secretary Salazar).  On the

contrary, the rulemaking history reflects years of thoughtful deliberation by government officials

and stakeholders such as NMA's members.  Moreover, the six-year rulemaking process

culminating in this final rule was conducted openly and with continuous opportunity for input

from the public, just as the APA requires for any rulemaking, and as SMCRA requires for

permanent program regulations governing surface coal mining and reclamation operations.  *See* 5

U.S.C. § 553; 30 U.S.C. § 1251(b).

Over six years ago, in 2003, as a result of conflicting federal court decisions, the

Department of the Interior's Office of Surface Mining Reclamation and Enforcement ("OSM")

began considering options to clarify its SMCRA regulations regarding stream buffer zones in

order to minimize disputes and misunderstandings associated with their application.  "Outreach

Document: Planned Rulemaking to Clarify Excess Spoil / Stream Buffer Zone Requirements"

(Mar. 21, 2003) (appended hereto as Ex. A).  On January 7, 2004, OSM published a notice of,

and solicited public comments on, a proposed rule to amend its regulations regarding stream

buffer zones.  69 Fed. Reg. 1,036.  After extending the comment period and holding five public

2

hearings on the proposal,[1] OSM revised its proposal and published a new proposed rule on August 24, 2007.  72 Fed. Reg. 48,891.  OSM's revised proposal was accompanied by a draft EIS, which it had begun preparing in 2005, on which OSM also solicited public comment.  *Id*. at 48,891, 48,913-15.  *See also* 70 Fed. Reg. 35,112 (June 16, 2005) (notice of intent to prepare EIS, soliciting pubic comment).

Again, OSM extended the original public comment period and held multiple public hearings and public meetings.[2]  On December 12, 2008, OSM published the final rule entitled "Excess Spoil, Coal Mine Waste, and Buffers for Perennial and Intermittent Streams," 73 Fed. Reg. 75,814.[3]  The rule took effect on January 12, 2009.  73 Fed. Reg. at 75,814.

The Final EIS accompanying the rule examined the alternatives OSM considered – including the provisions of the rule as it was finally adopted – and determined that further consultation with the U.S. Fish and Wildlife Service ("FWS") pursuant to § 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, was not necessary because any required consultation under the ESA had already occurred, and because the SBZ Rule would have no effect on species listed as endangered or threatened species under the ESA and would leave existing protections in place: "[N]one of the alternatives being considered would change the regulations that were specifically identified in the []FWS's 1996 [Biological Opinion] as pertinent to the no-jeopardy opinion.  The regulatory protections identified in the 1996 [Biological Opinion] continue to

---

[1]     Approximately 200 people testified at the 5 hearings, and OSM received approximately 32,000 written comments.  72 Fed. Reg. 48,891 (Aug. 24, 2007).

[2]     *See* 73 Fed. Reg. 75,821 (noting, *inter alia*, that approximately 750 persons attended the public hearings and meetings and that OSM received more than 43,000 comments).

[3]     As the rule's title denotes and as the substance of the regulatory language shows, this rule addresses more than just "mountaintop coal mining," as Defendants incompletely characterize it. *Compare* 73 Fed. Reg. at 75,875-85 (to be codified at 30 C.F.R. pts. 780, 784) (actual preamble and rule), *with* Def. Mot. Ex. 1 at 1, 3 (agency press release and Salazar remarks).

ensure the protection of listed endangered and threatened species, proposed species, and their

critical habitats. . . .  We do not anticipate there will be any effect upon threatened and

endangered species as the result of [the alternatives considered]."  Final EIS, IV-162 to 163

(excerpts appended hereto as Ex. B; full EIS available at

http://www.regulations.gov/fdmspublic/component/main?main=DocumentDetail&d=OSM-

2007-0008-0553).

