IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL PARKS CONSERVATION ) 
ASSOCIATION, )
 )
         Plaintiff, )     Case No. 1:09-cv-00115BJR
v. )     (Judge Barbara J. Rothstein)
 )
S.M.R. JEWELL,[1] Secretary of the United )
States Department of the Interior, )
JOE PIZARCHIK, Director of the )
Office of Surface Mining Reclamation and )
Enforcement, and BOB PERCIASEPE, )
Administrator of the United States )
Environmental Protection Agency, )
 )
         Defendants, )
 )
NATIONAL MINING ASSOCIATION, )
 )
         Intervenor-Defendant. )
_____ )

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

On December 12, 2008, the Office of Surface Mining Reclamation and Enforcement

("OSM") of the U.S. Department of the Interior published a final rule entitled, "Excess Spoil, Coal

Mine Waste, and Buffers for Perennial and Intermittent Streams," 73 Fed. Reg. 75,814 (Dec. 12,

2008) ("Stream Buffer Zone Rule" or "SBZ Rule").   Judge Kennedy previously denied the

Federal Defendants' motion for voluntary remand and vacatur of the SBZ Rule based, in part, on a

finding that it would be inappropriate to repeal a rule without judicial consideration of the merits.

ECF No. 18 at 5.   Since the Court's August 12, 2009 decision, Federal Defendants filed an answer

_____

[1] Pursuant to Federal Rule of Civil Procedure 25(d), S.M.R. Jewell is automatically substituted for Ken Salazar as Secretary of the Interior. Although the Secretary is named in her official capacity, Secretary Jewell is recused from the matters at issue in this litigation.

to Plaintiff's Amended Complaint that included a confession of error as to the claims underlying

Count II.   ECF No. 40.   More specifically, as detailed herein, OSM erroneously determined that

the SBZ Rule would have no effect on threatened or endangered species or on critical habitat and

thus failed to consult with the U.S. Fish and Wildlife Service ("FWS") as required by the

Endangered Species Act ("ESA") to evaluate possible effects of the SBZ Rule on threatened and

endangered species or on critical habitat.

In light of this admission, Federal Defendants have determined that it is in the public

interest to avoid further, unnecessary litigation.   Federal Defendants respectfully request that the

Court grant partial summary judgment in favor of Plaintiff as to pertinent portions of Count II of

Plaintiff's Amended Complaint, ECF No. 6 at ¶¶ 56-63.   However, Federal Defendants

respectfully request the Court to grant summary judgment in favor of Federal Defendants as to

Counts IV and V of Plaintiff's Amended Complaint, ECF No. 6 at ¶¶ 69-78, which present a

time-barred facial challenge to the merits of a biological opinion issued by FWS in 1996.

As to the appropriate remedy, Federal Defendants renew their request for vacatur of the

SBZ Rule, in light of Federal Defendants' motion for summary judgment in favor of Plaintiff as to

pertinent portions of Count II of the Amended Complaint.   The requested relief is fully within the

Court's discretion and obviates the need for protracted and unnecessary litigation as to the

remaining counts of Plaintiff's Amended Complaint.[2]   The grounds for this motion are further

explained herein.

---

[2]/ In addition, the requested relief would effectively moot the claims in a related case, <u>Coal River Mountain Watch, et al. v. Jewell</u>, No. 08-2212 (D.D.C.), as the plaintiffs in that case also seek the requested relief, albeit on different grounds.

## LEGAL FRAMEWORK

**I.**     **Surface Mining Control and Reclamation Act of 1977**

Congress enacted the Surface Mining Control and Reclamation Act of 1977 ("SMCRA")

to "establish a nationwide program to protect society and the environment from the adverse effects

of surface coal mining operations."   30 U.S.C. § 1202(a).   OSM administers and enforces

SMCRA on behalf of the Secretary of the Interior.   30 U.S.C. § 1211(c).   States may assume

jurisdiction over operations within their borders by developing a regulatory program meeting or

exceeding the standards of SMCRA, and approved by OSM.   30 U.S.C. § 1253.

SMCRA's regulatory provisions are set forth in Title V, 30 U.S.C. §§ 1251-1279.   In

general, Title V establishes a program of cooperative federalism that allows the states to enact and

administer their own regulatory programs once those programs have been approved by OSM.

The limits of these state regulatory programs are established by federal minimum standards with

oversight and limited backup enforcement authority by the Department of the Interior.[3]   See H.R.

Rep. No. 95-218, at 57 (1977), reprinted in 1977 U.S.C.C.A.N. 593, 595; Hodel v. Va. Surface

Mining and Reclamation Ass'n, 452 U.S. 264, 289 (1981).   Under Section 503 of SMCRA, a state

may assume primary jurisdiction ("primacy") over the regulation of surface coal mining and

reclamation operations within that state's borders by submitting a program proposal to the

Secretary of the Interior.   30 U.S.C. § 1253.   If a state does not assume primary regulatory

---

[3]/   Twenty-four states with surface coal mining and reclamation operations have achieved primacy, including
Alabama, Alaska, Arkansas, Colorado, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Mississippi,
Missouri, Montana, New Mexico, North Dakota, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West
Virginia, and Wyoming.   30 C.F.R. pts. 901, 902, 904, 906, 913, 914, 915, 916, 917, 918, 920, 924, 925, 926, 931,
934, 935, 936, 938, 943, 944, 946, 948, and 950.

authority, OSM will operate a federal regulatory program within that state.[4]   30 U.S.C. § 1254.

SMCRA, therefore, provides for either state or federal regulation to be exclusive within a state, but

not both.   See 30 U.S.C. §§ 1253(a), 1254(a).

Once a state regulatory program has been approved, the state law and regulations become

operative for the regulation of surface coal mining and reclamation operations in the state, and the

state officials administer the program.   See Bragg v. W. Va. Coal Ass'n, 248 F.3d 275, 289 (4th

Cir. 2001); see also In re Permanent Surface Mining Regulation Litigation, 653 F.2d 514, 518

(D.C. Cir.), cert. denied sub nom, Peabody Coal Co. v. Watt, 454 U.S. 822 (1981) ("Under a state

program, the state makes decisions applying the national requirements of [SMCRA] to the

particular local conditions of the state.").   However, OSM's role under SMCRA does not end

once it has approved a state's program.   SMCRA gives OSM ongoing authority to oversee the

effectiveness of the state's implementation of its program.   See, e.g., 30 U.S.C. §§ 1254(b),

1267(a), and 1271.

The decision to offer each state primary jurisdiction over its surface mining regulations

reflects Congress's awareness of the unique needs and environmental conditions of the individual

states as articulated in the Congressional findings made in SMCRA:

> [B]ecause of the diversity in terrain, climate, biologic, chemical and other physical
> conditions in areas subject to mining operations, the *primary governmental
> responsibility for developing, authorizing, issuing, and enforcing regulations for
> surface mining and reclamation operations subject to this chapter should rest with
> the States*[.]

---

[4]/   Only two states (Tennessee and Washington) with surface coal mining and reclamation operations do not have primacy and are considered federal program states.   30 C.F.R. pts. 942 and 947.   OSM is also the regulatory authority for three Indian tribes (the Crow Tribe, the Hopi Tribe, and the Navajo Nation) with active surface coal mining and reclamation operations.   30 C.F.R. § 750.6.   In addition, OSM remains the regulatory authority for Federal lands in states with primacy unless OSM has entered into a cooperative agreement with the state allowing it to perform permitting and other functions in accordance with the approved state regulatory program.   30 C.F.R. pt. 745.

30 U.S.C. § 1201(f) (emphasis added).   As this language indicates, states must be afforded

significant authority to tailor SMCRA to meet their particular state requirements.   SMCRA,

however, defines the degree to which its provisions can be tailored by the states.   Section 503 of

SMCRA requires that state rules and regulations be consistent with regulations issued by the

Secretary.   30 U.S.C. § 1253(a)(7).   Section 505(b) of SMCRA provides that "[a]ny provision of

any State law or regulation . . . which provides for more stringent land use and environmental

controls and regulations" than does SMCRA or the federal rules "shall not be construed to be

inconsistent" with SMCRA.   30 U.S.C. § 1255(b).

 In essence, SMCRA and the implementing federal regulations provide environmental

protection standards, including the requirement that surface coal mining operations, at a minimum,

"restore the approximate original contour of the land."   30 U.S.C. § 1265(b)(3).   This

requirement is subject to waivers when the land will be put to an "equal or better economic or

public use."   30 U.S.C. § 1265(e)(3)(A).   In certain steep-slope areas, such as in central

Appalachia, operators that remove rock and earth, i.e., "spoil," overlying coal deposits may not be

able to return some of the spoil to the mined area in a stable manner using the best technology

currently available.   When this occurs, some "excess spoil" is often placed in the upper reaches of

valleys adjacent to the mined areas, i.e., a "valley fill."   Streams often run through valleys in these

steep-slope areas, so valley fills are typically located in the vicinity of streams and streambeds.

