## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) |  |
| S.M.R. JEWELL, Secretary of the United States Department of Interior; JOSEPH G. PIZARCHIK, Director of the Office of Surface Mining Reclamation and Enforcement, and REGINA ("GINA") MCCARTHY, Administrator of the United States Environmental Protection Agency, | ) ) ) ) ) ) ) ) | No. 1:09-cv-00115-BJR |
| Defendants, | ) ) |  |
| and | ) ) |  |
| NATIONAL MINING ASSOCIATION, | ) ) |  |
| Intervenor-Defendant. | ) ) |  |

### INTERVENOR-DEFENDANT NATIONAL MINING ASSOCIATION'S
### MEMORANDUM IN RESPONSE TO FEDERAL DEFENDANTS'
### MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

GLOSSARY ........................................................................................................................vi

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................3

I.      The Development and Promulgation of the 2008 Rule ...............................................3

II.     Policy and Legal Developments After Promulgation of the 2008 Rule ..........................6

ARGUMENT .......................................................................................................................9

I.      The Proper Remedy For The Government's "Confessed Legal Error" Is
Remand Without Vacatur. .........................................................................................9

        A.    Because Vacatur Of The 2008 Stream Buffer Zone Rule Would
Allow OSM To Circumvent The APA's Notice And Comment
Requirements, This Court Should Remand The Rule Without
Vacatur For Further Rulemaking Proceedings. .................................10

        B.    Vacatur Of The 2008 Stream Buffer Zone Rule Is Not Warranted. ...................14

        C.    ESA Section 7(d) Further Demonstrates The Impropriety Of
Vacatur In This Case..................................................................15

II.     Alternatively, The Court Should Defer A Decision On The Merits Until
After The Parties Have Submitted Briefing On The Full Administrative
Record. ...................................................................................................................17

        A.    This Court Should Not Make A Determination On The Merits
Without An Administrative Record. ...............................................17

        B.    The Government Overlooks Evidence Directly Refuting Its
Claimed Legal Deficiencies In The 2008 Stream Buffer Zone Rule.................20

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Signal, Inc. v. NRC*,
    988 F.2d 146 (D.C. Cir. 1993) ......................................................................14, 15

*Am. Radio Relay League, Inc. v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008) ............................................................................18

*Bays' Legal Fund v. Browner*,
    828 F. Supp. 102 (D. Mass. 1993) ......................................................................16

*Bragg v. W. Va. Coal Ass'n*,
    248 F.3d 275 (4th Cir. 2001), *cert. denied*, 543 U.S. 1113 (2003)............................................4

*Carpenters Indus. Council v. Salazar*,
    734 F. Supp. 2d 126 (D.D.C. 2010) ........................................................2, 9, 10, 13

*Citibank, Fed. Sav. Bank v. FDIC*,
    836 F. Supp. 3 (D.D.C. 1993) ..............................................................................10

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)............................................................................................18

*Coal River Mountain Watch v. Jewell*,
    1:08-cv-2212-BJR (D.D.C.)..............................................................................6, 7

*Conservation Nw. v. Sherman*,
    715 F.3d 1181 (9th Cir. 2013) .....................................................................12, 13

*Consumer Energy Council of Am. v. FERC*,
    673 F.2d 425 (D.C. Cir. 1982) ......................................................................10, 11

*Douglas Timber Operators, Inc. v. Salazar*,
    774 F. Supp. 2d 245 (D.D.C. 2011) .....................................................................13

*Hawai'i Orchid Growers Ass'n v. USDA*,
    436 F. Supp. 2d 45 (D.D.C. 2006) .......................................................................17

*Kentuckians for the Commonwealth, Inc. v. Rivenburgh*,
    317 F.3d 425 (4th Cir. 2003) ...........................................................................3, 4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).............................................................................................12

*\* Chief authorities are designated with an asterisk.*

*Nat'l Parks Conservation Ass'n v. Salazar,
  660 F. Supp. 2d 3 (D.D.C. 2009) ................................................................. 1, 7, 11

*Nat'l Treasury Emps. Union v. Cornelius,
  617 F. Supp. 365 (D.D.C. 1985) ................................................................. 10, 11

Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs,
  No. 01-cv-273, 2005 WL 691775 (D.D.C. Mar. 23, 2005) ................................ 16

Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,
  556 F.3d 177 (4th Cir. 2009) ........................................................................... 4

Sugar Cane Growers Coop. of Fla. v. Veneman,
  289 F.3d 89 (D.C. Cir. 2002) ......................................................................... 14

Sw. Ctr. for Biological Diversity v. Babbitt,
  131 F. Supp. 2d 1 (D.D.C. 2001) ................................................................... 17

U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,
  513 U.S. 18 (1994) ....................................................................................... 14

*Walter O. Boswell Mem'l Hosp. v. Heckler,
  749 F.2d 788 (1984) ................................................................................ 18, 19

**STATUTES**

5 U.S.C. § 551(5) ............................................................................................ 10

*5 U.S.C. § 553 .......................................................................................... 10, 11

5 U.S.C. § 706 ................................................................................................ 18

16 U.S.C. § 1536 ....................................................................................... passim

16 U.S.C. § 1536(a)(2) .................................................................................... 16

16 U.S.C. §1536(b) ......................................................................................... 16

16 U.S.C. § 1536(d) .................................................................................... 15, 16

30 U.S.C. § 1276(b) ........................................................................................ 17

**OTHER AUTHORITIES**

42 Fed. Reg. 62,652 (Dec. 13, 1977) ................................................................. 3

48 Fed. Reg. 30,312 (June 30, 1983) ............................................................. 3, 23

51 Fed. Reg. 19,926 (June 3, 1986) ................................................................. 16

69 Fed. Reg. 1,036 (Jan. 7, 2004) ............................................................................4, 5

70 Fed. Reg. 35,112 (June 16, 2005) ...........................................................................4

72 Fed. Reg. 48,890 (Aug. 24, 2007) .......................................................................4, 5

73 Fed. Reg. 75,814 (Dec. 12, 2008) ............................................................... passim

74 Fed. Reg. 62,664 (Nov. 30, 2009) ...........................................................................7

75 Fed. Reg. 22,723 (Apr. 30, 2010) ...........................................................................8

75 Fed. Reg. 34,666 (June 18, 2010) ........................................................................1, 8

OSM, 2009 Annual Report, http://www.osmre.gov/reports/ annualreport/reports/2009.pdf .........5

