IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:09-cv-00115-BJR |
| S.M.R. JEWELL, Secretary of the United States Department of the Interior, JOSEPH G. PIZARCHIK, Director of the Office of Surface Mining Reclamation and Enforcement, and GINA MCCARTHY,[1] Administrator of the United States Environmental Protection Agency, | ) | (Judge Barbara J. Rothstein) |
| | ) | |
| Defendants, | ) | |
| | ) | |
| NATIONAL MINING ASSOCIATION, | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

**RESPONSE OF NATIONAL PARKS CONSERVATION ASSOCIATION
AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

<u>Nature of the Case</u>

Plaintiff National Parks Conservation Association ("NPCA") challenges the U.S.

Department of Interior's Office of Surface Mining Reclamation and Enforcement's ("OSM")

promulgation of the Final Rule entitled "Excess Spoil, Coal Mine Waste, and Buffers for

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Gina McCarthy is automatically substituted as Administrator of the U.S. Environmental Protection Agency, for Bob Perciasepe, formerly Acting Administrator.

Perennial and Intermittent Streams," 73 Fed. Reg. 75,814 (12 Dec. 2008) (codified at 30 C.F. R.

Parts 30 CFR Parts 780, 784, 816, and 817) ("2008 SBZ rule"), as well as the U.S. Environmental

Protection Agency's ("EPA") written concurrence in the promulgation of the rule.[2]  NPCA's

Amended Complaint (Doc. 6) alleges violations of the Surface Mining Control and Reclamation

Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201-1328 (2011); the Federal Water Pollution Control

("Clean Water") Act, 33 U.S.C. §§ 1251-1387 (2011); and the Endangered Species Act ("ESA"),

16 U.S.C. §§ 1531-1544 (2011).[3]  The 2008 SBZ rule replaces the stream buffer zone rule that

had been in effect since 1983 ("1983 SBZ rule").  That rule prohibited disturbances from surface

coal mining operations in or within 100 feet of a perennial or intermittent stream (collectively,

"stream"), unless the regulatory authority found that such activities "would not cause or

contribute to the violation of state or federal water quality standards and would not adversely

affect the water quantity and quality or other environmental resources of the stream."  30 C.F.R.

§§ 816.57(a)(1), 817.57(a)(1) (1983), amended by 73 Fed. Reg. 75,814 (Dec. 12, 2008).

While the 2008 SBZ rule retains the 100-foot buffer, it completely undercuts this

requirement by greatly relaxing the criteria for allowing an exception.  The 2008 rule allows

mining operations to occur in a stream, or within 100 feet of it, simply by showing that avoidance

"is not reasonably possible."  The rule also specifically authorizes "valley fills," where valley

floors are filled with the rubble and debris from surface mining, and it allows the construction of

sediment ponds and refuse piles, and other destructive mining operations in the stream or within

the buffer.[4]  *See* 73 Fed. Reg. at 75,815, 75,824; *see also* 73 Fed. Reg. at 75,876-85, 75,818.

---

[2] Letter from Stephen Johnson, Administrator, EPA, to Dirk Kempthorne, Secretary, U.S. Department of the Interior (2 Dec. 2008) (Ex. 1).
[3] NPCA initially filed its complaint on 16 January 2009 (Doc. 1), and subsequently the amended complaint on 17 February 2009 (Doc. 6), raising the ESA claims in Counts II-V, and Count VII.
[4] *See* 30 C.F.R. §§ 816.57(a)-(b), 817.57(a)-(b).  The buffer requirement itself, referred to as "Activities in or adjacent to perennial or intermittent streams," is set forth in 30 C.F.R. § 780.28 and 30 C.F.R. § 784.28 for surface mining and surface activities relating to underground mining permit applications, respectively, and in 30 C.F.R. §

The impacts of such mining operations are far-reaching and permanent.  OSM's 2008 Final Environment Impact Statement for the SBZ rule ("2008 FEIS") refers extensively to the 2003/2005 Draft and Final EIS on mountaintop mining and valley fills in Appalachia that OSM, EPA, and the U.S. Army Corps of Engineers jointly prepared ("MTM/VF" DEIS, FEIS).[5]  These documents catalogue some of the devastating losses from mountaintop mining and valley fills over time.  Even with the 1983 SBZ rule in place, mountaintop mining operations between 1992 and 2002, including valley fills, directly impacted over 1,200 miles of streams in central Appalachia, and, between 1985 and 2001, valley fills annihilated an estimated 724 stream miles.[6]  As OSM recited in the 2008 FEIS, "[w]hen streams are filled or mined through all biota living in the footprint of the fill or in the mined area are lost."[7]  Under the significantly weaker 2008 SBZ rule, these estimated losses would only be amplified.

On 17 July 2013, Federal Defendants OSM and EPA moved for partial summary judgment on NPCA's Count II, which alleges that OSM's failure to consult with the U.S. Fish and Wildlife Service ("FWS") before adopting the 2008 SBZ Rule violated Section 7(a)(2) of the ESA.  *See* 16 U.S.C. § 1536(a)(2).  The Federal Defendants admit that the failure to consult was "legal error," and that the 2008 SBZ rule "may affect" threatened or endangered species so as to require ESA Section 7 consultation, but on the basis that the 2008 FEIS indicated a slight positive or

---

816.57 and 30 C.F.R. §817.57 for performance standards applicable to both.  30 C.F.R. §§ 816.57(b) (1)-(b)(4), 817.57(b)(1)-(b)(4) provide exceptions to the buffer requirement, regarding stream diversions, placement of structures to facilitate crossing of streams, construction of sedimentation ponds, and construction of excess spoil fills and coal mine waste disposal facilities in streams.  Conforming changes to the permitting requirements and performance standards for these exceptions are also included.  *See* 30 C.F.R. §§ 780.25(d), 784.16(d) (coal mine waste impoundments and refuse piles); 30 C.F.R. §§ 780.35, 784.19, 816.71, 817.71 (disposal of excess spoil); and 30 C.F.R. §§ 816.43, 817.43 (stream diversions).

[5] *See* U.S. Dep't of the Interior, OSM-EIS-34, Final Environmental Impact Statement (EIS) Excess Spoil Minimization: Stream Buffer Zones (Sept. 2008) ("2008 FEIS") (Ex. 2) (citing U.S. EPA, EPA 9-03-R-00013, Mountaintop Mining/Valley Fills Final Programmatic Impact Statement (Oct. 2005) ("2005 MTM/VF FEIS") (Ex. H); U.S. EPA, EPA 9-03-R-00013, Mountaintop Mining/Valley Fills in Appalachia Draft Programmatic Environmental Impact Statement (June 2003) ("2003 MTM/VF DEIS") (Ex. I)).

[6] 2005 MTM/VF FEIS at 4. *See also* 2008 FEIS at IV-145.

[7] 2008 FEIS at IV-152 (citing 2003 MTM/VF DEIS at III.D-2).

beneficial impact from the 2008 SBZ rule.  That is simply not the case.  Instead, OSM arbitrarily

concluded in the FEIS that the SBZ rule would have no effect on federally protected species,

based on the sweeping conclusions in the FWS's 1996 biological opinion that surface coal

mining operations conducted in accord with SMCRA would not jeopardize any listed species.

*See* 2008 FEIS at IV-163 (citing FWS 1996 Formal Section 7 Biological Opinion and

Conference Report on Surface Coal Mining and Reclamation Operations Under SMCRA (24

Sept. 1996) ("1996 BiOp").[8]

In their brief, however, the Federal Defendants completely ignore the 1996 BiOp,

claiming instead that NPCA's claims regarding the BiOp should be dismissed.  NPCA's Counts

II, III, and IV, however, all relate to OSM's violations of section 7 of the ESA and cannot be

viewed in isolation.  Count II alleges that OSM's failure to consult on the 2008 SBZ rule violated

§ 7(a)(2), which OSM concedes.  Such failure, however, as NPCA alleges in Count III, was

based on OSM's improper reliance on the 1996 BiOp.  Underlying both of these claims is Count

IV.  OSM's failure to reinitiate consultation on the 1996 BiOp, as alleged in Count IV, in turn

led OSM to conclude that the BiOp precluded any finding of "may affect" on the SBZ rule.

Unless this Court addresses Count IV, and OSM's reliance on the BiOp to evade consultation on

the rule, as alleged in Count III, this Court cannot provide meaningful, effective relief on Count

II.  For the reasons set forth below, NPCA requests that this Court grant its cross-motion for

partial summary judgment on ESA Counts II, III, IV, and VII; that the Court vacate the 2008 SBZ

rule and the 1996 BiOp; and that the Court direct OSM to reinitiate consultation on the BiOp.

The issues raised in these counts are purely legal and are appropriate for resolution now

without the need for the full administrative record.  As the Federal Defendants state, Section 706

of the Administrative Procedure Act ("APA") allows a court to "hold unlawful and set aside

---

[8] The 1996 BiOp is included as Exhibit 1 to Doc. 43-1.

agency action," based on "the whole record or those parts of it cited by a party."  5 U.S.C. § 706 (2012).  This Court has allowed parties to proceed with motions for summary judgment prior to the filing of the full administrative record in other ESA cases.  *See, e.g. Wildearth Guardians v. Salazar*, Case No. 1:10-cv-01043, No. 21 (D.D.C. Mar. 11, 2010) (order denying defendant's motion to file administrative record before responding to plaintiff's motion for summary judgment); *Center for Biological Diversity v. Kempthorne*, Case No. 1:08-cv-02113 (D.D.C.) (allowing and granting plaintiffs' motion for summary judgment before record filed, *see* Doc. Nos. 6, 35, 234 (2 Apr., 28 Apr., 22 Dec. 2008)).  *See also Pacific Rivers Council v. Shepard*, 2012 WL 950032 at *3 (D. Or. 2012) (allowing reliance on partial record, including publicly available documents, to determine ESA claim challenging "no effect" decision); *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2009) (finding court may consider evidence outside administrative record for limited purposes of reviewing plaintiffs' ESA claim).[9]  For the reasons set forth in NPCA's Request for Judicial Notice, filed herewith, this Court can also consider publicly available documents, such as portions of the Federal Register, which are not a part of the administrative record, in support of this Response and Cross-Motion for Partial Summary Judgment.

