# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| S.M.R. JEWELL, Secretary of the United States Department of Interior; JOSEPH G. PIZARCHIK, Director of the Office of Surface Mining Reclamation and Enforcement, and REGINA ("GINA") MCCARTHY, Administrator of the United States Environmental Protection Agency, | ) ) ) ) ) ) ) ) ) | No. 1:09-cv-00115-BJR |
| Defendants, | ) ) | |
| and | ) ) | |
| NATIONAL MINING ASSOCIATION, | ) ) | |
| Intervenor-Defendant. | ) ) | |

## INTERVENOR-DEFENDANT NATIONAL MINING ASSOCIATION'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

Introduction................................................................................................................... 1

Background and Context................................................................................................ 2

I.      Background On SMCRA And The 2008 SBZ Rule .............................................. 2

      A.     Overview of the Regulation of Surface Coal Mining ............................ 2

      B.     History of the Stream Buffer Zone Rule................................................. 5

      C.     The 2008 Stream Buffer Zone Rule....................................................... 7

II.     Background On ESA Section 7 And ESA Consultation...................................... 8

III.    The Programmatic ESA Consultation On The SMCRA Regulatory Program In The 1996 Biological Opinion................................................................................ 9

IV.   OSM's Contemporaneous Reasons For Concluding That No ESA Consultation Was Required On The 2008 Rule ...................................................................... 13

Standard of Review..................................................................................................... 14

Argument .................................................................................................................... 16

I.      Preliminary Issues – Remedy, Administrative Record, and Governing Regulations ....... 16

      A.     The Proper Remedy, In Light Of OSM's Confessed Error, Is Remand Of The 2008 Rule. ............................................................................... 17

      B.     Any Review On The Merits Of The ESA Compliance On The 2008 SBZ Rule Must Be On The Complete Administrative Record Before OSM At The Time It Promulgated The 2008 Rule. ................................................ 17

      C.     The ESA Section 7 Rules Do Not Impose Legally Enforceable Duties Upon OSM................................................................................................... 19

II.     OSM Satisfied ESA Section 7 Procedural Duties On The 2008 Rule ............... 21

      A.     OSM Reasonably Determined That The 2008 Rule Has "No Effects" On Listed Species Or Critical Habitat. ...................................................... 21

      B.     OSM Reasonably Determined That The 2008 Rule Has No Effects On ESA Resources Different From Those Considered In The 1996 BiOp......... 23

      C.     NPCA Has Not Rebutted OSM's 2008 Logic That No ESA Consultation Was Required Due To The 2008 Rule. ....................................................... 26

      D.     The 2008 Rule Should Not Be Vacated Even If Some Curable ESA Procedural Error Were Found. ........................................................... 28

           1.    Vacatur Is Neither Required Nor Presumed. ........................... 28

           2.    Vacatur Of The 2008 Rule Is Not Warranted Under *Allied-Signal* Factors.................................................................................... 29

III.    The NPCA Claims That ESA Consultation Must Be Reinitiated On The 1996 BiOp Fail On Both Jurisdictional And Merits Grounds. .......................................... 33

A.      NPCA Cannot Attack The Validity Of FWS's 1996 BiOp Because The
        Statute Of Limitations Has Run And FWS Is Not A Named Defendant............. 34

B.      NPCA Has Not Provided Any Convincing Ground That ESA Consultation
        Must Be Reinitiated On The SMCRA Regulatory Program................................ 35

        1.      The 2008 Rule Did Not Trigger A Requirement To Reinitiate
                Consultation On The SMCRA Regulatory Program. ............................... 35

        2.      The Listing Of New Species And Designation Of Critical Habitats
                Since The 1996 BiOp Do Not Require Reinitiation Of Consultation....... 36

        3.      The Alleged New Information Cited By NPCA Does Not Require
                Reinitiation Of Consultation. .................................................................... 41

C.      The 1996 BiOp Remains Valid Even If OSM Must Reinitiate ESA
        Consultation ....................................................................................................... 41

Conclusion ........................................................................................................................ 43

**Introduction**

This case now stands in an unusual context.  Well after the 2008 adoption of the

challenged regulation in this case, known as the Stream Buffer Zone Rule ("2008 SBZ Rule,"

"2008 Rule," or "Rule"), a new Administration no longer wishes to defend that Rule, has

confessed error on the lack of Endangered Species Act ("ESA") Section 7 consultation on the

Rule, and again seeks vacatur and a remand for further ESA consultation and rulemaking,

without having the Court decide the ESA merits.  *See* Fed. Defs' Mem. in Support of Mot. for

Partial Summ. J. ("Fed. SJ Br.") (ECF Doc. 43-1) (July 17, 2013).  Intervenor Defendant

National Mining Association ("NMA") has opposed the Government's second attempt to obtain

a judicial vacatur.  *See* NMA Mem. in Resp. to Fed. Defs' Mot. for Partial Summ. J. ("NMA

Vacatur Opp.") (ECF Doc. 46) (Aug. 7, 2013).  Shortly after the United States filed its

preliminary motion, Plaintiff moved for summary judgment on the merits of its ESA claims.  *See*

Resp. of National Parks Conservation Ass'n ["NPCA"] and Mem. in Supp. of Cross-Mot. for

Partial Summ. J. ("Pl. SJ Br.") (ECF Doc. 48-1) (Aug. 7, 2013).  NMA must file its ESA merits

response before both NMA and the Court have access to the full administrative record (which is

due the same day as this brief).  *See* ECF Doc. 42.  Faced with such an unorthodox (and indeed,

illogical) posture, NMA repeats its objection to both vacatur and consideration of the ESA merits

prior to the submission of the full administrative record.  *See* ECF Doc. 46.

Nonetheless, in the event the Court reaches the merits at this time, NMA will proffer an

opposition to Plaintiff's motion based on the limited record before the Court.  In short, the

selected snippets from the administrative record attached to both the Government's and NPCA's

motions for partial summary judgment demonstrate that NPCA's ESA claims are unfounded and

the Government's confession of error is misplaced.  The contemporaneous statements from the

1

rulemaking agency, the U.S. Department of the Interior's Office of Surface Mining Reclamation and Enforcement ("OSM"), should control here.  Those statements demonstrate OSM's careful consideration of fish and wildlife resources, reasonable analysis of whether ESA consultation is warranted, and lawful conclusions on ESA compliance.  For these reasons and those set forth in detail below, NPCA's motion should be denied and the ESA claims dismissed.

## Background and Context

I.     **Background On SMCRA And The 2008 SBZ Rule**

A.     **Overview of the Regulation of Surface Coal Mining**

The Surface Mining Control and Reclamation Act of 1977 ("SMCRA") "strike[s] a balance between protection of the environment . . . and the Nation's need for coal as an essential source of energy."  30 U.S.C. § 1202(f); *see also Hodel v. Va. Mining & Reclamation Ass'n*, 452 U.S. 264, 268-69 (1981).  In enacting SMCRA, Congress recognized the value in coal mining and the use of the country's coal resources, but also was motivated to minimize the environmental effects of mining by establishing national minimum environmental performance standards, providing mechanisms for designating areas as unsuitable for mining, and ensuring that land affected by mining would be reclaimed.  *See, e.g.,* 30 U.S.C. § 1202(a), (c), (d), (e).

The 2008 Rule governs the conduct of mining activities near streams.  Although NPCA emphasizes the Rule's regulation of the surface coal mining technique of mountaintop removal, developed in the mountainous terrain of West Virginia,[1] the Rule applies broadly to the surface activities of all types of mining, including underground mining, and neither promotes nor

---

[1]     For a description of mountaintop mining methods, *see Ohio Valley Envtl. Coal. v. Aracoma Coal Co. ("OVEC")*, 556 F.3d 177, 186-87 (4th Cir. 2009).  Once such mining is completed, the mountaintop is returned to its approximate original contour, the valley fill is stabilized, and sediment ponds and stream segments are restored.  *See also* 69 Fed. Reg. 1,036, 1,036-37 (Jan. 7, 2004); 72 Fed. Reg. 48,890, 48,891-92 (Aug. 24, 2007).

discourages any particular method of mining.  *See, e.g.,* 73 Fed. Reg. 75,814, 75,816, 75,822 (Dec. 12, 2008); 72 Fed. Reg. at 48,891, 48,895.

Moreover, contrary to Plaintiff's policy preferences and hyperbolic characterizations, SMCRA explicitly authorizes surface coal mining activities and associated valley fills.  *See* 30 U.S.C. § 1291(28); *see also id.* § 1265(c)(2), (c)(4)(E), (b)(22); 73 Fed. Reg. at 814-15 (discussing relevant SMCRA provisions and legislative history).  As the Fourth Circuit has recognized, "SMCRA does not prohibit the discharge of surface coal mining excess spoil in waters of the United States," but rather "anticipates the possibility that excess spoil material could and would be placed in waters of the United States."  *Kentuckians for the Commonwealth, Inc. v. Rivenburgh,* 317 F.3d 425, 442-43 (4th Cir. 2003) (citing 30 U.S.C. § 1265(b)(22)(d), (b)(24)); *accord OVEC,* 556 F.3d at 190.

SMCRA recognizes that the stream impacts "must be carefully and thoughtfully evaluated, planned for, and minimized to assure the environment is protected during and after mining." 69 Fed. Reg. at 1,037.  To that end, OSM has enacted detailed performance standards that mine operators must follow to protect environmental values, including fish and wildlife, beginning with the exploration for coal and continuing through the permitting process to actual mining operations and reclamation.  *See, e.g.,* 30 C.F.R. § 773.15 (requiring the regulatory authority to determine that the proposed operation would not affect the continued existence of endangered and threatened species or result in destruction or adverse modification of their critical habitats); *id.* §§ 780.16 and 784.21 (requiring permit applicants to provide species information and describe how the operator will minimize disturbances to and adverse impacts on fish and wildlife); *id.* § 815.15 (prohibiting disturbance "of unique or unusually high value"

habitats for fish and wildlife during exploration activities).[2]  In addition, if an operator were to

discover ESA-listed species in the area, the operator must report that discovery to the regulatory

authority, and the regulatory authority "shall consult with the appropriate State and Federal fish

and wildlife agencies and, after consultation, shall identify whether, and under what conditions,

the operator may proceed."  *Id.* §§ 816.97(b), 817.97(b).  Such consultation is required because,

consistent with ESA Sections 7(a)(2) and 9, 16 U.S.C. §§ 1536(a)(2), 1538, "[n]o surface mining

activity shall be conducted which is likely to jeopardize the continued existence of" listed species

or result in the "adverse modification of designated critical habitats."  30 C.F.R. §§ 816.97(b),

817.97(b); *see also id.* §§ 816.97(d), 817.97(d) (warning coal operators that SMCRA rules do not

"authorize the taking of an endangered or threatened species" in violation of the ESA).