**Plaintiff's Complaints.**  The original complaint filed by Plaintiff National Parks

Conservation Association ("NPCA") on January 16, 2009 (Doc. No. 1) bears little resemblance

to the pleading described in Defendants' motion to vacate.  Of critical importance, NPCA did not

contest in either its original or amended complaint the procedural adequacy under the APA of the

lengthy notice-and-comment process OSM conducted before issuing the final rule, as described

above.  *See* Compl. ¶¶ 52-84; Am. Compl. ¶¶ 52-89.[4]  Indeed, NPCA acknowledges that it

participated in the administrative proceedings by submitting oral and written comments on the

proposed rule change.  Am. Compl. ¶ 16.

**Defendants' Motion to Vacate and Remand.**  On April 27, 2009, Defendants filed their

Motion for Voluntary Remand and Vacatur, asserting that "[t]he Secretary [of Interior] has

determined that OSM erred in failing to initiate consultation with the U.S. Fish and Wildlife

Service under the ESA to evaluate possible effects of the SBZ Rule on threatened and

endangered species" and requesting that, "[i]n light of the Secretary's determination," the Court

---

[4]      Defendants err in suggesting that the ESA claims first appeared in the amended
complaint.  *See* Def. Mot. at 2, ¶ 3.  As far as we can tell, the five ESA claims in the amended
complaint are identical to the five ESA claims in the original complaint, except for the addition
of two sentences alleging in the alternative that the previously alleged violations of the ESA
constitute violations for purposes of the ESA citizen suit provision.  *See* Am. Compl. ¶¶ 62, 68.

vacate the SBZ Rule and remand the challenged actions to the Interior Department.  Def. Mot. at 2-3, ¶¶ 4-5.

In support of vacating the rule, Defendants proffered a two-page News Release from the Secretary's Office stating his "determination" that the SBZ Rule is "legally defective" and should be vacated "due to this deficiency," but nowhere mentioning what the deficiency is; and a two-page Secretary's "Remarks" saying he has "determined" that the rule is "bad public policy," but again not identifying a specific legal deficiency.  **Neither document even mentions the ESA** (despite identifying other statutes), yet that does not stop Defendants from telling this Court that the Secretary's "statement" somehow embodies his determination that OSM failed to comply with the ESA, and that the Court should vacate the rule on the strength of that "determination."  Def. Mot. at 2, ¶ 4; Def. Mot. Ex. 1.  The motion maintains, furthermore, that vacatur of the SBZ Rule would not have disruptive consequences (and would preserve the status quo) because it would have the effect of reinstating prior regulations (the "1983 Rule") that were in effect on December 11, 2008; yet the motion also admits that no state has yet implemented the SBZ Rule by amending its state program to embody the rule.  *Id.* at 3-4.  Thus, Defendants' own motion undermines their argument that both remand *and* vacatur are necessary, as no state has yet formally adopted the SBZ Rule, and no state may amend its regulatory program without the approval of the Secretary.

## ARGUMENT

I.   **The Court Has An Independent Obligation to Decide Whether Vacatur is Appropriate Following Judicial Review of the Rule and Cannot Rely on the Secretary's Sua Sponte "Determination" of the Merits**

Defendants are under the mistaken belief that an agency head's independent determination of the legality of agency action compels concurrence by this Court.  But that is not the law.  As explained below, vacatur is a judicial remedy that follows substantive judicial

5

review.  It is not a tool for agencies to erase a prior Administration's final, properly promulgated, currently effective regulations merely to suit a new Administration's views on public policy.