 Section 515 of SMCRA includes several provisions that address potential effects of surface

coal mining operations on streams.   30 U.S.C. § 1265.   For example, Section 515(b)(10)(B)(i)

requires that surface coal mining operations be conducted so as to prevent the contribution of

additional suspended solids to streamflow or runoff outside the permit area to the extent possible

using the best technology currently available.   Id. § 1265(b)(10)(B)(i).   Section 515(b)(24)

5

requires that surface coal mining and reclamation operations be conducted to minimize

disturbances to and adverse impacts on fish, wildlife, and related environmental values "to the

extent possible using the best technology currently available."   Id. § 1265(b)(24).

## II.     The Endangered Species Act

Congress enacted the ESA, 16 U.S.C. §§ 1530-1541, "to provide a means whereby the

ecosystems upon which endangered species and threatened species depend may be conserved,

[and] to provide a program for the conservation of such endangered species and threatened

species. . . ."  16 U.S.C. § 1531(b).   The ESA is "the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation."   Tennessee Valley Auth. v. Hill,

437 U.S. 153, 180 (1978) ("TVA v. Hill").   After reviewing the "language, history, and structure

of the [ESA]," the Supreme Court concluded, "beyond doubt," that "[t]he plain intent of Congress

in enacting this statute was to halt and reverse the trend toward species extinction, whatever the

cost," and that "Congress intended endangered species to be afforded the highest of priorities."

Id. at 174, 184; see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687,

698-99 (1995) (quoting TVA v. Hill with approval).   Passage of the ESA resulted from Congress'

deep concern over the accelerating pace of species extinctions.   As noted by the Supreme Court,

the legislative proceedings were "replete with expressions of concern over the risk that might lie in

the loss of *any* endangered species."   TVA v. Hill, 437 U.S. at 177 (emphasis in the original).

ESA section 7(a)(2) provides that federal agencies must ensure that any action authorized,

funded, or carried out by such agency is not likely to "jeopardize the continued existence of any

endangered species or threatened species or result in the destruction or adverse modification of

habitat of such species which is determined by the Secretary[5] . . . to be critical. . . ." 16 U.S.C.

§ 1536(a)(2).[6] To achieve this objective, the ESA requires the action agency to consult with the

FWS whenever a federal action "may affect" an endangered or threatened species.[7] 50 C.F.R.

§ 402.14(a). Section 7 and its implementing regulations set out detailed consultation procedures

designed to provide agencies with expert advice to determine the biological impacts of their

proposed activities. 16 U.S.C. § 1536(b); 50 C.F.R. pt. 402.

The "formal consultation" process is described at length at 50 C.F.R. § 402.14.[8] Formal

consultation culminates in the issuance of a "biological opinion" by FWS or the National Marine

Fisheries Service ("NMFS"), which advises the action agency whether jeopardy is likely to occur

for any listed species and, if so, whether "reasonable and prudent alternatives" exist to avoid a

jeopardy situation. Id. § 402.14(h)(3). Reinitiation of consultation may be required under

certain circumstances such as where the identified action is subsequently modified in a manner

that causes an effect to the listed species or critical habitat that was not previously considered. 50

C.F.R. § 402.16.

---

[5]/ "Secretary" as used in the ESA means the Secretary of the Interior or the Secretary of Commerce. 16 U.S.C. § 1532(15).

[6]/ "Jeopardize the continued existence" means "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Critical habitat includes "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection. . . ." 16 U.S.C. § 1532(5)(A)(i).

[7]/ In general, FWS has authority over terrestrial and freshwater species and the National Marine Fisheries Service ("NMFS") has authority over marine species. See, e.g., Nw. Res. Info. Ctr. v. NMFS, 56 F.3d 1060, 1065 (9th Cir. 1995) (discussing the division of responsibility for listed species).

[8]/ The ESA's implementing regulations also recognize the use of "informal consultation" to assist an action agency in determining whether and when further consultation is necessary. Informal consultation "includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required." 50 C.F.R. § 402.02.

In 1998, FWS and NMFS jointly finalized an ESA Section 7 Consultation Handbook to provide internal guidance and establish national policy for conducting consultation and conferences pursuant to ESA Section 7.   The guidance specifically provided for the conduct of programmatic or national consultations to evaluate planning documents or broad programs affecting many species over all or a major portion of the country.   See ESA Section 7 Consultation Handbook at 4-48 (March 1998), available at http://www.fws.gov/endangered/esa-library/pdf/CH4.PDF (last visited Jul. 17, 2013).   As provided in the guidance, such programmatic or national consultations may properly reserve analysis of potential species effects for subsequent, site-specific consultations to occur under the umbrella of the agency action that is the subject of the programmatic or national consultation. See ESA Section 7 Consultation Handbook at 5-2, available at http://www.fws.gov/endangered/esa-library/pdf/CH5-9.PDF (last visited Jul. 17, 2013).

Section 9 of the ESA prohibits the "taking" of any endangered or threatened species.   16 U.S.C. § 1538(a)(1)(B).   "Take" as defined by the ESA means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect or to attempt to engage in such conduct.   16 U.S.C. § 1532(19).   The ESA's prohibition on taking species applies to all "persons,"—including individuals, corporations, and federal or state agencies—upon the final listing of a species.   16 U.S.C. § 1532(13).   The Secretary of the Interior has enforcement authority, 16 U.S.C § 1540(e)(1), and any person who violates the "take" prohibition may be subjected to civil and/or criminal penalties.   16 U.S.C. § 1540(a) (civil penalties) and (b) (criminal violations).   However, takings incidental to federal actions can be authorized as part of the consultation process in an incidental take statement attached to a final biological opinion pursuant to Section 7 of the ESA,

thus protecting the federal agency and others from Section 9 culpability.   16 U.S.C. § 1536(b)(4), 1536(o)(2).

## BACKGROUND

### I.   Past Regulation of Surface Mining in Stream Buffer Zones

Nothing in SMCRA specifically establishes or requires a buffer zone for streams. However, since the enactment of SMCRA, OSM has promulgated four sets of regulations that included the concept of a buffer zone for streams, including the 2008 SBZ Rule being challenged in this case.   In 1977, OSM published initial regulations providing that no land within 100 feet of an intermittent or perennial stream shall be disturbed by surface coal mining and reclamation operations unless the regulatory authority specifically authorizes surface coal mining and reclamation operations through such a stream.   42 Fed. Reg. 62,652 (Dec. 13, 1977).   However, the rule did not specify the conditions under which the regulatory authority may authorize surface coal mining operations within the buffer zone.   See id.

In 1979, OSM published the original version of its permanent program regulations.   44 Fed. Reg. 15,175 (Mar. 13, 1979).   These 1979 regulations provided that no land within 100 feet of a perennial stream or a stream with a biological community shall be disturbed by surface mining activities, except in accordance with 30 C.F.R. §§ 816.43-816.44 and 817.43-817.44 [the stream diversion regulations], unless the regulatory authority specifically authorizes surface mining activities closer to or through such a stream upon finding that the original stream channel will be restored; and during and after the mining, the water quantity and quality from the stream section within 100 feet of the surface mining activities shall not be adversely affected.   See 30 C.F.R. §§ 816.57 and 817.57 (1980).   Paragraph (c) of this rule provided that a biological community existed if the stream at any time contained an assemblage of two or more species of arthropods or

molluscan animals that were adapted to flowing water for all or part of their life cycle, dependent upon a flowing water habitat, reproducing or could reasonably be expected to reproduce in the water body where they are found, and longer than two millimeters at some stage of the part of their life cycle spent in the flowing water habitat.   Id.

In 1983, OSM further revised the regulations related to buffer zones.   48 Fed. Reg. 30,312 (June 30, 1983).   One revision made at that time was the deletion of the requirement that the original stream channel be restored.   Id.   Another revision replaced the biological community criterion for determining which non-perennial streams must be protected under the rule with a requirement for protection of all intermittent streams.   Id.   It also added a requirement that the regulatory authority make a finding that the proposed mining activities will not cause or contribute to a violation of applicable state or federal water quality standards and will not adversely affect the environmental resources of the stream.   Id.   Although several specific regulations make up the 1983 stream buffer zone rule, the primary focus of the rule throughout the years has been on 30 C.F.R. §§ 816.57(a) and 817.57(a), which stated:

> (a) No land within 100 feet of a perennial stream or an intermittent stream shall be disturbed by surface [or underground] mining activities, unless the regulatory authority specifically authorizes surface [or underground] mining activities closer to, or through, such a stream.   The regulatory authority may authorize such activities only upon finding that--
>
> > (1) Surface [or underground] mining activities will not cause or contribute to the violation of applicable State or Federal water quality standards, and will not adversely affect the water quantity and quality or other environmental resources of the stream; and
> >
> > (2) If there will be a temporary or permanent stream-channel diversion, it will comply with § 816.43.

30 C.F.R. §§ 816.57(a) and 817.57(a) (1997).   The 1983 stream buffer zone rule has previously

withstood judicial challenge in this court.   See In re: Permanent Surface Mining Regulation

Litigation II-Round II, [1984] 15 Envtl. L. Rep. (Envtl. Law Inst.) 20481 (D.D.C. Oct. 1, 1984).