**GLOSSARY**

| | |
|---|---|
| 1996 BiOp | U.S. Fish and Wildlife Service, Formal Section 7 Biological Opinion and Conference Report on Surface Coal Mining and Reclamation Operations Under the Surface Mining Control and Reclamation Act of 1977 (Sept. 24, 1996) (ECF No. 43-2) |
| 2008 Stream Buffer Zone Rule or 2008 Rule | "Excess Spoil, Coal Mine Waste, and Buffers for Perennial and Intermittent Streams," 73 Fed. Reg. 75,814 (Dec. 12, 2008) |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.* |
| EIS | Environmental Impact Statement, Excess Spoil Minimization – Stream Buffer Zones, OSM-EIS-34; Prepared by the U.S. Department of the Interior's Office of Surface Mining Reclamation and Enforcement (Sept. 2008) |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.* |
| FWS | U.S. Department of the Interior's Fish and Wildlife Service |
| Government | Defendants S.M.R. Jewell, Secretary of the U.S. Department of the Interior; Joseph G. Pizarchik, Director of the Office of Surface Mining Reclamation and Enforcement; and Regina "Gina" McCarthy, Administrator of the U.S. Environmental Protection Agency |
| Gov't MPSJ | Citation to Federal Defendants' Memorandum in Support of Motion for Partial Summary Judgment (filed on July 17, 2013) (ECF No. 43-1) |
| NMA | Intervenor-Defendant National Mining Association |
| NPCA | Plaintiff National Parks Conservation Association |
| OSM | U.S. Department of the Interior's Office of Surface Mining Reclamation and Enforcement |
| Pizarchik Declaration | Declaration of Joseph G. Pizarchik, Director of the Office of Surface Reclamation and Enforcement (July 17, 2013) (ECF No. 43-4) |
| SMCRA | Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201, *et seq.* |

## INTRODUCTION

Through its Motion for Partial Summary Judgment (ECF No. 43-1) the Government offers its latest attempt to repeal, without notice-and-comment rulemaking as required by law, its final rule entitled "Excess Spoil, Coal Mine Waste, and Buffers for Perennial and Intermittent Streams," 73 Fed. Reg. 75,814 (Dec. 12, 2008) (the "2008 Stream Buffer Zone Rule" or "2008 Rule"). The 2008 Stream Buffer Zone Rule is the product of a six-year rulemaking effort by the U.S. Department of the Interior, Office of Surface Mining Reclamation and Enforcement ("OSM"), which clarified and updated longstanding regulations that date back to the inception of the Surface Mining Control and Reclamation Act ("SMCRA") in 1977.

In early 2009, in the face of the present lawsuit and under new leadership, OSM reversed its position and asserted that the 2008 Stream Buffer Zone Rule is "legally defective." *See* ECF No. 43-1 (Gov't MPSJ) at 19; *see also* 75 Fed. Reg. 34,666, 34,667 (June 18, 2010) (OSM "decided to change the rule following the change in Administrations on January 20, 2009"). Specifically, former Secretary of the Interior Ken Salazar issued two public statements to that effect, but neither of those statements identified a specific legal deficiency. *See* ECF No. 10-1. Then, on April 27, 2009, the Government filed a motion in this case seeking voluntary remand and vacatur of the 2008 Rule, finally identifying OSM's own decision not to initiate consultation under Endangered Species Act ("ESA") Section 7, 16 U.S.C. § 1536, as the claimed legal error. *See* ECF No. 10, at 2. Despite that confession of error, this Court denied the Government's motion and refused to vacate the rule. *Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3 (D.D.C. 2009) (ECF No. 18). In so holding, Judge Kennedy emphasized that "granting vacatur here would allow the Federal defendants to do what they cannot do under the [Administrative Procedure Act], repeal a rule without public notice and comment, without judicial consideration of the merits." *Id.* at 5.

Rather than undertake notice-and-comment rulemaking to properly repeal the 2008 Rule during the nearly four years since the Court's decision, the Government now again confesses the same alleged legal error and again seeks vacatur of the Rule.  *See* ECF No. 43-1 (Gov't MPSJ) at 21-24, 32-34.  Only this time, the Government's request for vacatur takes the form of a "preliminary" motion for partial summary judgment, filed prior to the compilation and submission of the full administrative record.  Essentially, the Government expects the parties to litigate, and this Court to adjudicate, the merits of Plaintiff's Count II in the absence of a full administrative record so that OSM can erase the 2008 Rule from the Code of Federal Regulations without notice-and-comment rulemaking, contrary to the Court's earlier ruling.  Even though the Government purports to seek a ruling on the merits, its motion is in fact yet another attempt to circumvent the Administrative Procedure Act ("APA").

NMA urges the Court not to grant the Government's request for vacatur by ruling on an incomplete record.  Instead, if it accepts the Government's confessions of error, this Court should remand the 2008 Rule without vacatur.  Such a result "is the most equitable outcome, as it will preserve this Court's scarce judicial resources by allowing [OSM] to cure its own purported 'legal error,' and allow the agency to focus its efforts on issuing a revised [stream buffer zone regulation]" through proper notice-and-comment rulemaking.  *Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 137 (D.D.C. 2010).  Alternatively, if this Court is inclined to make a determination on the merits of the 2008 Stream Buffer Zone Rule, it should defer such a ruling until the parties have submitted briefing on the *full* administrative record.  It should not rule on the excerpts from the rulemaking docket that the Government has selectively quoted to try to substantiate OSM's claimed error.

# BACKGROUND

## I.      THE DEVELOPMENT AND PROMULGATION OF THE 2008 RULE

The 2008 Stream Buffer Zone Rule regulates stream buffer zones, stream-channel diversion, siltation structures, impoundments, excess spoil, and coal mine waste under SMCRA,[1] and was the fourth such rule promulgated by OSM.  *See* 73 Fed. Reg. at 75,816-17.  "SMCRA does not prohibit the discharge of surface coal mining excess spoil in waters of the United States" but rather "anticipates the possibility that excess spoil material could and would be placed in waters of the United Sates."  *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 442-43 (4th Cir. 2003).  As a result, and as the Government acknowledges, SMCRA does not require a buffer zone around streams to minimize erosion caused by mining activities.  *See* 73 Fed. Reg. at 75,816; ECF No. 43-1 (Gov't MPSJ) at 9.  Nevertheless, since 1977, OSM has provided for such a 100-foot buffer, with variances allowing for the disposal of excess spoil under certain circumstances.  *See* 42 Fed. Reg. 62,652 (Dec. 13, 1977).

Prior to the issuance of the challenged rule, the operative regulations governing stream buffer zones provided, *inter alia*, that mining disturbances within 100 feet of a perennial or intermittent stream must be specifically authorized by the regulatory authority upon certain findings.  *See* 48 Fed. Reg. 30,312 (June 30, 1983) ("1983 Rule").  In the late 1990s, litigation within the Fourth Circuit on the meaning and application of the 1983 Rule prompted OSM to conclude that the 1983 Rule needed to be clarified and updated because "[t]he issues and allegations raised . . . indicate that there remains considerable misunderstanding regarding the meaning of the [stream buffer zone] regulation . . . particularly as it applies to the placement of

---

[1] For a description of surface mining methods and the resulting fill material, *see* 73 Fed. Reg. at 75,823.

excess spoil fills within and near intermittent and perennial streams."[2]  69 Fed. Reg. 1,036, 1,038

(Jan. 7, 2004) (discussing *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001), *cert.*

*denied*, 543 U.S. 1113 (2003)).