<u>Background on Mountaintop Coal Mining</u>

The coal mining areas of central Appalachia (Kentucky, Tennessee, Virginia, and West Virginia) are characterized by steep mountain slopes with narrow ridge tops that are incised by narrow river valleys.  *See* 2003 MTM/VF DEIS at III.A-1-III.A.2.  The term "mountaintop mining" encompasses a variety of methods of surface coal mining prevalent in this area, including mountaintop removal mining, as well as cross-ridge mining, a technique used in

---

[9]  *See also Am. Bankers Ass'n v. Nat'l Credit Union Admin*, 271 F.3d 262, 266 (D.C. Cir. 2011) (non-ESA claim).

Tennessee.[10]  In general, to access the coal seams that are layered deep below the surface of the mountains, the coal company blasts apart the mountain, removing one or more ridges or the entire top of the mountain.  The soil and rock that overlie the coal seams are known in mining parlance as "overburden," or "spoil."  Despite the 1983 SBZ rule, regulators have condoned the practice in central Appalachia of letting the excess spoil remain in the stream valleys, creating what are known as "heads-of-hollows" fills, "hollow fills," or "valley fills," *see* 2003 MTM/VF DEIS at I-1, and of allowing operators to mine through streams.[11]

The removal of the tops of mountains essentially destroys the upper reaches of watersheds.[12]  This type of mining has resulted in hundreds of miles of streams being buried, profoundly affecting the region's ecology.   As Judge Haden, then-Chief Judge of the District Court for the Southern District of West Virginia, described the impacts from valley fills:

> When valley fills are permitted in intermittent and perennial streams, they destroy those stream segments.  The normal flow and gradient of the stream is now buried under millions of cubic yards of excess spoil waste material, an extremely adverse effect. If there are fish, they cannot migrate.  If there is any life form that cannot acclimate to life deep in a rubble pile, it is eliminated.  No effect on related environmental values is more adverse than obliteration. Under a valley fill, the water quantity of the stream becomes zero. Because there is no stream, there is no water quality.

*Bragg v. Robertson*, 72 F. Supp. 2d 642, 661-62 (S.D. W. Va. 1999), *rev'd on other grounds*, 248 F.3d 275 (4th Cir. 2001).

---

[10] Although the number and size of valley fills in Tennessee have been much smaller than elsewhere in central Appalachia, OSM has nevertheless issued permits for such operations.  From 1985 through 2001, OSM issued 35 permits in Tennessee, with 55 valley fills, and, in 1999, OSM issued a permit with 9 valley fills.  2003 MTM/VF DEIS at III.K-26.  The total acreage that OSM approved for valley fills in this period was 909 acres, with an average acreage per year of 52.88 acres.  *See id.* III.K-33.

[11] NPCA disputes any contention by the defendants that the 1983 rule on its face allowed such practices.  *See* Doc. 43-1 at 11.  As one commenter stated on the draft SBZ:  "*Lapses in the enforcement of the buffer zone* rule have allowed almost 2,000 miles of streams to be improperly and illegally buried or degraded by mining waste."  Letter from Frank McCormick, Am. Society of Ichthyologists and Herpetologists, to Brent Wahlquist and David Hartos, OSM (2007) (emphasis added), *reprinted in* 2008 FEIS at B-163.

[12] *See* 2008 FEIS at IV-145, III-133 (noting that excess spoil fills in valley often are constructed over small headwater streams).

Statutory Background

*Relevant SMCRA Provisions*[13]

While one of the purposes of SMCRA is "to assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided," 30 U.S.C. § 1202(f), Congress recognized the need to protect society and the environment from such impacts while meeting those needs.  In fact, the first purpose set forth in SMCRA is to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations."  30 U.S.C. § 1202(a).  Other purposes, such as that of assuring that "surface coal mining operations are so conducted as to protect the environment," 30 U.S.C. § 1202(d), reinforce this fundamental principle.

OSM has responsibility for "the establishment of appropriate standards to minimize damage to the environment . . .  and to protect the health and safety of the public." 30 U.S.C. § 1201(d); *see also* 30 U.S.C. § 1211(c)(2).  Section 515(a) of SMCRA provides that any surface mining permit issued pursuant to SMCRA "shall require that such surface coal mining operations will meet all applicable performance standards" of the Act.  30 U.S.C. § 1265(a).  In central Appalachia, the Commonwealths of Kentucky and Virginia and the State of West Virginia all have "primacy" to administer the SMCRA regulatory program, whereas OSM directly regulates surface coal mining operations in Tennessee.  *See* Doc. 43-1 at 3-4 & n. 3, 4.

*1983 SBZ Rule and 2008 SBZ Rule Changes*

According to OSM, the environmental protection performance standards set forth in SMCRA sections 515(b)(24) and 515(b)(10)(B) form the basis of the 2008 SBZ rule.  *See* 73

---

[13] Much of the SMCRA framework is included in Doc. 43-1 at 3-6, and is not repeated here.

Fed. Reg. at 75,815-16.  Section 515(b)(24) requires the mining operator "to the extent possible, using the best technology currently available," to "minimize disturbances and adverse impacts of the operation on fish, wildlife, and related environmental values. . . ." 30 U.S.C. § 1265(b)(24). Under section 515(b)(10)(B), the operator must "minimize the disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems. . ."  30 U.S.C. § 1265(b)(10).

The 1983 SBZ rule prohibited the disturbance of land within 100 feet of a stream by surface mining activities unless the regulatory authority specifically authorized such activities "closer to, or through such a stream."  40 Fed. Reg. 30,312 (30 June 1983).  Authorization could be allowed only upon a finding that "[s]urface mining activities will not cause or contribute to the violation of applicable State or Federal water quality standards, and will not adversely affect the water quantity and quality or other environmental resources of the stream. . . ."  30 C.F.R. § 816.57(a)(1) (1983) (surface mining); *accord* 30 C.F.R. § 817.57(a)(1) (1983) (underground mining); *see* 73 Fed. Reg. 75,814 (12 Dec. 2008).

The 2008 SBZ rule abruptly reverses course, by eliminating the required findings above. It also specifically authorizes not only the construction of "excess spoil fills" (i.e., valley fills), but also coal mine waste disposal facilities, slurry impoundments and sedimentation ponds, and other mining activities in the actual stream.  *See* 30 C.F.R. §§ 816.57(b); 817.57(b).  OSM claimed that "an undisturbed buffer" between these activities and the stream inherently cannot be maintained."  73 Fed. Reg. at 75,855.  OSM concluded that the 2008 buffer requirement therefore applied "only to activities that do not involve disturbances of the streambed and do not inherently occur within the buffer zone," *id*., an enormous loophole that swallows the rule.

8

As a result, under the 2008 SBZ rule, the operator need only show that avoidance "is not reasonably possible" for mining operations within the stream itself.  30 C.F.R. §§ 780.28(b)(1), 784.28(b)(1).  Similarly, mining operations within the buffer are allowed if the applicant can show either that avoidance of disturbance "is not reasonably possible" *or* "is not necessary to meet the fish and wildlife and hydrologic balance protection requirements of the regulatory program."  30 C.F.R. §§ 780.28(c)(1), 784.28(c)(1).

### The Endangered Species Act

The U.S. Supreme Court has called the ESA the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  According to the Court, the "plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."  *Id*. at 184.

Section 7(a)(2) is "the heart of the ESA."  *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1019 (9th Cir. 2012) (en banc) (internal citations omitted).  It requires every federal agency to consult with the FWS, or the National Marine Fisheries Service ("NMFS"), as appropriate, to "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of an endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ."  16 U.S.C. § 1536(a)(2).  Agency "action" is defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies . . . ."  50 C.F.R. § 402.02.  Formal consultation is required if an agency action "may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).

Section 7(a)(2) imposes both a procedural and substantive duty on federal agencies.  As this Court stated in *Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96 (D.D.C. 2011),

"[s]ubstantively, it requires that agencies ensure that their actions are not likely to jeopardize the existence of an endangered species," and "[p]rocedurally, it requires adequate consultation between the [a]gency and the FWS," to ensure that the substantive protections are met.  791 F. Supp. 2d at 113.  Further, as the court in *Florida Key Deer v. Stickney*, 864 F. Supp. 1222 (S.D. Fla. 1994), stated, the trigger for consultation is "set sufficiently low to allow Federal agencies to satisfy their duty to 'insure' under Section 7(a)(2)."  864 F. Supp. at 1229 (quoting 51 Fed. Reg. 19,949-50 (3 June 1986)) (emphasis deleted).[14]

Section 402.16 of the ESA regulations requires reinitiation of formal consultation for agency actions where "discretionary Federal involvement or control over the action has been retained [by the agency] or is authorized by law" and where any one of four criteria listed in the regulation is met.  As discussed in Part III, three of the four criteria apply in this case, namely where (1) "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" (2) "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion;" and (3) "a new species is listed or critical habitat designated that may be affected by the identified action."  50 C.F.R. § 402.16(b)-(d).

## ARGUMENT

### I.     THE COURT HAS JURISDICTION TO HEAR NPCA's ESA CLAIMS.

The Federal Defendants argue on various grounds that, because OSM has confessed error as to Count II and requested vacatur of the 2008 SBZ Rule, this Court either is without jurisdiction to, or need not, reach NPCA's additional ESA claims.  *See* Doc. 43-1 at 25-32, 35-38.  The defendants' assertions are incorrect.

---

[14] *See* FWS & NMFS, Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conf. Activities Under § 7 of the ESA at xvi (Mar. 1998) ("may affect" means "*any*" effect) (emphasis in original).