SMCRA and the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, also work in

concert to fulfill Congress' goal of developing the nation's coal resources while protecting the

environment.  For example, to construct a valley fill and to discharge excess spoil into

jurisdictional waters, a mine operator must obtain a SMCRA permit from the regulatory

authority, which must conform with numerous environmental performance standards, in addition

to the fish and wildlife related standards set forth in OSM's rules;[3] a certification from the state

---

[2]     In most states, called "primacy" states, the regulatory authority is a state agency that has
acquired "exclusive jurisdiction" over surface coal mining and reclamation operations by
obtaining OSM's approval of the state's regulatory program.  30 U.S.C. § 1253.  Only two states
with surface coal mining operations, Tennessee and Washington, do not have primacy, so OSM
itself is the regulatory authority there.  OSM is also the regulatory authority for three native-
American tribes with surface coal mining operations, and for operations on federal lands in
primacy states unless OSM has entered into a cooperative agreement with the state to provide for
state regulation of mining activities on federal land.  *See* Fed. SJ Br. at 4 n.4.

[3]     For example, valley fills must be constructed in accordance with plans that demonstrate
that the operation has been designed to minimize to the extent possible the volume of excess

(continued…)

authority under CWA Section 401 that any discharge will comply with all applicable water standards; a Section 402 permit from the appropriate CWA permitting authority (the Environmental Protection Agency ("EPA") or the state) if the project involves the discharge of a pollutant from a point source into navigable water; and a Section 404 dredge-and-fill permit from the U.S. Army Corps of Engineers that allows the disposal of excess spoil into jurisdictional waters.  30 U.S.C. § 1265; 33 U.S.C. §§ 1341, 1342, 1344; 30 C.F.R. §§ 780.35, 816.71-816.74 (providing that the disposal of excess spoil must conform to specific requirements); *OVEC*, 556 F.3d at 189-91.  Only then may an operator proceed.

### B.        History of the Stream Buffer Zone Rule

The 2008 Stream Buffer Zone Rule is part of the comprehensive SMCRA regulatory regime; it regulates "stream buffer zones, stream-channel diversion, siltation structures, impoundments, excess spoil, and coal mine waste."  73 Fed. Reg. at 75,814.  As the Government acknowledges, because SMCRA allows for the disposal of excess spoil material into waters of the United States, it does not require buffer zones around streams.  *See id.* at 75,816; Fed. SJ Br. at 9.  Nevertheless, since 1977, OSM has provided for a 100-foot buffer, with variances allowing for the disposal of excess spoil material within that buffer under certain circumstances.  *See* 42 Fed. Reg. 62,652 (Dec. 13, 1977); *see also* 69 Fed. Reg. at 1,040-42 (describing the history of stream buffer zone regulation).  The predecessor to the 2008 Rule, issued in 1983, provided, *inter alia*, that surface mining disturbances within 100 feet of a perennial or intermittent stream were prohibited unless specifically authorized by a regulatory authority upon a finding that the mining activities would not cause or contribute to the violation of water quality standards and

(continued…)

spoil generated and that the designed maximum cumulative volume of all proposed fills is no larger than needed.  30 C.F.R. §§ 780.35, 816.71(c).

would not adversely affect water quantity or quality.  *See* 48 Fed. Reg. 30,312, 30,313 (June 30,

1983) ("the 1983 Rule").  However, OSM historically has not interpreted any of its four stream

buffer zone rules (the 2008 Rule or any of its predecessors) to impose an absolute prohibition on

such mining activities within 100 feet of streams, but merely to provide the basis for limiting and

minimizing those impacts.  *See id.* at 30,313; *see also* 73 Fed. Reg. at 75,857; 69 Fed. Reg. at

1,040-41.

In the late 1990s, litigation within the Fourth Circuit on the meaning and application of

the 1983 Rule, in addition to the increased use of mountaintop mining, prompted OSM to

recognize that the 1983 Rule needed to be revised and updated.  OSM reasoned that "[t]he issues

and allegations raised . . . indicate that there remains considerable misunderstanding regarding

the meaning of the [stream buffer zone] regulation . . . particularly as it applies to the placement

of excess spoil fills within and near intermittent and perennial streams."[4]  69 Fed. Reg. at 1,038

(discussing *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001), *cert. denied*, 543 U.S.

1113 (2003)); *see also* 69 Fed. Reg. at 1,038-40.  In addition, OSM had found that coal mine

operators were overestimating the anticipated volume of excess spoil (and thus designing fills

larger than necessary to accommodate that anticipated volume), which OSM attributed to

inadequate regulatory guidance.  *Id.*  Although the existing regulations focused on ensuring that

fills were safe and stable, they did not explicitly address how permit applicants must demonstrate

consideration and minimization of the environmental effects of such fill construction.  *Id.*

---

[4]      Those misunderstandings had their origin in the federal district courts and were resolved
when the U.S. Court of Appeals for the Fourth Circuit clarified that Congress did indeed
contemplate the disposal of excess spoil and the creation of valley fills in SMCRA.  *See OVEC*,
556 F.3d at 195; *Kentuckians for the Commonwealth*, 317 F.3d at 443; *see also Bragg*, 248 F.3d
at 296.

Accordingly, in 2003, OSM began considering ways to clarify and update the 1983 Rule. OSM published proposed revisions to the rule in 2004, announced its intent to prepare an Environmental Impact Statement ("EIS") analyzing the potential impacts of the revised rule in 2005, and an amended proposed rule informed by the EIS in 2007.  *See* 72 Fed. Reg. 48,890; 70 Fed. Reg. 35,112 (June 16, 2005); 69 Fed. Reg. 1,036; Fed. SJ Br. at 10-11, 15.  OSM published the final rule on December 12, 2008, "[t]he product of nearly five years of intense work," including more than 43,000 public comments, four public hearings, and detailed environmental analyses.  OSM Annual Report at 10, *available at* http://www.osmre.gov/reports/annualreport/ reports/2009.pdf; *see also* 73 Fed. Reg. 75,818; 72 Fed. Reg. 48,890; 69 Fed. Reg. 1,036.

### C.      The 2008 Stream Buffer Zone Rule

NPCA mischaracterizes the 2008 Rule.  The Rule does not "abruptly reverse[] course" to promote or facilitate mountaintop mining as NPCA suggests, Pl. SJ Br. at 1, 8, but rather is intended "to minimize disputes and misunderstandings associated with application of the 1983 rule." 73 Fed. Reg. at 75,818; *see also id.* at 75,822.  It "distinguishes between those situations in which maintenance of an undisturbed buffer between mining and reclamation activities and a perennial or intermittent streams constitutes the best technology currently available to implement the underlying statutory provisions . . . and those situations in which maintenance of a buffer is neither feasible nor appropriate." *Id.*  Importantly, the 2008 Rule retains the 100-foot buffer zone, providing that permit applicants must design their operations to "avoid placement of coal mine waste in or within 100 feet of a perennial or intermittent stream," but also recognizes that the realities of geology, topography, mining mechanics, and economics mean that it is not always possible to avoid such disturbances.  *Id.* at 75,836.  The Rule tailors the findings that the regulatory authority must make before permitting mining activities within the buffer zone to better reflect SMCRA's environmental protection standards.  *Id.* (citing 30 U.S.C. § 1265(b)(24)

7

(requiring operators "*to the extent possible* using the best technology currently available, [to] minimize disturbances and adverse impacts of the operation on fish, wildlife, and related environmental values" (emphasis added)), 1266(b)(11) (same)); *see also id.* at 75,839-41, 75,876.  As OSM explained,

> The "to the extent possible" clause in these statutory provisions recognizes that, because surface coal mining operations inherently involve significant disturbance of the land, those operations necessarily result in some disturbances to and adverse impacts on fish, wildlife, and related environmental values.  Therefore, the determination of what constitutes the best technology currently available to minimize those adverse impacts is a site-specific determination that must be made in the context of the site's geologic, topographic, and ecological characteristics . . . and the nature of the mining operation.

*Id.* at 75,824.

The 2008 Rule also revises and clarifies the 1983 Rule by, *inter alia*, requiring that mine operators must return as much of the overburden as possible to the excavation area, that operators must minimize the volume of excess spoil generated, and that operators must design and construct fills to be no larger than needed to accommodate excess spoil.  *Id.* at 75,855, 75,860, 75,876.  The Rule further provides that the operator must avoid constructing excess fills, refuse piles, or slurry impoundments to the extent possible.  *Id.* at 75,849, 75,878.  When it is not possible to avoid such construction, the Rule requires that the operator identify a range or reasonable alternatives and select the alternative with the least overall adverse impact.  *Id.* at 75,818, 75,833, 75,876-77.  The Rule took effect on January 12, 2009.  *Id.* at 75,814.

## II.     Background On ESA Section 7 And ESA Consultation

Section 7(a)(2) of the ESA imposes certain substantive constraints and procedural duties on discretionary federal agency actions.  Substantively, Section 7(a)(2) only allows a federal agency to approve a discretionary proposed action if that action agency can ensure the action is

8

"not likely to jeopardize the continued existence of any endangered species or threatened

species" ("listed species") and not likely to result in the "adverse modification of [designated

critical] habitat."  16 U.S.C. § 1536(a)(2).  Procedurally, ESA Section 7(a)(2) provides that the

federal action agency shall make these assessments in "consultation" with the "Secretary," who

acts through the Interior Department's U.S. Fish and Wildlife Service ("FWS") or the Commerce

Department's National Marine Fisheries Service (collectively, the "Services").  *Id.*

     The ESA Section 7 rules jointly adopted by the Services require an action-by-action

consultation procedure only if the federal action agency determines that its proposed action "may

affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  This Court has effectively found

that limitation on ESA consultation to be lawful.

> [T]he Court must conclude that Congress intended to allow Action Agencies to
> initially evaluate the potential environmental consequences of federal actions and
> to move forward on many of them without first consulting the Services if they
> concluded that they had "no effect" on listed species and their critical habitat.

*Defenders of Wildlife v. Kempthorne*, No. 04-1230, 2006 WL 2844232, at *19 (D.D.C. Sept. 29,

2006).

### III.     The Programmatic ESA Consultation On The SMCRA Regulatory Program In The 1996 Biological Opinion

     The ESA Section 7 rules and the *Endangered Species Consultation Handbook* (Services

1998) ("ESA Section 7 Handbook") allow ESA consultation to occur at broad levels, such as on

an agency program.  50 C.F.R. § 402.14(c)(6); ESA Section 7 Handbook at xvii, 4-50, and E-13,

*available at* http://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf.