The Supreme Court has characterized the act of vacatur as an "extraordinary remedy." *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 26 (1994).  Black's Law Dictionary defines "vacate" as:  "To annul or cancel; make void; invalidate."  *Black's Law Dictionary* 1584 (8th ed. 2004).  In the context of federal agency action such as rulemaking, vacatur is a remedy that a court may deem appropriate if, *following judicial review* under the APA, 5 U.S.C. § 706, the court determines that agency action is unlawful and should be set aside.[5]  *See, e.g., Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 185 (D.D.C. 2008); *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 90-91 (D.D.C. 2007).[6]

Of course, there has been no judicial review of the rule at issue in this case – that is exactly what Defendants want to forestall.  Doing so would preempt the adversarial process by giving the Plaintiff precisely "what its Amended Complaint requested – that the Final Rule be set aside," as Defendants admit.  Def. Mot. at 5.  But Defendants' argument that vacatur "obviates the need for a judicial determination" of Plaintiff's claims puts the cart before the horse.  *See id.* Vacatur represents a formal decision by a court that an agency action (such as a rule or order) is so seriously flawed that it should be annulled, and thus vacatur *is* a "judicial determination" affecting the legal status of the agency rule or order.

---

[5]     The APA states that "[t]he reviewing court shall . . . hold unlawful and set aside agency action  . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]  In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706(2)(A).

[6]     As explained below, the cases cited in Defendants' Motion in support of their request for vacatur involved an independent determination by a court that the challenged agency action was flawed, not a bare proclamation to that effect by the head of the agency.

The very test for vacatur espoused in Defendants' motion presupposes that the Court will take a hard look at the rulemaking record (which currently is not even before the Court) and come to its own conclusion regarding any alleged "deficiencies" of the agency's actions, following briefing by truly adversarial litigants.[7]  One factor courts consider in determining whether to vacate a rule, according to Defendants, is "'the seriousness of the deficiencies in the completed rulemaking and the doubts that the deficiencies raise about whether the agency chose properly from the various alternatives open to it in light of statutory objectives.'"  Def. Mot. at 4 (citations omitted).  A court cannot, of course, evaluate the "seriousness" of the deficiencies of a rule without first determining for itself – not just on an agency's say-so – that the rule is deficient.

Defendants' request that the Court vacate the rule without first deciding whether the rule is unlawful also contradicts basic principles of separation of powers, under which the three co-equal branches must operate in their proper and respective spheres.  *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (Article III of the Constitution "gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy," and "with an understanding . . . that a judgment conclusively resolves the case because a judicial power is one to render dispositive judgments") (citing *Marbury v. Madison*, 1 Cranch 137 (1803)) (internal quotations and other citation

---

[7]     Defendants acknowledge the need for a live case or controversy before a Court can rule on the merits of a challenge to federal agency action.  *See* Def. Mot. at 5.

omitted) (emphasis in original).[8]  Secretary Salazar would undermine these time-honored principles by imposing his own "determination" of "bad public policy" on the Court.

Moreover, even if – after reviewing the briefs of truly adversarial litigants and the administrative record – the Court satisfies itself that the challenged agency action is unlawful, vacatur does not automatically follow.  As an extensive body of jurisprudence in the D.C. Circuit demonstrates, courts in those situations have discretion to vacate a rule or simply remand to the agency.  *Sugar Cane Growers Coop. of Fla., et al. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (citing multiple cases; rejecting party's argument that the court has no discretion and *must* vacate an agency action that is procedurally deficient because "that is simply not the law").[9]  Here, where there has been no briefing by the parties, judicial vacatur is even less appropriate than it would be in a fully litigated case.

---

[8]     Similarly, in the context of reviewing lower court judgments, courts do not automatically vacate at the Government's or any other party's request, even when it claims error.  Courts have an independent obligation to review the record and resolve the dispute or remand the case.  *In re Mem'l Hosp., Inc.*, 862 F.2d 1299, 1301 (7th Cir. 1988) ("When the Solicitor General confesses error in the Supreme Court, the parties agree on the appropriate outcome.  It does not follow, however, that the Court either dismisses the petition as moot or vacates the judgment reflexively.  The Court reviews the record, either resolving the dispute on the merits . . . or remanding so that the court of appeals may reconsider in light of the litigants' new position . . . ."); *Clarendon Ltd. v. Nu-West Industries, Inc.*, 936 F.2d 127, 129 (3d Cir. 1991) (holding that even where parties jointly request that the court vacate a lower court order, the court will not do so without first "determinin[ing] that such action is warranted on the merits").