Historically, OSM and the state regulatory authorities applied the 1983 stream buffer zone

rule in a manner that allowed the placement of excess spoil fills, refuse piles, slurry

impoundments, and sedimentation ponds in intermittent and perennial streams.   See generally 73

Fed. Reg. at 75,817.   OSM's historic interpretation of the 1983 stream buffer zone is consistent

with SMCRA.   Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 195 (4th Cir. 2009)

("Congress clearly contemplated that the regulation of the disposal of excess spoil and the creation

of valley fills falls under the SMCRA rubric."); Kentuckians for the Commonwealth v.

Rivenburgh, 317 F.3d 425, 443 (4th Cir. 2003) ("Indeed, it is beyond dispute that SMCRA

recognizes the possibility of placing excess spoil material in waters of the United States even

though those materials do not have a beneficial purpose."); see also Bragg v. W. Va. Coal Ass'n,

248 F.3d 275, 296 (4th Cir. 2001), cert. denied, 534 U.S. 1113 (2002) (dismissing challenge to

West Virginia's counterpart to OSM's 1983 stream buffer zone rule without reaching the merits of

the case); 30 U.S.C. § 1265(b)(22)(D) (requiring the regulation of the placement of "all excess

spoil . . . in such a manner that . . . the disposal area does not contain springs, *natural water courses*

or wet weather seeps unless lateral drains are constructed from the wet areas to the main

underdrains in such a manner that filtration of the water into the spoil pile will be prevented . . . ."

(emphasis added)); H.R. Rep. No. 95-218, at 101 (1977) (specifically referring to placing mining

spoil in mountain valleys or hollows).

II.     **Formal Section 7 Biological Opinion and Conference Report on Surface Coal Mining Regulatory Programs Under SMCRA**

On March 21, 1995, OSM requested formal Section 7 ESA consultation regarding the continuation and approval of surface coal mining and reclamation operations under state and federal regulatory programs adopted pursuant to SMCRA, as amended, and its implementing regulations.   On September 24, 1996, the FWS rendered its formal Biological Opinion ("BiOp"), filed herewith as Ex. 1.   As of June 1, 1996, a total of 308 species were listed as threatened or endangered within states with primacy, and 337 listed species occurred within states with federal regulatory programs.   BiOp at 3.   However, the Biological Opinion specified that it was intended to address "all present and future Federally listed and proposed species and designated or proposed critical habitats that may be affected by the implementation and administration of surface coal mining regulatory programs under SMCRA."   BiOp at 6.

In its Biological Opinion, FWS explained that the effect of surface coal mining and reclamation operations on plant and animal communities depends on the nature of the affected plant, animal, or critical habitat, the type of mining and its intensity, reclamation techniques and timing, the seral history of the site (i.e., the relative stage of ecological succession in an ecosystem advancing toward its climax stage), and postmining land use.   BiOp. at 6.   Generally, surface coal mining and reclamation operations can result in impacts, such as changes in pH of waters and/or soils; siltation of bodies of water; increased turbidity of water bodies, thus reducing primary productivity; deposition of metals in water bodies; and synergistic effects of mining wastes with other pollutants.   Id.   FWS recognized that surface coal mining and reclamation operations may result in direct effects consisting primarily of habitat alteration by land clearing and earthmoving operations.   BiOp at 7.   In addition, such operations may indirectly affect threatened,

12

endangered, or proposed species or proposed or designated critical habitat by increasing human access to species and/or their habitats and by causing or contributing to long-term changes in land use and local ecology.   Id.

Notwithstanding these potential adverse effects of mining and reclamation operations, FWS recognized that SMCRA and its implementing regulations set forth programmatic standards and procedures designed to minimize mining related impacts on fish and wildlife in general and threatened and endangered species in particular.   BiOp at 7.   Under SMCRA and its implementing regulations, OSM, states with approved regulatory programs under SMCRA, state fish and game or conservation agencies, and local FWS offices must develop additional species-specific or site-specific standards and procedures if needed to protect listed and proposed species, their habitats, and designated or proposed critical habitats.   Id.   For example, under 30 C.F.R. §§ 780.16 (surface mining) and 784.21 (underground mining) each permit application must include fish and wildlife resource information for the permit and adjacent area, as determined by the regulatory authority in consultation with the state and federal agencies with responsibilities for fish and wildlife.   Id. §§ 780.16(a) and 784.21(a).   Each permit application must provide a protection and enhancement plan, which must include description of how the operator will minimize disturbances and adverse impacts on fish and wildlife and related environmental values, including compliance with the ESA.   Id. §§ 780.16(b) and 784.21(b).   The regulatory authority must coordinate review and issuance of permits with applicable requirements of the ESA and other environmental laws (30 C.F.R. § 773.5) and must provide written notice of complete applications for coal mining permits to state and federal fish and wildlife agencies.   30 C.F.R. § 773.6(a)(3)(ii). In addition, upon request by the FWS, the regulatory authority must supply this permit information directly to the FWS for further review.   Id. §§ 780.16(c) and 784.21(c).

After reviewing SMCRA, its implementing regulations, the effects of the proposed action, and the cumulative effects of future state, tribal, local, or private actions that are reasonably certain to occur, FWS concluded that surface coal mining and reclamation operations conducted in accordance with properly implemented federal and state regulatory programs under SMCRA are not likely to jeopardize the continued existence of listed or proposed species and are not likely to result in the destruction or adverse modification of designated or proposed critical habitat.   BiOp at 11.   In addition, to be exempt from the prohibitions of Section 9 of the ESA, FWS provided in the Biological Opinion that SMCRA regulatory authorities must comply with the following terms and conditions of the incidental take statement:

> 1.      The regulatory authority, acting in accordance with the applicable SMCRA regulatory program, must implement and require compliance with any species-specific protective measures developed by the Service field office and the regulatory authority (with the involvement, as appropriate, of the permittee and OSM).
>
> 2.      Whenever possible, the regulatory authority must quantify the take resulting from activities carried out under this program.   Whenever a dead or impaired individual of a listed species is found, the local Service office must be notified within one (1) working day of the discovery.
>
> 3.      Whenever the regulatory authority decides not to implement one or more of the species-specific measures recommended by the Service, it must provide a written explanation to the Service.   If the Service field office concurs with the regulatory authority's action, it will provide a concurrence letter as soon as possible.   However, if the Service does not concur, the issue must be elevated through the chain of command of the regulatory authority, the Service, and (to the extent appropriate) OSM for resolution.

BiOp at 13-14.   In closing the Biological Opinion, FWS stated that reinitiation of formal consultation is required:

> when discretionary Federal agency involvement or control over the action has been maintained (or is authorized by law) and if (1) new information reveals that the agency action may affect listed species or critical habitats in a manner or to an extent not considered in this opinion, or (2) the agency action is modified in a

> manner that causes an adverse effect to listed species or critical habitat that was not
> considered in this opinion.

BiOp at 14.   Notably, the listing of new species and the designation of critical habitat were *not*

included as factors that may trigger the need to reinitiate consultation pursuant to the ESA.

## III.   The 2008 SBZ Rule

On January 7, 2004, OSM first proposed to revise its stream buffer zone rules.   69 Fed.

Reg. 1,036 (Jan. 7, 2004).   OSM received many comments requesting that OSM consider other

alternatives to the proposed rule and prepare an environmental impact statement ("EIS").   In

response to these comments, in 2005, OSM announced its intent to prepare an EIS pursuant to the

National Environmental Policy Act, 42 U.S.C. §§ 4321 - 4345.   70 Fed. Reg. 35,112 (June 16,

2005).   For the next two years, OSM held meetings, gathered information, and prepared and then

published a revised proposed rule and a notice of availability of the draft EIS ("DEIS").   72 Fed.

Reg. 48,890 (Aug. 27, 2007); OSM's DEIS (April 2007), available at

http://federal.eregulations.us/rulemaking/document/OSM-2007-0008-0002 (last visited July 17,

2013).   OSM received more than 43,000 written comments on the revised proposed rule and the

DEIS.   73 Fed. Reg. 75,814, 75,821.   After considering the comments, OSM published a notice

of availability of a final EIS ("FEIS").   73 Fed. Reg. 63,510 (Oct. 24, 2008); OSM's FEIS

(October 2008), available at

http://www.regulations.gov/#!documentDetail;D=OSM-2007-0008-0553 (last visited July 17,

2013).   OSM published the final SBZ Rule on December 12, 2008.   73 Fed. Reg. 75,814.

In the preamble to the final SBZ Rule, OSM stated that the purpose of the rule is:

> to clarify the scope and meaning of the stream buffer zone rule, consistent with
> underlying statutory authority, and to ensure that regulatory authorities, mine
> operators, other governmental entities, landowners, and citizens all can have a
> common understanding of what the stream buffer zone rule does and does not

require. The final rule also includes additional permitting requirements intended to ensure that operations are designed to minimize the creation of excess spoil and to require consideration of alternatives to the disposal of excess spoil and coal mine waste in perennial or intermittent streams or their buffer zones to minimize the adverse impacts on fish, wildlife, and related environmental values to the extent possible using the best technology currently available.