Accordingly, in 2003, OSM began considering ways to clarify and update its 1983 Rule

regarding stream buffer zones and disposal of excess spoil.  *See* 69 Fed. Reg. at 1,038-40.  To

that end, OSM published proposed revisions to the 1983 Rule in 2004.  *Id.*; *see also* 73 Fed. Reg.

at 75,817-18; ECF No. 43-1 (Gov't MPSJ) at 10-11.  OSM announced its intent to prepare an

Environmental Impact Statement ("EIS") analyzing the potential impacts of the revised rule in

2005, and it published an amended proposed rule informed by the EIS in 2007.  *See* 72 Fed. Reg.

48,890 (Aug. 24, 2007); 70 Fed. Reg. 35,112 (June 16, 2005).  OSM published the final rule on

December 12, 2008.  73 Fed. Reg. 75,814.

The 2008 Rule was intended "to minimize disputes and misunderstandings associated

with application of the 1983 [R]ule.  73 Fed. Reg. at 75,818.  It "distinguishe[d] between those

situations in which maintenance of an undisturbed buffer between mining and reclamation

activities and a perennial or intermittent stream constitutes the best technology currently

available to implement the underlying statutory provisions . . . and those situations in which

maintenance of a buffer is neither feasible nor appropriate."  *Id.*  The 2008 Rule revised and

clarified the 1983 Rule by, *inter alia*, retaining the 100-foot buffer of land within 100 feet of a

perennial or intermittent stream, requiring the minimization of excess fill material from surface

mining, and tailoring the findings that the regulatory authority must make before granting

---

[2] Those misunderstandings had their origin in the federal district courts, but the U.S. Court of
Appeals for the Fourth Circuit ultimately clarified that Congress did indeed contemplate the
disposal of excess spoil and the creation of valley fills in SMCRA.  *See Ohio Valley Envtl. Coal.
v. Aracoma Coal Co.*, 556 F.3d 177, 195 (4th Cir. 2009); *Kentuckians for the Commonwealth*,
317 F.3d at 443; *see also Bragg*, 248 F.3d at 296.

authorization to conduct mining activities within the buffer zone to better reflect SMCRA's requirements.  *Id.* at 75,818, 75,875-82.  The 2008 Rule was "[t]he product of nearly five years of intense work," including more than 43,000 public comments, four public hearings, and detailed environmental analysis which OSM submitted for public comment and in which "[a]gency officials . . . after careful consideration, . . . chose the most environmentally protective alternative for the final rule."  OSM, 2009 Annual Report at 10, *available at* http://www.osmre.gov/reports/ annualreport/reports/2009.pdf; *see also* 73 Fed. Reg. at 75,818; 72 Fed. Reg. 48,890; 69 Fed. Reg. 1,036.

As described further below, OSM determined in the Final EIS accompanying the 2008 Rule that consultation with the U.S. Fish and Wildlife Service ("FWS") under Section 7 of the ESA was not necessary.  OSM observed that numerous regulations implementing SMCRA contain provisions to protect threatened and endangered species and their critical habitat.  *See* ECF No. 43-3 (Gov't MPSJ, Ex. 2, EIS, Book One) at IV-160 to 163.  Those regulations were the subject of previous consultations between FWS and OSM that culminated in FWS's issuance of a Formal Section 7 Biological Opinion and Conference Report on Surface Coal Mining and Reclamation Operations Under the Surface Mining Control and Reclamation Act of 1977 (Sept. 24, 1996) ("1996 BiOp").  In that BiOp, which OSM does not repudiate,[3] "[t]he Service . . . concluded that the [approval and conduct of surface coal mining and reclamation operations under State and Federal regulatory programs adopted pursuant to SMCRA] is not likely to jeopardize the continued existence of any threatened, endangered, or proposed species or result in adverse modification of designated or proposed critical habitats."  ECF No. 43-2 (Gov't

---

[3] To the contrary, the Government defends the BiOp against NPCA's attacks in this case.  *See* ECF No. 43-2 (Gov't MPSJ) at 25-32.

MPSJ, Ex. 1) at 1, 3; *see also* ECF No. 43-3 (Gov't MPSJ, Ex. 2, EIS, Book One) at IV-160 to

163.  In light of that earlier conclusion, OSM determined that the 2008 Rule, which did not

change any of the existing regulatory provisions that protect threatened or endangered species,

would have no effect on such species.  In particular, OSM determined that the 2008 Stream

Buffer Zone Rule was a

> narrow change to the comprehensive Federal regulatory program
> under SMCRA.  This action would not determine whether surface
> coal mining and reclamation operations in existence can continue
> or whether future operations would be approved.  Rather, the EIS
> evaluates the environmental effects of revising several specific
> regulations to establish permit application requirements and review
> procedures for applications . . . .

*Id.* at IV-162.

The 2008 Stream Buffer Zone Rule took effect on January 12, 2009.  73 Fed. Reg. at

75,814.

## II.    POLICY AND LEGAL DEVELOPMENTS AFTER PROMULGATION OF THE 2008 RULE

Almost immediately after promulgation of the 2008 Rule, Plaintiff National Parks

Conservation Association ("NPCA") filed this suit against the Secretary of the Interior, the

Director of OSM, and the Administrator of the U.S. Environmental Protection Agency ("EPA")

alleging, *inter alia*, that OSM had violated the ESA by not initiating formal consultation on the

2008 Stream Buffer Zone Rule.[4]

Shortly after the transition to the new Administration, the new leadership at the Interior

Department proclaimed the 2008 Stream Buffer Zone legally deficient.  On April 27, 2009, then

Secretary of the Interior Ken Salazar issued two press releases denouncing the 2008 Stream

_____

[4] Other environmental groups sued separately, challenging the rule on different grounds in the
related case *Coal River Mountain Watch v. Jewell*, 1:08-cv-2212-BJR (D.D.C.).

Buffer Zone Rule as an "11th hour rule" despite the tremendous agency resources that had been dedicated to the rulemaking process over the preceding *six-year period*.  *See* ECF No. 10-1, at 3-4 (Department of Interior, Secretary Salazar, Remarks on Mountaintop Mining Rule (Apr. 27, 2009)); *see also id.* at 1 (Dep't of Interior, News Release (Apr. 27, 2009)).  The Government then moved to vacate and remand the rule and to dismiss the Amended Complaint, and its only basis for requesting vacatur – then as now – was that OSM allegedly erred by failing to initiate ESA consultation.[5]  ECF Nos. 10, 12.