A.   None of NPCA's ESA Claims Is Moot.

Contrary to the defendants' assertion, NPCA's claims under Counts III and IV are not moot because vacatur of the 2008 SBZ rule under Count II would only provide a partial remedy to NPCA's injuries.  A case is moot only "if the court is unable to grant 'any effectual relief whatever to the prevailing party.'" *Center for Food Safety v. Salazar*, 900 F. Supp. 2d 1, 5 (D.D.C. 2012) (emphasis omitted) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). The availability of even a partial remedy is sufficient to prevent a case from being deemed moot. *See Church of Scientology v. United States*, 506 U.S. 9, 13 (1992).  Here, OSM's violations as to Counts III and IV may be remedied by declaring the 1996 BiOp invalid and vacating it, and by ordering OSM to reinitiate consultation.

As discussed above, the 1996 BiOp is central to each of NPCA's ESA section 7 claims in Counts II, III, and IV.  The defendants' rationale for its admission of error on Count II is contrary to its own statements in the FEIS that the rule would have no effect on listed species. Despite ample evidence that the 2008 rule in fact may adversely impact listed species and habitat, OSM relied on the 1996 BiOp to brush aside these effects and evade § 7 consultation.

This Court is now faced with the anomaly of the Federal Defendants' concession as to NPCA's Count II but its continued refusal to recognize the 1996 BiOp as the underlying cause. Thus, this Court must reach Counts II, III, and IV to effectively resolve NPCA's § 7 claim.  The defendants cannot cherry-pick which of the § 7 claims to concede, and thereby insulate the 1996 BiOp from judicial scrutiny.  Moreover, while the BiOp remains in place, OSM's representations that it has "begun discussions" with the FWS regarding the consultation process, Doc. 43-4 at 9, are meaningless; because the results of any such consultation are pre-ordained by the BiOp.  The ESA prescribes essential procedural and substantive requirements to which each federal agency

11

must adhere.  NPCA's claims under the ESA set forth in each of Counts II, III, and IV not only present a live case or controversy, but are essential in order for this Court to provide effective relief on Count II.  Thus, this Court should reject the defendants' claim under the procedural mootness doctrine that the Court "stay its hand" regarding NPCA's claims on the 1996 BiOp.  Doc. 43-1 at 37.  The cases the Federal Defendants cite on pages 36-37 are inapposite, because the defendants there had ceased the challenged activity.[15]  Here, by contrast, the Department of the Interior has refused to reinitiate formal consultation on the 1996 BiOp.  In fact, in January 2008, NPCA and the State of Tennessee petitioned OSM and FWS to reinitiate consultation as to the 1996 BiOp, but to no avail.[16]

        **B.   NPCA's Claim Under Count IV Is Not Time-Barred**.

        The Federal Defendants' claim that Count IV is time-barred mistakes the very nature of OSM's regulation to reinitiate consultation under 50 C.F.R. § 402.16.   The issue is whether there is ongoing agency action over which the agency has discretionary involvement or control, and whether one of the four criteria listed in the regulation has occurred, each of which elements have been met here, as discussed in Part III.  The timing of the adoption of the biological opinion itself has no bearing on the agency's subsequent duty to reinitiate consultation.

---

[15] Similarly, any argument that NPCA's claims fall within the voluntary cessation exception to the mootness doctrine is incorrect.  A defendant has the heavy burden of establishing both that the alleged violation will not occur and that the relief has "completely and irrevocably" eliminated the effects of the alleged violation, *Center for Food Safety v. Salazar*, 900 F. Supp. 2d 1, 4-5 (D.D.C. 2012) (internal citations omitted), which for the reasons discussed cannot be met.  The Federal Defendants' reliance on the primary jurisdiction doctrine, Doc. 43-1 at 37-38, is also misplaced, because the issues before this court are legal in nature.

[16] *See* Petition Before the U.S. Fish and Wildlife Service and the Office of Surface Mining Reclamation and Enforcement to Reinitiate Formal Consultation on All Surface Mining Activities Conducted Under the Authority of the Surface Mining Control and Reclamation Act of 1977 (15 Jan. 2008) (Doc. 6) (Ex. L).  The State of Tennessee's Department of Environment and Conservation ("TDEC") also independently requested the FWS to reinitiate consultation on the 1996 BiOp, which that agency likewise failed to do.  *See* Letter from Paul L. Sloan, Director, TDEC, to H. Dale Hall, Director, FWS (11 Jan. 2008) (Ex. K).  *See also* Letter from Lyle Laverty, Assistant Secretary for Fish and Wildlife and Parks, U.S. Department of Interior, to Deborah Murray, Southern Environmental Law Center (28 Mar. 2008) (regarding 15 Jan. 2008 petition to reinitiate formal consultation on 1996 BiOp) (Ex. J).

Accordingly, those courts that have considered whether an agency improperly failed to reinitiate consultation under 50 C.F.R. § 402.16 have routinely rejected such arguments, based on the inherent nature of the claim itself. *See Coalition for a Sustainable Delta v. Fed. Emergency Management Agency*, 812 F. Supp.2d 1089 (E.D. Cal. 2011); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012); *see also Nat'l Wildlife Federation v. Fed. Emergency Mgmt Agency*, 345 F. Supp. 2d 1151 (W.D. Wa. 2004), all discussed in Part III below. Finally, Count IV cannot be considered time-barred because NPCA seeks relief under the APA "to compel agency action unlawfully withheld." *See Wilderness Soc. v. Norton*, 434 F.3d 584, 588-89 (D.C. Cir. 2006) ("This court has repeatedly refused to hold that actions seeking relief under [the APA] to 'compel agency action unlawfully withheld or unreasonably delayed' are time-barred if initiated more than six years after an agency fails to meet a statutory deadline."). [17]

To afford NPCA full relief, this Court should also address Count VII regarding defendant EPA's failure to consult on the SBZ rule. Under section 501 of SMCRA, EPA's written concurrence is necessary before OSM can promulgate any environmental protection standard that relates to "water quality standards promulgated under the authority of the [Clean Water Act, , as amended] . . . ." 30 U.S.C. § 1251(a)(B). EPA provided such concurrence on 2 December 2008, (Ex. 1). EPA's written concurrence in the SBZ rule thus constitutes "agency action" under section 7(a)(2) of the ESA as an "activit[y] . . . of any kind authorized . . . in whole or in part" by a federal agency. 50 C.F.R. § 402.02.

---

[17] *See also In re United Mine Workers of America International Union*, 190 F.3d 545 (D.C. Cir. 1999) (claims not time-barred where union challenged failure to act rather than specific agency action).These arguments also dispose of the claim that there is no exception to the statute of limitations in cases against the government. *See* Doc. 43-1 at 31. Likewise, the courts have not settled the question whether equitable tolling in 28 U.S.C. § 2401(a) may apply. As this court noted in *McKinney v. U.S. Postal Serv.*, 11-CV-631 RLW, 2013 WL 164283 (D.D.C. 2013), the D.C. Circuit has "expressly refrained from deciding whether § 2401(a) is 'susceptible to judicial exceptions' and equitable doctrines." *Id.* at 3 (citation omitted).

With respect to Count V, NPCA concedes that the six-year statute of limitations has run regarding the validity of the BiOp as adopted in September 1996; however, the inability to assert a facial challenge to the BiOp, as adopted, cannot prevent a challenge to OSM's failure to reinitiate consultation on the BiOp.

C.   NPCA's Claims are Ripe for Review.

Counts III and IV are also ripe for review because they do not rest upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 425 (D.C. Cir. 2007) (quotation omitted).  OSM's failure to reinitiate consultation on the 1996 BiOp in turn led to its improper reliance on the 1996 BiOp in failing to consult on the 2008 SBZ rule.  Thus each of the ESA section 7 claims against OSM, and the consequent harm suffered by NPCA, are occurring and will continue to occur if this Court were to withhold consideration of either Counts III or IV.

D.   NPCA Has Standing to Raise the ESA Claims in Counts II-IV and VII.

NPCA is a nonprofit citizens' organization with offices across the country, including a Southeast Regional Office in Knoxville, Tennessee.  NPCA's mission is to protect, preserve, and enhance the National Park System for present and future generations, and it has over 360,000 members nationwide, including about 6,000 members in Tennessee and 16,000 members in the other central Appalachian states of Kentucky, Virginia, and West Virginia.  *See* Declaration of Don Barger ("Barger Decl.") (Ex. 3) ¶ 4.  NPCA's members plainly satisfy the requirements for Article III standing:  (1) injury in fact, (2) causation, and (3) redressability.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  NPCA has standing to bring suit on behalf of its members in this case, because "its members would otherwise have standing to sue in their own right, the interests at stake are germane to [NPCA's] purpose, and neither the claim asserted

nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

NPCA's members readily satisfy all three prongs of Article III standing. Injury in fact exists because NPCA's members include individuals who have suffered, or imminently will suffer, concrete and particularized harms to their recreational, aesthetic, scientific, professional, and procedural interests as a result of the Federal Defendants' actions. *See Laidlaw*, 528 U.S. at 181. As set forth in the declarations filed herewith, NPCA members regularly use and enjoy public lands and waterways in the Appalachian region, including the Big South Fork National River and Recreation Area ("NRRA") and the Big South Fork of the Cumberland River ("Big South Fork"), for recreational activities such as hiking, camping, canoeing, taking photographs, and observing fish and wildlife. *See* Barger Decl., ¶ 20-23; Declaration of David A. Etnier ("D. Etnier Decl.") (Ex. 4) ¶ 14; Declaration of Elizabeth L. Etnier ("E. Etnier Decl.") (Ex. 5) ¶ 5-8. NPCA members also use and enjoy these areas for scientific, educational, research, and professional interests, visiting repeatedly and with the intent to return soon and frequently in the future for study and for work. *See* D. Etnier Decl., ¶ 5-7, 9-13; E. Etnier Decl., ¶ 4, 8; Barger Decl., ¶ 15-16, 22. Their interests in these areas are harmed by surface coal mining, which threatens watersheds and aquatic ecosystems throughout the region. *See* Barger Decl., ¶¶ 5, 15, 18-19; D. Etnier Decl., ¶¶ 15-25; E. Etnier Decl., ¶ 9.