     In 1995 and 1996, OSM and FWS conducted formal ESA Section 7 consultation on the

"approval and conduct of surface coal mining and reclamation operations under State and

Federal regulatory programs adopted pursuant to SMCRA." Fed. SJ Br. Ex. 1 (ECF No. 43-2) (1996 Biological Opinion or "1996 BiOp") at 3;[5] see Fed. SJ Br. at 12. As the 1996 BiOp states, it is a comprehensive or programmatic biological opinion on the entire regulatory program for permitting "[s]urface coal mining and reclamation operations" under the standards in "Title 30, Chapter VII of the Code of Federal Regulations." 1996 BiOp at 7; see also id. at 3, 7-13.

The 1996 BiOp considered the panoply of SMCRA "regulations pertinent to protection of fish and wildlife and related environmental values." 1996 BiOp at 7; see id. at 8-9.[6] Those

---

[5] The government is filing the administrative record the same day as this brief. The 1996 BiOp currently is before the Court at Ex. 1 to the Fed. SJ Br. See ECF Doc. 43-2.

[6] For example, regulatory authorities must "ensure that coal exploration and surface coal mining and reclamation operations are conducted" in a manner which "will provide for . . . [p]rotection of endangered and threatened species and their critical habitats as determined by the Endangered Species Act of 1973." 30 C.F.R. § 810.2(k); see also id. § 773.5 (coordination in SMCRA and ESA reviews); id. §§ 780.16(a) and 784.21(a) (application for surface coal mining operation must provide information on nearby ESA resources and describe how ESA resources will be protected and perhaps enhanced); id. §§ 780.16(b) and 784.21(b) (protection and enhancement plan must be prepared to "minimize disturbances and adverse impacts on fish and wildlife and related environmental values, including compliance with the Endangered Species Act"); id. §§ 780.16(c) and 784.21(c) (ESA information is shared with FWS, which provides comments to protect listed species); id. §§ 816.97(b) and 817.97(b) ("[n]o surface mining activity shall be conducted which is likely to jeopardize the continued existence of" listed species or result in the "adverse modification of designated critical habitats" and requiring operator to report any discovered listed species in the permit area to the regulatory authority, which "shall consult with the appropriate State and Federal fish and wildlife agencies and, after consultation, shall identify whether, and under what conditions the operator may proceed"); id. §§ 816.97(d) and 817.97(d) (SMCRA rules do not "authorize the taking of an endangered or threatened species").

These regulations create a presumption that no surface coal mining operation may "take" an ESA-listed species, a presumption that can be overcome only through an operation-specific or permit-specific process in which FWS participates in finding an acceptable and minimized level of allowed incidental take. Moreover, the regulatory authority cannot issue a permit to engage in ground-disturbing surface coal mining operations unless it finds that the operation is "consistent with the [above-described ESA constraints] of § 816.97," including the use of "buffer zones" to protect listed species and critical habitat. 30 C.F.R. § 780.16(b); see id. at § 773.15(k); 1996 BiOp at 9. Finally, in states that have obtained regulatory primacy under SMCRA, their program must be equally protective of ESA resources. See 30 C.F.R. § 732.15.

10

regulations ensure that mining operations are designed to protect listed species and that consultation occurs on a site-specific basis—if a listed species is found in an area where surface coal mining operations would be permitted, a permit-specific or site-specific "consultation" procedure must be completed before any "take" of listed species can be authorized.  1996 BiOp at 9.  Incidental takes of listed species also are generally prohibited under each operator's independent duty to avoid unlawful take under ESA Section 9, allowing that operator to receive incidental take authorization only through consultation under provisions like 30 C.F.R. § 816.97(b) and under the incidental take statement described in the 1996 BiOp at 11-14.  *See* 16 U.S.C. § 1538(a).  SMCRA therefore requires "close coordination and cooperation" between FWS and the regulatory authority so that they can identify "measures to minimize incidental take, and, if needed, the imposition of permit terms or conditions to implement these measures." 1996 BiOp at 12; *see id.* at 13.  Under the 2008 Rule, these procedures and ESA-protective standards apply to a proposal to conduct a surface coal mining and reclamation operation in the 100-foot zone around perennial and intermittent streams.  *See* 30 C.F.R. §§ 780.28, 817.57. Those operations may be conducted only when ESA resources are protected to the standards set in the rules and to satisfaction of the regulatory authority, after consultation-like review by FWS.

Thus, the SMCRA regulatory program contains several substantive protections for ESA resources, and procedural protections.  These protections warrant and substantiate OSM's 2008 "no effects" determination.  In light of those structural protections, FWS's programmatic 1996 BiOp concluded that the SMCRA regulatory program, and surface coal mining operations that are permitted under the regulatory standards, comply with ESA Section 7(a)(2):

> [I]t is the Service's biological opinion that surface coal mining and reclamation operations conducted in accordance with properly implemented Federal and State regulatory programs under SMCRA are not likely to jeopardize the continued existence of listed or proposed species, and are not likely to result in the destruction or adverse

> modification of designated or proposed critical habitats.  This conclusion is based on
> compliance with [identified regulations, including] . . . 816.97, and 817.97 [these
> provisions . . . prohibit the taking of an endangered or threatened species in violation of
> the Endangered Species Act and prohibit mining activity which is likely to jeopardize the
> continued existence of endangered or threatened species.  The regulatory authority must
> consult with appropriate State and Federal fish and wildlife agencies to determine
> whether and under what conditions the operation may proceed].

1996 BiOp at 10 (second bracketed text in original).  As Federal Defendants have summarized in

the present case, "FWS recognized that SMCRA and its implementing regulations set forth

programmatic standards and procedures designed to minimize mining related impacts on fish and

wildlife in general and threatened and endangered species in particular."  Fed. SJ Br. at 13.

Due to the overlapping substantive and procedural structural protections of ESA

resources built into the SMCRA regulatory program, FWS made clear that the programmatic

1996 BiOp did not need to be revisited every time a new species is listed or new critical habitat

is designated.  The programmatic 1996 BiOp "addresses all present and *future* Federally listed

and proposed species and designated or proposed critical habitats *that may be affected by the*

*implementation and administration of surface coal mining regulatory programs under SMCRA*."

1996 BiOp at 6 (emphasis added).  Consequently, listing of new species or designation of new

critical habitat were not described as triggering events for reinitiating ESA consultation in the

1996 BiOp. *See id.* at 14.

Moreover, the programmatic 1996 BiOp on the SMCRA regulatory program, and mining

operations under that program, states that ESA consultation need not be reinitiated unless "the

agency action is modified in a manner that causes an adverse effect to listed species or critical

habitat that was not considered in this opinion."  *Id.* at 14.  FWS's cover letter to OSM explicitly

adopts this tiering concept that a new or reinitiated consultation is not required where the effects

on ESA resources would be the same as had already been approved under the comprehensive

BiOp: "The biological opinion and conference report does not absolve OSM from following

appropriate conference/consultation procedures at any implementation level that may affect

proposed or listed species or their proposed or designated critical habitat *in a manner not*

*considered in this consultation/conference*." *Id.* at 2 (emphasis added).

**IV.  OSM's Contemporaneous Reasons For Concluding That No ESA Consultation Was Required On The 2008 Rule**

OSM provided well-reasoned explanations in the *Final Environmental Impact Statement*

*(EIS) Excess Spoil Minimization Stream Buffer Zones* (Sept. 2008) ("FEIS") on why the 2008

Rule had no effects on listed species or critical habitat, or at least no effects different from those

already considered in the programmatic 1996 BiOp.  Some self-selected portions of FEIS Book

One are before the Court at this time as Fed. Def. Ex. 2 (ECF No. 43-3), and some of the

pertinent portions of FEIS Book Two are before the Court at this time as Fed. Def. Ex. 5 (ECF

No. 43-6).

In the FEIS, OSM determined that the 2008 SBZ Rule has no effects on listed species,

and has no different effects from those considered in the 1996 BiOp that might trigger

reinitiation of ESA consultation.  As OSM explained, the changes enacted in the 2008 Rule were

relatively narrow:  the Rule simply modified "the backfilling and grading regulations to

minimize the creation of excess spoil and revise[d] the regulations governing surface coal mining

operations within 100 feet of a perennial or intermittent stream to more closely track the

underlying statutory provisions."  FEIS Book One at IV-162.  The Rule was instead perhaps

more notable for what it did *not* do; the 2008 Rule did not change the approval of some mining

activities within 100 feet of streams, in place since the prior rule's enactment in 1983.  *Id.* at IV-

141 to 142.  The 2008 Rule also had no effect on whether surface coal mining and reclamation

operations that were currently in existence could continue or whether future operations could be

approved.  *Id.* at IV-162.  Finally, the 2008 Rule did not disturb the existing robust statutory and

13

regulatory protections for fish and wildlife, which FWS had relied on in concluding in 1996 that "continuation and approval of [surface coal mining] operations would not likely jeopardize the continued existence of any threatened, endangered, or proposed species or result in adverse modification of designated or proposed critical habitat." *Id.* at IV-162; *see also id.* at IV-160 to 163.  OSM therefore did not "anticipate a major shift in on-the-ground consequences" in revising the rule.  *Id.* at IV-141.

> As OSM summarized in a response to an NPCA comment:
>
> As discussed in Section IV.B.4 of the EIS, our existing regulations contain extensive provisions that the U.S. Fish and Wildlife Service, in a 1996 biological opinion, found adequate to protect threatened and endangered (T & E) species and their habitat.  The biological opinion did not include the stream buffer zone rule as one of those provisions. None of the alternatives under consideration in this EIS would alter any of the regulations listed in the biological opinion. . . .  [W]e anticipate that none of the action alternatives would have any effect on T & E species.  We have revised Section IV.B.4 of the final EIS to reflect this determination.  Therefore, there is no need to initiate formal consultation under Section 7 of the Endangered Species Act.

FEIS Book Two and Appendix C-109.

As developed in Section II of the Argument below, OSM's reasons for not conducting an independent ESA Section 7 consultation on the 2008 SBZ Rule are sound, and not arbitrary. Therefore, OSM's 2008 decision should be upheld under the deferential standards for judicial review.

### Standard of Review

OSM's determination that the 2008 Rule did not require ESA consultation is presumed to be lawful, and NPCA bears the burden of showing that OSM's determination was arbitrary or otherwise unlawful.  5 U.S.C. §§ 556(d), 706; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971) (every agency action is "entitled to a presumption of regularity").  Thus, a court will not "upset an agency's assessment of its obligations under section 7 unless we

determine it to be arbitrary and capricious." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1327

(9th Cir. 1992).  Further,

> [b]ecause the "no effect" decision is the agency's to make, the decision to consult
> formally with the Service, is the agency's decision as well, not the Service's.  Thus,
> unless the Corps's determination of "no effect" was arbitrary and capricious, the Corps
> need not reinitiate consultation.