[9]     Thus, *after* (but only after) determining that a rule or order is flawed, courts will carefully consider the seriousness of the deficiencies and the disruptive consequences of potential vacatur.  When an agency decision contains serious substantive errors and there is little or no evidence that vacating will produce significant disruption, courts may decide that vacatur is appropriate.  *See, e.g., Bldg. Indus. Legal Def. Fund, et al.*, 231 F. Supp. 2d 100, 105-07 (D.D.C. 2002).  In contrast, when vacatur is likely to cause disruption or when deficient agency action can be cured, a court may ultimately decide to remand the matter.  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993).

The authorities Defendants cite in support of vacatur involved either an independent determination by the court that vacatur would be appropriate because the challenged agency action was legally defective *or*, in one (but only one) case, complete agreement among the parties that the challenged regulation was unlawful coupled with the court's finding to that effect.[10]   There has been no judicial determination here, and NMA disputes Defendants' freshly conceived view that OSM's decision not to engage in further ESA consultation renders the rule unlawful.   Therefore, as summarized below, those cases do not support Defendant's request for vacatur, and indeed we have found none that do:

- In the case procedurally most analogous to this one, *Bldg. Indus. Legal Def. Fund*, various industry groups sued the FWS in this Court, challenging the agency's designations of critical habitat for two ESA-listed species of toad and shrimp.  231 F. Supp. 2d at 101.  Meanwhile, in separate litigation involving other ESA-listed species, the Tenth Circuit concluded that the FWS's approach to analyzing the economic impact of any critical habitat designation for ESA-listed species was unlawful for failing to conduct a full economic analysis.  *Id.* at 102.  The FWS adopted the Tenth Circuit's decision as correct and asked this Court to vacate and remand the FWS critical habitat designations for the toad and shrimp because they suffered from the same flaw as the designations overturned by the Tenth Circuit.  *Id.*  Although the parties' views in this Court differed on the soundness of the Tenth Circuit's reasoning, *all* parties (including

---

[10]      In fact, one case Defendants cite in support of vacatur (Mot. at 4), *did not involve vacatur at all, but only a remand*.  *Ethyl Corp. v. Browner*, 989 F.2d 522 (D.D.C. 1993).  The Government in that case requested only that the court remand a matter to the Environmental Protection Agency, which the court determined was appropriate in light of the emergence of new evidence pending appeal that all the parties acknowledged made the record on appeal "incorrect or incomplete."  *Id.* at 524.

environmental group intervenor-defendants) agreed, and this Court also found, that the FWS's economic impact analyses for the critical habitat designations were flawed under the Tenth Circuit decision. *Id.* at 102-03, 105 ("Regardless of whether the Tenth Circuit's approach or intervenors' proposed approach is the right one, there is no doubt that the agency was wrong in electing to use the baseline approach" rejected by the Tenth Circuit.). Under those circumstances, this Court granted the agency's motion to vacate the critical habitat determinations. **But those circumstances are not present here.** First, there has been no court of appeals determination, much less OSM acquiescence, that, *as a matter of law*, further ESA consultation is required in this case. Second, this Court has made no such determination and cannot do so without merits briefing by truly adverse litigants. Third, unlike the intervenor-defendants in that case, NMA here vigorously disputes whether, even assuming OSM has the discretion as a matter of "public policy" to choose to engage in further consultation, the absence of further consultation means that the SBZ Rule is unlawful.

- In *United Mine Workers of Am. v. Dole*, *after* determining that the Secretary of Labor's roof plan regulations for underground coal mines were invalid, the D.C. Circuit separately inquired whether it would be appropriate simply to remand the regulations so that they could be cured or, rather, to vacate the regulations, thereby leaving the agency to initiate a new rulemaking altogether. 870 F.2d 662, 673-74 (D.C. Cir. 1989).