73 Fed. Reg. at 75,818.   Accordingly, the revised rule distinguishes between those situations in which maintenance of an undisturbed buffer between mining and reclamation activities and a perennial or intermittent stream constitutes the best technology currently available to implement the underlying statutory provisions and those situations in which maintenance of a buffer is neither feasible nor appropriate.   Id.

During promulgation of the SBZ Rule, OSM determined that the rule would have no effect on threatened or endangered species and thus did not consult with FWS under the ESA to evaluate possible effects of the SBZ rule on threatened and endangered species or on critical habitat.   See OSM Final Environmental Impact Statement ("FEIS") Excess Spoil Minimization Stream Buffer Zones (FEIS Book I excerpts filed herewith as Ex. 2), p. IV-163 ("We do not anticipate there will be any effect upon threatened and endangered species as the result of implementing the 'No Action' alternative or Alternatives 1, 2, 3, and 4.").   See also Declaration of OSM Director Joe Pizarchik ("Pizarchik Declaration") (filed herewith as Ex. 3) at ¶ 7.   OSM based its "no effect" determination on the following facts:   (1) the existing regulations, specifically 30 C.F.R. §§ 772.12(b)(9), 772.12(d)(2)(ii), 773.5, 773.6, 773.15, 774.13, 774.15, 780.16(a)-(c), 784.21(a)-(c), 815.15, 816.97(a)-(b), 816.97(f), 817.97(a)-(b), and 817.97(f), contain numerous provisions to protect threatened and endangered species and critical habitat; (2) the FWS had determined in the 1996 Biological Opinion that surface coal mining operations conducted in compliance with those regulatory provisions are not likely to jeopardize the continued existence of any threatened,

16

endangered, or proposed species or result in adverse modification of designated or proposed critical habitats; and (3) the SBZ Rule did not change any of the regulatory provisions designed to protect threatened or endangered species.   See id.   However, this "no effect" determination was contradicted by other statements in the OSM's DEIS (DEIS excerpts filed herewith as Ex. 4) and FEIS, which indicated that the SBZ Rule actually would have effects upon the environment and that these effects, in turn, may affect listed species or their critical habitat.   See FEIS p. IV-163 (Sept. 2008).   See also, e.g., FEIS p. IV-142 (Table IV-1 Summary of the impacts of four alternatives with the impacts of the "No Action" alternative); p. IV-147 (noting "less direct impacts to streams would occur" under the preferred alternative); pp. IV-149-150 (noting additional potential effects of the preferred alternative to water quality); pp. IV-152 (concluding that "[t]he impacts of these regulatory changes are inconclusive:   the on-the-ground changes may reduce or increase the potential of flooding . . . ."); pp. IV-154, 157, 159 (acknowledging "slightly positive effect" on aquatic and terrestrial fauna under the preferred alternative as a result of the more rigorous environmental analyses of the placement of coal waste); p. IV-192 ("[C]oal mining has the potential to adversely affect threatened and endangered species and their habitat"); see also, e.g., DEIS p. IV-121 (Table IV- Summary comparison of the impacts of four alternatives with the impacts of the "No Action" alternative); p. IV-138 (discussing the effects of Alternative 1, the SBZ rule, on the human environment); p. IV-139 (stating that the preferred alternative would provide "positive but unquantifiable benefits" to streams); id. ("The revisions to the excess spoil regulations considered in Alternatives 1, 2, and 3 would slightly decrease the risks to threatened and endangered species in the steep-slope terrain of the central Appalachian coalfields"); see also SBZ Rule, 73 Fed. Reg. 75,875 (discussing the effects of the SBZ Rule on the environment).

On those lands where OSM is the regulatory authority; i.e., on Indian lands in all states and on all lands in the states of Arizona, California, Georgia, Idaho, Massachusetts, Michigan, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee and Washington, the SBZ Rule became effective on January 12, 2009.   However, as detailed in Pizarchik Declaration, the application and effects of the SBZ Rule on those lands have been minimal for three reasons.   First, mining on Indian lands occurs almost exclusively on relatively flat areas within arid and semiarid regions containing very few perennial or intermittent streams.   Pizarchik Declaration, Ex. 3 ¶ 17.   In addition, of the states listed above, only Tennessee contains mines that are actively producing coal. Id.   Yet, the amount of coal mined in Tennessee is negligible, constituting less than 0.1% of the total tonnage of coal mined nationally.   Id.   Moreover, various state laws and policies in Tennessee provide various state agencies authority to limit the approval of surface coal mining and reclamations that propose to fill or mine through perennial or intermittent streams.   See, e.g., Tenn. Comp. R. & Regs. 0400-42-07.03(1)(g) (2013).

On all other lands, i.e., where the state is the approved regulatory authority, the SBZ Rule is not yet effective.   Pursuant to 30 C.F.R. § 732.17(e)(1), each state must submit a program amendment to OSM for approval whenever, as a result of changes to the federal regulations, the approved state program no longer meets the statutory or regulatory requirements.   OSM traditionally does not require states to submit such program amendments until any litigation related to the promulgation of the federal regulations has concluded.   Pizarchik Declaration, Ex. 3 ¶ 18.   Thus, OSM has neither received nor approved state program amendments implementing the SBZ Rule in any state with an approved state regulatory program.   Id.

IV.     **The Instant Litigation**

Plaintiff National Parks Conservation Association ("NPCA") filed its lawsuit challenging the SBZ Rule on January 16, 2009.   Plaintiff filed an amended complaint to specifically allege claims pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1854(g)(1) on February 17, 2009. On April 27, 2009, Federal Defendants filed a motion for voluntary remand and vacatur based on a statement by the Secretary of the Interior that the SBZ Rule is "legally defective."   See ECF No. 10 Ex. 1.   Judge Kennedy denied the Federal Defendants' motion in a memorandum opinion and order filed August 12, 2009.   ECF No. 18.   Judge Kennedy cited other cases in which courts had vacated rules following a review of the merits of the rules at issue.   Id. at 3-5.   Judge Kennedy reasoned that it would be inappropriate to vacate a duly promulgated rule without public notice and comment absent judicial consideration of the merits of the SBZ Rule.

In an Advance Notice of Proposed Rulemaking, OSM announced its intent to initiate a further rulemaking process pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, that would address stream buffer zones and related issues and requested public comments. 74 Fed. Reg. 62,664 (Nov. 30, 2009).   The Federal Defendants notified the Court concerning OSM's intent to undertake further rulemaking, see ECF No. 21, as well as Federal Defendants' intent to complete consultation with FWS before publication of any final rule, see id. Ex. 1 at ¶ 10 (Declaration of Glenda Owens).   In light of Federal Defendants' intent to sign a proposed rule to amend or replace the 2008 SBZ Rule by February 28, 2011, the Federal Defendants entered an agreement with Plaintiff to stay this litigation on March 19, 2010.   ECF No. 29.   The Court granted the parties' motion to hold this litigation in abeyance in an order filed April 2, 2010, ECF No. 30, and OSM subsequently published a notice of intent to prepare an EIS.   75 Fed. Reg. 34,666 (June 18, 2010).

19

Despite Federal Defendants' best efforts, a proposed rule has not yet been completed, and Plaintiff filed a motion to lift the agreed stay.   ECF No. 37.   The Court has granted Plaintiff's motion to lift the stay, ECF No. 39, and Federal Defendants filed an answer to Plaintiff's Amended Complaint on May 20, 2013.   ECF No. 40.   Federal Defendants' answer included a confession of error as to the claims underlying Count II of the Amended Complaint.   See ECF No. 40 at ¶ 7 ("Federal Defendants aver that the Secretary of the Interior has determined that OSM erred in failing to initiate consultation with the FWS under the ESA to evaluate possible effects of the SBZ Rule on threatened and endangered species.").   See also id. at ¶¶ 9, 10, 47, 59, and 61 (same).

Federal Defendants are filing this motion for partial summary judgment in an attempt to avoid unnecessary litigation and/or narrow the scope of issues under litigation.   Specifically, in light of Federal Defendants' admission as to the claims in Count II of Plaintiff's Amended Complaint, Federal Defendants' seek partial summary judgment on behalf of the Plaintiff. However, as to Plaintiff's claims concerning the 1996 Biological Opinion, Federal Defendants respectfully request that the Court grant partial summary judgment in favor of the Federal Defendants.   For the reasons set forth below, Federal Defendants respectfully submit that a ruling on these claims should result in the vacatur of the 2008 SBZ Rule and thereby obviate the need for a ruling on Plaintiff's remaining claims.

## **STANDARD OF REVIEW**

To the extent Plaintiff's claims are cognizable[9] its claims in this action are subject to review under the APA, 5 U.S.C. § 706, which provides for judicial review of final agency actions.