This Court declined to endorse the Government's attempt to circumvent the APA through judicial vacatur.  Judge Kennedy denied the requested vacatur because, despite Secretary Salazar's confession of error, there had been no APA process for repealing the Rule and no judicial determination on the merits that the 2008 Stream Buffer Zone Rule was legally deficient, and because all parties to the case did not agree that the rule should be vacated.  *Nat'l Parks Conservation Ass'n*, 660 F. Supp. 2d at 4.  The Court concluded that "granting vacatur here would allow the Federal defendants to do what they cannot do under the APA, repeal a rule without public notice and comment, without judicial consideration of the merits."  *Id.* at 5.

OSM did not to follow the Court's guidance on repealing the Rule and reinstating the predecessor Rule.  Rather, OSM chose to leave the 2008 Rule in place and commence a new rulemaking.  OSM published an Advance Notice of Proposed Rulemaking ("ANPR") and a notice of intent to prepare a supplemental EIS to consider replacing and revising the 2008 Stream Buffer Zone Rule.  74 Fed. Reg. 62,664 (Nov. 30, 2009).  Thereafter, the Government and

---

[5] OSM's motion to dismiss the related case as moot rested in part on former Secretary Salazar's statement that if the Court were to vacate the rule, OSM planned to issue guidance to states regarding the application of the 1983 Rule and to gather public comment on how to update and improve the "Reagan-era rule."  *See Coal River*, ECF No. 11-1, at 4.

NPCA reached a settlement agreement (following negotiations from which Intervenor-Defendant NMA was excluded) that set timetables for a proposed and final rule.  NPCA and the Government agreed to stay this litigation unless and until OSM failed to meet those deadlines (February 28, 2011, and June 29, 2012, respectively).  *See* ECF No. 29.  The Court then stayed this case.

OSM initiated the rulemaking process, issuing a notice of intent to prepare an EIS, followed by a second notice of intent that expanded the scoping opportunities for comment.  75 Fed. Reg. at 34,667; 75 Fed. Reg. 22,723 (Apr. 30, 2010).  But over three years has passed since OSM announced its intention to replace or revise the 2008 Rule, and OSM still has not issued a proposed rule, despite having spent approximately $8.6 million on that rulemaking as of April 2, 2013, including $6 million on a draft EIS.  *See* Letter from Joseph G. Pizarchik to Chairman Doc Hastings (Apr. 2, 2013), attached hereto as Ex. 1.  And, importantly, OSM has not undertaken any process under the APA to repeal the 2008 Rule and reinstate its predecessor, or to initiate the ESA consultation it claims was lacking.  The new proposed rule is not expected to be published until sometime in 2014.  *Id.*

Based on OSM's failure to meet the rulemaking deadlines in the settlement agreement, NPCA moved to lift the stay in this case on February 25, 2013.  The Court granted that motion on March 19, 2013, and placed this case back on the Court's active docket.

The Government filed an Answer on May 20, 2013, in which it again asserted that OSM erred in not initiating consultation with the FWS.[6]  ECF No. 40 (Answer) ¶¶ 6-7, 9, 10, 59, 61-62).  The Government has now filed a partial motion for summary judgment, styled as a

---

[6] Although OSM admitted the validity of the ESA consultation claim, the Federal Defendants denied all of the other allegations in the Complaint.

"preliminary" motion filed prior to making the administrative record available to the Court and the parties, *see* ECF No. 43-1 (Gov't MPSJ), asking the Court once again to vacate the rule based on its "confessed error" as to Plaintiff's ESA failure-to-consult claim (Count II).  NMA hereby opposes that request for vacatur.

<u>**ARGUMENT**</u>

Given the Government's insistence that the 2008 Stream Buffer Zone Rule is legally deficient, its asserted intent to promulgate a replacement rule in the future, and its ongoing refusal not to initiate APA proceedings to repeal the 2008 Rule and reinstate the 2003 Rule, this Court should follow the holding in *Carpenters Industrial Council* and remand the 2008 Rule without vacatur.  *See* 734 F. Supp. 2d at 133-37.  Such an outcome is in the interest of judicial economy and would ensure that if OSM chooses to repeal the 2008 Rule, it does so through notice-and-comment rulemaking, *not* by the expedient of confessing error and obtaining a premature ruling on the merits in the absence of an administrative record.  Alternatively, if this Court determines that an adjudication of the merits of the 2008 Stream Buffer Zone Rule is appropriate, it should defer such a ruling until after the parties have had a chance to submit briefing on the *complete* administrative record that was before OSM at the time it promulgated the rule, as well as any necessary supplementation to document OSM's change of position.[7]

I.      **THE PROPER REMEDY FOR THE GOVERNMENT'S "CONFESSED LEGAL ERROR" IS REMAND WITHOUT VACATUR.**

The Government's latest attempt to persuade this Court to vacate the 2008 Rule on the basis of cherry-picked documents from the rulemaking docket and a self-serving "extra-record"

---

[7] NMA agrees with the Government that NPCA lacks standing to present a facial challenge to the 1996 BiOp and that any such challenge would be untimely.  *See* ECF No. 43-1 (Gov't MPSJ) at 25-32.

declaration once again amounts to an end-run around the APA's notice-and-comment

requirements.  Vacatur based on the alleged ESA defect is *not* an appropriate remedy here –

particularly given OSM's refusal for over four years to initiate proceedings to repeal the 2008

Rule or to initiate consultation on the Rule, and its failure to explain its inaction.[8]  Rather, if this

Court accepts the Government's confessions of error, the Court should follow the roadmap set

forth in *Carpenters Industrial Council* and remand the 2008 Rule without vacatur to "preserve

this Court's scarce judicial resources by allowing [OSM] to cure its own purported 'legal error,'

and allow the agency to focus its efforts on issuing a revised [rule]."  734 F. Supp. 2d at 137.

Such a remedy is also more in proportion with the limited error the Government now professes.

> **A.      Because Vacatur Of The 2008 Stream Buffer Zone Rule Would Allow OSM
> To Circumvent The APA's Notice And Comment Requirements, This Court
> Should Remand The Rule Without Vacatur For Further Rulemaking
> Proceedings.**

Under the APA, "rule making" is defined to include the "agency process for . . . repealing

a rule."  5 U.S.C. § 551(5).  Thus, if OSM wishes to repeal a rule, it must comply with the APA's

notice and comment requirements.  *See id.* § 553.  Nothing has prevented OSM from doing so.

Courts in this Circuit have repeatedly held that a duly promulgated rule cannot be repealed

without notice and comment merely because the agency that promulgated the rule later confesses

legal error.  *See, e.g.*, *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C.

Cir. 1982); *Carpenters Indus. Council*, 734 F. Supp. 2d at 135-36; *Citibank, Fed. Sav. Bank v.

FDIC*, 836 F. Supp. 3, 7 (D.D.C. 1993); *Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp.