This Court has consistently found the type of interests NPCA's members have sufficient for standing purposes. *See, e.g. Pub. Emps. for Envtl. Responsibility v. U.S. Dept. of the Interior*, 832 F. Supp. 2d 5, 17-18 (D.D.C. 2011) (finding injury in fact where members' aesthetic enjoyment was diminished and research interests were harmed by threat to endangered species); *Defenders of Wildlife v. Norton*, 257 F. Supp. 2d 53, 62-63 (D.D.C. 2003) (finding injury in fact

where impacts on endangered species had direct effect on members' aesthetic, scientific, and recreational interests). *See also Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230 n.4 (1986) (finding injury in fact where members' wildlife watching and studying activities were adversely affected by continuing decline of species' populations). NPCA members also have procedural interests in the proper protection of listed species in Appalachia's public lands and waterways. *See* Barger Decl. ¶ 24; D. Etnier ¶ 28. These interests have been harmed by the Federal Defendants' failure to comply with the ESA's requirements regarding initiation and reinitiation of consultation, as discussed below. *See Lujan*, 504 U.S. at 571-73 (finding procedural right in ESA citizen-suit provision).

As to causation and redressability,[18] the interests of NPCA's members are impaired by the promulgation of the 2008 SBZ rule and the Federal Defendants' failure to comply with their procedural and substantive duties under Section 7 of the ESA before adopting and concurring in the rule. *See* D. Etnier Decl., ¶¶ 26-29; E. Etnier Decl., ¶¶ 9-10; Barger Decl., ¶¶ 24-25. They are also impaired by the Federal Defendants' reliance on the 1996 BiOp and failure to reinitiate formal consultation as to the 1996 BiOp, in violation of ESA regulations. *See* Barger Decl. ¶¶ 12, 25. Thus, NPCA's members' injuries are "fairly traceable" to the Federal Defendants' actions. *See Friends of the Earth*, 528 U.S. at 180-81. A decision in NPCA's favor, vacating the 2008 SBZ rule and requiring consultation, is likely to redress NPCA members' injuries, because it will result in the reinstatement of the former 1983 SBZ rule, which had stricter environmental protections, and compel the Federal Defendants' properly comply with the ESA's requirements. *See id.* Moreover, a decision vacating the 1996 BiOp and ordering OSM to reinitiate consultation on coal

---

[18] When parties claim standing based on violations of a procedural right, they "can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7; *see also Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 51 (D.C. Cir. 1999) (in procedural rights cases, the "necessary showing" supporting the "constitutional minima of injury in fact, causation, and redressability... is reduced.").

mining activities under SMCRA will redress NPCA members' injuries by ensuring Federal

Defendants properly comply with the ESA's requirements and prevent harm to listed species.

Regarding NPCA's organizational standing, it is clear that the interests at stake in this

case are germane to the purposes of NPCA. *See* Barger Decl. ¶ 4. One of the primary objectives

of NPCA's Southeast Regional Office is protecting water quality, fish and wildlife, and the scenic

and recreational values of public lands in the Appalachian region from the adverse impacts of

surface coal mining. *Id*. NPCA specifically works to protect the Big South Fork NRRA located

on the Cumberland Plateau in Tennessee and Kentucky. Barger Decl. ¶¶ 5, 8, 9, 12, 13. The

interests at stake are germane because a more protective SBZ rule and ensuring the Federal

Defendants' compliance with the ESA will help address some of the harm from large-scale coal

mining upstream of the Big South Fork NRRA that could irreversibly damage habitat for fish

and wildlife and water quality downstream. *Id*. ¶ 18. NPCA participated in the administrative

processes regarding the 2008 SBZ rule, filing two sets of public comments out of concern for the

devastating impacts that surface mining is having on some of the region's most diverse river

systems, including the Big South Fork and its tributaries. *Id.* ¶ 6. NPCA's interests are directly

and irreparably injured by the Federal Defendants' violations of law challenged here and as

detailed in this Memorandum in Support of Plaintiff's Response and Cross-Motion for Partial

Summary Judgment.

The Federal Defendants' assertion that NPCA lacks standing to pursue its claims as to the

1996 BiOp is entirely without merit. *See* Doc. 43-1 at 25-27. As discussed below, NPCA is not

pursuing a facial or stand-alone challenge to the 1996 BiOp, and the Federal Defendants' argument

as such is a contortion of NPCA's claims in an attempt to avoid the issues surrounding the 1996

BiOp. Indeed, the Federal Defendants' application of *Summers v. Earth Island Inst*., 555 U.S.

488 (2009) is wholly misguided, because NPCA is *not* challenging the basis for a "regulation in

the abstract… apart from any concrete application that threatens imminent harm to [plaintiff's]

interests."  Doc. 43-1 at 27 (quoting *Summers*, 555 U.S. at 494).  Instead, NPCA is challenging

OSM's failure to reinitiate consultation as to the 1996 BiOp, and NPCA has standing because

this failure has already caused injury and continues to present an imminent threat and increased

risk to NPCA's interests.  In this respect, the instant case is distinguishable from *Summers*, like

another recent case, because it involves a challenge to OSM's "failure to follow proper

procedures," and NPCA "has *already* suffered the procedural injury that forms the basis of its

standing."  *See Citizens for Better Forestry v. U.S. Dept. of Agric.*, 632 F. Supp.2d 968, 979 (N.D.

Cal. 2009) (emphasis in original).

NPCA is also challenging OSM's arbitrary and capricious reliance on the 1996 BiOp,

which is rendered invalid by the agency's failure to reinitiate consultation and thusly cannot excuse

the Federal Defendants' failure to consult as to the 2008 SBZ rule or any other rule.  If the 1996

BiOp remains in place, it will continue to serve as a roadblock to proper compliance with the ESA,

and nothing will prevent the Federal Defendants from relying on it again to assert consultation is

not required for future actions.  OSM promulgates mining regulations like the 2008 SBZ rule and,

in Tennessee, issues permits for surface mining.  Indeed, it conducts its entire regulatory program

for surface mining under the auspices of the 1996 BiOp, which guides its decision-making about

the impacts to listed species.  Thus, the Federal Defendants' actions *do* threaten imminent harm to

NPCA's interests, and NPCA has standing to bring suit on its claims regarding the 1996 BiOp.

## II.     OSM'S FAILURE TO CONSULT VIOLATES ESA § 7(A)(2), AND ITS RELIANCE ON THE 1996 BIOLOGICAL OPINION TO JUSTIFY SUCH FAILURE IS ARBITRARY AND CAPRICIOUS (COUNTS II, III).

**A.** **OSM's Failure to Consult Before Promulgating the 2008 SBZ Rule Violates the ESA Because the Rule "May Adversely Affect" Listed Species and Designated Critical Habitat.**

The Federal Defendants concede that OSM's failure to consult before adopting the 2008 SBZ rule was "legal error."  Doc. 43-1 at 21-22.  The Defendants correctly acknowledge that OSM's "promulgation of [the] regulation" is "agency action" under the ESA.  *See id*. (citing 50 C.F.R. § 402.02(b)).  Their contention that the FEIS indicates that the rule would have "slightly positive" or "beneficial" effects on threatened or endangered species, however, *see* Doc. 43-1 at 22-24, is contrary to the statements in the FEIS, albeit erroneous, that the rule would have "no effect" on listed species.[19]  These assertions are contrary to the evidence, as discussed below, and are in fact based on OSM's improper reliance on the 1996 BiOp.  *See, e.g.,* 2008 FEIS at IV-163 (changes to SBZ regulations "would have no on-the-ground effect on threatened or endangered species or critical habitats" because the regulations under SMCRA identified in the BiOp "will b[e] [sic] unaffected by this rulemaking action").

Inexplicably, the defendants now refuse to acknowledge OSM's reliance on the BiOp. Instead they argue in essence that this Court should accept their post-hoc theory as to why OSM failed to consult on the SBZ rule, making it "unnecessary" for the Court to reach the merits of Count III.  Doc. 43-1 at 35.  The defendants further assert that once NPCA's counts are "stripped" of the assertions regarding OSM's reliance on the BiOp, "the remaining ESA-related Counts" (i.e., Count IV) "present only a facial, policy-based challenge to the [BiOp]."  Doc. 43-1 at 25. The defendants' "straw man" argument is without merit.  It is axiomatic that the plaintiff "is the master of the complaint."  *See, e.g.*, *Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., LLC*, 531 F. Supp. 2d 747, 755 (S.D. W. Va. 2008) (internal citations omitted).  As the record shows,

---

[19] The statements regarding the alleged positive impact referred to the overall impact of the rule and not to the effect on listed species.  [*See, e.g.*, FEIS at IV-142, Table IV-1 (comparing various "slight" positive effects with "[N]o change" on listed species.)]

Counts III and IV together present a clear, as-applied challenge to OSM's failure to reinitiate formal consultation on the BiOp, based here on OSM's improper reliance on the BiOp in failing to consult on the SBZ rule.  The defendants cannot be allowed to refashion not only NPCA's complaint, but also the facts, to claim otherwise.

The record in fact shows that the 2008 SBZ rule may adversely affect listed species or their critical habitats, such that OSM's failure to consult on the SBZ rule violated ESA Section 7. OSM admits that the direct effect of in-stream mining operations is almost complete obliteration of aquatic communities there.[20]  The indirect effects are equally certain:  aquatic communities downstream of surface coal mining sites are less diverse and more pollution-tolerant because of increased sedimentation and increased water contamination and toxicity,[21] and the overall health of the aquatic ecosystem suffers as a result of the destruction of headwater streams in central Appalachia from surface mining.[22]

In fact, as OSM notes, these changes to stream quality are particularly problematic for the numerous threatened and endangered mussel species in the Appalachian coalfields.[23]  There is no dispute regarding the presence of federally listed threatened and endangered species in these Appalachian streams.  The 2008 FEIS acknowledges, for example, that "[s]everal Federally listed threatened and endangered species of mussels occur in the study area," specifically naming 16 different mussel species.  2008 FEIS at IV-157.  Mussels are particularly vulnerable to increased sedimentation, "which may occur below fills."  *Id.*  As OSM admits in the 2008 FEIS, in some instances, surface coal mining "may have contributed to the endangerment of species,"

---

[20] 2008 FEIS at IV-152 ("When streams are filled or mined through all biota living in the footprint of the fill or in the mined area are lost.  There is little question that perennial streams support viable aquatic communities that could be lost from valley fills.").
[21] 2005 MTM/VF FEIS at 4.
[22] *See* 2008 FEIS at III-133-141.
[23] *See generally* 2008 FEIS at IV-159-160 (discussing the negative impact of surface coal mining activities on mussel species and other endangered and threatened species).

and, if a species "lacks individual mobility," as is certainly the case with mussels, surface mining operations "may result in a direct take." *Id.* at IV-160. This information is more than sufficient to meet the standard of "may affect," so as to require section 7 consultation on the SBZ rule.