*Protect Our Water v. Flowers*, 377 F. Supp. 2d 844 (E.D. Cal. 2004).  *See Defenders of Wildlife*

*v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005).[7]  As this Court stated in an ESA case, the APA-

specified

> standard of review is highly deferential to the agency, so that a court need not find that
> the agency's decision is "the only reasonable one, or even that it is the result [the court]
> would have reached had the question arisen in the first instance in judicial proceedings."
> . . . Rather, to survive the "arbitrary and capricious" standard, an agency need show only
> that it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its
> action, including a 'rational connection between the facts found and the choice made.'"

*Conservation Force v. Salazar*, 919 F. Supp. 2d 85, 89 (D.D.C. 2013) (Rothstein, J.).  However,

because OSM confessed error during this litigation, it "is obligated to supply a reasoned analysis

for the change beyond that which may be required when an agency does not act in the first

instance." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

This deferential judicial review extends to whether OSM had a duty to "reinitiate" ESA

consultation on the entire SMCRA regulatory program.  "Although the broad language of 50

C.F.R. § 402.16 may give a different impression, the standard for demonstrating that an agency

was arbitrary and capricious in failing to reinitiate consultation is an exacting one." *Hawksbill*

*Sea Turtle v. FEMA*, 11 F. Supp. 2d 529, 550 (D.V.I. 1998).  Not "every modification of or

---

[7]     *See also Sw. Ctr. for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1447
(9th Cir. 1996); *Newton Cnty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 810 (8th Cir. 1998); *Sierra
Forest Legacy v. U.S. Forest Service*, 598 F. Supp. 2d 1058, 1065-67 (N.D. Cal. 2009) (all
sustaining "no effect" determinations).

uncertainty in a complex and lengthy project [or program] requires the action agency to stop and reinitiate consultation." *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987).[8]

"Where a plaintiff alleges that an agency violated the reinitiation requirement, that plaintiff bears the exacting burden of establishing that the agency acted arbitrarily and capriciously in failing to reinitiate consultation." *Defenders of Wildlife v. Bureau of Ocean Energy Mgmt., Regulation and Enforcement*, 871 F. Supp. 2d 1312, 1323 (S.D. Ala. 2012). So long as the action agency "has articulated an explanation establishing a rational connection between the facts found and the choice made," not "reinitiat[ing] formal consultation does not rise to the level of 'arbitrary and capricious' under the APA." *Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 94 (D.D.C. 2003).[9]

## <u>Argument</u>

## I.     Preliminary Issues – Remedy, Administrative Record, and Governing Regulations

The ESA claims in this case are in an unusual posture. Federal Defendants no longer wish to defend the merits of ESA compliance on the 2008 Rule, Plaintiff has briefed the ESA merits, and NMA's responsive brief is due on the same day that the administrative record becomes available on the ESA issues. Like the Government, Plaintiff asserts that vacatur of the Rule is appropriate and that the Court can rule on its ESA claims in the absence of an

---

[8]     In *Sierra Club v. Marsh*, reinitiation was ordered because the mitigation lands FWS relied upon to avoid jeopardy had not been transferred, and the Army Corps had not acceded to FWS's request to reinitiate ESA consultation. 816 F.2d at 1386-88. In the instant case, there is no jeopardy issue.

[9]     *See also Oceana, Inc. v. Bryson*, No. C-11-6257, __ F. Supp. 2d __, 2013 WL 1563675, at *29-30 (N.D. Cal. Apr. 12, 2013); *Miccosukee Tribe of Indians v. United States*, 420 F. Supp. 2d 1324, 1337 (S.D. Fla. 2006); *Gerber v. Babbitt*, 146 F. Supp. 2d 1, 5 (D.D.C. 2001); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 120 F. Supp. 2d 1005, 1025-26 (M.D. Fla. 2000) (all affirming decisions to not reinitiate ESA consultation).

administrative record.  As explained in NMA's prior brief and supplemented below, Plaintiff is

wrong on both counts.  In addition, as a preliminary matter, NPCA misconstrues the governing

regulatory scheme.  While NPCA is alleging that OSM is in violation of 50 C.F.R. §§ 402.14(a)

and 402.16 (on consultation in a "may affect" situation and on reinitiation of ESA consultation in

certain circumstances), those FWS rules, which were issued jointly by the Services, impose no

legally enforceable duties on OSM.

**A.      The Proper Remedy, In Light Of OSM's Confessed Error, Is Remand Of
The 2008 Rule.**

Contrary to NPCA's argument and as NMA has previously explained, the equitable result

that best serves judicial economy is for the Court simply to remand the 2008 Rule to OSM,

without vacatur and without addressing the ESA merits.  *See* NMA Vacatur Br. at 9-17.  That

result would accord with *Carpenters Industrial Council v. Salazar*, 734 F. Supp. 2d 126 (D.D.C.

2010), where the court remanded ESA issues without vacatur after a federal agency declined to

defend a rule.  This result is consistent with Judge Kennedy's reasoning *in this case* that remand

of the Rule, *with vacatur*, as requested by the Federal Defendants should not be granted, because

it eliminates APA procedural protections (*e.g.*, the repeal of a rule requires notice-and-comment

rulemaking).  *Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3, 5 (D.D.C. 2009).[10]

**B.      Any Review On The Merits Of The ESA Compliance On The 2008 SBZ Rule
Must Be On The Complete Administrative Record Before OSM At The Time
It Promulgated The 2008 Rule.**

Should this Court elect to adjudicate the merits of OSM's ESA compliance in the

issuance of the 2008 Rule, that review must be based on the "whole [administrative] record"

---

[10]      *See also Note: Confessions of Error by Administrative Agencies*, 67 Wash. & Lee L. Rev.
1197, 1202-05, 1222, 1226-27 (2010) (noting that it appears the succeeding Administration did
not like the 2008 SBZ Rule politically, and only later came up with the rationale that ESA
consultation may not have been sufficient).

before OSM at the time it adopted the Rule.  5 U.S.C. § 706; *accord* 30 U.S.C. § 1276(b)

(judicial review of SMCRA regulations must be based "solely on the record made before the

Secretary").  Both Federal Defendants and NPCA acknowledge that APA principles generally

apply to ESA claims against federal agencies.  *See* Fed. SJ Br. at 20-21; Pl. SJ Br. at 4-5.  NPCA

argues, however, that some courts outside of the D.C. Circuit permit extra-record review of ESA

claims against federal agencies.  *See* Pl. SJ Br. at 5.  This is unavailing, as it is "unquestionably

the law of this Circuit" that review in ESA citizen suits is confined to the administrative record.

*Sw. Ctr. for Biological Diversity v. Babbitt*, 131 F. Supp. 2d 1, 5 (D.D.C. 2001).[11]  Moreover,

those cases, unlike this one, did not involve judicial review of *SMCRA* rulemakings, which that

statute expressly requires be based "solely" on the record.  30 U.S.C. § 1276(b).  *See* Am.

Compl. ¶ 11 (invoking jurisdiction under SMCRA, 30 U.S.C. § 1276(a)(1)).

     Moreover, NPCA misleadingly asserts that this Court has in prior cases allowed

preliminary "motions for summary judgment prior to the filing of the full administrative record."

Pl. SJ Br. at 5.  But, in fact, both of the cases NPCA cites were transferred from other district

courts *after* those courts allowed for briefing on such preliminary motions.[12]  Those opinions

---

[11]     *See, e.g., Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 684 (D.C. Cir. 1982) (clarifying that ESA citizen suit provision "merely provides a right of action" and "does not direct trial courts to conduct *de novo* review in adjudicating such actions"); *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 248 (D.D.C. 2008) ("court's review is limited to the administrative record and the grounds for decision invoked by the agency"); *Defenders of Wildlife v. Kempthorne*, No. 04-c-1230, 2006 WL 2844232, at *8 (D.D.C. Sept. 29, 2006) (noting that courts "must limit the scope of their review to the administrative record").

[12]     Specifically, *Wildearth Guardians v. Salazar* (No. 10-cv-1043) was transferred from the District of Colorado in December 2008, several months *after* that Court's March 11, 2010, order denying defendant's motion to file the administrative record before responding to the plaintiffs' preliminary motion for summary judgment.  Likewise, *Center for Biological Diversity v. Kempthorne* (No. 08-cv-2113) was transferred from Northern District of California in December

(continued…)

were controlled by law-of-the-case principles, not the law of this Circuit.  Moreover, neither was a SMCRA case.  While other circuits may allow district courts to look beyond the administrative record in ESA citizen suits, that is not the rule here, and especially not in challenges to SMCRA rulemakings.

Under this Circuit's precedents, the Court's review on the merits of Plaintiff's ESA claims *must* be on the administrative record, even in cases that do not involve judicial review under SMCRA.  That record should contain "neither more nor less information than [] the agency [had] when it made its decision."  *IMS, PC v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997).  "It is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made," and cannot consider post-decisional declarations or any other extra-record materials. *Id.*[13]  Therefore, if the Court elects to review the ESA claims on the merits, it must await the August 30 submittal of the administrative record and the briefing that will follow.  This Circuit's precedent does not sanction any other result.

C.      **The ESA Section 7 Rules Do Not Impose Legally Enforceable Duties Upon OSM.**

Plaintiff misconstrues the governing regulatory scheme for ESA consultation, arguing that the *Services'* regulations and the 1996 BiOp impose duties on *OSM*.  A federal agency (e.g.,

---

(continued…)

2008, several months *after* that Court's April 24, 2008, order granting preliminary motion for summary judgment before the filing of the administrative record.

[13]     *See also Am. Bioscience v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) ("Rather than calling for the administrative record, the district court appears to have relied on the parties' written or oral representations to discern the basis on which the [agency] acted.  Surely that was not sufficient."); *AT&T Info. Sys. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) ("[W]e have repeatedly ... bar[red] the introduction of litigation affidavits to supplement the administrative record.").

FWS) has authority to issue rules binding other federal agencies and the private sector only if the agency has been delegated such rulemaking authority by Congress. *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649-50 (1990). ESA Section 7 fails this test. Under Section 7, the federal action agency (here, OSM) has the final agency word on ESA Section 7 compliance, and FWS has only an assisting "consultation" role. 16 U.S.C. § 1536(a)(2) ("Each federal agency shall, in consultation" with FWS, ensure that an action "carried out by such [action] agency . . . is not likely to jeopardize" listed species or adversely modify critical habitat). As the preamble to the ESA rules recognizes, the "Service performs strictly an advisory function under section 7 by consulting," and the "Federal agency makes the ultimate decision as to whether its proposed action will satisfy" ESA §7(a)(2). 51 Fed. Reg. 19,926, 19,928 (June 3, 1986) (preamble to final ESA Section 7 rules).