- In *United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, *after* reviewing the record and concluding that the agency's action was deficient based on a *finding* that the Assistant Secretary of Labor did not offer a reasoned basis for his decisions, the D.C. Circuit considered the question of whether to remand with or without vacating. 920 F.2d

960, 966-67 (D.C. Cir. 1990).  The court concluded that because the record afforded no basis for the conclusion that the deficiencies in the agency's action would prove fatal, it was proper to remand the case without vacatur.  *Id.* at 967.

- Similarly, in *Allied-Signal, Inc.*, the D.C. Circuit considered the question of vacatur *after* examining the administrative record and determining that the challenged agency action (a rule) "cannot be viewed as reasoned decision-making."  988 F.2d at 150.  It concluded that vacatur was inappropriate due to the likely disruptive consequences of vacating and the possibility that the agency could cure the deficiencies in the rulemaking.  *Id.* at 151.

In sum, the cases Defendants cite do not support their view that the Court should vacate, rather than just remand, the SBZ Rule merely because the new Administration disagrees with its predecessor's policies.  And no court of which we are aware has ever blindly vacated a final regulation based solely on the Executive's assurance that it is appropriate to do so.  Defendants' extraordinary request has no basis in law and should be denied.

## II.     The Parties Actively Dispute the Secretary's Claim That the Rule is "Legally Defective," and Thus it Would Be Inappropriate for the Court to Vacate

As noted above, not all parties agree on the validity of the challenged agency action.  The parties include not just Defendants and Plaintiff, but also an Intervenor.  NMA, as an active stakeholder in the OSM's rulemaking process, sought to intervene early in this litigation, and the Court granted its motion on February 17, 2009.  NMA disputes the Secretary of Interior's vague and confusing characterization of the SBZ Rule – which the OSM developed over six years, using an open and deliberative process – as "legally defective."[11]  The Court cannot simply

---

[11]     Third-party interests, as represented by NMA in this case, are especially germane "if there is even a hint of collusion between the purported representative and those to whom the representative is formally opposed in the litigation, or if for any other reason it appears that the

(continued…)

11

vacate the SBZ Rule upon an *assumed* legal error, at Defendants' request and with the tacit

approval of the Plaintiff.  To do so would be tantamount to ceding authority to the Executive

Branch to decide an issue properly reserved for judicial resolution.

Furthermore, OSM's newly minted view that the SBZ Rule is defective because it

violates the ESA's procedural requirements is refuted by the rulemaking record – further

highlighting the inappropriateness of the Government's request for vacatur.[12]  The Final EIS for

the SBZ Rule examined the alternatives being considered by the OSM and determined, based on

prior ESA consultation, that no further consultation was required at the rulemaking level:

> None of the alternatives being considered would change the regulations
> that were specifically identified in the [Fish and Wildlife Service's] 1996
> [Biological Opinion] as pertinent to the no-jeopardy opinion.  The
> regulatory protections identified in the 1996 [Biological Opinion] continue
> to ensure the protection of listed endangered and threatened species,
> proposed species, and their critical habitats. . . .  We do not anticipate
> there will be any effect upon threatened and endangered species as the
> result of [the alternatives considered].

Final EIS, IV-162 to 163; *see also id.* at IV-159 to 163, IV-192.  Under that approach to ESA

compliance, potential effects of actual mining operations (as opposed to a nationwide

rulemaking) are addressed during the permit application process for individual operations,

subject to the many standards in OSM's regulations addressing potential effects on wildlife.  *Id.*

_____

(continued)

representative is not making or may not make a diligent effort to protect the absentee's interest."
7C WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 1909 at 428-29 (3d ed.
2007).  OSM clearly is not protecting NMA's interests by turning its back on a rule in which
NMA and the public invested six years of time and resources.