---

[9] As discussed below, this Court lacks jurisdiction to hear counts IV and V of Plaintiff's Amended Complaint, and if this case were to proceed to the merits, the United States would show that Counts VI and VII against EPA are also not subject to judicial review because the EPA's actions were committed to agency discretion by law.

Section 706(2) of the APA generally permits a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).   In making the foregoing determinations, "the court shall review the whole record <u>or those parts of it cited by a party</u>. . . ."   <u>Id.</u> § 706 (emphasis added).   Although Federal Defendants have not yet assembled the administrative record pertaining to Plaintiff's claims, the complete record is not needed to adjudicate the merits of Count II given that the issue presented is a legal one informed by a very limited number of administrative record materials that are publicly-available agency documents and are cited herein. With respect to Counts IV and V, the complete record is also not needed at this time because the United States' motion on those counts is predicated on jurisdictional defenses over which there are no issues of disputed fact.   The United States provides the declaration of Director Pizarchik, not as a supplement to the administrative record, but as extra-record evidence concerning post-rulemaking decisions and agency actions that are relevant to this Court's consideration of the remedy to impose for the conceded legal error.   <u>See Earthworks v. U.S. Dep't of the Interior</u>, 279 F.R.D. 180, 185-86 (D.D.C. 2012) (discussing distinction between supplementation of record and submission of extra-record material).

## **ARGUMENT**

**I.**      **<u>Federal Defendants Have Properly Confessed Error As to Plaintiff's Count II Claim That OSM Erroneously Failed To Initiate ESA Consultation on the SBZ Rule</u>.**

It is undisputed that OSM did not engage in formal ESA consultation with FWS prior to issuing the 2008 SBZ Rule.   FEIS, Book II, Appendix C-108 ("[T]here is no need to initiate formal consultation under Section 7 of the Endangered Species Act.") (FEIS Book II excerpts filed herewith as Ex. 5).   At that time, OSM erroneously concluded that any consultation was

unnecessary (i.e., that the rule would have "no effect") despite OSM's findings in the draft and final EIS documents that the 2008 SBZ Rule has the potential to have on-the-ground effects on threatened or endangered species or critical habitat.   Compare FEIS, p. IV-163 ("We do not anticipate there will be any effect upon threatened and endangered species as the result of implementing the 'No Action' alternative or Alternatives 1, 2, 3, and 4.") with, e.g., DEIS, p. IV-139 ("The revisions to the excess spoil regulations considered in Alternatives 1, 2, and 3 would slightly decrease the risks to threatened and endangered species in the steep-slope terrain of the central Appalachian coalfields").   Instead of considering the on-the-ground direct and indirect effects of the agency action—i.e., the SBZ Rule—OSM erroneously relied on other preexisting regulations to support its conclusion that there would be no effects on threatened and endangered species or critical habitat from this action.

As stated above, the consultation requirement under Section 7 of the ESA is triggered whenever a federal agency undertakes a discretionary action that "may affect" a listed species or critical habitat.   50 C.F.R. §§ 402.03 and 402.14(a).   The SBZ Rule unambiguously fits within the ESA definition of an "action" by a federal agency.   See id. at § 402.02 (including the "promulgation of regulations" within definition of "action").   Thus, the only question for the agency is whether the SBZ Rule "may affect" a listed species or its critical habitat and, if so, the agency must engage in Section 7 consultation.

At the time OSM promulgated the SBZ Rule, it concluded that other existing regulations would prevent any effects on threatened or endangered species or their critical habitat.   See, e.g., FEIS, p. IV-162-63.   Yet, OSM's "no effect" statement itself describes potential on-the-ground effects of the SBZ Rule despite the existence of additional, validly-promulgated regulations related to threatened and endangered speceis.   FEIS, p. IV-163 ("Even if the changes to the excess

22

spoil regulations considered under Alternatives 1, 2, and 3, would result in *smaller fill footprints and less streams impacted*, the current regulations under the SMCRA that address the protection of threatened and endangered species will be unaffected by this rulemaking action and protection of threatened and endangered species will continue." (emphasis added).   Moreover, the SBZ Rule acknowledges effects would occur as a result even within the current regulatory environment. See, e.g., 73 Fed. Reg. 75,875 ("We estimate that the combination of the excess spoil and coal mine waste provisions in Alternative 1 would result in *slight positive effects on the human environment with respect to direct hydrologic impacts, water quality, and aquatic fauna when compared to the ''no action'' alternative* [the prior stream buffer zone regulations].   In the final rule, *we are adopting* this alternative, which is both *the most environmentally protective alternative* and the preferred alternative. (emphasis added)); see also Pizarchik Declaration, Ex. 3 at ¶ 15.

Given FWS's broad interpretation of "may affect," OSM was required to consult when it recognized the potential effects of the SBZ Rule.   Section 7 Consultation Handbook at xvi, available at http://www.fws.gov/endangered/esa-library/pdf/CH5-9.PDF (last visited Jul. 17, 2013) (Consultation is "the appropriate conclusion when a proposed action may pose **any** effects on listed species or designated critical habitat." (emphasis in original)); see also Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1024 (9th Cir. 2012) (en banc) ("Under Section 7 of the ESA, a federal agency action need not be 'major' to trigger the duty to consult.   It need only be an "agency action."); Cal. ex rel. Lockyer v. U.S. Dep't of Agric., 459 F. Supp. 2d 874, 910 (N.D. Cal. 2006) ("The threshold for triggering the ESA consultation process is low.").   After considering the allegations raised in Plaintiff's complaint, the Department acknowledged its error

on this point.   <u>See, e.g.</u>, Answer, ECF No. 40 at ¶¶ 7, 9, 10, 47, 59, 61, & 62; Motion for Remand

and Vacatur, ECF No. 10 Ex. 1; and Pizarchik Declaration, Ex. 3 at ¶¶ 4-5, and 10.

Although Federal Defendants do not concede that <u>formal</u> ESA consultation was necessary

as a matter of law, Federal Defendants do acknowledge that some level of consultation was

warranted—whether formal or informal.   This failure to conclude either formal or informal

consultation constitutes a violation of Section 7 of the ESA, 16 U.S.C. § 1536, which includes both

a substantive requirement to ensure against jeopardy of species and adverse modification of

critical habitat, as well as a procedural requirement to consult with FWS concerning agency

actions that have the potential to jeopardize species or adversely modify critical habitat.   <u>E.g.</u>,

<u>Am. Bird Conservancy, Inc. v. FCC</u>, 516 F.3d 1027, 1034 (D.C. Cir. 2008) (vacating order of

Federal Communications Commission where agency failed to adequately explain reason for not

consulting with FWS regarding effects of communications towers on threatened and endangered

species) (citing 16 U.S.C. §§ 1536(a)(2) and (a)(4)).

In light of this confession of error as to certain claims articulated in Count II of Plaintiff's

Amended Complaint, ECF No. 6 at ¶¶ 56-62, the issue before the Court is what the appropriate

remedy should be to redress this ESA violation.   For the reasons described in the Pizarchik

Declaration and in Section III below, Federal Defendants respectfully request the Court to vacate

the 2008 SBZ Rule and reinstate the applicable regulations as they existed prior to the

promulgation of the 2008 SBZ Rule.[10]

---

[10] Reinstatement of the applicable regulations as they existed prior to the promulgation of the 2008 SBZ Rule will
effectively reinstate the 1983 stream buffer zone regulations and all modifications of those regulations prior to 2008.

## II.     The Court Lacks Jurisdiction to Consider Plaintiff's Claims Concerning the 1996 Biological Opinion.

Other than Federal Defendants' promulgation of the 2008 SBZ Rule, Plaintiff does not

challenge any specific agency action that OSM has undertaken in reliance on the 1996 Biological

Opinion.   Thus, stripped of Plaintiff's Count II claims concerning the Federal Defendants'

admitted failure to initiate ESA consultation on the SBZ Rule, the remaining ESA-related Counts

of Plaintiff's Amended Complaint concerning the 1996 Biological Opinion (i.e., Counts IV and V,

ECF No. 6 ¶¶ 69-78) present only a facial, policy-based challenge to the Biological Opinion,

which FWS issued on September 24, 1996, and which has remained in effect since.   Plaintiff

lacks standing to pursue this facial challenge.   Plaintiff's claims under Counts IV and V are also

time-barred under the applicable six-year statute of limitations.

### A.     If the SBZ Rule Is Vacated, Plaintiff Lacks Standing to Pursue a Facial Challenge to the 1996 Biological Opinion.