365, 371-72 (D.D.C. 1985).  Indeed, this Court reached such a holding at the outset of this

---

[8] Contrary to the Government's argument (ECF No. 43-1 (Gov't MPSJ) at 34), leaving the 2008
Rule in place and requiring OSM to undertake APA rulemaking proceedings to *repeal* the 2008
Rule would not necessitate consultation on that Rule.  Properly repealing the Rule would
eliminate any need to consult on it.

litigation when it rejected the Government's first request for vacatur.  *See Nat'l Parks Conservation Ass'n*, 660 F. Supp. 2d at 4-5.

Importantly, the D.C. Circuit has recognized that the APA's notice and comment requirements must apply even to repeals of "defectively promulgated regulations" because to allow otherwise "would permit an agency to circumvent the requirements of [APA] § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."  *Consumer Energy Council*, 673 F.2d at 447 n.79.  And this Court has similarly proclaimed that "[i]t would significantly erode the usefulness of the APA if agencies were permitted unilaterally to repeal regulations dealing with the substantive rights of individuals under federal statutes, by declaring that the earlier regulations were just a mistake."  *Nat'l Treasury Emps. Union*, 617 F. Supp. at 371.

In light of these basic principles of administrative law, vacatur of the 2008 Rule is not appropriate here, where OSM has had well over four years since it initially confessed error to repeal the rule in accordance with the APA's requirements.  "[T]he question whether the regulations are indeed defective *is* one worthy of notice and an opportunity to comment."  *Consumer Energy*, 673 F.2d at 447 n.79 (emphasis added).  Moreover, repeal through notice-and-comment rulemaking would "ensure that all relevant matters are considered by the agency repealing its regulation and provide a reviewing court with a full record."  *Nat'l Treasury Emps. Union*, 617 F. Supp. at 371.  OSM's insistence upon vacatur to compensate for its long-running refusal "to provide notice and an opportunity to comment [on the repeal of the 2008 Stream Buffer Zone Rule] is not justified by any urgency and there is no indication that the agency would have suffered any harm by complying with the requirements of [APA] § 553."  *Id.* at 372.

11

Nor can OSM escape the requirement that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

Indeed, OSM "run[s] afoul of statutory rulemaking procedures" by agreeing with Plaintiff that the agency erred in failing to consult with the FWS and asking the Court to vacate "an agency rule that would have otherwise been subject to statutory rulemaking procedures." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013).  As the Ninth Circuit recently held in analogous circumstances in *Conservation Northwest v. Sherman*, a district court abuses its discretion when it enters a sue-and-settle consent decree between government agencies and plaintiff groups that "permanently and substantially amend[s] an agency rule," which could not otherwise occur without public notice and comment.  *Id.*  In that case, several federal agencies and a coalition of environmental groups entered into a consent decree that contained substantial changes to the Northwest Forest Plan's Survey and Manage program, including new exemptions and management requirements.  *Id.* at 1184-85.  But because those changes were potentially permanent, and were substantial enough to qualify as amendments of an existing rule, they were subject to public participation rules under the governing statutes that could not be circumvented by a consent decree.  *Id.* at 1187-88.  As in *Conservation Northwest*, vacating the 2008 Stream Buffer Zone Rule by reason of the Government's agreement with the Plaintiff would allow OSM to effectively repeal the rule and to substantially and permanently "set[] the rules" for stream buffer zones (that is, by reverting to the 1983 Rule that OSM previously determined was outdated and misunderstood), all without notice and comment.[9]  *Id.* at 1188.

_____

[9] OSM could well let the 1983 Rule stand indefinitely after vacatur, particularly in light of the lengthy delay in OSM's projected formulation of a proposed new stream buffer zone rule—a

(continued…)

Given the circumstances, OSM cannot expect to eradicate the rule from the books merely by confessing error and requesting judicial vacatur.

In sum, the Government "need not resort to judicial proceedings to amend a mistake." *Douglas Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 258 (D.D.C. 2011). Rather, if OSM wanted to nullify the 2008 Rule, the agency could have, and should have, initiated APA proceedings to repeal it at some point during the last four years "by following procedures that require public participation." *Id.* Or, if it wanted to cure the alleged ESA defect, it could have and should have initiated consultation on the rule. Its failure to do either ought to cut off any right to have this Court vacate the *entire* rule based on the alleged error. This Court should instead follow *Carpenters Industrial Council* and remand the 2008 Stream Buffer Zone Rule to OSM without vacatur. *See* 734 F. Supp. 2d at 136-37. This result would avoid rewarding OSM for its longstanding decision not to commence APA proceedings to repeal the Rule or to undergo ESA consultation on that Rule and for its equally longrunning delay in commencing any new rulemaking or initiating ESA consultation. Like in *Carpenters Industrial Council*, by allowing OSM to focus on properly repealing the 2008 Rule and/or promulgating a revised rule, the Court may avoid considering the merits of Plaintiff's claims,[10] thereby "preserv[ing] this Court's scarce judicial resources." *Id.* at 137.

_____

(continued…)

result that OSM cannot achieve without complying with the APA. *See Conservation Nw.*, 715 F.3d at 1186-88.

[10] This Court should also decline to "decide the issue on the papers already before it." *Id.* at 136 n.10. Contrary to the Government's contentions, whether OSM has properly confessed error requires consideration of the full administrative record that has not yet been made available to the Court and all parties, not just portions the Government chose to disclose in support of its preliminary motion.

**B.      Vacatur Of The 2008 Stream Buffer Zone Rule Is Not Warranted.**

Vacatur is an "extraordinary remedy."  *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
513 U.S. 18, 26 (1994).  Upon making a judicial determination that a regulation is unlawful, a
court has discretion either to vacate the regulation or remand it to the agency without vacatur.
*See Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (collecting
cases and rejecting argument that the court lacked discretion and was required to vacate a
procedurally deficient agency action because "that is simply not the law").  The Government
nevertheless insists that vacatur is the appropriate outcome in this case, citing the two-part test in
*Allied Signal, Inc. v. NRC*: (i) "'the seriousness of the order's deficiencies (and thus the extent of
doubt whether the agency chose correctly'"); and, (ii) "'the disruptive consequences of an
interim change that may itself be changed.'"  988 F.2d 146, 151 (D.C. Cir. 1993) (citation
omitted); *see also* ECF No. 43-1 (Gov't MPSJ) at 32-34.  An examination of those factors
compels the conclusion that vacatur is not warranted here.