In addition, three of the sixteen endangered mussel species that are specifically identified in the 2008 FEIS are of particular concern to NPCA: the Cumberland elktoe (*Alasmidonta atropurpurea*), the Oyster mussel (*Epioblasma capsaeformis*), and the Cumberlandian combshell (*Epioblasma brevidens*). In 2004, the FWS designated twenty-seven miles of the main stem of the Big South Fork and nine miles of the New River in Tennessee as critical habitat for these species.[24] The Big South Fork is formed by the confluence of the New River, which begins in the coal mining region of northeast Tennessee, and Clear Fork, just upstream of the NRRA, an area that NPCA has worked for many years to protect. *See* Barger Decl. ¶¶ 5, 8, 9, 12, 13. The critical habitat designation makes clear that, because of their limited range and specialized habitat, these mussels are particularly vulnerable to extinction, and the designated critical habitats are crucial to the species survival. *See* 2004 Mussel Critical Habitat, 69 Fed. Reg. at 53,147, 53,137-38. According to the FWS, both active and past pollution from upstream coal mining threaten the mussels' critical habitat and their survival.[25]

As stated above, the 2008 SBZ rule specifically authorizes, and exempts from the buffer requirement, valley fills, and the construction of coal mine waste disposal facilities, slurry impoundments, and sedimentation ponds, as well as other mining activities in the stream or within the buffer zone, such as stream diversions. *See* 30 C.F.R. §§ 816.57(b), 817.57(b). OSM asserts

---

[24] Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Five Endangered Mussels in the Tennessee and Cumberland River Basins, 69 Fed. Reg. 53,136, 53,149 (Aug. 31, 2004) ("2004 Mussel Critical Habitat") (Ex. B). These listing documents may properly be included as extra-record evidence; they are publicly available, and they pertain to species referred to in the 2008 FEIS.

[25] *See* U.S. Fish and Wildlife Service, Recovery Plan for Cumberland Elktoe, Oyster Mussel, Cumberlandian Combshell, Purple Bean, and Rough Rabbitsfoot (24 May2004) ("2004 Mussel Recovery Plan") (Ex. G), at 35, *available at* http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=F01K#recovery.[25]

that, in the steep slope terrain of central Appalachia, streams and valleys are "the only logical and

technologically and economically feasible location" for excess spoil, fills, refuse piles,

sedimentation ponds, and coal mine waste impoundments.  73 Fed Reg. at 75,855 (preamble).

OSM further claims that "[a]doption of a rule (or interpretation of an existing rule) to prohibit

placement of excess spoil and coal mine waste in streams… would be inconsistent with… SMCRA

because mountaintop removal operations—and most other types of mining operations in steep-

slope areas—typically cannot be conducted without construction of excess spoil fills in streams."

73 Fed. Reg. at 75,825.  *See also* 73 Fed. Reg. at 75,860 (similar statements).

As a result, OSM deleted the two conditions in the 1983 rule for a waiver of the buffer

requirement, namely that the operations would not cause or contribute to the violation of water

quality standards and would not adversely affect water quality and quantity or other

environmental resources of the stream.  *See* 73 Fed. Reg. at 75,840 (preamble to regulations).

Instead, the new rule simply requires the operator to show that avoidance is not reasonably

possible and that it will minimize adverse impacts to "fish, wildlife, and related environmental

values to the extent possible," using the best technology available.  In commenting on this

change, the FWS told OSM that it was "adopting a less protective standard"[26]  *See* 73 Fed. Reg.

at 75,853.  OSM responded:  "*We do not dispute this characterization*."  *Id*. (emphasis added).

Thus, not only did OSM essentially make the buffer requirement the exception rather than the rule,

but it also freely admitted that the 2008 SBZ rule is less protective than the 1983 rule.

OSM claimed that "the absolute nature of the 'will not adversely affect' language" of the

1983 regulation was "inconsistent" with the SMCRA provisions that surface mining operations

be conducted to meet the standards of "'to the extent possible' using the 'best technology

---

[26] FWS's specific comment was in reference to allowing stream diversions, but such comment applies equally to all stream filling activities in the 2008 rule because OSM used the same lax standard for each.

currently available,'"[27]  73 Fed. Reg. at 75,841, and that "the new standard is one that reflects the provisions of SMCRA."  73 Fed. Reg. at 75,853.  It claimed that the rule revisions not only will "make the requirements clear and consistent with the underlying statutory authority in SMCRA," 2008 FEIS at IV-142, but that such changes will also reduce "the volume of excess spoil generated . . . [and] reduce the size of the areas directly affected."  *Id.* at IV-141.

NPCA disagrees that the 1983 SBZ rule, in effect for nearly thirty years, was inconsistent with SMCRA.  After all, as the Federal Defendants point out, the 1983 SBZ rule has "previously withstood judicial challenge in this court."  Doc. 43-1 at 11 (citing *In re: Permanent Surface Mining Regulation Litigation II-Round II*, [1984] 15 Envtl. L. Rep. 20481 (D.D.C. 1 Oct. 1984)).  Moreover, the new rule adds nothing that is not already required.  The performance standards set forth in SMCRA already require operators to "minimize disturbances" both at the mine site and in associated off site areas, and "to minimize disturbances and adverse impacts of the operation on fish, wildlife, and related environmental values," 30 U.S.C. §§ 1265(b)(10), (b)(24), among other requirements.

Regardless, the 2008 SBZ rule all but eliminates the protections of the 100-foot stream buffer by narrowly restricting its reach and expressly allowing mining operations such as valley fills, refuse piles, and impoundments in the stream or buffer.  Such practices, as OSM admits, have already eliminated or impaired hundreds of miles of streams in central Appalachia.  The weaker rule thus readily meets the "may affect" standard such that the failure to consult violated Section 7(a)(2) and was arbitrary and capricious and not in accordance with law.

---

[27] OSM does acknowledge in the preamble that the rule "effectively prescribes" the maintenance of the 100-foot buffer as "the best technology currently available" to meet the SMCRA requirements for sediment control and protection of fish and wildlife, *except*, however, in the case of surface mining operations in central Appalachia.  *See* 73 Fed. Reg. at 75,855 (citing SMCRA §§515(b)(10)(B)(i), 515(b)(24)) ("[T]he concept of maintenance of an undisturbed buffer zone as the best technology currently available for purposes of those sections of the Act applies only to activities that do not involve disturbance of the streambed and do not inherently occur within the buffer zone.").

B.   The 1996 Biological Opinion Cannot Excuse OSM's Failure to Consult.

In "effect" relying on the "no jeopardy" conclusion of the 1996 BiOp, to conclude that ESA section 7 consultation was not required on the new rule, OSM claimed that, because the 2008 SBZ rule did not alter any of the specific regulations identified in the BiOp, the statute and regulations would "continue to ensure the protection of listed endangered and threatened species, proposed species, and their critical habitats."  2008 FEIS at IV-162.

OSM's premise is fundamentally flawed.  The BiOp makes clear that the specified regulations are not the only ones relevant to the "no jeopardy" conclusion.  Instead, it indicates that the conclusion was "based on compliance with, *but not limited to*," those regulations.  1996 BiOp at 10 (emphasis added).  The action in the BiOp broadly covers surface coal mining and reclamation operations conducted under the State and Federal regulatory programs adopted pursuant to SMCRA.   As such, the FWS's opinion necessarily was based upon the Act and regulations in effect at the time, which included the 1983 SBZ rule.  That the 1983 SBZ rule is not specifically mentioned in the BiOp makes no difference.  Equally obvious, the BiOp could not have considered the changes to the former rule resulting from the adoption of the 2008 rule. As alleged in Count III, OSM's attempt to bootstrap the 1996 BiOp to evade its consultation obligation on the 2008 SBZ rule is plainly unlawful under ESA § 7(a)(2), and is arbitrary and capricious, and not in accordance with the law under the APA, 5 U.S.C. § 706.

C.   The 2008 SBZ Rule Should Be Vacated.

The Court should vacate the 2008 SBZ rule given the Federal Defendants' clear and admitted violation of the ESA.  Section 7(a)(2) affirmatively commands that all federal agencies insure their actions are not likely to jeopardize the "continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such

species." 16 U.S.C. § 1536(a)(2).  As the Federal Defendants readily confess, OSM promulgated

the 2008 SBZ rule without complying with Section 7's exacting requirements.  *See* Doc. 43-1 at

21-22.  To remedy this significant violation of law, the Court should vacate and remand the 2008

SBZ rule.  Vacatur is appropriate in this case because it is the standard remedy for unlawful

agency action, and neither of the *Allied-Signal* factors indicates the Court should depart from this

standard.  Vacatur is especially appropriate here because setting aside the 2008 SBZ rule will

result in the reinstatement of the 1983 SBZ rule, furthering the protective purposes of the ESA.

> i. *Vacatur is the Presumptively Appropriate Remedy for Defendants' ESA Violations.*

The standard of review for challenging agency actions under the ESA citizen suit

provision is the APA standard of review.  *See Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d

96, 106 (D.D.C. 2011).  The APA expressly directs courts to "hold unlawful and set aside agency

actions, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Accordingly, "both the Supreme

Court and the D.C. Circuit Court have held that remand, along with vacatur, is the presumptively

appropriate remedy for a violation of the APA."  *Sierra Club v. Antwerp*, 719 F. Supp. 2d 77, 78

(D.D.C. 2010).  Indeed, where a plaintiff "prevails on its APA claim, it is entitled to relief under

that statute, which normally will be a vacatur of the agency's order."  *Am. Bioscience Inc. v.