Because the structure of ESA Section 7 places the federal agencies in charge of ESA compliance and gives the Services only a "consultation" role, the Services' ESA Section 7 rules are not binding on other agencies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568-69 (1992) (Scalia, J., writing for a plurality); *accord* Pet'r Br., *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) (No. 90-1424), 1991 WL 577003, at *24-25. And a unanimous Supreme Court later clearly stated that a BiOp does not legally bind an action agency.

> The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for "any person" who knowingly "takes" an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment.

*Bennett v. Spear*, 520 U.S. 154, 170 (1997).

Under this logic, the Services' ESA Section 7 rules and the 1996 BiOp do not create legally enforceable duties that are binding on OSM. Accordingly, provisions like 50 C.F.R. § 402.16 (on reinitiation of ESA Section 7 consultation) and the 1996 BiOp's statements on

reinitiating ESA consultation do not create OSM duties on which plaintiffs can seek judicial

relief. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 301-06 (1979). Hence, the Court should

dismiss NPCA's claims that OSM is violating § 402.16 or some BiOp "standard" in not

reinitiating ESA consultation on the basis that those documents create no judicially enforceable

standard.

## II.    OSM Satisfied ESA Section 7 Procedural Duties On The 2008 Rule

NPCA argues that OSM did not satisfy an ESA Section 7(a)(2) consultation duty that

allegedly applies to the 2008 Rule. *See* Pl. SJ Br. at 18-24; Counts II and III in the Amended

Complaint. The ESA claims against the 2008 Rule fail on the merits.[14]

### A.    OSM Reasonably Determined That The 2008 Rule Has "No Effects" On Listed Species Or Critical Habitat.

OSM cogently explained why the 2008 Rule itself has no effects on listed species or

critical habitat and thus required no consultation:

> The action analyzed in this EIS [the 2008 SBZ Rule, and alternatives] is a narrow change to the comprehensive Federal regulatory program under SMCRA. This action would not determine whether surface coal mining and reclamation operations in existence can continue or whether future operations can be approved. . . . *We do not anticipate there will be any effect upon threatened and endangered species* as the result of implementing the "No Action" alternative or Alternatives 1, 2, 3, and 4. . . . [T]he current regulations under the SMCRA that address the protection of threatened and endangered species will b[e] unaffected by this rulemaking action and protection of threatened and endangered species will continue. The changes to the stream buffer zone regulations considered in Alternatives 1, 2, and 4 would have *no on-the-ground effect on threatened or endangered species or critical habitats*.

FEIS Book One at IV-162 to 163 (emphasis added); *see also* FEIS Book Two at Appendix C-

109. No ESA consultation is required on such "no effect" actions. "If the action agency

---

[14]    Count VII of the Amended Complaint brings a claim that EPA's concurrence on OSM's 2008 Rule also is an action that requires ESA Section 7 consultation. While NPCA alludes to Count VII in its introduction (Pl. SJ Br. at 13), there is no argument on it and thus no possible basis for summary judgment on NPCA's present motion.

determines that its action will have no effect on a listed species or critical habitat, the consultation requirements are not triggered and the action agency does not need to take any further steps to consult with the relevant federal wildlife agency." *Ark Inst. v. U.S. Forest Serv.*, No. 06-cv-02418, 2010 WL 3323661, at *5 (D. Colo. Aug. 18, 2010); *see* Background and Context Section II, IV *supra*; Argument Section III, *infra*.

OSM's logic is eminently reasonable, and certainly not arbitrary, for several reasons:

1.     The 2008 Rule does not dictate that any particular surface coal mining operations can occur in or near listed species or critical habitat.  See FEIS Book One at IV-12 to 163.  That is, listed species or critical habitat "may be affected," within the meaning of 50 C.F.R. § 402.14(a), only if particular surface coal mining operations are permitted by a regulatory authority.  The Rule merely provides one set of considerations in a 100-foot zone around streams that will be applied, along with other considerations and ESA-protective standards stated in the SMCRA regulations, in deciding *at a later time* whether to permit specific surface coal mining operations.  *See Habitat Educ. Ctr. v.* Bosworth 363 F. Supp. 2d 1090, 1112 (E.D. Wis. 2005) (court should be deferential to an action agency's judgment of "no effect" on listed species); *Ark Inst.*, 2010 WL 3323661, at *7 (because the action has "no on-the-ground effect . . . . , consultation is not required").

2.     OSM also reasoned that the 2008 Rule had no effects on listed species because the SMCRA regulatory provisions protective of ESA resources that were described in the 1996 BiOp remain in place and are unchanged.  *See* FEIS Book One at IV-162 to 163.  This reasoning also is persuasive, not arbitrary.  Near streams, the 2008 Rule does not alter the substantive SMCRA constraints that no surface coal mining operation can be permitted that adversely affects listed species or critical habitat, unless incidental take is authorized by what amounts to a permit-

specific ESA consultation and authorization of incidental take.  *See* note 6, *supra*; 1996 BiOp at 8-9.

  3. Moreover, the ESA-protective SMCRA regulatory program provides that no surface coal mining operation is expected to be approved that would result in the unlawful "take" of listed wildlife.  In the rare situation where ESA take is expected at an approved mining operation, the SMCRA regulatory program only allows incidental take as authorized by FWS. *See* 1996 BiOp at 9, 11-12.  OSM's conclusion that the SBZ Rule was not expected to result in unlawful ESA take further supports OSM's "no effects" determination.

  **B.** **OSM Reasonably Determined That The 2008 Rule Has No Effects On ESA Resources Different From Those Considered In The 1996 BiOp.**

  OSM's "no effects" determination also supplies independent grounds on why consultation on the entire SMCRA program need not be reinitiated.  OSM reasoned that: (1) formal ESA consultation occurred on the entire SMCRA program in 1996; (2) that consultation resulted in the 1996 BiOp, which addressed program-wide impacts and concluded those impacts satisfied ESA Section 7(a)(2)'s substantive compliance standards; and (3) the 2008 changes to the 1983 Rule are not expected to have any impacts different from those that were already considered and approved by FWS in the 1996 BiOp.  FEIS Book One at IV-159 to 163.  OSM's reasoning refutes NPCA's "reinitiation" claims for several reasons:

  1. The ESA Section 7 rules and ESA Section 7 Handbook allow programmatic consultations that can streamline ESA Section 7 compliance for later-implemented parts of the program.  50 C.F.R. § 402.14(c)(6); ESA Section 7 Handbook at xvii, 4-48, 4-50, and E-13; Fed. SJ Br. at 8 (the "guidance specifically provided for the conduct of programmatic or national consultations to evaluate planning documents or broad programs"); *see Buckeye Forest Council*

23

*v. U.S. Forest Serv.*, 378 F. Supp. 2d 835, 842-44 (S.D. Ohio 2005) (approving tiered ESA consultation).

Because the ESA effects of the then-existing SMCRA regulatory program had been analyzed and approved in the programmatic 1996 BiOp, the question for OSM was whether the 2008 Rule altered those effects in a way that required reinitiation of ESA consultation on the action covered by that BiOp, which is the overall SMCRA regulatory program.  On this question, ESA consultation need not be reinitiated unless "the agency action is modified in a manner that causes an adverse effect to listed species or critical habitat that was not considered in this opinion." 1996 BiOp at 14.  This tiering concept – that a new or reinitiated consultation is not required where the effects on ESA resources would be the same as had already been approved under the comprehensive BiOp – also is stated in FWS's cover letter to OSM.  Fed. Def. Ex. 1 at 2.

2.    In the analogous context of tiered review under the National Environmental Policy Act ("NEPA"), *see* 40 C.F.R. §§ 1500.4, 1502.20, the Supreme Court has explained why there is a high hurdle before a supplemental Environmental Impact Statement ("EIS") can be required by a court under NEPA.  *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989).  A Supplemental EIS, like a reinitiated ESA consultation, imposes significant costs and time delays.  Under NEPA's "rule of reason":

> an agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made. . . .  [If an agency must change its documentation every time] "some new circumstance has arisen, some new trend has been observed, or some new facts discovered, there would be little hope that the administrative process could ever be consummated."

*Marsh,* 490 U.S. at 373 & n.19 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 554-55 (1978)).  The urge to await better information and to conduct

more analyses repeats what logicians call Zeno's Paradox, where one never gets to the finish line. *Cronin v. U.S. Dept. of Agric.*, 919 F.2d 439, 447 (7th Cir. 1990). Courts should not overturn an agency judgment against further supplementation unless there has been a "clear error of judgment." *Marsh,* 490 U.S. at 376-78 (internal quotation marks omitted); *see id.* at 378-85 (sustaining the Forest Service's judgment that the new information was not significant enough to warrant a supplemental EIS).

3. Under the deferential rationale of *Marsh*, OSM reasonably determined that ESA consultation was not required due to the 2008 changes to the existing regulations. As OSM concluded, the adoption of the 2008 Rule itself has no on-the-ground effects on ESA resources. FEIS Book One at IV-141 to 142, 160 to 163. The Rule itself does not authorize or permit surface coal mining operations. Further, the ESA-related constraints on permitting surface coal mining operations remain in place. Accordingly, the change in the SBZ Rule has no different effects on listed species than were addressed in the 1996 BiOp. Thus, the 1996 BiOp's standard for reinitiating consultation on the SMCRA regulatory program was not met.

4. OSM reasonably concluded that the 2008 Rule does not have materially different effects on ESA resources from the 1983 Rule that require further ESA consultation. The 1983 Rule must be interpreted in a way "consistent with the underlying statutory authority in SMCRA." *Id.* at IV-141. "OSM's historic interpretation of the 1983 stream buffer zone" had "allowed the placement of excess spoil fills, refuse piles, slurry impoundments, and sedimentation ponds in intermittent and perennial streams," and this is lawful under SMCRA. Fed. SJ Br. at 11. The 2008 Rule simply added clarity, by removing confusing portions of the 1983 Rule that could be misinterpreted. *See, e.g.,* 73 Fed. Reg. at 75,818, 75,822. OSM stated: "The purpose of revising the stream buffer zone regulation is to make the requirements clear and

consistent with the underlying statutory authority in SMCRA.  OSM would not anticipate a major shift in on-the-ground consequences from any of the alternatives."  FEIS Book One at IV-141.

With respect to "T & E Species" OSM predicted "No change" from the impacts *already considered* in the 1996 BiOp, due to the persistence of the portions of the SMCRA permitting program that protect listed species and other ESA resources.  FEIS Book One at IV-142.  Because OSM responsibly concluded that the 2008 Rule had no effects not previously considered, the triggering standard for reinitiation of consultation on the SMCRA regulatory program was not met.

###   C.   NPCA Has Not Rebutted OSM's 2008 Logic That No ESA Consultation Was Required Due To The 2008 Rule.

NPCA does not rebut OSM's stated 2008 reasoning, but instead relies primarily on Federal Defendants' post-decisional change of heart that OSM should have conducted some form of ESA consultation.  *See* Pl. SJ Br. at 3-4, 19.[15]  But those post-decisional statements are not part of the administrative record for assessing whether OSM's 2008 reasons for not engaging in ESA consultation are reasonable, and those post-decisional statements cannot be considered by the Court on Counts II and III.  *See* Argument Section I.B, *supra*.