[12] There is no certified administrative record yet before the Court, but the agency's rulemaking
docket for the 2007 proposed SBZ Rule can be found at
http://www.regulations.gov/fdmspublic/component/main?main=DocketDetail&d=OSM-2007-0007.

at IV-160 to 162.  Also in the rulemaking record, the FWS filed comments on the proposed SBZ

Rule (attached at Ex. C) and made no mention of any legal deficiency related to a lack of

consultation.  Defendants' Motion, nonetheless, rests on the conclusory assertion that "OSM

erred in failing to initiate consultation with the U.S. Fish and Wildlife Service under the ESA to

evaluate possible effects of the SBZ Rule on threatened and endangered species."  Def. Mot. at 2,

¶ 4.

The fact is, ESA consultation at this level of administrative generality has already

occurred; any further determination of the effects of an individual mining operation on ESA-

listed wildlife will be addressed during each permit issuance process, taking into account the

specific circumstances of the proposed operation, as explained by the Assistant Secretary in a

March 2008 letter to Plaintiff's counsel.  *See* Letter to Deborah Murray, Southern Environmental

Law Center (Mar. 28, 2008), attached at Ex. D (explaining the requirement that the FWS "be

given an opportunity to comment on every permit <u>and</u> the opportunity to provide species-specific

and site-specific standards and procedures, if needed, to protect listed and proposed species and

their habitats, as well as designated or proposed critical habitats").[13]  Although the Plaintiff

questions whether a wildlife-protection process structured in this way satisfies the ESA, that is

something for a court undertaking judicial review to determine through truly adversarial

proceedings, not a case such as this, in which the defendant agency simply walks away.

## III.   Vacating the Rule Would Violate the APA's Requirements Governing Reconsideration and Repeal of Final Regulations

The APA's procedural requirements that bind agencies when conducting rulemakings,

such as providing the public with notice and opportunity to comment, are well known.  5 U.S.C.

---

[13]     The SMCRA regulatory requirements for this process are summarized in the Final EIS, III-94 to 96 (included in the excerpts at Ex. B).

§ 553(b), (c); *e.g., Sugar Cane Growers*, 289 F.3d at 95 ("The APA sets forth several steps an agency must take when engaged in rulemaking: it must publish a general notice of proposed rulemaking in the Federal Register; give an opportunity for interested persons to participate in the rulemaking through submission of written data, views, or arguments; and issue publication of a concise general statement of the rule's basis and purpose.").  These obligations apply equally to the act of rescinding rules that, like the SBZ Rule, have been published in the Federal Register and have entered into effect.  *See* 5 U.S.C. § 551(5) (defining "rule making" as "formulating, amending, *or repealing* a rule") (emphasis added); *Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n*, 673 F.2d 425, 446 (D.C. Cir. 1982), *aff'd,* 463 U.S. 1216 (1983) ("[T]he APA expressly contemplates that notice and an opportunity to comment will be provided prior to agency decisions to repeal a rule.").  *Cf. Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 919 (D.C. Cir. 1998) ("Once a rule is final, an agency can amend it only through a new rulemaking."); *Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408, 413 (7th Cir. 1987) ("[O]nce a regulation is adopted by notice-and-comment rulemaking . . . its text may be changed only in that fashion.").

The reason for requiring public notice and opportunity to comment to rescind an existing rule underscores the transparent, participatory, and collaborative nature of the rulemaking process.  "The value of notice and comment prior to repeal of final rule is that it ensures that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal."  *Consumer Energy Council of Am.*, 673 F.2d at 446.  Only in very limited circumstances, such as when the APA's "good cause" exception (which Defendants do not invoke here) is met or when Congress expressly directs an agency to

withdraw a rule,[14] may agencies use alternate procedures to rescind a rule published through notice and comment procedures.  *See* 5 U.S.C. § 553; 74 Fed. Reg. 20,421 (May 4, 2009).