The "irreducible constitutional minimum of standing" requires that:   (1) the plaintiff has

suffered an injury in fact; (2) the injury complained of is fairly traceable to the challenged action of

the defendant; and (3) it is likely that the injury will be redressed by a favorable decision.   Lujan

v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations omitted); Fla. Audubon

Soc'y v. Bensten, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).   If any one of these essential

elements is lacking, there is no "case or controversy" under Article III of the Constitution, and the

case must be dismissed for lack of subject matter jurisdiction.   Lujan, 504 U.S. at 560.   In this

case, Plaintiff's Amended Complaint challenges only one specific agency action that was

allegedly undertaken in reliance on the 1996 Biological Opinion:   the 2008 SBZ Rule.   See, e.g.,

ECF No. 6 at ¶ 64 ("OSM's reliance on the 1996 BiOp to evade its formal consultation duties is

unlawful.").   If the Court vacates the 2008 SBZ Rule, it is unnecessary to reach the merits of any

remaining claims concerning that rule, for the reasons set forth in Section III below, and Plaintiffs are left with a facial challenge concerning the sufficiency of the Biological Opinion itself.[11] Assuming for the sake of argument that Plaintiff's Amended Complaint alleged sufficient facts to establish standing to pursue an as-applied challenge to the 1996 Biological Opinion vis-a-vis their challenge to the 2008 SBZ Rule, Plaintiff's Amended Complaint does not allege sufficient facts for a stand-alone challenge to the 1996 Biological Opinion itself.

When a party's as-applied claims concerning agency regulations are dismissed from a suit, the party can demonstrate standing only if the party can demonstrate that application of the regulations will affect the party in a concrete manner.   Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009).   In Summers, the plaintiffs filed a complaint challenging the failure of the Forest Service to apply its regulations to a particular timber salvage sale on the Sequoia National Forest. Id. at 491.   Although the parties settled the claims concerning the challenged timber sale, the district court proceeded to adjudicate the merits of the plaintiffs' challenges to the regulations that were initially at issue.   Id. at 492.   The U.S. Court of Appeals for the Ninth Circuit affirmed the district court's holding that the regulations were subject to review, notwithstanding the dismissal of the as-applied claim.

The Supreme Court reversed the decision below, noting that the plaintiffs had identified no other application of the invalidated regulations that threatened imminent and concrete harm to the interests of their members.   Id. at 495.   Specifically, the plaintiffs had failed to allege that any

---

[11]/   To the extent that Plaintiff is attempting to bring a programmatic challenge concerning OSM's actions in reliance on the 1996 Biological Opinion, see, e.g., ECF No. 6 at ¶ 35 ("The 1996 BiOp has been wholly inadequate to prevent jeopardy to threatened and endangered species . . . .") such a claim is contrary to the holding in Lujan v. National Wildlife Fed'n, 497 U.S. 871 (1990), in which the Supreme Court prohibited an environmental group from seeking wholesale correction of a broad agency program.

particular timber sale or other project claimed to be unlawfully subject to the regulations would

impede a specific and concrete plan of plaintiffs to enjoy the National Forests.   Id.   The Court

reasoned that

> [w]e know of no precedent for the proposition that when a plaintiff has sued to
> challenge the lawfulness of certain action or threatened action but has settled that
> suit, he retains standing to challenge the basis for that action (here, the regulation in
> the abstract), apart from any concrete application that threatens imminent harm to
> his interests.   Such a holding would fly in the face of Article III's injury-in-fact
> requirement.

Id. at 494.

Here, Plaintiff's Amended Complaint describes the involvement by NPCA members in the

administrative proceedings surrounding the promulgations of the 2008 SBZ Rule, including

Plaintiff's petition requesting that OSM reinitiate ESA consultation in light of the SBZ rulemaking

proceedings.   See ECF No. 6 at ¶ 16.   Although Plaintiff's members allegedly live, recreate, use,

and/or enjoy lands near mining areas, id. ¶ 15, the Amended Complaint does not identify any

specific agency action that OSM has allegedly taken in reliance on the 1996 Biological Opinion.

Based on the reasoning in Summers, the facts alleged in the Plaintiff's Amended Complaint are

insufficient to establish standing to pursue a stand-alone challenge to the 1996 Biological Opinion

other than the SBZ Rule.

**B.**      **Plaintiff's Facial Claims Concerning the 1996 Biological Opinion Are Time-Barred.**

Assuming for sake of argument that Plaintiff may allege further facts to establish standing,

the Court nonetheless lacks jurisdiction to consider Plaintiff's claims concerning the 1996

Biological Opinion.   "The ESA prescribes no statute of limitations; therefore 28 U.S.C.

§ 2401(a), the general six-year statute of limitations for civil actions against the federal

government, provides the applicable limitations period."   Conservation Force v. Salazar, 811 F.

Supp. 2d 18, 27 (D.D.C. 2011) (citation omitted).   This provision provides in relevant part that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."   28 U.S.C. § 2401(a).   Section 2401(a) is a "jurisdictional condition attached to the government's waiver of sovereign immunity, and as such must be strictly construed."   Spannaus v. U.S. Dep't of Justice, 824 F.2d 52, 55 (D.C. Cir. 1987) (citing United States v. Mottaz, 476 U.S. 834 (1986)); Conservation Force, 811 F. Supp. 2d at 27 (same).   A cause of action against an administrative agency accrues within the meaning of Section 2401(a) as soon as the person challenging the agency action can institute and maintain a suit in court.   Spannaus, 824 F.2d at 56.

A challenge to agency action first accrues for statute of limitations purposes when the action was taken.   Harris v. FAA, 353 F.3d 1006, 1009-10 (D.C. Cir. 2004); see Hardin v. Jackson, 625 F.3d 739, 743 (D.C. Cir. 2010) (holding that "the appellants' right of action accrued when EPA conditionally registered [the pesticide] and the six-year limitation period began to run on that day").   Thus, an APA claim challenging FWS's issuance of the 1996 Biological Opinion, pursuant to 5 U.S.C. § 706, as provided in Bennett v. Spear, 520 U.S. 154, 175 (1997), would have accrued immediately upon issuance of the Biological Opinion.   Well over six years passed between the time FWS issued the Biological Opinion on September 24, 1996, and the time Plaintiff commenced this action on January 16, 2009 (ECF No. 1).   Thus, to the extent that Plaintiff challenges the substance of the 1996 Biological Opinion itself, such a facial challenge is clearly time-barred.   E.g., Oregon Natural Ass'n v. U.S. Forest Serv., No. 04-3096-PA, 2007 WL 1072112, at *6 (D. Or. 2007) (holding that statute of limitations barred claim filed more than six years after the biological opinion was issued).   Although Plaintiff theoretically might be able to challenge some discrete, recent action taken by OSM pursuant to the 1996 Biological Opinion

28

(e.g., an "as-applied" challenge),[12] the facial challenge to the 1996 Biological Opinion presented here is time-barred.   E.g., Florida Keys Citizens Coal. v. West, 996 F. Supp. 1254, 1256 (S.D. Fla. 1998) (rejecting the plaintiffs' claim that a challenge to the Corps of Engineers' "after-the-fact" permit regulations was an "as applied" challenge and granting motion to dismiss on statute of limitations grounds because the plaintiffs alleged that the regulation was "inconsistent with its enabling statute."); Nat'l Wildlife Fed'n v. NMFS, No. CV 01-640-RE, CV 05-23-RE, 2005 WL 1278878 at *20 (May 26, 2005) (holding that facial challenge to ESA Section 7 consultation regulations was time-barred).

An ESA citizen suit claim concerning OSM's implementation of the FWS Biological Opinion pursuant to 16 U.S.C. § 1540(g)(1)(A)[13] would have accrued 60 days after provision of the statutorily-required notice of intent to sue by some party, following issuance of the Biological Opinion, pursuant to 16 U.S.C. § 1540(g)(2)(A).   Various courts have held that the six-year statute of limitations applies to ESA Section 11(g)(1)(A) citizen suits alleging that an agency has failed to consult under ESA Section 7.   E.g., Sierra Club v. EPA, 162 F. Supp. 2d 406, 422 n.26 (D. Md. 2001) (Section 7 claim not brought within six years of challenged agency action time barred);   Kentucky Heartwood v. Worthington, 20 F. Supp.2d 1076, 1092-93 (E.D. Ky. 1998) (applying six-year statute of limitations to ESA Section 7 challenges to Forest Plan and amendments thereto); Broadened Horizons Riverkeepers v. U.S. Army Corps of Eng'rs, 8 F. Supp.

---

[12]/   Any such claim, however, would not properly be part of *this* litigation; rather, in this theoretical scenario Plaintiff would have to initiate a new lawsuit challenging the new agency action, assuming other jurisdictional prerequisites are met, such as exhausting any applicable administrative remedies and complying with any applicable notice-of-suit requirements pursuant to the ESA and/or the Clean Water Act.

[13]/   The ESA's citizen suit provision provides in relevant part that "[a]ny person may commence a civil suit on his own behalf . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A).

2d 730, 736 n.9 (E.D. Tenn. 1998) (applying six-year statute of limitations to ESA Section 7 challenges to river dock permits).   Cf. <u>Strahan v. Linnon</u>, 967 F. Supp. 581, 607 (D. Mass. 1997) (applying six-year statute of limitations to ESA Section 7 challenge to ESA consultation regulation).