The *Allied Signal* test applies only *after* a court has adjudicated the merits, taking into
account the full administrative record, which the Government has yet to file in this case.  *See*
Section II *infra*.  The Government's attempt (MPSJ at 34) to evade Judge Kennedy's 2009
decision and the cases discussed above concerning proper repeals of agency rules is not
persuasive.  The Government claims that "the circumstances are different now" because "OSM
has admitted and fully explained the procedural defect with the promulgation of the SBZ rule,"
(*id.*) yet those circumstances were present too when Judge Kennedy ruled, *see* ECF No. 10, at 2
(admitting and explaining alleged defect).  Moreover, Judge Kennedy's denial of vacatur did not
rest on the absence of a fuller explanation of the alleged defect, but on the Government's *failure
to comply with the APA's notice-and-comment requirements*.  ECF No. 18, at 4.  The
Government's self-serving declaration by Director Pizarchik—whatever its level of detail—does

14

not cure the agency's undisputed failure to subject the wholesale withdrawal of the 2008 Rule to public scrutiny, as Judge Kennedy correctly concluded the APA requires.

Similarly, as we elaborate in Section II below, the Government's resort now to a "preliminary" motion also lacks the transparency needed for informed argument and decisionmaking. The Government cannot fairly expect this Court to make any determinations regarding "the seriousness of the [2008 Rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly)," without first reviewing the merits of Count II following briefing by the parties on the full administrative record. *See Allied Signal*, 988 F.2d at 150-51. That OSM has confessed error, selectively cited to passages it alone has culled from the rulemaking docket, and submitted the made-for-litigation Pizarchik Declaration, (ECF No. 43-4), does not negate the need for this Court to evaluate the "seriousness" of the deficiencies, taking into account the whole record. *See* ECF No. 43-1 (Gov't MPSJ) at 21-24. In short, this Court cannot even apply the *Allied Signal* test at this stage in the litigation.[11]

### C.    ESA Section 7(d) Further Demonstrates The Impropriety Of Vacatur In This Case.

ESA Section 7(d), which provides a measure of Congress's intent on when and how an agency may act pending ESA consultation, confirms that vacatur is not warranted in this case. *See* 16 U.S.C. § 1536(d). That section describes which agency actions may and may not proceed once formal ESA consultation has commenced. It provides that

> [a]fter initiation of consultation . . . the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the

---

[11] Not only is it impossible for this Court to evaluate the first factor under *Allied Signal* without the administrative record, the second factor weighs against vacatur in any event because "the consequences of vacating [the 2008 Stream Buffer Zone Rule] may be quite disruptive." *See* 988 F.2d at 151.

formulation or implementation of any reasonable and prudent alternative measures which would not violate [ESA Section 7(a)(2)].

*Id.*

Section 7(d) undercuts the Government's insistence that vacatur of the 2008 Rule is a necessary or appropriate remedy for the alleged ESA error it has confessed.  Nowhere does the Government explain why leaving the rule in place pending remand will have *any* effect on ESA-listed species, much less foreclose "the formulation or implementation of any reasonable and prudent alternative measures" if (1) OSM were to engage in formal consultation; and, (2) that consultation were to result in a determination that the rule jeopardized an ESA-listed species.  Indeed, at this point, the Government does not even know whether it thinks *formal* consultation, which is the predicate for the limited Section 7(d) constraint,[12] or instead *informal* consultation, is needed.  *See* ECF No. 43-1 (Gov't MPSJ) at 24.  But even if formal consultation had commenced and the limitation in Section 7(d) were to apply at this time, nothing in the ESA compels vacatur of the rule so long as it does not cross the Section 7(d) threshold.  OSM has not demonstrated why leaving the 2008 Rule in place pending future consultation, *as OSM has chosen to do*, would cross this threshold, or any threshold for that matter, in terms of foreclosing ESA remedies should the agency find that there is a "reasonable likelihood . . . [of] jeopardiz[ing] the continued existence of an endangered or threatened species or result[ing] in the destruction or adverse modification of habitat of such species."  *Nat'l Wilderness Inst. v. U.S.*

---

[12] Since the consultation procedure described in ESA § 7(a)(2) and (b) ends with a biological opinion, and biological opinions are issued only in formal consultation, ESA § 7(d) applies only during the formal consultation period.  *See Bays' Legal Fund v. Browner*, 828 F. Supp. 102, 112 & n.23 (D. Mass. 1993); 51 Fed. Reg. 19,926, 19,940-41 (June 3, 1986) (only "'[f]ormal consultation' is required under section 7(a)(2)").

*Army Corps of Eng'rs*, No. 01-cv-273, 2005 WL 691775, at *16 (D.D.C. Mar. 23, 2005)

(internal quotation marks omitted).  Vacatur is thus inappropriate on these grounds as well.

## II.   ALTERNATIVELY, THE COURT SHOULD DEFER A DECISION ON THE MERITS UNTIL AFTER THE PARTIES HAVE SUBMITTED BRIEFING ON THE FULL ADMINISTRATIVE RECORD.

Should this Court decline to remand the 2008 Stream Buffer Zone Rule to OSM without

vacatur, it should nevertheless defer its adjudication on the merits of Plaintiff's Count II—

including, whether OSM has properly confessed error—until after the parties have submitted

briefing based on the complete, certified administrative record.

### A.   This Court Should Not Make A Determination On The Merits Without An Administrative Record.

It is beyond dispute that "[t]he Court must review the agency's action based on the

administrative record before the court."  *Hawai'i Orchid Growers Ass'n v. USDA*, 436 F. Supp.

2d 45, 49 (D.D.C. 2006).  Indeed, this Court has previously concluded that "courts restrict

review in ESA citizen suits to the administrative record and this is unquestionably the law of this

Circuit."  *Sw. Ctr. for Biological Diversity v. Babbitt*, 131 F. Supp. 1, 5 (D.D.C. 2001)

(collecting cases).  Similarly, SMCRA's judicial review provision prescribes review "solely on

the record made before the Secretary" and clarifies that "the findings of the Secretary if

supported by substantial evidence *on the record considered as a whole*, shall be conclusive."  30

U.S.C. § 1276(b) (emphasis added).  Finally, this Court's rules presuppose that dispositive

motions in cases like this involving judicial review of administrative actions cannot be ruled

upon without an administrative record.  *See* LCvR 7(n) ("[C]ounsel shall provide the Court with

an appendix containing copies of those portions of the administrative record that are cited or

otherwise relied upon in any memorandum in support of or in opposition to any dispositive

motion.");  *see also* Comment to LCvR 7(n) (explaining that the rule is "intended to assist the

Court in cases involving a voluminous record (*e.g.*, environmental impact statements) by providing the Court with copies of relevant portions of the record relied upon in any dispositive motion" but cautioning that *"[t]he rule does not relieve any party from any obligation to file **the complete record** with the Clerk of Court*" (emphasis added)).

Not only is this Court's review confined to the administrative record, it must be on the *complete* record. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[R]eview is to be based on the *full* administrative record that was before the Secretary at the time he made his decision." (emphasis added)); *accord Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 243 (D.C. Cir. 2008) (Tatel, J., concurring).  The D.C. Circuit emphasized the importance of the "whole record" requirement in *Walter O. Boswell Mem'l Hosp. v. Heckler*: "review[ing] less than the full administrative record might allow a party to withhold evidence unfavorable to its case, and so the APA requires review of 'the whole record.'"  749 F.2d 788, 792 (1984) (quoting 5 U.S.C. § 706).