Thompson*, 269 F. 3d 1077, 1084 (D.C. Cir. 2001).

Courts acknowledge that vacatur is the presumptive remedy in cases involving the ESA.

*See Defenders of Wildlife v. U.S. Envt.. Prot. Agency*, 420 F.3d 946, 978 (9th Cir. 2005)

("Typically, when an agency violates the [APA] and the [ESA], we vacate the agency's action

and remand to the agency to act in compliance with its statutory obligations.") (overturned on

unrelated grounds in *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)).

Indeed, this court recently vacated and remanded a final rule held unlawful under the ESA and

APA, finding that "the ESA's preference for protecting endangered species counsels strongly in

favor of vacating [a final rule in violation of the ESA]."  *See Humane Soc'y of the U.S. v.*

*Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008).  Consistent with this finding, the D.C. Circuit

has regularly concluded that vacatur is the appropriate remedy for agency actions contrary to the

ESA.  *See, e.g. Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027 (D.C. Cir. 2008) (finding

vacatur appropriate for failure to consult under ESA without inadequate explanation for failure);

*Building Indus. Legal Def. Found. v. Norton*, 231 F. Supp. 2d 100 (D.D.C. 2002) (finding vacatur

of critical habitat designation appropriate remedy for ESA violation).  *See also Pac. Rivers*

*Council v. Shepard*, 2011 WL 7562961, at *9-10 (D. Or., Sept. 29, 2011) (finding vacatur

appropriate for agency's failure to consult under section 7 of the ESA); *Cal. ex rel. Lockyer v.*

*U.S. Dep't of Agric.*, 575 F. 3d 999, 1020-21 (9th Cir. 2009) (setting aside rule where failure to

consult under ESA section 7 of the ESA was arbitrary and capricious).

ii.   *Both of the Allied-Signal Factors Counsel Vacatur of the 2008 SBZ Rule.*

The D.C. Circuit has established a test to determine the limited set of circumstances

under which a court may remand a legally defective rule without vacatur.  *See Allied-Signal Inc.*

*v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).  Under the *Allied-*

*Signal* test, the decision whether to vacate an unlawful agency action depends on two factors:

first, the "seriousness of the order's deficiencies (and thus the extent of doubt whether the agency

chose correctly)," and second, the "disruptive consequences" of vacating the agency's unlawful

action.  *Id.* at 150-51.  Vacatur may be considered "disruptive" because setting aside an unlawful

agency action creates an "interim change that may itself be changed" when the agency considers

the matter on remand. *Id.* However, neither of these two factors indicates that the Court should depart from the presumptively appropriate remedy of vacatur here.

First, the seriousness of the 2008 SBZ rule's deficiencies and the error of the Federal Defendants' choice in promulgating the rule without consultation cannot be doubted. As the Supreme Court has affirmed, the ESA reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies," *TVA v. Hill*, 437 U.S. at 185, and the Section 7 consultation process is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species." *Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d at 100 (quoting *Lujan*, 504 U.S. at 603). In failing to initiate consultation as to the 2008 SBZ rule, the Federal Defendants violated their most basic and fundamental duty under the ESA, which is "unquestionably a 'serious' deficiency" and an "error of sufficient gravity" warranting vacatur of the 2008 SBZ rule. *See AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 91 (D.D.C. 2007). Indeed, the D.C. Circuit has stated that vacatur is *required* when an agency "has wholly failed to comply with [a] specific statutory requirement" and renders "an arbitrary-and-capricious decision" as a result. *See Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004); *see also Nat'l Ass'n of Home Builders v. Norton*, 2001 WL 1876349 at *3 (D. Ariz., 21 Sept. 2001) (vacatur of final rule necessary, because "failure to comply with the statutory requirements [of the ESA] . . . is more than a minor procedural error" and "calls the very substance of the [final rule] into question").

The first *Allied-Signal* factor also favors vacatur because the Federal Defendants' clear confession of legal error as to the 2008 SBZ rule removes any "serious possibility" that OSM would be able to substantiate its decision on remand or develop a reasoned explanation justifying

its action.  *See Allied-Signal*, 988 F.2d at 151.  As the Federal Defendants admit, "OSM did not

engage in formal ESA consultation with FWS prior to issuing the 2008 SBZ Rule," and "OSM

erroneously concluded that any consultation was unnecessary (i.e. that the rule would have 'no

effect') despite OSM's findings in the draft and final EIS documents that the 2008 SBZ Rule has

the potential to have on-the-ground effects on threatened or endangered species or critical

habitat."  Doc. 43-1 at 21-22.  Furthermore, this court was not persuaded that there was a

"serious possibility" an agency could substantiate its decision on remand in another ESA case

where the agency's action was procedurally deficient and the agency had avoided judicial review

on the merits of its decision for years, as is the case here.  *See Hawaii Longline Ass'n v. NMFS*,

288 F. Supp. 2d 7, 12 (D.D.C. 2003) (finding remand without vacatur inappropriate remedy for

biological opinion and regulations held to be unlawful).

     As to the second *Allied-Signal* factor, which considers the disruptive consequences of

setting aside unlawful agency action, the burden is on the Federal Defendants to provide

"compelling evidence" that vacatur of the 2008 SBZ rule would indeed be "unduly disruptive."

*See Reed v. Salazar*, 744 F. Supp. 2d 98, 119 (D.D.C. 2010).  The defendants here have not only

failed to provide such evidence; they have in fact asserted the inverse:  that it would be

disruptive if the 2008 SBZ Rule is remanded *without* vacatur.  *See* Doc. 43-1 at 33-34.

     Setting aside the 2008 SBZ rule would be minimally disruptive in any event, because

vacatur would result in the reinstatement of the previous 1983 SBZ rule, which governed surface

mining activities for nearly 30 years and with which the regulated community is well familiar.

*See Croplife America v. EPA*, 329 F.3d 876, 884-85 (D.C. Cir. 2003) (finding result of rule's

vacatur is reinstatement of prior rule).  As the Federal Defendants acknowledge, "typically courts

will vacate an improperly promulgated rule when there is a lawful, pre-existing regulatory

structure in place than can be reverted to and will prevent disruption to the regulated community." Doc. 43-1 at 33 (citing *Comcast Corp. v. FCC*, 579 F.3d 1, 19-23 (D.C. Cir. 2009). Indeed, this court recently concluded in another ESA case that disruption was "not a substantial concern" when vacatur of an unlawful agency action resulted in the reinstatement of regulatory regime that had been in effect for nearly 30 years, since returning to that regime would create "[l]ittle confusion or inefficiency . . . particularly given the fact that state and federal . . . authorities have been working in tandem for years." *Humane Soc'y of the U.S.*, 579 F. Supp. 2d at 21 (setting aside 2007 rule and reinstating regime in place from 1978 to 2007). Vacatur would similarly be appropriate here, because it would reinstate a long-established rule from the Reagan era, mitigating the risk of regulatory uncertainty for the mining industry.

While NPCA and the Federal Defendants are in agreement that vacatur of the 2008 SBZ rule would not be disruptive, it must be noted that NPCA fundamentally disagrees with one of the reasons the Federal Defendants submit in support of this conclusion: namely, that "the application and effects" of the 2008 rule "have been minimal" on lands in Tennessee. See Doc. 43-1 at 18; Pizarchik Decl. ¶ 17. Contrary to the government's assertions, *see id.*, the amount of coal mined in Tennessee relative to the amount of coal mined *nationally* is of no consequence for whether mining conducted under the 2008 rule in Tennessee has harmful effects on local watersheds and aquatic ecosystems in the state. Moreover, the "added risk" to the environment and to protected species remains in Tennessee, because the mining industry is operating under a rule promulgated by "governmental decisionmakers [who made] up their minds without having before them an analysis… of the likely effects of their decision on the environment." *See Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 884 (N.D. Cal. 2006). The Federal

Defendants' failure to comply with ESA procedural requirements has thus, by itself, harmed the interests of NPCA and its members in Tennessee.  *See* Barger Decl. ¶ 24-25.

Also contrary to the government's assertions regarding the effects of the 2008 SBZ rule in Tennessee, *see* Doc. 43-1 at 18; Pizarchik Decl. ¶ 17, the fact that the mining industry may be subject to regulation under state laws and policies does *not* excuse OSM's compliance with the ESA, an entirely different, federal statute with wholly separate requirements.  *See Ore. Envtl. Council v. Kunzman*, 714 F.2d 901, 905 (9th Cir. 1983).  Indeed, the existence of state laws and policies concerning surface coal mining *cannot* relieve the Federal Defendants of their fundamental duty to ensure that their actions do not harm threatened and endangered species and critical habitat.  After all, if an agency action, such as the promulgation of the 2008 SBZ rule, "is allowed to proceed without substantial compliance with [the ESA's] procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result," and "[t]he latter, of course is impermissible."  *Thomas v. Peterson*, 753 F. 2d 754, 764 (9th Cir. 1985) (citing *TVA v. Hill*, 437 U.S. 153 (1978)).

In sum, both the first and second *Allied-Signal* factors counsel in favor of vacatur in the instant litigation, because the 2008 SBZ rule's deficiencies are sufficiently serious and any disruptive consequences of setting aside the rule would be minimal.

      iii.  *Reinstating the 1983 Rule is Consonant with the Protective Purposes of the ESA.*

Vacatur is especially appropriate in this case because setting aside the 2008 SBZ rule furthers the purposes of the ESA by returning to the more protective 1983 rule, pending further action by OSM on remand.  As outlined above, the 1983 rule provides greater protection for threatened and endangered species, since it prohibits the disturbance of land within 100 feet of a perennial or intermittent stream by surface mining activities, and allows an exception only upon

a finding that mining activities will not cause or contribute to the violation of water quality standards and will not adversely affect the water quantity and quality or other environmental resources of the stream. *See* 30 C.F.R. §§ 816.57(a)(1), 817.57(a)(1) (1983). Vacatur is thus consonant with the protective purposes of the ESA and "Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species." *See Nat'l Wildlife Fed. v. Burlington Northern R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir. 1994).