NPCA's other main tactic is to invoke portions of the FEIS providing general statements that some in-stream and near-stream surface coal mining operations can alter the biotic communities.  Pl. SJ Br. at 20-23.  But NPCA cites only statements regarding potential or hypothetical impacts to non-ESA fish and wildlife resources generally, not the FEIS Section addressing non-effects on the *ESA-listed* fish and wildlife resources.  *See* Pl. SJ Br. at 20-23

---

[15]    While OSM has always been free to conduct notice-and-comment rulemaking to change the 2008 Rule or to reinitiate ESA consultation, it has not done so.

(citing only to FEIS sections on general aquatic fauna (e.g., FEIS Book One at IV-152), not to the separate FEIS section IV.B.4 (*id.* at IV-159 to 163) on aquatic fauna and other *species listed under the ESA*).  As we have described, ESA resources benefit from unchanged special protections under the SMCRA regulatory program.  Even assuming *arguendo* that Plaintiff (*e.g.*, at 23) has made some showing that the 2008 Rule has some connection to increased effects on non-ESA water resources, NPCA has not shown that the 2008 Rule "may affect" ESA-listed species, as 50 C.F.R. § 402.14(a) requires for a consultation procedure.

NPCA's other arguments on Counts II and III likewise are unpersuasive.  NPCA focuses on certain listed mussel species and their critical habitat, Pl. SJ Br. at 21, 37-38, but has not identified an administrative record statement that these listed mussels or their designated critical habitat "may be affected" by the 2008 Rule.  NPCA (at 22-23) also emphasizes that the 2008 Rule contains fewer standards and constraints within streamside zones.  Yet, NPCA has not shown why other still-applicable ESA constraints and procedures for permitting a specific surface coal mining operation would not protect ESA resources.  And, lastly, NPCA ascribes to OSM a claim that only the rules cited in the 1996 BiOp are relevant in assessing whether there should be ESA consultation on the 2008 change to the 1983 Rule, *see* Pl. SJ Br. at 24, but OSM never made that claim, and there is no other basis for NPCA's strained view of the 1996 BiOp.

*      *      *

In sum, NPCA has not carried its "exacting" burden of persuasion needed to overcome OSM's presumptively correct "no effects" determination and to show the determination is "arbitrary."  *Hawksbill Sea Turtle*, 11 F. Supp. 2d at 550.  Plaintiff's motion for partial summary judgment on Counts II and III should be denied.

**D.     The 2008 Rule Should Not Be Vacated Even If Some Curable ESA
          Procedural Error Were Found.**

If the Court were to find some defect in the ESA Section 7 procedural compliance on the

2008 Rule, vacatur (as requested by NPCA) is not an appropriate remedy.  Any procedural defect

in the consultation procedures is curable by additional consultation while the 2008 Rule remains

in place.

**1.     Vacatur Is Neither Required Nor Presumed.**

Contrary to NPCA's argument, vacatur is not required by the APA, nor is it the

"presumptively appropriate remedy."  Pl. SJ Br. at 24-26.  To begin with, the APA does not

mandate vacatur.  Vacatur is an equitable remedy and requires the exercise of sound judicial

discretion.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. __, 130 S. Ct. 2743, 2761

(2010); Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in

Administrative Law*, 53 Duke L. J. 291, 309-44 (2003).  While 5 U.S.C. § 706 mentions set-aside

relief, the APA also provides that "[n]othing ... affects other limitations on judicial review or the

power or duty of the court to dismiss any action or deny relief on any other appropriate legal or

equitable ground."  5 U.S.C. § 702(1).  Thus, the APA does not eliminate this Court's

longstanding equitable discretion "to mould each decree to the necessities of the particular case."

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001).

With respect to curable procedural defects, there no presumption in favor of vacatur.

"[I]f the agency has not considered all relevant factors, or if the reviewing court simply cannot

evaluate the challenged agency action on the basis of the record before it, the proper course,

*except in rare circumstances*, is to remand to the agency for additional investigation or

explanation."  *Fla. Light & Power Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphasis added).

As the D.C. Circuit has stated: "We have *commonly remanded* without vacating an agency's rule

or order where the failure lay in lack of reasoned decisionmaking . . . but also where the order

was otherwise arbitrary and capricious." *Int'l Union, United Mine Workers v. Fed. Mine Safety*

*& Health Admin.*, 920 F.2d 960, 966-67 (D.C. Cir. 1990) (emphasis added).

NPCA quotes from *Sierra Club v. Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010), where

Judge Lamberth opined that vacatur "is the presumptively appropriate remedy for a violation of

the APA." But the alleged presumption runs headlong into Supreme Court authority, such as

*Florida Power & Light*, which Judge Lamberth recognized. *Id.* Rather, remand is the typical

remedy where administrative record does not support the agency's action or where the agency

has not considered all relevant factors. *Fla. Power & Light*, 470 U.S. at 744. "[B]edrock

principles of administrative law preclude [a court] from definitively declaring that [an agency]

was arbitrary and capricious without first affording [the agency] an opportunity to articulate, if

possible, a better explanation." *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir.

1999).

### 2.     Vacatur Of The 2008 Rule Is Not Warranted Under *Allied-Signal* Factors.

When courts in this Circuit evaluate whether or not to vacate a rule, they consider

"'[1] the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency

chose correctly) and [2] the disruptive consequences of an interim change that may itself be

changed.'" *Allied Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C.

Cir. 1995) (quoting *Int'l Union,* 920 F.2d at 967). Under the first factor, vacatur is not warranted

if the agency can show "'a serious possibility that [it] will be able to substantiate its decision on

remand.'" *Apache Corp. v. FERC*, 627 F.3d 1220, 1223 (D.C. Cir. 2010) (*quoting Allied-Signal,

Inc.*, 988 F.2d at 151). Thus, this Court should not vacate the 2008 Rule unless it is "unlikely"

that OSM would "be able to justify a future decision to retain [that R]ule." *Fox Television*

*Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002).  If there is a "non-trivial likelihood" that, after procedural ESA consultation, OSM would be able to justify the 2008 Rule on remand, this Court should not vacate the rule.  *WorldCom, Inc. v. FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002).

Here, the alleged incomplete procedural ESA consultation on the 2008 Rule is not serious and does not call into question the substantive legality of the 2008 Rule.  That is, NPCA has *not* argued, much less shown, that the 2008 Rule substantively would jeopardize the continued existence of any listed species or adversely modify designated critical habitat.  Those are the two substantive constraints on federal agency actions in ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2).

Rather, NPCA is raising only a *curable procedural defect* – that there was incomplete ESA consultation on the 2008 Rule.  But in 2008, as we have shown above, OSM reasonably concluded that no consultation was required.  *See* Background and Context Section IV, *supra*. Even if the prior ESA consultation were not sufficient, there is a record of SMCRA concern for ESA resources that counsels against vacatur or an injunction.  *See Winter v. Natural Res. Defense Council*, 555 U.S. 7, 23 (2008) (where there had been a "hard look" at environmental effects, this is a factor that weighs against an injunction for an inadequate NEPA document).  A remand without vacatur is appropriate for a strictly procedural defect in part because what level of ESA consultation that would be conducted with respect to the 2008 Rule is properly up to OSM.  *See* Fed. SJ Br. at 24 (conceding that some form of ESA consultation was required, but not conceding whether it should be informal or formal).

OSM's own uncertainty counsels against vacatur.  There is a "serious possibility" or a "non-trivial likelihood" that, after conducting ESA consultation, OSM would have the legal authority to continue the 2008 Rule through further investigation and explanation.  *Apache*

*Corp.*, 627 F.3d at 1223; *WorldCom*, 288 F.3d at 434.[16]  The ESA consultation procedure would

not prevent OSM from choosing the same 2008 Rule.  Indeed, OSM may well decide, upon

further consideration, that its original "no effect" finding was justified.  In either case, OSM

would be able to "substantiate its decision on remand." *Allied Signal*, 988 F.2d at 151.  Hence,

the 2008 Rule should not be vacated, regardless of whether vacatur would cause disruptive

consequences. *See Apache Corp.*, 627 F.3d at 1223.

      Courts should prefer a narrowly tailored and "less drastic remedy." *Monsanto*, 130 S. Ct.

at 2761.  The narrow remedy that cures any ESA consultation defect is to direct OSM to

reinitiate ESA consultation (if it chooses not to initiate notice and comment procedures under the

APA to rescind the Rule). *See Winter*, 555 U.S. at 33 (finding that a procedural "injunction

tailored to the preparation of an EIS," rather than enjoining an ongoing agency program, was the

appropriate equitable remedy).  Thus, a remand of the 2008 Rule with a directive to engage in

ESA consultation is the appropriate remedy if an ESA defect is found.

      As to the second *Allied-Signal* factor, the D.C. Circuit has decided against vacatur where

there was not a high degree of disruptive consequences, or even *any* disruption. *See, e.g.*,

*Apache Corp.*, 627 F.3d at 1223 (finding of no vacatur-induced disruption); *Fox Television

Stations, Inc.*, 280 F.3d at 1048-49 (no vacatur where "disruptive consequences of vacatur might

---

[16]     For ongoing agency actions, courts have recognized that an analogous type of procedural
defect (failure to comply with NEPA) is curable and that remand without vacatur is an
appropriate remedy. *See, e.g.*, *Natural Res. Def. Council v. Nuclear Reg. Comm'n*, 606 F.2d
1261, 1272-73 (D.C. Cir. 1979); *State of Alaska v. Andrus*, 580 F.2d 465, 485-87 (D.C. Cir.
1978); *Gov't of Province of Manitoba v. Norton*, 398 F. Supp. 2d 41, 66-67 (D.D.C. 2005).  And
courts should not vacate the underlying decision on the assumption that, without vacatur, the
agency will not fairly reconsider its decision following a procedural NEPA analysis – or here, a
procedural ESA consultation. *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456-57 (D.C. Cir.
1977).

not be great"). These authorities, and many others,[17] contradict NPCA's assertion that there is a presumption or requirement of vacatur. Indeed, where there has been a procedural NEPA defect, a court cannot "presume that an injunction is the proper remedy for a NEPA violation. . . . No such thumb on the scales is warranted." *Monsanto*, 130 S. Ct. at 2757. The same should hold true for a procedural ESA consultation defect.[18]

In addition, disruptive consequences would flow from vacatur. The 2008 Rule comprises revisions or modifications of portions of 22 different sections of the Code of Federal Regulations. *See* 73 Fed. Reg. at 75,875-85. The goal of the entire rulemaking, which OSM does not dispute, was to "clarify the scope and meaning of the stream buffer zone rule" after years of confusing agency application and judicial interpretation, unrelated to compliance with the ESA. *Id.* at 75,818 (quoted in Fed. SJ Br. at 15); *see id.* 75,817-18 (discussing diversified application and interpretation of 1983 Rule). Vacating the entire Rule would undo the clarification it provides on non-ESA issues and return the regulatory program to its previous confused and uncertain state, which would remain in place for years to come until OSM issues a new notice of proposed rulemaking (currently promised for 2014) and, eventually, a new final

---

[17]    *See, e.g.*, *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008); *Mori v. Dep't of Navy*, 731 F. Supp. 2d 43, 49 (D.D.C. 2010); *Utility Workers Union of Am. v. Fed. Election Comm'n*, 691 F. Supp. 2d 101, 107-08 (D.D.C. 2010); *Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 123-25 (D.D.C. 2006); K. Daugirdas, Note, *Evaluating Remand Without Vacatur: A New Judicial Remedy for Defective Agency Rulemakings*, 80 N.Y.U. L. Rev. 278, nn. 89-94 (2005) (collecting D.C. Circuit cases ordering remand without vacatur).