Furthermore, just as when it promulgates a rule, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).  Defendants' explanation for wanting to vacate the rule fails this well-known test.  The Secretary himself identifies no specific legal defect, stating only that the rule is "bad public policy."  *See* Def. Mot. Ex. 1 at 3. Defendants' Motion, in contrast, identifies a legal defect (lack of further consultation under the ESA), but neither that alleged legal defect nor any other specific legal defect is explained in the Secretary's press release and remarks.  Given the lack of a coherent and consistent rationale, OSM has failed to "articulate a satisfactory explanation for its action."  *State Farm*, 463 U.S. at 43.

Only one conclusion can be drawn from these bedrock principles of administrative law: if the Secretary of the Interior wants to change regulations that have been issued through notice-and-comment rulemaking, he must do so through a proper, public APA rulemaking process, not through the back channel of a motion to vacate.  The proper process would afford NMA and the public their full right of participation by giving all concerned an opportunity to "comment on the

---

[14]     For example, in the 2009 Omnibus Appropriations Act, Congress authorized the Department of the Interior and Department of Commerce to withdraw new regulations regarding the ESA § 7 consultation process and reinstate previous ESA rules on the subject without adhering to the APA's notice and comment or other ordinarily applicable procedures.  Omnibus Act § 429(a), Act of Mar. 11, 2009, Pub. L. 111-8, 123 Stat. 524, 749 (2009).  Coincidentally, **on the same day he issued the press release and remarks about nullifying the SBZ Rule (April 27, 2009)**, Secretary Salazar signed a final rule withdrawing the ESA § 7 rules based specifically on the authority of the Omnibus Act.  *See* 74 Fed. Reg. 20,421-22.  As Defendants well know, that special statutory authority does not apply to the SBZ Rule or in any way relieve OSM of its obligation to comply with the APA before removing the SBZ rule from the books.

wisdom of repeal" of regulations representing the investment of tremendous time and public resources. *See Consumer Energy Council of Am.*, 673 F.2d at 446.

Defendants' assurance that, upon vacatur and remand, OSM would issue "an emergency regulation formally withdrawing the SBZ Rule" misses the point entirely. Def. Mot. at 3, ¶ 5. OSM can engage in proper APA procedures to repeal the rule without needing an order vacating the rule. The Court should make clear that if the rule is remanded, the Secretary must ensure the transparency integral to a fair and legal regulation by following the notice and comment procedures required by the APA. *See* 5 U.S.C. § 553.

In addition, Defendants' argument (Mot. at 5) that vacatur somehow will conserve judicial resources is spurious. As Defendants themselves explain in the same breath, what conserves judicial resources in this scenario is *remanding*, not vacating. Remand, without vacatur, is at most all that occurred in the cases Defendants cite. *See Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) (remand for possible supplementation of administrative record and further agency explanation of its action; no vacatur); *Occidental Petroleum Corp. v. SEC*, 873 F.3d 325, 338-39 (D.C. Cir. 1989) (remand for agency supplementation of administrative record; no vacatur); *Envtl. Def. Fund v. Costle*, 657 F.2d 275, 286 (D.C. Cir. 1981) (upholding agency action; no remand or vacatur). Moreover, all those cases involved some sort of judicial ruling on the merits, not an agency's request that the court endorse the agency's unilateral and unlitigated "determination" that its action was "bad public policy."

By moving the Court to vacate the SBZ Rule, the Government circumvents the longstanding procedural safeguards established in the APA. The message the Motion sends, unfortunately, is that transparency and accountability in agency action are important only when

they are convenient and consistent with affirmative policy goals.  Defendants' request is contrary to law and indeed to the very values this Administration has vowed to uphold.[15]

## IV.    Defendants Mischaracterize the Effect of Vacatur

In an attempt to persuade the Court that vacatur would not be disruptive, Defendants claim that vacatur of the SBZ Rule would merely preserve the status quo by reinstating the 1983 Rule, which was in effect on December 11, 2008.  Def. Mot. at 4.  Similarly, the Secretary's statement claims that the SBZ Rule "replaced" the 1983 Rule.  Def. Mot. Ex. 1 at 1.  As much as Secretary Salazar might hope that, through vacatur, he could simply undo the SBZ Rule and extensive rulemaking history that it represents, his basic premise misperceives the regulatory landscape he now oversees.  As explained below, the "status quo" embodies state regulatory interpretations of the 1983 Rule *that are consistent with* the SBZ Rule.