The fact that the instant case presents a claim of alleged failure to reinitiate consultation in light of the listing of new endangered species and the designation of critical habitat, <u>see</u> ECF No. 6 at ¶ 45—rather than an alleged failure to initiate consultation in the first instance—does not allow Plaintiff to avoid the six-year statute of limitations.   On its face, the Biological Opinion applies to "*all present and future* Federally listed and proposed species and designated or proposed critical habitats that may be affected by the implementation and administration of surface coal mining regulatory programs under SMCRA."   BiOp at 6 (emphasis added).   Claims concerning the sufficiency of the 1996 Biological Opinion in light of potential future species listing and critical habitat designation necessarily accrued when FWS issued this Biological Opinion.

To the extent that Plaintiff alleges some continuing ESA violation in light of OSM's alleged failure to implement terms of the 1996 Biological Opinion, such as the development of species-specific measures to minimize anticipated take, <u>see</u> ECF No. 6 at ¶ 77, this does not lay the predicate for circumventing the applicable statute of limitations.   Although Federal Defendants do not agree with Plaintiff concerning their assertions that OSM has failed to adhere to the terms and conditions of the FWS Biological Opinion, it is unnecessary to reach this factual issue.   On its face, the Biological Opinion does not include any deadline by which OSM is obligated to implement any particular species-specific protective measures.   <u>See</u> BiOp at 13.   Even assuming for sake of argument that OSM has failed to implement one of the terms and conditions, the Court may not toll the date on which Plaintiff's claim accrued because the applicable statute of

limitations is jurisdictional.   Ctr. for Biological Diversity v. Hamilton, 453 F.3d 1331, 1335-36

(11th Cir.2006) ("Because section 2401 unambiguously imposes a six-year statute of limitations,

our refusal to extend the application of the continuing doctrine comports with principles of

sovereign immunity.").   Although some Ninth Circuit decisions have recognized exceptions to

the six-year statute of limitations for continuing or ongoing agency actions, e.g., Coal. for a

Sustainable Delta v. FEMA, 812 F. Supp. 2d 1089 (E.D. Cal. 2011)[14], such judicially-created

exceptions have not been endorsed by the U.S. Court of Appeals for the District of Columbia.   P

& V Enters. v. U.S. Army Corps of Eng'rs, 516 F.3d 1021, 1026-27 (D.C. Cir. 2008) (The court

"has long held that section 2401(a) creates 'a jurisdictional condition attached to the government's

waiver of sovereign immunity.'") (quoting Spannaus, 824 F.2d at 55); West Virginia Highlands

Conservancy v. Johnson, 540 F. Supp. 2d 125, 143 (D.D.C. 2008) ("[T]he entire basis for

plaintiffs' argument that their complaint is timely—that the continuing violations doctrine tolled

the limitations period—is not legally viable."); Alaska Cmty. Action on Toxics v. EPA, No.

12-1299 (JDB), ___ F. Supp. 2d ___, 2013 WL 1876795, at *10 (D.D.C. May 7, 2013) (holding

that statute of limitations is jurisdictional).   But see Wilderness Soc'y v. Norton, 434 F.3d 584,

588-89 (D.C. Cir. 2006) (without addressing whether § 2401(a) is jurisdictional, suggesting in

dictum that an agency's continuing violations of its statutory obligations could toll the limitations

---

[14]/   The reasoning underlying the discussion of the statute of limitations and an agency's ongoing or continuing violations in Coalition for a Sustainable Delta and the cases cited therein has been called into question in light of the decision of the U.S. Court of Appeals for the Ninth Circuit in Karuk Tribe, 681 F.3d at 1021, which explicitly requires plaintiffs to identify an affirmative agency act—such as the renewal of existing contracts, the creation of management strategies, and the issuance of permits—to invoke Section 7's consultation requirement.   See Ctr. for Biological Diversity v. EPA, No. 11-cv-00293-JCS, 2013 WL 1729573, at *22 (N.D. Cal. Apr. 22, 2013) ("[I]n light of the Ninth Circuit's decision in Karuk Tribe, Plaintiffs cannot merely identify an "ongoing agency action" based on discretionary control or authority.   Rather, Plaintiffs must identify an affirmative act.").

period set by § 2401(a)), <u>cited in</u> <u>AKM LLC v. Sec'y of Labor</u>, 675 F.3d 752, 763 n. 6 (D.C. Cir. 2012).

It is also of no moment that Plaintiff petitioned OSM to reinitiate ESA consultation in 2007.  <u>See</u> Initial Complaint Ex. 1, ECF 1-1.   The circumstances here do not allow for an exception to the statute of limitations based on the doctrine of equitable tolling, which may apply in certain situations in which an individual has taken some action to preserve his legal rights.   <u>See generally</u> <u>Irwin v. Dep't of Veterans Affairs</u>, 498 U.S. 89 (1990).   Putting aside the fact that the ESA does not empower private citizens to petition for the initiation or reinitiation of ESA consultation (or otherwise participate in the consultation process as third parties in situations where they are not a permit applicant), the U.S. Court of Appeals for the District of Columbia has observed that "[a] petition for review of an informal agency rulemaking would not likely meet the test" to equitably toll the six-year statute of limitations.   <u>Chung v. U.S. Dep't of Justice</u>, 333 F.3d 273, 277 (D.C. Cir. 2003).   In any event, Plaintiff's petition itself was submitted approximately *eleven* years after FWS issued the 1996 Biological Opinion.

Plaintiff's claims concerning the 1996 Biological Opinion are time-barred, and the Court should grant summary judgment as to Counts IV and V, based on lack of subject-matter jurisdiction.

## III.     <u>As Remedy For the Admitted ESA Violation, the Court Should Vacate the SBZ Rule</u>.

It is well-settled that the appropriate remedy in cases where an agency has failed to discharge its statutory duties is generally to remand to the agency for further proceedings consistent with the agency's duties.   <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985).   In the context of rulemaking, although courts certainly have authority to keep improperly promulgated regulations in effect pending corrective action by the agency, <u>Allied-Signal, Inc. v.</u>

NRC, 988 F.2d 146, 150 (D.C. Cir. 1993), typically courts will vacate an improperly promulgated rule when there is a lawful, pre-existing regulatory structure in place that can be reverted to and will prevent disruption to the regulated community.   See, e.g., Comcast Corp. v. FCC, 579 F.3d 1, 19-23 (D.C. Cir. 2009).   In this case, as discussed below, vacatur of the 2008 SBZ Rule would have almost no impact on the regulated community because virtually all coal mining is still being regulated under the 1983 regulatory regime.[15]

A remedy of vacatur is appropriate in light of the two-part test articulated in Allied Signal:

The decision whether to vacate depends on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."

Id. at 151 (quoting International Union, UMN. v. FMSHA, 920 F.2d 960, 966-67 (D.C. Cir. 1990)).   As to the first part of this test, the admitted ESA violation entails both a procedural and substantive violation of the ESA, 16 U.S.C. § 1536.   The violation is procedural to the extent that OSM failed to undertake any ESA consultation whatsoever.   The violation is also substantive because, absent consultation with FWS, there is no confirmation that the 2008 SBZ Rule would avoid jeopardizing threatened or endangered species or adversely modifying designated critical habitat.   The admitted violation is serious in view of the Supreme Court's admonition in TVA v. Hill that "Congress intended endangered species to be afforded the highest of priorities."   437 U.S. at 184.

As to the second part of the Allied Signal test, there would be disruptive consequences if the 2008 SBZ Rule is retained in effect.   As OSM has noted, it is in the process of comprehensively reviewing and rewriting these and other regulations related to surface coal

---

[15]   Federal Defendants note that the Plaintiff requests, as part of its relief, vacatur of the 2008 SBZ Rule.   See ECF No. 6 at 31.

mining and reclamation operations in and near streams.   See ECF No. 21; Pizarchik Declaration at ¶ 19.   No state with an approved regulatory program has amended its program to reflect the SBZ Rule, see Pizarchik Declaration ¶ 26, and it would make little sense to require these states to amend their programs when further amendments would likely be required once OSM issues its new regulations.   Retaining the 2008 SBZ Rule in effect may also necessitate ESA consultation as to that rule, pending promulgation of OSM's new regulations.   As Federal Defendants have previously advised the Court, OSM will consult with FWS in connection with the ongoing notice-and-comment rulemaking, before it finalizes any new regulations.   Pizarchik Declaration, Ex. 3 at ¶ 25; see also ECF No. 21 Ex. 1 at ¶ 10 (Declaration of Glenda Owens).   It makes little sense to require the agency to consult on both the 2008 SBZ Rule and the rulemaking that will replace the SBZ Rule simultaneously.   Thus, applying the Allied Signal test, 988 F.2d at 151, it is in the public interest to have the SBZ Rule vacated at this time.