Here, the Government seeks partial summary judgment and vacatur of the 2008 Stream Buffer Zone Rule even though it has not yet compiled *any* administrative record for this Court's or the other parties' review, let alone the complete record.  In accord with the case law just cited, a ruling on the merits of Plaintiffs' Count II must be deferred.  Otherwise, the Government could withhold evidence unfavorable to its position and to paint a one-sided picture on the issue of "confessed error."

Predictably, the Government disclaims the need for a complete administrative record, arguing that "the issue presented is a legal one informed by a very limited number of administrative record materials that are publicly-available agency documents and are cited herein."  ECF No. 43-1 (Gov't MPSJ) at 21.  But, as the D.C. Circuit has cautioned, resolution of

a motion for summary judgment in this manner "might allow [OSM] to withhold evidence unfavorable to its case." *Walter O. Boswell*, 749 F.2d at 792. In that case, the Court observed that "[s]ome of the documents of which the plaintiffs were apparently unaware [we]re quite critical of the . . . study that the [agency] cite[d] as a basis for the [final rule]." *Id.* at 793. To avoid a similar scenario in this case, the Court must defer a ruling on the merits, and should not accept at face value the Government's assertion that the only relevant materials are appended to its motion. Rather, the Court "should have before it neither more nor less information than did the agency when it made its decision." *Id.* at 792.

The Government also offers the Pizarchik Declaration, "not as a supplement to the administrative record, but as extra-record evidence concerning post-rulemaking decisions and agency actions that are relevant to this Court's consideration of the remedy to impose for the conceded legal error." ECF No. 43-1 (Gov't MPSJ) at 21. The Government's suggestion that it only offers that declaration on the remedy issue is demonstrably false. That declaration explains why OSM believes the 2008 Stream Buffer Zone Rule is legally deficient, and the Government cites to it to try to bolster its case on the merits, not merely to aid this Court in fashioning a remedy. *See, e.g.*, *id.* at 23 (citing Pizarchik Declaration ¶ 15); *id.* at 24 (citing Pizarchik Declaration ¶¶ 4-5, 10).[13] But the Government has not provided any explanation why this Circuit's precedents allow for consideration of the Pizarchik Declaration as *extra-record* evidence during adjudication of the merits *and before submittal of the administrative record*. Moreover, it would be particularly inequitable to allow the Government to rely on that declaration when the other parties have not yet had an opportunity to review the full

---

[13] Paragraph 10 of the Pizarchik Declaration states that the Secretary of the Interior found that OSM erred in determining that it need not initiate ESA Section 7 consultation "for the reasons set out in Paragraphs 11 to 16 below." *See* ECF No. 43-4.

administrative record, including material bearing on the agency's about-face on the need for ESA

consultation, to uncover any evidence that may discredit or contradict Director Pizarchik's

statements.

In short, there is nothing in the Government's motion that supports departing from the

bedrock administrative law principle that requires judicial review based on a complete record.

The Court should reject the Government's attempt to short circuit the resolution of this case.

**B.      The Government Overlooks Evidence Directly Refuting Its Claimed Legal Deficiencies In The 2008 Stream Buffer Zone Rule.**

The Government intimates that the merits of Plaintiff's ESA failure-to-consult claim are

not even close now that it has confessed error, yet that posture is undercut by the agency's own

original determination that, consistent with the 1996 BiOp and wildlife protections already in

place in OSM's regulations, no further consultation was necessary.  The Government rationalizes

this turnabout by quoting selectively from a few documents within OSM's rulemaking docket

and by relying on post-decisional press releases and the Pizarchik Declaration.  That the very few

materials the Government cites themselves refute whether OSM violated the ESA only confirms

the need for the Court to defer a ruling on the merits until after the parties can submit briefing on

the full administrative record.[14]

_____

[14] The Government cited materials from the rulemaking docket that purportedly "contradict" OSM's determination that the 2008 Rule would have "no effect" on threatened or endangered species.  *See* ECF No. 43-1 (Gov't MPSJ) at 17.  Those citations either do not concern threatened or endangered species but rather other environmental impacts (e.g., on streams), come from a draft decision document (the DEIS), or are taken out of context and, in fact, support OSM's "no effect" determination.   For example, the Government quotes OSM's EIS (at IV-192) as stating that "coal mining has the potential to adversely affect threatened and endangered species and their habitat."  ECF No. 43-1 (Gov't MPSJ) at 17.  But the Government's brief omits the next sentence in the EIS, which states:  "*However*, the State and Federal SMCRA programs contain numerous statutory and regulatory requirements to ensure that these impacts don't occur."  ECF No. 43-3 (Gov't MPSJ, Ex. 2, EIS, Book One) at IV-192 (emphasis added).

Specifically, in the EIS that accompanied the 2008 Stream Buffer Zone Rule, OSM determined that further consultation with FWS under ESA Section 7 was unnecessary in light of existing SMCRA regulations that protect threatened and endangered species and their critical habitat and the 1996 BiOp that evaluated those regulations. *See* ECF No. 43-3 (Gov't MPSJ, Ex. 2, EIS, Book One) at IV-160 to 163. Even now, the Government goes to lengths to defend that BiOp against challenge by NPCA in this case. *See* ECF No. 43-1 (Gov't MPSJ) at 12-15, 25-34.

The Government's defense of the 1996 BiOp is well taken and makes its present "confession of error" all the more puzzling. In the 1996 BiOp, FWS recognized that SMCRA and the federal implementing regulations "set forth programmatic standards and procedures designed to minimize mining-related impacts on fish and wildlife in general and threatened and endangered species in particular," including the following provisions in Title 30 of the Code of Federal Regulations, which provide for species protections in connection with particular permits:

- Section 722.12 permit requirements for exploration removing more than 250 tons of coal or occurring on lands designed unsuitable for surface coal mining operations, including describing any endangered or threatened species identified with the proposed exploration area and a written finding by the regulatory authority that such activities would not jeopardize the continued existence of an endangered or threatened species or result in habitat destruction or modification;

- Section 815.5 performance standards for coal exploration prohibiting disturbance of habitats of unique or unusually high value for fish, wildlife, and other related environmental values and critical habitats of threatened or endangered species;

- Section 773.5 regulatory coordination requiring that each regulatory program provide for the coordination of review and issuance of permits with the ESA, the Fish and Wildlife Coordination Act, the Migratory Bird Treaty Act, and the Bald Eagle Protection Act;

- Sections 780.16 and 784.21 fish and wildlife information requiring that each permit include fish and wildlife resource information for the permit and adjacent area, including site-specific information when that area is likely to include listed or proposed endangered or threatened species, the scope of which will be determined by the regulatory authority in

consultation with relevant state and federal fish and wildlife agencies, describing how the operator will minimize disturbances and adverse impacts, and requiring the regulatory authority to provide information to the FWS as requested;

- Sections 773.6, 774.13, and 774.15 requiring the regulatory authority to provide written notification to state and federal fish and wildlife agencies whenever the authority receives an application for a new permit, significant revisions of a permit, or permit renewal; and

- Sections 816.97 and 817.97 protection of fish, wildlife, and related environmental values requiring the operator to minimize disturbance of and adverse impacts on fish, wildlife, and related environmental values, prohibiting the taking of an endangered or threatened species and any mining activity which is likely to jeopardize such species, requiring notification and consultation when protected species are present within the permit area, and requiring that the operator avoid disturbances to, enhance where practicable, and restore habitats of unusually high value for fish and wildlife.