Returning to the 1983 SBZ rule is also the proper remedy because it will eliminate the "added risk" of environmental harm posed by the Federal Defendants' decision to promulgate the 2008 rule without an analysis of the likely effects their decision might have on the threatened and endangered species that depend on healthy waterways and ecosystems. *See Cal. Ex rel. Lockyer*, 459 F. Supp. 2d at 913-16. The ESA entitles these species to the most protective rule while OSM reconsiders this matter on remand and develops a new Stream Protection Rule; it does not entitle the mining industry to the benefits of an unlawful rule, let alone one that undermines the heart and purpose of the ESA.

In sum, the 2008 SBZ rule must be vacated because its promulgation without consultation was a clear violation of the ESA and allowing this unlawful rule to remain in place poses a serious risk of substantive harm to threatened and endangered species. "In enacting the ESA, Congress definitively skewed the balancing process in favor of species protection," and vacatur of the 2008 SBZ rule is necessary because courts "cannot ignore this clear command." *Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1243 (D. Colo. 2011).

### III.   OSM'S FAILURE TO REINITIATE CONSULTATION ON THE 1996 BIOLOGICAL OPINION VIOLATES 50 C.F.R. 402.16 (COUNT IV).

As discussed below, OSM's failure to reinitiate consultation on the 1996 BiOp violates its mandatory duties under 50 C.F.R. § 402.16 and section 7 of the ESA. For the reasons discussed

below, this Court should direct OSM to reinitiate formal consultation on the 1996 BiOp and set

aside the 1996 BiOp as invalid.

    A.   <u>Agency Action is Ongoing Over Which Discretionary Federal Involvement or Control Has Been Retained by OSM or Is Authorized by Law</u>.

Under 50 C.F.R. § 402.16, reinitiation of formal consultation "is required and shall be

requested by the Federal agency or by the [FWS], where discretionary Federal involvement or

control over the action has been retained or is authorized by law," and where any of the four

criteria listed in the regulation is met.  The 1996 BiOp defines the "action" as "the continuation

and approval" and the "conduct" of surface coal mining and reclamation operations "under State

and Federal regulatory programs adopted pursuant to SMCRA where such operations may

adversely affect threatened or endangered species."  1996 BiOp at 1, 3.  The criteria for § 402.16

plainly are satisfied with respect to OSM's conduct of the SMCRA program in Tennessee.  OSM

has ongoing control and discretion over the SMCRA regulatory program there, and it has

conducted the program in Tennessee since 1984.  Among its responsibilities, OSM has the

authority to review and grant permits under SMCRA, which itself is one example of agency

action triggering the consultation obligation.  50 C.F.R. § 402.02(c).  OSM also has ongoing

authority in Tennessee generally to administer, implement and enforce the SMCRA regulatory

program.[28]

Nor is there an issue whether surface coal mining and reclamation operations "may

adversely affect threatened or endangered species," as set forth in 50 C.F.R. § 402.16.  For

example, the BiOp itself acknowledges that such operations have "the potential to adversely

affect listed and proposed species and may result in the incidental take of listed species.  1996

---

[28] *See, e.g.*, 30 U.S.C. § 1211(c)(1)(certain enforcement responsibilities).

BiOp at 12.  Further, the BiOp provides that "[i]n some cases, surface coal mining and reclamation activities may have contributed to the endangerment of species."  *Id.* at 6.

The key issue addressed in this section is whether OSM's ongoing oversight responsibility in states with primacy constitutes ongoing agency action over which OSM has discretionary involvement or control to trigger reinitiation.  As the Federal Defendants state, "OSM's role under SMCRA does not end once it has approved a state's program.  SMCRA gives OSM ongoing authority to oversee the effectiveness of the state's implementation of its program." Doc. 43-1 at 4 (citing 30 U.S.C. §§ 1254(b), 1267(a), and 1271)).  As such, OSM conducts oversight inspections of selected mine sites, 30 U.S.C. § 1211(c), and assists the states in evaluating the administration, implementation, and maintenance of approved regulatory programs.[29]  SMCRA also authorizes OSM to order federal inspections in instances in which OSM has reason to believe that the mine operations are not in compliance with SMCRA, and to take immediate action if there is imminent danger to the public or significant, imminent environmental harm.  *See* 30 U.S.C. § 1271(a).[30]

OSM's ability to conduct federal inspections and to issue cessation orders is sufficiently broad to allow OSM to act for the benefit of listed species, the standard that courts use to interpret "discretionary involvement or control," 30 U.S.C. §§ 1271(a)(1)-(2), as discussed below.  Under SMCRA § 515(b)(24), a mining operator must "minimize disturbances and adverse impacts of the operation on fish, wildlife, and related environmental values," 30 U.S.C. § 1265(b)(24), which would encompass potential adverse impacts on threatened and endangered species.  Any permit issued under SMCRA, whether by a state or by OSM, must meet this

---

[29] *See generally,* OSM Making Oversight More Effective, Office of Surface Mining Reclamation and Enforcement, http://www.osmre.gov/topic/Oversight/SCM/ImprovementActions.shtm#discussionpapers, http://www.osm.gov/topic/Oversight/SCM/WhatIsOversight.pdf (last visited 6 Aug. 2013).

[30] SMCRA also allows OSM under certain limited circumstances to revoke a state program. 30 U.S.C. § 1271(b); 30 C.F.R. Part 733.  30 U.S.C. § 1271(b).

minimum requirement.  Because OSM is empowered to take certain action in the event of a violation of this or other SMCRA provisions, OSM's continued involvement or oversight in state programs qualifies as "ongoing," discretionary action "carried out . . . in part" by OSM.  The BiOp's definition of the "agency action" also, on its face, assumes ongoing federal involvement not only in Tennessee but also in primacy states.  The action in the BiOp includes the "continuation" and "conduct" of surface coal mining operations, "under State and Federal" regulatory programs.

Numerous cases support NPCA's claim that OSM's oversight authority represents ongoing agency action over which OSM has retained discretionary involvement or control.  For example, in *Washington Toxics Coalition v. U.S. Envtl. Prot. Agency*, 413 F.3d 1024 (9th Cir. 2005), plaintiffs challenged the agency's failure to consult before it approved certain pesticides. EPA contended that it was not bound by the ESA consultation requirements because it had complied with the requirements of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, *et seq.*, approving the pesticides.  *Id.* at 1028.  The Ninth Circuit disagreed, holding that compliance with FIFRA did not allow the agency to escape its ESA obligations.  *Id.* at 1032.  The court also rejected EPA's argument, that, once EPA approved a pesticide, the agency action had been "completed."  Rather, EPA's authority was ongoing because it retained discretion to alter or cancel the registration for environmental concerns.  *Id.* at 1033.  Notably, the court rejected the same argument that the Federal Defendants make here regarding "primary jurisdiction."  As the court stated, that EPA also had authority under FIFRA to protect listed species did not mean that "FIFRA provides an exclusive or primary remedy." 413 F.3d at 1034.  Here too, OSM's oversight authority does not end with approval of the SMCRA program.  *See also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1030 (9th

Cir. 2012) (en banc) (broadly finding that agency failed to consult before approving Notices of

Intent to conduct mining operations in critical habitat on national forest; s*ee also Turtle Island

Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969 (9th Cir. 2003) (finding that

NMFS issuance of fishing permits was ongoing and discretionary because the statute gave the

agency discretion to condition permits for benefit of listed species); *Pac. Rivers Council v.

Thomas,* 30 F.3d 1050, 1053 (9th Cir. 1994) (holding that Forest Service was required to

reinitiate consultation on forest management plans following a new listing of a threatened

species because of "ongoing and long-lasting effect" of plan, governing "a multitude of

individual projects." *But see Forest Guardians v. Fosgren*, 478 F.3d 1149, 1158-59 (10th Cir.

2007) (holding that standards and guidelines in forest plan do not constitute "action" requiring

consultation).

 *Florida Key Deer v. Paulson*, 522 F.3d 1133 (11th Cir. 2008), involved a challenge to the

failure of the Federal Emergency Management Agency ("FEMA") and the FWS to consult

regarding FEMA's administration of the National Flood Insurance Program ("NFIP") in the

Florida Keys.  Under the relevant statute, FEMA was required to make flood insurance available

to localities, provided the community had adopted adequate land use and control measures that

were consistent with comprehensive criteria that Congress authorized FEMA to adopt.  *Id*. at

1136-37.  The court held that FEMA's administration of the NFIP program constituted ongoing,

discretionary action requiring section 7 consultation.  Although FEMA was charged with

providing flood insurance to localities, it developed the criteria that the localities had to meet,

and "enjoy[ed] broad discretion in so doing."  *Id*. at 1142.  The court also found that FEMA had

discretion in administering the NFIP to consider the protection of threatened or endangered

species as an end in itself. [31]   *Id.* at 1141 (citing *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ("NAHB")).

The foregoing cases show that OSM's continued oversight in those states with primacy satisfies the elements of ongoing agency action and with the discretion to consider protection of listed species.  Should this Court disagree, however, OSM's clear ongoing authority to conduct the SMCRA regulatory program in Tennessee compels a finding that OSM must reinitiate consultation on the BiOp, because, in addition at least one of the "triggers" in 50 C.F.R. § 402.16 has been met.

B.  One or More of the "Triggers" in 50 C.F.R. § 402.16 Has Been Met Requiring Reinitiation of Consultation on the 1996 BiOp.