[18]    Additionally, ongoing development actions also were not halted for procedural defects in *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542-46 (1987) (mineral development; no presumption of irreparable environmental injury), and in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) (naval training exercises can continue while a Clean Water Act permit is obtained).

rule.  In contrast, remanding without vacatur would allow OSM to cure any defects in ESA compliance without reverting to the previous untenable state of regulation.

NPCA argues that vacating the 2008 Rule, and reinstating the 1983 Rule, would be most in keeping with the ESA's protective purposes.  Pl. SJ Br. at 30-31.  Notably, however, NPCA does not argue that the ESA compels vacatur for a curable procedural consultation error on an ongoing agency program.  Nor does NPCA argue that the ESA overrides the *Allied-Signal* factors on deciding if a simple remand or with vacatur is appropriate.

In any event, the ESA simply does not require the result that allegedly would most assist listed species, particularly in the absence of evidence of harm to those species.  *Platte River Whooping Crane Trust v. FERC*, 962 F.2d 27, 33-34 (D.C. Cir. 1982); *see Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669-71 (2007) (limiting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978)).  ESA Section 7 should be administered "to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives."  *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997).  Thus, the ESA should not alter the calculus against vacatur of the 2008 Rule while any procedural consultation defect is cured – especially where there is no allegation that species will be jeopardized or critical habitats adversely modified in the interim.

III.    **The NPCA Claims That ESA Consultation Must Be Reinitiated On The 1996 BiOp Fail On Both Jurisdictional And Merits Grounds.**

NPCA's Section III argument addresses "OSM's Failure To Reinitiate Consultation On The 1996 Biological Opinion Violates 50 C.F.R. 402.16 (Count IV)."  Pl. SJ Br. at 31.  But ESA consultation and reinitiation of consultation do not occur on BiOps, but on a distinct OSM "Federal agency action."  16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14 and 402.16.  Accordingly,

we presume NPCA is arguing that ESA Section 7 consultation must be reinitiated on the agency

action the 1996 BiOp covers, which is the entire SMCRA regulatory program.

NPCA also sends mixed signals on the relief it seeks.  Though NPCA's brief contains no

argument concerning Count V of NPCA's Amended Complaint (which directly attacks the

validity of the 1996 BiOp), NPCA's brief seeks to "vacate" or "set aside the 1996 BiOp as

invalid" at several points (*e.g.*, at 32, 39-41), while NPCA's Proposed Order (filed later, on

August 9) does not seek set-aside relief.  *See* ECF Doc. 50; *see also* NPCA's Am. Compl. (ECF

Doc. 6).  Neither NPCA's brief nor its Proposed Order seek any relief against the SMCRA

regulatory program itself.

Against that backdrop, both the jurisdictional defects (subsection A *infra*) and merits

defects (subsection B) in NPCA's claims regarding the 1996 BiOp and reinitiation of

consultation are set forth below.  Subsection C explains why the 1996 BiOp cannot and should

not be set aside.

### A.   NPCA Cannot Attack The Validity Of FWS's 1996 BiOp Because The Statute Of Limitations Has Run And FWS Is Not A Named Defendant.

NPCA's Count V asserts that FWS's "1996 BiOp as adopted" is unlawful.  Am. Compl.

¶ 77 (ECF Doc. 6).  But Count V's facial challenge against the 1996 BiOp is time barred by the

six-year statute of limitations in 28 U.S.C. § 2401(a), as Federal Defendants have shown.  *See*

Fed. SJ Br. at 27-32.  Acknowledging this, "[w]ith respect to Count V, NPCA concedes that the

six-year statute of limitations has run regarding the validity of the BiOp as adopted."  Pl. SJ Br.

at 14.  Thus, Count V should be dismissed.

NPCA also cannot directly challenge FWS's 1996 BiOp because FWS is not a named

Defendant in NPCA's Amended Complaint.  *See* ECF Doc. 6, ¶¶ 18-20 (where NPCA names as

Defendants only the Director of OSM, the Secretary of the Interior as supervisor of OSM, and

the Administrator of EPA).  "[B]ecause the FWS is not a party to this action," any claim that

FWS's BiOp is faulty "misses the mark" and is not before the Court.  *Pyramid Lake Paiute Tribe*

*v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).  Because Plaintiff has sued only the

action agency and not FWS, the legal issue before the Court is "not whether the BiOp itself is

somehow flawed."  *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006).

       For these reasons, there cannot be any direct claims against FWS's 1996 BiOp in this

case, or any relief against that BiOp.  Thus, the Court lacks jurisdiction to vacate or set aside or

declare invalid FWS's 1996 BiOp.

       **B.     NPCA Has Not Provided Any Convincing Ground That ESA Consultation
               Must Be Reinitiated On The SMCRA Regulatory Program.**

       NPCA attempts to show (at 36-39) that one or some of the triggering events for

reinitiating consultation in 50 C.F.R. § 402.16 and the 1996 BiOp have occurred.  These claims

fail for the reasons set forth below.

              **1.     The 2008 Rule Did Not Trigger A Requirement To Reinitiate
                      Consultation On The SMCRA Regulatory Program.**

       Under 50 C.F.R. § 402.16(c), a reinitiated consultation purportedly is required "[i]f the

identified action [that has been the subject of a prior consultation] is subsequently modified in a

manner that causes an effect to the listed species or critical habitat that was not considered in the

[earlier] biological opinion."  In two conclusory paragraphs, NPCA asserts that the 2008 Rule

(and the SMCRA regulatory program) requires a reinitiated consultation on the entire SMCRA

regulatory program.  Pl. SJ Br. at 24 and 39.

       Tellingly, NPCA provides no supporting case law.  As explained in Argument Section II,

above, the 2008 Rule requires no independent ESA consultation and it does not trigger

reinitiation of consultation (as the Rule has no ESA effects not already considered in the 1996

BiOp).  Thus, NPCA's central claim – that the 2008 Rule triggers a duty for some type of

additional ESA consultation – fails on the merits.

> ### 2. The Listing Of New Species And Designation Of Critical Habitats Since The 1996 BiOp Do Not Require Reinitiation Of Consultation.

The balance of NPCA's brief (at 36-39) asserts that post-1996 developments other than

issuance of the 2008 Rule legally require reinitiation of ESA consultation on the entire SMCRA

regulatory program.  None have merit, as explained below.

NPCA asserts (at 37-39) that, under 50 C.F.R. § 402.16(d), whenever a new species is

listed or critical habitat is designated that might or might not be affected by an ongoing action

that had been the subject of a biological opinion, reinitiation of ESA consultation is mandatory.

Pl. SJ Br. at 36-39.  Both law and logic provide otherwise:

1.       If NPCA's view governed, government actions would grind to a halt.  That is,

new species are listed and critical habitats are designated monthly, if not weekly.  And federal

agencies engage in thousands of broad, ongoing, or repetitive actions that have been the subjects

of prior biological opinions.  If thousands of ESA consultations must be reinitiated every time a

new species is listed or critical habitat is designated in an area potentially affected by an agency

action, it would cause analysis paralysis and overwhelm Service and action agency resources.

Thus, as in *Marsh v. ONRC*, there are powerful practical reasons not to require supplemental

environmental analysis every time there is some small change or new information.  *See* 490 U.S.

at 373 & n.19.

FWS's regulation (50 C.F.R. § 402.16(d)) can be reasonably interpreted as not requiring

reinitiation of consultation every time a new species is listed.  Instead, if § 402.16(d) creates any

duty binding on OSM at all, it suggests reinitiation of consultation "[i]f a new species is listed or

critical habitat designated that *may be affected* by the identified action."  50 C.F.R. § 402.16(d)

(emphasis added).  Thus, consultation need not be reinitiated unless and until the action agency

(here, OSM) concludes that a newly listed species or newly designated critical habitat may be

affected by the SMCRA regulatory program in a way not covered by the 1996 BiOp.  *See Protect*

*Our Water v. Flowers*, 377 F. Supp. 2d 844, 876-79 (E.D. Cal. 2004) (affirming an agency's

conclusion that a newly listed species did not require reinitiation of ESA consultation).

      2.      The 1996 BiOp provides another compelling set of reasons why new ESA listings

do not warrant reinitiation of ESA consultation.  The 1996 BiOp (at 9-10) relies on a series of

structural protections of ESA resources built into the SMCRA regulatory program.  *See*

Background and Context Section III, *supra*.  NPCA does not challenge the program here.

Because those protections apply to new species when they are listed and new critical habitats

when they are designated, FWS stated that the programmatic 1996 BiOp "addresses all present

and future Federally listed and proposed species and designated or proposed critical habitats that

may be affected by the implementation and administration of surface coal mining regulatory

programs under SMCRA."  1996 BiOp at 6.  Consequently, listings of new species and

designations of new critical habitat were not described as triggering events for reinitiating ESA

consultation in the 1996 BiOp.  *See* 1996 BiOp at 14.  Thus, the "new listing" basis for

reinitiation of consultation is unpersuasive because FWS told OSM that it need not reinitiate

consultation if a new species is listed or new critical habitat is designated.