Under SMCRA, the regulation of surface coal mining operations is primarily a matter of state law, under state regulatory programs that have been approved by OSM.  *See* 30 U.S.C. § 1253.  State program rules and regulations must be "consistent with," but need not be identical to, the corresponding provisions of SMCRA and OSM's regulations.  *Id.* § 1253(a)(7).  In fact, the SBZ Rule codifies many *existing* state interpretations of the 1983 Rule, providing clarification and regulatory certainty to regulators and stakeholders.  For example, the West Virginia Surface Mining Board ruled that the West Virginia SBZ rule does not apply to the construction of valley fills for the disposal of excess spoil in intermittent and perennial streams. *See WV Highlands Conservancy v. Coal-MAC, Inc.*, No. 03-40-SMB at 12-35 (2004) (attached at

---

[15]     *See* 74 Fed. Reg. 4,685-86 (Jan. 26, 2009) (Presidential "Memorandum for the Heads of Executive Departments and Agencies" on "Transparency and Open Government") ("Government should be transparent. . . .  Executive departments and agencies should offer Americans increased opportunities to participate in policy-making . . . .").

Ex. E).  *See also, e.g.,* 405 KAR 16:070 § 11 (Kentucky SBZ rule clarifies that the rule does not apply to any reach of a stream that is upstream of an impounding structure located within the permit area and within the stream channel); 25 Pa. Code Sec. 86.102 (Pennsylvania SBZ rule describing how variances of the rule may be granted upon a demonstration by the operator beyond a reasonable doubt that there will be no adverse hydrologic impacts).  Thus, the 2008 SBZ Rule is a clarification to embody such existing interpretations, *not* a reversal of the predecessor rule.  *See* 73 Fed. Reg. at 75,822.  *See also* 73 Fed. Reg. at 75,827 ("[The SBZ] rule is intended in part to address and resolve the controversy and uncertainty surrounding the 1983 stream buffer zone rule").  Contrary to the Secretary's novice claim, vacating the SBZ Rule would not return the law to a simple "status quo," but would in fact revive uncertainty in the legal landscape that the SBZ Rule was designed to stabilize.

Finally, as Defendants admit (Mot. at 3), no state with delegated state program authority under SMCRA has amended its program to formally reflect the SBZ Rule.  That undisputed fact weighs in favor of allowing the SBZ Rule to remain in place on remand, at least until OSM properly complies with the APA should it decide to rescind it.  No harm will come of it as states cannot amend their programs without Secretarial approval, and the APA goals of informed and participatory rulemaking will benefit.  The Secretary has not provided even a scintilla of evidence to prove otherwise.

## CONCLUSION

Secretary Salazar's public statements and Defendants' Motion – not the SBZ Rule itself – reflect a rush to judgment, not the careful and public process the law requires before an existing regulation such as the SBZ Rule can be rescinded.  The Court should deny the motion for vacatur and require the Secretary to follow the APA process that will foster, rather than frustrate, the goal of transparent and participatory rulemaking.

For these reasons, the motion for vacatur should be denied.

Respectfully submitted,


*/s/ J. Michael Klise*
J. Michael Klise, No. 412420
jmklise@crowell.com
Kirsten L. Nathanson, No. 463992
knathanson@crowell.com
Jessica A. Hall, No. 977283
jhall@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

Attorneys for Intervenor-Defendant National
Mining Association

Dated:  May 11, 2009