Although Judge Kennedy previously denied Federal Defendants' request to vacate the 2008 SBZ Rule, the Court is not constrained by Judge Kennedy's previous holding.   In denying Federal Defendant's motion, Judge Kennedy reasoned that the Federal Defendants were seeking "a remand and vacatur of the SBZ Rule without a determination on the merits that the SBZ Rule is legally deficient."   ECF No. 18 at 3.   The circumstances are different now as OSM has admitted and fully explained the procedural defect with the promulgation of the SBZ Rule and is seeking a determination by the Court on the merits that its failure to initiate consultation with the FWS was erroneous.   As such, Federal Defendants respectfully request the Court to vacate the 2008 SBZ Rule in light of OSM's undisputed failure to initiate ESA consultation on the SBZ Rule, and reinstate the prior, validly promulgated regulations.

**IV.**   **It Is Unnecessary To Reach Plaintiffs' Remaining Claims.**

In light of Federal Defendants' confession of error as to Count II (alleging OSM violated

its duty to consult under the ESA) and motion for partial summary judgment as to Counts IV and

V, it is unnecessary for the Court to reach the merits of Plaintiff's remaining claims in the

Amended Complaint, ECF No. 6 (i.e., Count I (alleging violation of SMCRA environmental

protection standards); Count III (alleging OSM erroneously relied on the 1996 BiOp to avoid

formal ESA consultation); Count VI (alleging EPA violated the Clean Water Act); and Count VII

(alleging EPA violated the ESA through its concurrence in the SBZ Rule)).   Federal courts lack

jurisdiction "to give opinions upon moot questions or abstract propositions, or to declare principles

or rules of law which cannot affect the matter in issue in the case before it."   Church of

Scientology v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653

(1895).   A case is moot when the issues no longer involve a live case or controversy with respect

to which the court can provide meaningful relief.   See Arizonans for Official English v. Arizona,

520 U.S. 43, 45 (1997); Murphy v. Hunt, 455 U.S. 478, 481 (1982); Aetna Life Ins. Co. v.

Haworth, 300 U.S. 227, 241 (1937).

Provided that the Court vacates the SBZ Rule as requested in this memorandum, the

Pizarchik Declaration, and in Plaintiff's own Amended Complaint, ECF No. 6 at p. 31, the issues

presented in the remaining counts of the Amended Complaint would be jurisdictionally moot, as

the Court cannot fashion any further relief with respect to the SBZ Rule.   E.g., Natural Res. Def.

Council v. U.S. Nuclear Reg. Comm'n, 680 F.2d 810, 814 (D.C. Cir. 1982) (the court cannot order

a defendant to do something the defendant has already done).   If the SBZ Rule is vacated,

Plaintiff's remaining requests for declaratory relief concerning alleged legal deficiencies of the

SBZ Rule itself (or EPA's actions in connection with the SBZ Rule) would also be jurisdictionally

moot.   A federal court may grant declaratory relief only in the case of an "actual controversy."

Burke v. Barnes, 479 U.S. 361, 364 (1987).   Further litigation on such claims would invite the

Court to render an advisory opinion without practical consequences.   In short, if the SBZ Rule is

vacated, the issues presented in the remaining counts would no longer be live and the parties would

lack a legally cognizable interest in the remaining claims presented in the Amended Complaint.

Already, LLC v. Nike, 133 S. Ct. 721, 726 (2013); Murphy v. Hunt, 455 U.S. 478, 481 (1982).

Even assuming for sake of discussion that certain claims, e.g., Plaintiff's Count III claims

concerning OSM's continued reliance on the 1996 Biological Opinion, are not deemed

jurisdictionally moot, the Court may nevertheless dismiss such claims without prejudice under the

doctrine of prudential mootness.   Chamber of Commerce v. Dep't of Energy, 627 F.2d 289, 291

(D.C. Cir. 1980).   In Chamber of Commerce, the plaintiffs challenged the Department of

Energy's ("DOE") decision to provide funds to a consumer organization so the organization could

pay the costs of intervention in a DOE proceeding, a decision that plaintiffs alleged was one

instance of a continuing practice of such funding to intervenors.   627 F.2d at 290-91.   The district

court dismissed the case as jurisdictionally moot, on the grounds that the challenged DOE

proceeding had ended.   Id. at 290.

On appeal, the circuit court upheld the case as moot, but as prudentially moot rather than

jurisdictionally moot.   In making this finding of prudential mootness, the D.C. Circuit noted that

the challenged funding of consumer intervenors by DOE was "under review and may never recur."

627 F.2d at 292.   Thus, the court concluded that "considerations of prudence and comity for

coordinate branches of government counsel the court to stay its hand, and to withhold relief it has

the power to grant."   Id. at 291.   Moreover, the court further observed that if the challenged

funding did recur, there would be "ample opportunity for [the plaintiffs] to renew their complaint."
Id. at 292.

Here, as in Chamber of Commerce, the Court should stay its hand and withhold further
action with respect to Plaintiffs' claims concerning the SBZ Rule and the 1996 Biological Opinion
in light of Federal Defendants' ongoing efforts to promulgate a new stream protection rule that will
be subject to ESA consultation before issuance.   E.g., Oregon Natural Res. Council v. Keys, No.
CV-02-3080-CO, 2004 WL 1048168 (D. Or. May 7, 2004) (magistrate recommendations),
adopted by the Court Oregon Natural Res. Council v. Keys, No. CV-02-3080-CO, 2004 WL
1490320 (D. Or. June 29, 2004) (dismissing, on grounds of prudential mootness, claims for alleged
violations of ESA Section 7, 16 U.S.C. § 1536, with respect to allegedly inadequate
implementation of an existing biological opinion, where underlying biological opinion was still in
effect but consultation was expected to be reinitiated shortly).   Following dismissal of any
remaining claims, Plaintiffs would be free to pursue site-specific challenges concerning the
OSM's application of the (reinstated) stream buffer zone rules and/or the 1996 Biological Opinion,
if necessary, subject to any applicable jurisdictional requirements, such as participating in the
applicable SMCRA administrative and judicial review procedures.   See, e.g., 30 C.F.R. Part 775
(procedures for administrative and judicial review); 30 U.S.C. § 1264(c) (procedures for
administrative review of decisions by regulatory authorities).

The Court also has discretion to dismiss any remaining claims in deference to the primary
jurisdiction of OSM and FWS.   The doctrine of primary jurisdiction was first recognized by the
Supreme Court in the case of Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426
(1907).   As the Supreme Court later explained, it is intended to "promot[e] proper relationships
between the courts and administrative agencies charged with particular regulatory duties."

United States v. W. Pac. Ry. Co., 352 U.S. 59, 63 (1956).   A district court may dismiss a suit "on the ground that [an agency] has primary jurisdiction [over it], i.e., that [the agency] is best suited to make the initial decision on the issues in dispute, even though the district court has subject matter jurisdiction."   Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc., 965 F.2d 1118, 1120 (D.C. Cir. 1992).   Here, it is unnecessary for the Court to retain jurisdiction following vacatur of the SBZ Rule, as OSM is actively working on the promulgation of a replacement regulation and has announced its intent to consult with FWS prior to finalizing such regulation.   E.g., Alaska Ctr. for the Env't v. West, 31 F. Supp. 2d 714, 724 (D. Alaska 1998) (declining to reach claims concerning alleged ESA violations and noting with approval that agency had voluntarily initiated consultation).   Federal Defendants respectfully request the Court to vacate the SBZ Rule, reinstate the prior, validly promulgated regulations, and remand this matter as proposed in the Pizarchik Declaration.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request the Court to grant summary judgment in favor of Plaintiff as to the pertinent portions of Count II of the Amended Complaint, ECF No. 6 at ¶¶ 56-62, in favor of Federal Defendant as to Counts IV and V of the Amended Complaint, ECF No. 6 at ¶¶ 69-78, and to dismiss the remaining claims as moot or otherwise subject to the primary jurisdiction of OSM and FWS.   As remedy for the admitted ESA violation, Federal Defendants respectfully request the Court to vacate the SBZ Rule, reinstate the prior stream buffer zone regulations, and remand this matter to OSM for further rulemaking proceedings, as proposed in the Pizarchik Declaration.

Respectfully submitted,

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division

/s/ Brian H. Lynk
Brian H. Lynk, D.C. Bar No. 459525
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C.   20026-3986
(202) 514-6187 (telephone)
(202) 514-8865 (facsimile)
brian.lynk@usdoj.gov

/s/ Ruth Ann Storey
Ruth Ann Storey
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington, D.C.   20044-0663
(202) 305-0493 (telephone)
(202) 514-8865 (facsimile)
ruth.ann.storey@usdoj.gov

DATED: July 17, 2013          By:      /s/ Mark Arthur Brown
                                        Mark Arthur Brown, D.C. Bar No. 470050
                                        United States Department of Justice
                                        Wildlife and Marine Resources Section
                                        P.O. Box 7369
                                        Washington, D.C. 20044-7369
                                        (202) 305-0204 (telephone)
                                        (202) 305-0275 (facsimile)
                                        mark.brown@usdoj.gov

                                        Attorneys for the United States

OF COUNSEL:

Emily D. Morris
Thomas Bovard
Division of Mineral Resources
Office of the Solicitor
U.S. Department of the Interior

Michael G. Lee
Office of General Counsel
U.S. Environmental Protection Agency