ECF No. 43-3 (Gov't MPSJ, Ex. 2, EIS, Book One) at IV-160 to 162.

OSM also determined that the 2008 Stream Buffer Zone Rule was a

narrow change to the comprehensive Federal regulatory program under SMCRA. This action would not determine whether surface coal mining and reclamation operations in existence can continue or whether future operations would be approved. Rather, the EIS evaluates the environmental effects of revising several specific regulations to establish permit application requirements and review procedures for applications . . . .

*Id.* at IV-162; *see also id.* at III-94 to 96 (describing regulatory protections). As OSM explained

at the time and does not dispute now, all of those protections remain in place and are unaffected

by the 2008 Stream Buffer Zone Rule. *Id.* at IV-170; *see also id.* at IV-192 (recognizing that,

although coal mining has the potential to adversely affect threatened and endangered species,

state and federal SMCRA programs contain numerous statutory and regulatory requirements to

ensure such impacts do not occur).

Importantly, OSM focused in the rulemaking process on permit-specific and site-specific

protections because "[t]he effect of surface coal mining and reclamation operations on plant and

animal communities depends on" certain species-specific and site-specific factors, including "the nature of the affected plant, animal, or critical habitat, the type of mining and its intensity, reclamation techniques and timing, the serial history of the site, and postmining land use." *Id.* at IV-159; *see also id.* at II-30 to 31 (explaining that restrictions on the size of excess spoil fills should be based on relevant site-specific factors and operational considerations; a Mountaintop Mining/Valley Fill Programmatic EIS had concluded that there were no restrictions "applicable in every situation" that would warrant programmatic or absolute restrictions). In light of the protections in SMCRA's implementing regulations, and the regulation's emphasis on site-specific protections, the agency concluded that "[n]one of the alternatives being considered would change th[ose] regulations [which] . . . continue to ensure the protection of listed endangered and threatened species, proposed species, and their critical habitats." *Id.* at IV-162. And any such changes were further limited in scope by the small number of coal-producing states with federal surface mining programs. *Id.*

Moreover, because the 2008 Stream Buffer Zone Rule did not propose any changes to the 100-foot buffer distance, OSM explained that the final rule would not affect protections of fish, wildlife, and related environmental values associated with streams—the width of the buffer zone "which has long been a matter of settled law" was based on sediment control considerations and protection of aquatic ecosystems. 73 Fed. Reg. at 75,857-58 (citing 48 Fed. Reg. 30,314); *see also* ECF No. 43-3 (Gov't MPSJ, Ex. 2, EIS, Book One) at II-33 (same) (also concluding that "establishing a buffer zone based on the needs of terrestrial species is not practical because the optimal width of the buffer zone for each species will var[y] considerably"). In short, even the Government's own culled version of the rulemaking docket disclaims its new position of "error."

The Government also relies heavily on post-decisional documents to try to explain why its confessed error convincingly establishes an ESA Section 7 violation.  None of these materials would properly be part of the administrative record for the challenged 2008 rulemaking, once such a record is filed.  And the absence of a record at this point does not excuse the Government's failure to file a motion asking this Court to consider such post-decisional materials (namely, the Pizarchik Declaration) as extra-record evidence.  If this Court is inclined to consider the testimony provided in the Pizarchik Declaration (ECF No. 43-3), it is only fair that that the Government also account for any and all other material bearing on that decision, including other post-decisional statements by Director Pizarchik, that may call into question the Government's confessed error theory.[15]

For example, although the Government has consistently maintained in this litigation that OSM has determined it erred by failing to initiate consultation with FWS, Director Pizarchik's recent testimony before Congress is remarkable for the complete absence of any reference to the ESA, necessarily casting doubt on OSM's motivation for renouncing the 2008 Stream Buffer Zone Rule.  *See* Pizarchik Nov. 4, 2011 testimony, attached hereto as Ex. 2; Pizarchik July 19, 2012 testimony, attached hereto as Ex. 3; Pizarchik July 23, 2013 testimony, attached hereto as Ex. 4.  Rather than credit the post hoc, made-for-litigation declaration of Director Pizarchik, this Court should await briefing on the full administrative record before it makes its determination on

---

[15] If the Court is inclined to grant the Government relief on the basis of Director Pizarchik's post-decisional statements (in what effectively amounts to *de novo* review of the Government's preliminary motion), it would be appropriate first to allow NMA discovery (via documents and depositions) of other post-decisional communications within OSM and between OSM and other agencies regarding the Government's change in position on the 2008 Rule, so that all parties have a full and fair opportunity to present facts related to the Government's preliminary motion.

whether the Government has properly confessed error and whether there is any ESA Section 7 violation in this case.

## <u>CONCLUSION</u>

For these reasons, NMA respectfully requests that the Government's request for vacatur be denied.[16]  The Court should either remand the 2008 Rule without vacatur to the agency for processes in accord with the Administrative Procedure Act to repeal or revise the 2008 Rule (if the Court accepts OSM's confession of error), or, in the alternative, the Court should defer consideration of the merits of the 2008 Rule until after the parties have submitted briefing on the complete, certified administrative record.

Respectfully submitted,

/s/ Kirsten L. Nathanson

| | |
|---|---|
| *Of counsel*: | J. Michael Klise No. 412420 |
| Katie Sweeney | Kirsten L. Nathanson, No. 463992 |
| Bradford Frisby | David Y. Chung, No. 500420 |
| NATIONAL MINING ASSOCIATION | Sherrie A. Armstrong, No. 1009642 |
| 101 Constitution Avenue, N.W. | CROWELL & MORING LLP |
| Washington, DC 20001 | 1001 Pennsylvania Ave., NW |
| (202) 463-2600 | Washington, D.C.  20004 |
| | (202) 624-2500 |

*Counsel for National Mining Association*

Dated:  August 7, 2013

---

[16] Should the Court grant the Government's motion and vacate the 2008 Rule, however, then all pending challenges to the 2008 Rule (both this case and the related case) should be dismissed as moot.  *See* ECF No. 43-1 (Gov't MPSJ) at 35-37.