The Federal Defendants state in their brief that reinitiation of consultation "*may*" be required under certain circumstances. Doc. 43-1 at 7.  In fact, the regulation plainly mandates not only that reinitiation of consultation occur once the relevant conditions are met, but also that reinitiation of formal consultation "*shall be requested by the Federal agency*," 50 C.F.R. § 402.16, which OSM has refused to do.  The Federal Defendants appear to imply that, because only two of the four triggering criteria for reinitiation of consultation are specifically mentioned in the 1996 BiOp, the remaining two criteria are inapplicable.  They say that "[n]otably, the listing of new species and the designation of critical habitat were *not* included as factors that may trigger the need to reinitiate consultation pursuant to the ESA." Doc. 43-1 at 15 (emphasis in original). As discussed below, the two criteria for reinitiation that are specifically mentioned in the BiOp are satisfied here, namely where "(1) new information reveals that the agency action may affect

---

[31] Similarly, the court found that FEMA had broad discretion to consider listed species in its rating system that allowed discounts on premiums for localities. *Id.* at 1142.  *Accord Coal. for a Sustainable Delta v. FEMA*, 812 F. Supp. 2d 1089 (E.D. Cal 2011) (finding discretionary action and control under NFIP program), *National Wildlife Federation v. FEMA*, 345 F. Supp. 2d 1151 (W.D. Wash. 2004) (finding FEMA has discretion under NFIP to act for the benefit of endangered salmon species in Puget Sound).

listed species or critical habitats in a manner or to an extent not considered in this opinion" and where "(2) the agency action is modified in a manner that causes an adverse effect to listed species or critical habitats that was not considered in this opinion."  1996 BiOp at 14.

However, the omission of the criterion for the listing of new species and designation of critical habitat in the BiOp cannot mean, as the defendants suggest, that this criterion is inapplicable.  The regulation mandates reinitiation on this or any of the other triggering events. Thus, OSM cannot exempt itself from a statutory obligation to which Congress clearly intended every federal agency to be subject.  See *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2005 WL 1278878 at *11 (D. Or. 26 May 2005) ("If Congress had meant to provide additional exemptions [to ESA], it would have done so.")  Thus, OSM must reinitiate consultation, as discussed below, because of the subsequent listing of species and designation of critical habitats since 1996.

The Federal Defendants also incorrectly argue that relying on this criterion to trigger OSM's duty under 50 C.F.R. § 402.16 amounts to a facial challenge to the BiOp that is barred by the statute of limitations.  *See* Doc 43-1 at 27 (citing 28 U.S.C. § 2401(a)).  This assertion is invalid for the reasons already discussed.  It makes no difference whether theoretically such a claim could have been brought when the BiOp was adopted.  Rather, the requirements of 50 C.F.R. § 402.16 now compel OSM to reinitiate consultation.

        i.  *The Listing of New Species And Designation of Critical Habitats Compels Reinitiation of Formal Consultation on the 1996 BiOp.*

"Because new species [have been] listed [and] critical habitat designated that may be affected by the identified action," 50 C.F.R. § 402.16(d), OSM must reinitiate consultation on the BiOp.  As stated above, in 2004, the FWS designated twenty-seven miles of the main stem of the Big South Fork and nine miles of the New River in Tennessee as critical habitat for three

endangered mussel species found in the Big South Fork river system:  the Cumberland elktoe (*Alasmidonta atropurpurea*), the Oyster mussel (*Epioblasma capsaeformis*), and the Cumberlandian combshell (*Epioblasma brevidens*).  These endangered mussel species exist in only a few small, isolated populations.[32]  Because of their limited range and specialized habitat, they are particularly vulnerable to extinction.  2004 Mussel Critical Habitat, 69 Fed. Reg. at 53,148.  In the 2004 Recovery Plan for these species, the FWS indicated that adverse impacts from upstream coal mining "such as increased sedimentation, heavy metal pollution, and low pH" continue to threaten the populations of these species and their critical habitat designated areas.  2004 Mussel Recovery Plan at 35.

Likewise, in its 2011 listing of the Cumberland darter (*Etheostoma susanae*) as endangered, the FWS stated that the "primary threat" to the darter is "physical habitat destruction or modification," resulting from a variety of human-induced impacts, the most significant of which is siltation "caused by excessive releases of sediment from activities such as resource extraction," including coal mining. 76 Fed. Reg. at 48,731 (citations omitted) (Ex. C).  Because this species occurs in only "sparse, fragmented, and isolated populations in the upper Cumberland River system of Kentucky and Tennessee," in 2012, the FWS designated parts of these streams as critical habitat for the species.  77 Fed. Reg. at 63,604 (Ex. D).  The FWS opined that "the presence of relatively silt-free substrates is the major limiting factor for both the species' continued existence and its ability to colonize new habitats," 77 Fed. Reg. at 63,617, and it agreed with a commenter that "large surface coal mine operations in Campbell and Scott Counties, Tennessee, are a potential threat to the Cumberland darter. . ."  77 Fed. Reg. at 63,610.  As the FWS explained, "[s]treams associated with surface coal mining and valley fills are typically characterized by elevated conductivity, elevated total dissolved solids, and increased

---

[32] The FWS listed these species as endangered in 1997. *See* 62 Fed. Reg. 1647 (Ex. A).

concentrations of sulfate, bicarbonate ions, and metals such as manganese, iron, aluminum, and selenium," *id.*,[33] which adversely affect this species.

    ii.  *New Information on the Adverse Impacts of Mining on Listed Species and Habitat, and Modification of the Action Require Reinitiation of Consultation.*

Under 50 C.F.R. § 402.16(b), reinitiation of consultation is also triggered by "new information" that "reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." Plainly, in the 2005 MTM/VF FEIS qualifies, showing that hundreds of miles of streams in central Appalachia have been directly impacted or destroyed as a result of surface mining operations conducted and approved under SMCRA. Reinitiation of consultation is also triggered, under 50 C.F.R. § 402.16(c), because of the "modification" of the identified action. The SBZ rule is part of the "action" identified in the BiOp, as part of the SMCRA regulatory program governing surface mining operations. The 2008 rule significantly weakens the buffer requirement, expressly authorize valley fills and mining through streams, for example, with the acknowledged impact of eliminating "all biota living in the footprint of a fill or in the mined area." 2008 FEIS at IV-152.

    C.  <u>The 1996 BiOp Must Be Set Aside as Invalid and OSM Must Reinitiate Consultation.</u>

As stated above, OSM has plainly failed to comply with ESA regulations, which require federal agencies to reinitiate consultation under four criteria, three of which are present as to the 1996 BiOp and the 2008 SBZ rule. *See* 50 C.F.R. § 402.16. To remedy OSM's clear and continuing violation of this mandate, the Court should both declare as invalid and set aside the 1996 BiOp. The Court should also direct OSM to reinitiate formal consultation regarding the continuation and approval of surface coal mining and reclamation operations under SMCRA.

The foregoing request for relief is appropriate because courts have affirmed that "[w]hen reinitiation of consultation is required, the original biological opinion loses its validity . . ." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1108 (9th Cir. 2012) (citing *Or. Natural Resources Council v. Allen*, 476 F.3d 1031, 1037 (9th Cir. 2007)). Indeed, the 1996 BiOp is rendered invalid because "continued reliance" on a biological opinion becomes "legally impossible" when one of the four triggers for reinitiation occurs, as is the case here. *See Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000). NPCA is entitled to a declaratory judgment that the Federal Defendants violated the ESA by failing to reinitiate consultation. *See Sierra Club v. Marsh*, 816 F. 2d 1376, 1389 (9th Cir. 1987) (holding that plaintiff was entitled to "a declaration that the COE violated the ESA by refusing to reinitiate consultation"). Setting aside the 1996 BiOp is critical because "an agency cannot meet its section 7 obligations by relying on a Biological Opinion that is legally flawed or by failing to discuss information that would undercut the opinion's conclusion." *Ctr. for Biological Diversity*, 698 F.3d at 1127-28.

The fact OSM's violations as to Counts III and IV may be remedied—(1) by declaring the 1996 BiOp invalid, (2) by vacating the 1996 BiOp, and (3) by ordering OSM to reinitiate consultation— reinforces NPCA's argument that that its claims as to the 1996 BiOp are not moot. Indeed, the Court can and should provide further relief to NPCA in this case beyond setting aside the 2008 SBZ rule. If the Court orders vacatur of the 2008 SBZ rule *without* declaring the 1996 BiOp invalid, setting the 1996 BiOp aside, and compelling OSM to reinitiate consultation, OSM may continue to violate its procedural and substantive duties under the ESA,

causing harm to threatened and endangered species and the interests of NPCA and its members.[34]

## CONCLUSION

For the foregoing reasons, NPCA respectfully requests that this Court grant summary judgment in its favor on Counts II, III, IV, and VII of the Amended Complaint, Doc. No. 6, and to deny the Federal Defendants' request to dismiss Counts III, IV, and VII.  Further, NPCA respectfully requests that the Court vacate the SBZ Rule and the 1996 Biological Opinion, reinstate the 1983 Stream Buffer Zone Rule, and remand the matter to OSM with instructions to reinitiate consultation on the 1996 Biological Opinion, and to award Plaintiff its reasonable attorneys' fees, and such further and additional relief as this Court deems appropriate.

NPCA requests that this Court grant oral argument on this matter.


Respectfully submitted this 7th day of August 2013.


/s/ Deborah M. Murray
Deborah M. Murray (D.C. Bar No. 362563)
Senior Attorney
Catherine Malina (*pro hac vice*)
Associate Attorney

Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA 22902
(434) 977-4090 Telephone
(434) 977-1483 Fax
dmurray@selcva.org

*Counsel for National Parks*

---

[34] Moreover, as stated above, OSM has improperly relied upon the 1996 BiOp to excuse its failure to consult as to the 2008 SBZ rule, and the fact that the 1996 BiOp has lost its validity due to OSM's failure to reinitiate consultation underscores the importance of vacating the 2008 SBZ rule.  *See Wild Fish Conservancy v. Salazar*, 628 F. 3d 513, 532 (9th Cir. 2010) (finding reliance on legally flawed biological opinion was arbitrary and capricious and therefore violated substantive duty to ensure did not jeopardize continued existence of listed species).

*Conservation Association*