      NPCA counters (at 36-37) that the 1996 BiOp is unlawfully overriding a regulation.  But

the 1996 BiOp does not purport to override § 406.16(d).  Rather, the BiOp says that, because the

effects of the SMCRA program on new species/critical habitat are addressed by the SMCRA

regulatory program's structural protections for ESA resources, such new species listings/critical

habitat designations have no effects on listed species not already considered, and do not meet the "may be affected" test in § 402.16(d).[19]

3.      NPCA has not demonstrated that OSM had to reinitiate ESA consultation on the entire SMCRA regulatory program.  With respect to three mussel species, NPCA describes that FWS designated critical habitat in a few river basins in 2004, and that FWS's 2004 recovery plan for those species suggests past mining may have affected them.[20]  NPCA makes similar allegations with respect to the 2011 listing of the Cumberland darter fish, and the 2012 designation of its critical habitat.  But NPCA has not shown that those actions have any effects on ESA resources not addressed in the 1996 BiOp and in the overlapping ESA resource protections in the SMCRA regulatory program.  As in other reinitiation cases, NPCA's allegations here are too general and conclusory to justify a conclusion that OSM has been arbitrary.  *See Gerber v. Babbitt*, 146 F. Supp. 2d 1, 5 (D.D.C. 2001); *see also Miccosukee Tribe of Indians v. United States*, 420 F. Supp. 2d 1324, 1337 (S.D. Fla. 2006); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 120 F. Supp. 2d 1005, 1025-26 (M.D. Fla. 2000).

4.      Moreover, the ESA does not apply "retroactive[ly]" to a "*prior* action of a federal agency."  *Tenn. Valley Auth.*, 437 U.S. at 186 n.32.[21]  Instead, when a new species is listed or a

---

[19]     And, in any event, NPCA cannot challenge the validity of the 1996 BiOp because NPCA has not sued FWS and the challenge is time-barred, as NPCA concedes.  *See* Argument Section III.A, *supra*.

[20]     Because those species were listed under the ESA in 1997, NPCA is time-barred from challenging the 1997 listings as a basis for reinitiating consultation.

[21]     This accords with the general "presumption against statutory retroactivity," which applies unless Congress specifically intends that a statute be applied retroactively.  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 271-73 (1994).  "[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past."  *Union Pac. R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199 (1913).  The Supreme Court in *TVA v. Hill* "made plain that Congress did not intend for section 7 to apply retroactively, but only to 'projects which remain to be

(continued…)

new critical habitat is designated, the ESA takes the world as it finds it on that date. Thus, Plaintiff's assertion that *past* mining has affected the three mussel species and later-designated critical habitat is insufficient to require reinitiation of ESA consultation. NPCA has not shown what new action OSM is taking in 2013 that may affect the mussel species and darter.

5. While NPCA (at 32-36) cites some authority (e.g., *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1033-34 (9th Cir. 2005)) that ongoing federal actions sometimes may warrant ESA Section 7 consultation, Plaintiff neglects to inform the Court that subsequent Ninth Circuit rulings hold otherwise. Under the more-recent decisions, including a controlling *en banc* ruling, ESA consultation is triggered only by a federal agency's affirmative *action*, not by the existence of unexercised agency discretion to take an action. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021-24 (9th Cir. 2012) (*en banc*); *Cal. Sportfishing Prot. Alliance v. FERC*, 472 F.3d 593, 594-95 (9th Cir. 2006); *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1107-08 (9th Cir. 2006). As a district court recently reasoned:

> Although *Pacific Rivers*, *Washington Toxics* and other Ninth Circuit cases discuss "ongoing" agency action, the Ninth Circuit altered the "agency action" analysis while sitting *en banc*. In *Karuk Tribe*, the court held that "[a]n agency must consult under Section 7 *only* when it makes an 'affirmative' act or authorization." *Karuk Tribe*, 681 F.3d at 1021 (emphasis added). . . . Thus, to the extent "ongoing" agency action is based upon regulatory authority or discretionary control, such ongoing agency action does not trigger Section 7's consultation requirement. . . . Thus, to the extent prior cases held that ongoing control over a previous agency action is sufficient to trigger Section 7's consultation requirement without any further affirmative act, those holdings have been implicitly overruled in *Karuk Tribe*.

---

(continued…)

authorized, funded, or carried out' by the federal agency." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1510-12 (9th Cir. 1995).

*Ctr. for Biological Diversity v. EPA*, No. 11-cv-00293-JCS, 2013 WL 1729573, at *10 (N.D. Cal. Apr. 22, 2013).[22]

If an affirmative agency action is needed before there is a duty to engage in an initial ESA consultation, it follows that reinitiation of ESA consultation is triggered only by some new affirmative federal agency action. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 73 (2004) (though a federal land use plan may have a 10 to 15 year life, the federal "action is completed when the plan is approved," and there is "no ongoing" action for NEPA analysis purposes). Because NPCA has not shown that OSM is taking some new regulatory action now or is approving some new surface coal mining operation now that creates new effects on the

---

[22]   NPCA's "ongoing action" theory is also flawed because it is not before the Court in this lawsuit and because it rests on a mistaken view of OSM's highly limited authority in primacy states. P. SJ Br. at 33. NPCA's Amended Complaint contains no allegation that OSM's limited oversight role in primacy states is an "action" that triggers the ESA's consultation provisions, and no claim is based on that theory. Thus, the Court lacks jurisdiction to hear such a claim.

In any event, NPCA's theory is without merit. Once a state achieves primacy, OSM "is not directly involved in local decisionmaking." *In re Permanent Surface Mining Regulation Litig.*, 653 F.2d 514, 518 (D.C. Cir. 1981) (*en banc*). The state alone issues permits, determines who will mine, evaluates reclamation plans, sets bond amounts, conducts inspections, and imposes penalties for noncompliance. *Id.* at 519. OSM's role reverts to one of oversight, which involves occasional on-site federal inspections "to evaluate the administration of approved State programs." 30 U.S.C. § 1267(a).

The existence of some unexercised OSM authority to override a State SMCRA decision (if such authority even existed) is not enough to trigger a duty to reinitiate ESA consultation. Congress limited the ESA "consultation" duty to "federal agency actions" – there is no ESA Section 7 consultation duty on State actions (e.g., permitting actions in a State with SMCRA primacy) and other non-federal actions. 16 U.S.C. § 1536(a)(2). And, as already explained, ESA Section 7 case law focuses on an affirmative agency action – not the mere existence of some unexercised purported oversight authority – as necessary to create an ESA Section 7 consultation duty. Finally, the Supreme Court has recently ruled in another context involving the transfer of environmental permitting authority to a State (under the CWA), that ESA Section 7 consultation duties do not attach to EPA's transfer decision. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007). That same logic applies here.

three mussel species or darter that require some ESA consultation, it has not carried its

"exacting" burden of persuasion that reinitiating ESA consultation is required.

> **3.     The Alleged New Information Cited By NPCA Does Not Require
> Reinitiation Of Consultation.**

The key factor in deciding whether reinitiation of ESA consultation is warranted is

described in § 402.16(b):  does "new information reveal[] effects of the action that may affect

listed species or critical habitat in a manner or to an extent not previously considered" in the

earlier biological opinion?  50 C.F.R. § 402.16(b).

NPCA (at 3, 5-6, 39) cites only one new piece of new information that allegedly requires

OSM to reinitiate ESA consultation – a 2005 EIS on mountaintop mining valley fills.  But NPCA

simply cites that document in a conclusory fashion and does not demonstrate what new

information (not addressed in the 1996 BiOp) is so different as to compel reinitiation of ESA

consultation.  Thus, NPCA has not carried its "exacting" burden of persuasion.  *See Oceana, Inc.*

*v. Bryson*, -- F. Supp. 2d --, 2013 WL 1563675, at *29 (N.D. Cal. Apr. 12, 2013) ("Plaintiff's

briefs fail to cite to new scientific information indicating that species listed under the ESA are

adversely affected by current fishing practices . . . in ways not previously considered").

Further, the information in the 2005 EIS appears additive of the environmental impacts

known at the time of the 1996 BiOp.  Such largely additive information does not require

reinitiation of ESA consultation.  *Heartwood v. Agpaoa*, 611 F. Supp. 2d 675, 692-93 (E.D. Ky.

2009), *rev'd on other grounds* 628 F.3d 261 (6th Cir. 2010).

> **C.     The 1996 BiOp Remains Valid Even If OSM Must Reinitiate ESA
> Consultation**

NPCA's brief (at 40-41) argues that, if this Court finds that OSM has a present duty to

reinitiate ESA Section 7 consultation on some or part of the SMCRA regulatory program, the

1996 BiOp must be vacated.  There are several reasons, however, why the 1996 BiOp should not

be invalidated.  First, as already noted, NPCA has not sued FWS and the statute of limitations has run on challenging the 1996 BiOp.  *See* Argument Section III.A, *supra*.

Second, because NPCA has brought only a claim that OSM must reinitiate ESA consultation, the narrowly tailored, curative, and appropriate remedy is to direct OSM to reinitiate some form of ESA consultation.  Vacating FWS's 1996 BiOp would be an overly broad remedy and would be directed at the wrong agency.

Third, as a logical matter, a valid BiOp should not become invalid simply because the action agency reinitiates ESA Section 7 consultation.  Based on similar reasoning regarding the continuing validity of a BiOp, FWS has stated that, if the level of incidental take allowed in a BiOp is exceeded, this "does not ... require the stopping of an ongoing action during reinitiation of consultation" – instead, the BiOp has some continuing validity.  51 Fed. Reg. 19,954 (June 3, 1986).

NPCA (at 40) cites some Ninth Circuit analysis supporting the invalidity of a BiOp if ESA consultation is reinitiated, but those loosely framed statements are not fully reasoned.  The Eleventh Circuit has recently declined to follow them, stating that an agency's "choice to reinitiate consultation with NMFS and FWS [does not] automatically render[] the former biological opinion[] invalid."  *Defenders of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1252 (11th Cir. 2012).  The Eleventh Circuit's interpretation adopted the United States' interpretation of the ESA and ESA Section 7 rules.  Such a reasonable agency interpretation of the ambiguous ESA Section 7 and implementing rules should be controlling in court.  *See NAHB*, 551 U.S. at 664-69 (affirming the Services' construction of their ESA Section 7 rules over the construction preferred by the Ninth Circuit).

For all these reasons, the 1996 BiOp should not be set aside.

**Conclusion**

Plaintiff's motion for partial summary judgment should be denied and NPCA's ESA claims should be dismissed.

Respectfully submitted,

/s Kirsten L. Nathanson

|  |  |
|---|---|
| *Of counsel*: | J. Michael Klise No. 412420 |
| Katie M. Sweeney | Kirsten L. Nathanson, No. 463992 |
| Bradford Frisby | Thomas R. Lundquist, No. 968123 |
| NATIONAL MINING ASSOCIATION | David Y. Chung, No. 500420 |
| 101 Constitution Avenue, N.W. | Sherrie A. Armstrong, No. 1009642 |
| Washington, DC 20001 | CROWELL & MORING LLP |
| (202) 463-2600 | 1001 Pennsylvania Ave., NW |
|  | Washington, D.C.  20004 |
|  | (202) 624-2500 |

*Counsel for National Mining Association*

Dated:  August 30, 2013