IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL PARKS CONSERVATION ASSOCIATION,    )
    )
    )
    Plaintiff,    )    Case No. 1:09-cv-00115BJR
v.    )    (Judge Barbara J. Rothstein)
    )
S.M.R. JEWELL, Secretary of the United    )
States Department of the Interior,    )
JOE PIZARCHIK, Director of the    )
Office of Surface Mining Reclamation and    )
Enforcement, and GINA MCCARTHY,[1]    )
Administrator of the United States    )
Environmental Protection Agency,    )
    )
    Defendants,    )
    )
NATIONAL MINING ASSOCIATION,    )
    )
    Intervenor-Defendant.    )
    )

**FEDERAL DEFENDANTS' COMBINED REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 43)
AND IN OPPOSITION TO NATIONAL PARKS CONSERVATION ASSOCIATION'S
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 48)**

## INTRODUCTION

Federal Defendants have moved for partial summary judgment as to Count II of Plaintiff

National Parks and Conservation Association's ("NPCA") Amended Complaint based on a

confession of error as to the final rule entitled "Excess Spoil, Coal Mine Waste, and Buffers for

Perennial and Intermittent Streams," 73 Fed. Reg. 75,814 (Dec. 12, 2008) ("Stream Buffer Zone

Rule" or "SBZ Rule").   As detailed in Federal Defendants' opening memorandum, ECF No. 43-1

at 21-24, the Office of Surface Mining Reclamation and Enforcement ("OSM") erred in failing to

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Gina McCarthy is automatically substituted for Bob Perciasepe as Administrator of the United States Environmental Protection Agency.

initiate consultation with the U.S. Fish and Wildlife Service ("FWS") under the Endangered

Species Act ("ESA") to evaluate possible effects of the 2008 SBZ Rule on threatened and

endangered species and critical habitat.   Federal Defendants also moved for partial summary

judgment as to Plaintiff's remaining ESA against OSM claims on various jurisdictional grounds.

In its memorandum supporting its cross-motion, NPCA concurs in Federal Defendants'

request for the Court to remand and vacate the SBZ Rule as remedy for the Federal Defendants'

admitted ESA violation.   ECF No. 48-1 at 25-30.   In addition, NPCA concurs in Federal

Defendants' assertion that the appropriate remedy upon vacatur of the 2008 SBZ Rule is to

reinstate the applicable regulations as they existed prior to the promulgation of the 2008 SBZ Rule,

pending further action by OSM on remand.   Id. at 30-31.

Defendant-Intervenor National Mining Association ("NMA"), on the other hand, argues

that vacatur is not the appropriate remedy for the confessed ESA violation.   ECF No. 46 at 15-23.

In the alternative, NMA argues that the Court should not consider the merits of the confessed ESA

violation until after briefing has been completed on the administrative record.   For the reasons set

forth below, these arguments lack merit.

Notwithstanding Federal Defendants' and NPCA's general agreement as to the appropriate

remedy for the admitted ESA violation during the promulgation of the 2008 SBZ Rule, NPCA

asserts that remand and vacatur of the 2008 SBZ Rule will not redress certain additional claims

related to the 1996 FWS Biological Opinion, a separate and discrete agency action on which

Federal Defendants do not confess error.   For the reasons set forth in Federal Defendants' opening

memorandum, and as further explained below, the Court should not reach the merits of NPCA's

claims concerning the 1996 Biological Opinion.   To begin, NPCA fails to articulate any credible

basis to establish its standing on any claim other than the claims against the SBZ Rule.   Likewise,

NPCA's claim that OSM failed to reinitiate consultation is unripe.   Moreover, its claims challenging the 1996 Biological Opinion are clearly barred by the statute of limitations for challenging final agency actions.   NPCA's remaining claims are also moot.   Assuming, *arguendo*, that NPCA is not jurisdictionally barred from the claims related to the 1996 Biological Opinion, OSM did not err by failing to re-initiate consultation because none of the regulatory criteria triggering re-initiation of consultation are met.

Finally, although it is unnecessary for the Court to reach these claims, Federal Defendants are entitled to summary judgment with respect to the ESA-related claims raised by NPCA against the Environmental Protection Agency ("EPA") regarding its concurrence to OSM's 2008 SBZ Rule under Section 501 of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"). See Amended Complaint Count VII, ECF No. 6 at ¶¶ 84-89.   The Court lacks jurisdiction over NPCA's Count VII claim, because the EPA's concurrence is not a reviewable, final agency action, and EPA's concurrence is committed to agency discretion.   Assuming for the sake of argument that the Court has jurisdiction over this NPCA Count VII claim, it was unnecessary as a matter of law for EPA to consult with FWS before rendering its concurrence to OSM.

## ARGUMENT

### I.   Federal Defendants And NPCA Correctly Request Remand And Vacatur Of The 2008 SBZ Rule Pursuant To Count II Of Plaintiff's Amended Complaint.

In Count II of Plaintiff's Amended Complaint, NPCA correctly alleges that OSM violated its duty to consult with FWS under the ESA when it enacted the SBZ Rule.   Contrary to NMA's arguments, the proper remedy for this violation is vacatur of the SBZ Rule and a reinstatement of the prior regulatory regime.

#### A.   As A Matter of Law, OSM Failed To Consult With FWS As Required By The ESA When It Issued The SBZ Rule.

3

Although Federal Defendants and NPCA agree that OSM violated the ESA by failing to initiate consultation on the 2008 SBZ Rule, these parties differ somewhat in their respective characterizations of the circumstances triggering OSM's legal duty to consult with FWS concerning potential effects of the 2008 SBZ Rule on threatened and endangered species and their designated critical habitat.   As explained in detail in Federal Defendants' opening memorandum and not repeated here, OSM's determination that consultation was unnecessary because the 2008 SBZ Rule would have "no effect" on species was contradicted by statements in OSM's own Draft Environmental Impact Statement ("EIS") and Final EIS, which indicated that the SBZ Rule actually would have effects upon the environment and that these effects, in turn, may affect listed species or their critical habitat.   See ECF No. 43-1 at 16-17.   NPCA disagrees with Federal Defendants' assertion that the SBZ Rule might have certain slight positive effects on species.   See ECF No. 48-1 at 19-23.   These differences in reasoning, however, are of no import.   Regardless of whether such effects are deemed slightly positive or negative, both NPCA and Federal Defendants agree that the 2008 SBZ Rule may affect threatened and endangered species or critical habitat to some degree.   The potential for such effects triggered a legal duty for OSM to consult with FWS on the 2008 SBZ Rule, pursuant to the ESA, 16 U.S.C. § 1536(a)(2), but OSM did not carry through with its responsibility.   It is undisputed that OSM failed to consult with FWS on the 2008 SBZ Rule.

Although NMA recognizes that OSM did not consult on the 2008 SBZ Rule, it suggests that the Court wait to find that OSM violated its statutory duty under the ESA until after briefing based on the administrative record.   See ECF No. 46 at 17-20.   As stated in our opening brief, however, a court is permitted under the Administrative Procedure Act ("APA") to "hold unlawful

and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" based on a review of "the whole record or those parts of it cited by a party."   5 U.S.C. § 706(2)(A) (emphasis added); ECF No. 43-1 at 21.

In this case, all parties cite to the same publicly-available parts of the record--including the 2008 SBZ Rule itself and the Draft and Final EISs--to support their respective positions that the 2008 SBZ Rule either had or did not have any effects that would trigger the responsibility to consult.[2]  Compare ECF No. 48-1 at 19-23 (NPCA citing primarily to the Final EIS and the preamble to the 2008 SBZ Rule to argue the rule "may affect" listed species) with ECF No. 46 at 20-23 (NMA citing to the Final EIS to conclude the rule would cause "no effect" to listed species).[3] The fact that all parties cite to the same documents to reach different conclusions about the impact of the SBZ Rule underscores that OSM itself in its decision documents was inconsistent in describing the Rule's effects on threatened and endangered species and critical habitat.   This inconsistency supports Federal Defendants' position that the ultimate "no effect" decision contained in the 2008 SBZ Rule was arbitrary and capricious.   Moreover, NMA does not explain what other types of record information--apart from the biological opinion itself, certain publicly-available Draft and Final Environmental Impact Statements, and the final rule preamble

---

[2]  Federal Defendants have filed the Administrative Records of the Department of the Interior and the Environmental Protection Agency, respectively.   Although Federal Defendants maintain that this case can be decided based on the parts of the record cited by the parties to date, Federal Defendants are including citations to the Administrative Record for the convenience of the Court and the parties.   Citations to the Administrative Record of the Department of the Interior will reference the "SBZ" Bates numbers on the certified index of the Department of the Interior.   See ECF No. 55-1.   Citations to the Administrative Record of the Environmental Protection Agency will reference the "AR" document numbers on the certified index of the Environmental Protection Agency.   See ECF No. 54-2.
[3]  NMA also maintains that Federal Defendants heavily rely on post-decision documents to justify its error.   ECF No. 46 at 24.   Federal Defendants' dispute this characterization.   As discussed below, the post-decisional documents that Federal Defendants have included go only to the appropriate remedy for the failure to consult—not as evidence of the erroneous and, thus, arbitrary and capricious decision not to consult.

already cited by the parties--would be needed to determine whether OSM had a legal duty to consult.   No other parts of the record are necessary to reach this conclusion, and the Court need not delay reaching a decision to conclude this case.

### B.      Vacatur Is The Proper Remedy For The Admitted ESA Violation In This Case.

Despite NMA's insistence that the Court wait to confirm the admitted ESA violation until further briefing on the record, the only true issue currently before the Court is how the Court should remedy that admitted ESA violation.   Federal Defendants and NPCA concur in requesting the Court to exercise its remedial powers to vacate the SBZ Rule and reinstate the applicable regulations as they existed prior to the promulgation of the 2008 SBZ Rule, pending further actions by OSM on remand.   As demonstrated in Federal Defendants' opening memorandum, ECF No. 43-1 at 32-34, and in NPCA's brief, ECF No. 48-1 at 24-31, this requested relief is fully within the Court's equitable powers.

Defendant-Intervenor NMA opposes the requested vacatur of the 2008 SBZ Rule on various grounds.   In particular, NMA suggests that the Court should remand the 2008 SBZ Rule without vacatur in light of the reasoning in the Court's previous opinion, ECF No. 18 at 5; Nat'l Parks Conservation Ass'n v. Salazar, 660 F. Supp. 2d 3, 4-5 (D.D.C. 2009) (Kennedy, J.).   In that opinion, however, the Court did not hold that vacatur was outside of its equitable powers; rather, the Court concluded only that it was inappropriate to vacate the SBZ Rule at that time without judicial consideration of the merits.   See, e.g., id. at 4 ("Here, the Federal defendants seek a remand and vacatur of the SBZ Rule without a determination on the merits that the SBZ Rule is legally deficient.").   The circumstances are different now because OSM has now fully explained the merits of the defect that occurred with the promulgation of the SBZ Rule and is seeking a

determination by the Court on the merits that its failure to initiate consultation with FWS on the

2008 SBZ Rule was erroneous.

Moreover, vacatur is the appropriate remedy here in light of the two-part test articulated in

Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 151 (D.C. Cir. 1993).

There, the D.C. Circuit described the criteria for granting vacatur as follows:

> The decision whether to vacate depends on the seriousness of the order's
> deficiencies (and thus the extent of doubt whether the agency chose correctly) and
> the disruptive consequences of an interim change that may itself be changed.

Id. at 150-551 (quotations and citation omitted).   As to the first part of the test, Federal

Defendants have articulated the seriousness of OSM's failure to engage in ESA consultation with

respect to the 2008 SBZ Rule.   See ECF No. 43-1 at 33.   In response, NMA asserts that the SBZ

Rule could theoretically be retained in effect pending ESA consultation in accordance with ESA

Section 7(d), which provides that:

> [a]fter initiation of consultation required under subsection (a)(2) of this section, the
> Federal agency and the permit or license applicant shall not make any irreversible
> or irretrievable commitment of resources with respect to the agency action which
> has the effect of foreclosing the formulation or implementation of any reasonable
> and prudent alternative measures which would not violate subsection (a)(2) of this
> section.

16 U.S.C. § 1536(d); see ECF No. 446 at 15-17.   However, because there has been no

consultation on the 2008 SBZ Rule, the degree and scope of any effects on threatened and

endangered species or critical habitat is unknown.   Thus, NMA's argument that the SBZ Rule

does not cross the "Section 7(d) threshold" is purely hypothetical.

In any event, as to the second part of the test, NMA has entirely failed to articulate why or

how vacatur of the 2008 SBZ Rule would be disruptive.   NMA simply makes the bald assertion

that "the consequences of vacating [the 2008 Stream Buffer Zone Rule] may be quite disruptive."

ECF No. 46 at 15 n. 11 (quoting Allied-Signal, 988 F.2d at 150-51).   To the contrary, Federal

Defendants have shown that vacatur of the 2008 SBZ Rule would have almost no impact on the

regulated community because virtually all coal mining is still being regulated under the regulatory

regime in effect prior to adoption of the 2008 SBZ Rule with respect to mining activities in or near

perennial and intermittent streams.   See Pizarchik Dec., ECF No. 43-4 at ¶ 26.

Federal Defendants have also demonstrated why a remand *without* vacatur would be

contrary to the public interest.   As explained in the Pizarchik Declaration, ECF No. 43-4 at ¶¶

19-26, OSM is currently developing a new stream protection rule, which will, in effect, replace

most, if not all, of the provisions of the 2008 SBZ Rule.   If Federal Defendants were to proceed

with administratively withdrawing the SBZ Rule as NMA suggests, it would entail a costly and

burdensome process involving notice-and-comment procedures--potentially including further

National Environmental Policy Act ("NEPA") and ESA reviews--concerning the effects of

reverting back to the previous regulations.[4]   See, e.g., Nat'l Wildlife Fed'n v. Clark, 577 F. Supp.

825, 829 (D.D.C. 1984) (holding that an agency cannot rescind existing regulations without strict

adherence to the rulemaking procedures even if the statutory basis for the existing regulation is

void).   Such expenditures would be unnecessary and imprudent in the current federal fiscal

climate, particularly considering that OSM is already undertaking these procedural reviews as it

works to replace the 2008 SBZ Rule with the new stream protection regulations that are under

development.   In addition, it would serve no purpose and might create regulatory confusion if

OSM were to undertake simultaneous rulemaking procedures to reinstate the previous regulations

---

[4] It is of no moment that several years have passed since Federal Defendants' initial confession of error.   Although
NMA asserts that OSM should have commenced proceedings to administratively withdraw the 2008 SBZ Rule during
that time, the fact is that OSM, after balancing its agency priorities, decided not to commence such proceedings and
instead has devoted its limited resources toward developing a new stream protection rule, which would effectively
replace the 2008 SBZ Rule, as explained in the Pizarchik Declaration.

*and* promulgate new regulations that would immediately replace those reinstated regulations when the Court is statutorily authorized to exercise its remedial powers to achieve the same interim result with respect to the previous regulations.   5 U.S.C. § 706(2) ("The reviewing court shall--…(2) hold unlawful and set aside agency action, findings, and conclusions found to be--(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . ."); Air Transport Ass'n of Canada v. F.A.A., 254 F.3d 271, 277 (D.C. Cir. 2001) ("[B]y vacating or rescinding the recissions [sic] proposed by ER–1245, the judgment of this court had the effect of reinstating the rules previously in force. . . .") quoting Action on Smoking and Health v. Civil Aeronautics Bd., 713 F.2d 795, 797 (D.C. Cir. 1983); Georgetown Univ. Hosp. v. Bowen, 821 F.2d 750, 757 (D.C. Cir. 1987) (same), aff'd 488 U.S. 204 (1988).

## II.      The Court Lacks Jurisdiction To Address NPCA's Remaining Claims.

The only discrete, as-applied agency action challenged by NPCA in this case is the 2008 SBZ Rule.   Federal Defendants have now moved the Court for summary judgment seeking vacatur of the SBZ Rule, and NPCA concurs in that result.   Nonetheless, NPCA insists that the Court should adjudicate its remaining ESA counts regarding the 1996 Biological Opinion (Counts II-IV) even though those claims are untethered to any specific agency action.   In essence, NPCA now seeks to mount a facial challenge to the 1996 Biological Opinion and its application to abstract circumstances.   However, notwithstanding NPCA's desire for an advisory opinion on these issues, the Court lacks jurisdiction for a variety of reasons to adjudicate these claims.

### A.      NPCA Lacks Standing To Pursue Its Claims Challenging The 1996 Biological Opinion And OSM's Alleged Failure To Re-Initiate Consultation.

#### 1.      NPCA Fails To Establish Injury-In-Fact.

The Supreme Court has made clear that plaintiffs bear the burden of establishing standing for each type of relief sought.   Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).   As explained in our opening memorandum, ECF No. 43-1 at 26, even assuming *arguendo* a plaintiff can show standing for one claim, if that claim is resolved, the plaintiff does not retain standing to challenge the underlying basis for that action absent a concrete application that threatens imminent harm to its interests.   Summers, 555 U.S. at 494 ("We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to his interests."). Yet this is precisely what NPCA seeks to do here.   Federal Defendants have moved for summary judgment and vacatur of the 2008 SBZ Rule--the one discrete agency action of OSM challenged here--and NPCA agrees with that result.   NPCA cannot now bootstrap standing for their remaining claims regarding the 1996 Biological Opinion.   Rather, they must independently show standing to pursue their remaining claims related to the 1996 Biological Opinion.   This they have not done.   While NPCA asserts that its members will be injured by surface coal mining, NPCA fails to identify any particular project or final agency action that has been authorized under the 1996 Biological Opinion that has resulted in any injury to its members' interests.   Instead, NPCA desires to continue to pursue claims related to the 1996 Biological Opinion in the abstract.   This course of action is squarely foreclosed by the Supreme Court's decision in Summers.

None of NPCA's attempts to demonstrate concrete harm or imminence save their claims. In support of its assertion that NPCA has standing to bring the ESA claims asserted in Counts II-IV of the Amended Complaint, NPCA asserts that its members' use and enjoyment of public lands in the Appalachian region is "harmed by surface coal mining, which threatens watersheds and

aquatic ecosystems throughout the region."   ECF No. 48-1 at 15.   NPCA has proffered

declarations of its members that substantiate the assertion that NPCA members use and enjoy

public land.   Notably, however, NPCA has entirely failed to demonstrate that its members are

harmed by any particular agency action resulting from the 1996 Biological Opinion, which

comprises the basis of NPCA's remaining ESA-related claims, or that any injury may be redressed

by an order of this Court.   Instead, NPCA invites the Court to *presum*e that its members will be

injured by any surface coal mining that occurs in the Appalachian region.   Such claims of injury

are vague and amorphous, and are simply variants of arguments that have been squarely rejected

by the Supreme Court.

     In Lujan v. National Wildlife Fed'n, 497 U.S. 871, 886-89 (1990), for instance, the plaintiff

organization submitted affidavits (in response to the government's summary judgment motion)

from two of its members who claimed injury based on use of federal lands "in the vicinity" of lands

that were being opened for the staking of mining claims and oil and gas leasing.   The Supreme

Court held that these affidavits failed to establish injury-in-fact because they failed to provide

specific facts linking those members' claims of injury to the particular lands that were the subject

of the government action.   Id. at 889.[5]   In a subsequent decision, the Supreme Court reiterated

that it is insufficient for an environmental organization to allege that its members enjoy recreation

"in the vicinity" of a challenged government action.   Lujan v. Defenders of Wildlife, 504 U.S.

---

[5] The Supreme Court specifically stated that:

     Rule 56(e) is assuredly not satisfied by averments which state only that one of respondent's
     members uses unspecified portions of an immense tract of territory, on some portions of which
     mining activity has occurred or probably will occur by virtue of the governmental action.   It will
     not do to "presume" the missing facts because without them the affidavits would not establish the
     injury that they generally allege.

Nat'l Wildlife Fed'n, 497 U.S. at 889.   Although Plaintiff's affidavits specify some areas in particular that its
members use, it is pure speculation that these specific areas encompass a location where activities might be affected by
a surface coal mining operation in the future.

555, 565-66 (1992) (quoting <u>Nat'l Wildlife Fed'n</u>, 497 U.S. at 887-889) ("[A] plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it.").   The <u>Defenders of Wildlife</u> court further emphasized its rejection of such claims of standing when it considered (and rejected) an "ecosystem nexus" argument which proposed that a person who uses any part of an ecosystem could have standing even if the challenged government activity was located a great distance away.   504 U.S. at 565-66.

In the instant case, NPCA submits the declarations of three of its members who state that they recreate in largely unspecified locations of vast areas of Appalachia.   Don Barger expressed his concerns regarding "ongoing and future coal mining operations on the Cumberland Plateau, and in the New River watershed, specifically. . . ."[6]   ECF No. 48-3 at ¶ 18.   Elizabeth Etnier states that it is her understanding that "surface coal mining activities have caused degradation of the Big South Fork and its tributaries, and I am generally aware that surface coal mining activity continues to take place upstream of the Big South Fork in the New River watershed."   ECF No. 48-4 at ¶ 9.   Dr. David Eitner states that "coal mining-caused increases in siltation rates throughout the creeks and rivers of much of the Big South Fork system and adjacent portions of the Cumberland River drainage are seen as the primary threat to the wellbeing and persistence" of several threatened and endangered fish species.   ECF No. 48-5 at ¶ 17.   In addition, Dr. Eitner states that he is concerned that "several mussel species within the Big South Fork are already federally listed as endangered and would be adversely affected by the impacts of surface coal

---

[6]  The Cumberland Plateau encompasses most of Eastern Kentucky, a large swath of Eastern Tennessee, and extends south into Northern Georgia and Alabama.   Final EIS at III-38, SBZ000159.   The New River watershed covers portions of West Virginia, North Carolina, and Virginia and encompasses an area of 6,965 square miles.   <u>See</u> National Park Service (NPS), "New River Geology: Ribbon Through Time," (Apr. 2012) <u>available at</u> http://www.nps.gov/neri/planyourvisit/upload/Geology2012-4page-FINAL.pdf (last visited Aug. 30, 2013).

mining."[7]   ECF No. 48-5 at ¶ 25.   However, none of Plaintiff's declarants identifies a single specific surface coal mining project that was allegedly authorized in reliance on the 1996 Biological Opinion.   As in National Wildlife Fed'n and Defenders of Wildlife, it is insufficient to allege that Plaintiff's members enjoy recreation throughout an immense tract of territory, some portions of which might hypothetically be indirectly affected by surface coal mining.   Because NPCA has not shown that any specific mining operation authorized in reliance on the 1996 Biological Opinion affects an area where its members recreate, NPCA cannot establish standing.

NPCA nonetheless contends that it is possible to allege injury where impacts on endangered species have some effect on members' aesthetic, scientific, and recreational interests. In support of this proposition, NPCA relies on Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 231 n.4 (1986), in which the Supreme Court held that plaintiff whale watchers alleged sufficient injury-in-fact by asserting that their ability to engage in whale watching activities would be adversely affected by continued whale harvesting.   However, the Supreme Court subsequently noted that Japan Whaling marks the "outermost limit" of constitutional standing:

> It is even plausible -- though it goes to the outermost limit of plausibility -- to think that a person who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm, since some animals that might have been the subject of his interest will no longer exist, see Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 231, n.4 . . . (1986).   It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.

---

[7]   The watershed of the Big South Fork of the Cumberland River encompasses an area of 1,382 square miles primarily in Tennessee and Kentucky.   See NPS, "Geology and History of the Cumberland Plateau," p. 1, available at http://www.nps.gov/biso/planyourvisit/upload/webgeo.pdf (last visited Aug 30, 2013).

Defenders of Wildlife, 504 U.S. at 566-67.   Although an alleged injury to aesthetic, scientific, and recreational interests might suffice to establish injury based on alleged harm to a wide-ranging species, such as the whales at issue in Japan Whaling, under the reasoning in the subsequent Lujan case, NPCA must tie the government's alleged actions (or unlawful inactions) to an alleged injury to a specific plaintiff.   E.g. Conservation Force v. Jewell, ---F.3d.---, No. 11-5136, 2013 WL 4417452, at *5 (D.C. Cir. Aug. 20, 2013) ("In this case, there is no record evidence to support the claim that any of the appellants suffers an injury-in-fact from the [FWS'] alleged ongoing policy of delay.").   NPCA fails to make this showing, however, for it does not demonstrate any injury-in-fact based on specific coal mining operations at any particular location.

Indeed, NPCA now is seeking to do what Lujan foreclosed:   wholesale improvement in OSM's implementation of the 1996 Biological Opinion without challenging a specific action. National Wildlife Fed'n, 497 at 891 (plaintiff cannot seek wholesale improvement of an agency's implementation of a program but instead must "direct its attack against some particular 'agency action' that causes it harm").   Here, NPCA does not refer to any specific SMCRA mining permit issued by OSM or otherwise issued in reliance on the 1996 Biological Opinion.   Instead, the affiants refer only to unspecified mining activities in Appalachia and contend that they are being harmed by OSM's implementation of the surface mining program generally due to alleged violations of the ESA.   These generalized allegations of harm are not sufficient to establish standing.[8]   Id.

---

[8]   This result is not altered by the fact that NPCA frames its claim seeking to compel re-initiation of consultation on the 1996 Biological Opinion as a failure to act under APA Section 706(1),   While framed as seeking to compel re-initiation of consultation on the 1996 Biological Opinion, consultation is conducted on agency actions, not biological opinions.   In effect, NPCA is not complaining of agency inaction but is alleging that OSM is continuing an agency action, reliance on the 1996 Biological Opinion, in violation of the ESA.   In any event, whether framed as agency action taken not in accordance with law or agency action unlawfully withheld, the result is the same:   NPCA's challenge must be directed to a discrete agency action.   Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 65

2.      **NPCA Fails To Establish The Causation And Redressability Elements of Standing.**

A plaintiff need not demonstrate causation and redressability to a certainty.   Nat'l Wildlife Fed'n v. Hodel, 839 F.2d 694, 705 (D.C. Cir. 1988).   However, a plaintiff should "precisely trace the connection between injury and relief" because it is not up to a court to construct a "'plausible' scenario whereby an order of this court might provide relief for injuries not specifically pleaded." Dellums v. U.S. Nuclear Regulatory Comm'n, 863 F.2d 968, 974-75 (D.C. Cir. 1988).   NPCA is not itself   "the object of the government action or inaction" being challenged.   Defenders of Wildlife, 504 U.S. at 562.   In such cases, where causation between the injury and the alleged violation is indirect or attenuated, standing is "not precluded, but it is ordinarily 'substantially more difficult' to establish."   Id. (citing Allen v. Wright, 468 U.S. 737, 758 (1984)) (other citations omitted).   Where numerous third parties and independent variables lead to an injury, the plaintiff has the burden of showing that, but for the particular governmental action that is challenged, the injury would abate.   Dellums, 863 F.2d. at 980.   Moreover, a plaintiff must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"   Defenders of Wildlife, 504 U.S. at 561 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38 (1976)).

In the instant case, the causal relationship between the challenged 1996 Biological Opinion and the unspecified surface coal mining operations referenced in Plaintiff's declarations is highly attenuated at best.   NPCA has presented no evidence drawing a link between the 1996 Biological Opinion and any specific coal mining operation causing it harm or demonstrating that allegedly harmful surface coal mining will stop or even slow if the Court vacates the 1996 Biological

(2004).

Opinion and orders OSM to re-initiate consultation, as Plaintiff requests.   In short, NPCA has not

established standing to pursue its claims related to the 1996 Biological Opinion.   Nor has it even

challenged a particular, discrete agency action by OSM, other than the SBZ Rule, that could be

remedied by the Court.   Therefore, the Court should grant summary judgment in favor of Federal

Defendants on NPCA's ESA-related claims other than the specific Count II claims on which

Federal Defendants have confessed error.

### B.      NPCA's Remaining ESA Claims Are Also Unripe.

As a related matter, the Court also lacks jurisdiction over NPCA's remaining ESA claims

concerning the 1996 Biological Opinion, because those claims are unripe.   Determining whether a

claim is ripe for review requires an evaluation of (1) the fitness of the issues for judicial decision

and (2) the hardship to the parties of withholding court consideration.   Nat'l Park Hospitality

Ass'n v. Dep't of the Interior, 538 U.S. 803, 808 (2003).   The Supreme Court has made clear that

"[a]bsent [a statutory provision providing for immediate judicial review], a regulation is not

ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the

scope of the controversy has been reduced to more manageable proportions, and its factual

components fleshed out, *by some concrete action applying the regulation to the claimant's

situation in a fashion that harms or threatens to harm him*.   Id. (emphasis added).   Applying

these factors here, NPCA's re-initiation claim is clearly unripe.

Apart from the 2008 SBZ Rule, which Federal Defendants and NPCA agree was issued in

error, NPCA has not identified any specific application of the 1996 Biological Opinion that harms

or threatens to harm it or its members.   NPCA's remaining ESA claims are no longer anchored to

any action, but instead are presented in the abstract.   Moreover, if OSM applies the 1996

Biological Opinion (without re-initiation of consultation) in a specific, concrete application that

affects NPCA, NPCA remains free to raise a "failure to re-initiate" claim at that time assuming all other jurisdictional requirements are met.   But, unless and until those circumstances arise, NPCA's attempts to obtain an advisory opinion on the 1996 Biological Opinion or on the alleged need to re-initiate consultation are unripe for review.[9]

### C.     NPCA's Claims Under Counts IV Are Time-Barred Under The Applicable Six-Year Statute of Limitations.

Generally, the statute of limitations for any particular cause of action begins to run against an agency as soon as the action is final for purposes of judicial review.   Spannaus v. U.S. Dep't of Justice, 824 F.2d 52, 56 (D.C. Cir. 1987).   The Supreme Court has held that a biological opinion of FWS is a "final agency action" on the date of issuance.   Bennett v. Spear, 520 U.S.154, 177-78 (1997).   It is undisputed that the biological opinion here was issued in 1996 and that Plaintiff filed its complaint in 2009—well after the expiration of the six-year period set forth in 28 U.S.C. § 2401(a) for challenges to a final agency action of this type.

In an apparent attempt to avoid the application of the statute of limitations, NPCA asserts that its claims under Count IV[10] are not time-barred because NPCA is challenging an ongoing agency action (presumably, OSM's ongoing reliance on the 1996 Biological Opinion), over which the agency allegedly has discretionary involvement or control.   Plaintiff's theory of an ongoing violation would essentially toll the statute of limitations.   Such an interpretation would effectively nullify the applicable statute of limitations and upset the balance struck by Congress between administrative finality and the interests of litigants.   E.g., Raton Gas Transmission Co. v.

---

[9]   This conclusion is not changed by the fact that a biological opinion is considered a final agency action, see Bennett v. Spear, 520 U.S. 154, 169-70 (1997) (holding a biological opinion constitutes final agency action).   Even if an action is considered final, it may still be unripe for review.   Nat'l Park Hospitality Ass'n., 538 U.S. at 812.

[10]   With respect to Count V, NPCA "concedes that the six-year statute of limitations has run regarding the validity of the BiOp as adopted in September 1996."   ECF No. 48-1 at 14.   Count V should be dismissed accordingly.

FERC, 852 F.2d 612, 615 (D.C. Cir.1988) ("Strict enforcement of the time limit is necessary to preserve finality in agency decisionmaking and to protect justifiable reliance on agency rules.").

In addition to the flawed argument that that the statute of limitations is not applicable because of OSM's unspecified ongoing activities in reliance on the 1996 Biological Opinion, NPCA also asserts that its Count IV claim is not time-barred because NPCA allegedly is seeking to compel agency action unlawfully withheld--the alleged failure to re-initiate consultation on the 1996 Biological Opinion.   ECF No. 48-1 at 13.   Under NPCA's reasoning, a claim concerning the merits of a FWS biological opinion could never be deemed to be time-barred, provided that a plaintiff couched its challenge in terms of an alleged failure to re-initiate consultation.   However, NPCA's reliance on Wilderness Society v. Norton, 434 F.3d 584 (D.C. Cir. 2006), is misplaced because the plaintiff in that case alleged that the National Park Service had failed to meet specific statutory deadlines governing the identification and management of "wilderness" in the National Park System.   Under the circumstances, the court reasoned that the plaintiff "does not complain about what the agency has done but rather about what the agency has yet to do."   Id. at 589 (quoting In re United Mine Workers of Am. Int'l Union, 190 F.3d 545, 549 (D.C. Cir. 1999).

Here, unlike the plaintiff in Wilderness Society, NPCA does not identify any specific statutory duties "unlawfully withheld" since adoption of the 1996 Biological Opinion; that is; apart from Federal Defendants' admitted failure to initiate ESA consultation on the SBZ Rule.   NPCA fails to identify any other specific deficiency or occurrence that allegedly triggers a legal duty on the part of OSM or FWS to reinitiate consultation.   It is not sufficient for a plaintiff to merely identify an "ongoing agency action" to avoid application of the statute of limitations in the context of an alleged failure to reinitiate ESA consultation.   Rather, a plaintiff must identify an affirmative act that allegedly triggers a duty to reinitiate consultation.   Karuk Tribe of Cal. v. U.S.

Forest Serv., 681 F.3d 1006, 1024 (9th Cir. 2012) (en banc) (consultation is triggered only by

affirmative agency action), cert. denied sub nom., New 49'ers v. Karuk Tribe, 133 S.Ct. 1579

(2013).   NPCA's Count IV claim should be dismissed, as NPCA has failed to identify any such

triggering act.

      **D.**    **Plaintiff's Remaining ESA-Related Claims Are Also Moot.**

Provided that the Court vacates the 2008 SBZ Rule (as requested by both NPCA and

Federal Defendants), NPCA's remaining claims concerning the merits of the SBZ Rule would be

jurisdictionally moot, as the Court cannot fashion any further relief with respect to the SBZ Rule.

Notably, NPCA does not assert that, upon vacatur of the 2008 SBZ Rule, there would be any live

controversy as to its Count I claims concerning OSM's alleged violation of SMCRA

environmental protection standards.   See ECF No. 48-1 at 10-12.   However, NPCA asserts that

its remaining ESA-related claims under Counts II, III, and IV would continue to present a live case

or controversy to the extent that the 1996 Biological Opinion would remain in effect.   Id. at 12.

For the reasons explained in Federal Defendants' opening memorandum, ECF No. 43-1 at 36-37,

such claims should be deemed prudentially moot in light of Federal Defendants' ongoing efforts to

develop a new stream protection rule that will be subject to ESA consultation before issuance.

**III.**    **In the Alternative, Federal Defendants Are Entitled To Summary Judgment As To The Merits Of NPCA's Remaining ESA-Related Claims.**

      **A.**    **The Court Should Grant Summary Judgment In Favor Of Federal Defendants As To NPCA's Count IV Claims Against OSM.**

Assuming for sake of argument that NPCA's Count IV claims concerning OSM's alleged

failure to reinitiate ESA consultation are not time-barred and the Court otherwise has jurisdiction,

the Court should grant summary judgment in favor of Federal Defendants as to these claims.   The

agency action that Plaintiff challenges appears to be "the continuation and approval" and the

19

"conduct" of surface coal mining and reclamation operations "under state and Federal regulatory programs adopted pursuant to SMCRA where such operations may adversely affect threatened or endangered species."   ECF No. 48-1 at 32 (quoting 1996 Biological Opinion at 1, 3).   For purposes of this memorandum, Federal Defendants do not dispute that OSM has continuing discretionary involvement or control with respect to its SMCRA-authorized activities that are the subject of the 1996 Biological Opinion.   Rather, the issue before the Court is whether there has been any occurrence since 1996 that would trigger the duty for OSM or FWS to reinitiate ESA consultation.

According to the FWS consultation regulations, reinitiation of consultation is required:

(a) If the amount or extent of taking specified in the incidental take statement is exceeded;[11]

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16.   Moreover, citing to this regulation, the language of the 1996 Biological Opinion itself specifies when reinitiation is required:

> As provided in 50 CFR 402.16, reinitiation of formal consultation is required when discretionary Federal agency involvement or control over the action has been maintained (or is authorized by law) and if (1) new information reveals that the agency action may affect listed species or critical habitats in a manner or to an extent *not considered in this opinion*, or (2) the agency action is modified in a manner that causes an adverse effect to listed species or critical habitat *that was not considered in this opinion*.

---

[11]  As to this criterion, NPCA has neither alleged nor shown that the extent of incidental take contemplated in the 1996 Biological Opinion has changed since it was issued.

1996 Biological Opinion at 14; SBZ037400 (emphasis added).   Contrary to NPCA's assertions,

none of these "triggers" contemplated in either the Biological Opinion or the regulations for

reinitiating consultation has been met.

> **1.      The Listing Of New Species And Designation Of Critical Habitat Does Not Automatically Compel Reinitiation Of Formal Consultation On The 1996 Biological Opinion.**

FWS regulations provide for reinitiation of ESA consultation:   "If a new species is listed

or critical habitat designated *that may be affected by the identified action*."   50 C.F.R. § 402.16(d)

(emphasis added).   Federal Defendants acknowledge that critical habitat for endangered mussel

species has been designated since issuance of the 1996 Biological Opinion.   See 69 Fed. Reg.

53,136 (Aug. 31, 2004) (designation of critical habitat for Cumberland elktoe, Oyster mussel, and

Cumberlandian combshell).   In addition, the Cumberland darter was recently listed as an

endangered species, see 76 Fed. Reg. 48,722, 48,731 (Aug. 9, 2011), and critical habitat was

subsequently designated.   77 Fed. Reg. 63,604 (Oct. 16, 2012).   However, it is of no moment that

FWS rendered these determinations *after* publication of the 1996 Biological Opinion because

these newly-listed species will not be affected by the "conduct of surface coal mining and

reclamation operations under State and Federal regulatory programs adopted pursuant to

SMCRA," see 1996 Biological Opinion at 1, 3; SBZ037387, SBZ037389, as long as the provisions

of the Biological Opinion are followed.

To begin, on its face, the Biological Opinion specifically contemplates the listing of future

species and critical habitat.   1996 Biological Opinion at 6; SBZ037392 (emphasis added) ("This

biological opinion and conference report addresses *all present and future* Federally listed and

proposed species and designated or proposed critical habitats that may be affected by the

implementation and administration of surface coal mining regulatory programs under SMCRA.");

see also id. at 13; SBZ037399 ("This document . . . *applies to both current and future listed species and critical habitats."* (emphasis added)).   As a recognition that it applies to future listings, the re-initiation section of the 1996 Biological Opinion does not list the addition of new species or critical habitat as a reason for re-initiating consultation.   Thus, even though new species have been listed since 1996, OSM reasonably relied on the plain language of the 1996 Biological Opinion and has not re-initiated consultation.

Moreover, the 1996 Biological Opinion establishes procedures that protect any new species that might be listed and any critical habitat that might be designated in the future.   For instance, the 1996 Biological Opinion requires the FWS to maintain a current, updated list of all of the "protected species and habitats and the specific measures needed to ensure the protection of these species and habitats" and "routinely distribute this list *and any updates* to OSM and State regulatory authorities."   Id. at 6; SBZ037392 (emphasis added).   In addition, the 1996 Biological Opinion requires OSM or the applicable state regulatory authority adhere to a planning, coordination, and dispute resolution process designed to minimize the likelihood and extent of incidental take by both existing and future surface coal mining and reclamation operations.   See, e.g., id. at 13; SBZ037399.   The agency actions identified in the Biological Opinion will not be affected by new listings or critical habitat designation because the process set forth in that document includes the identification of measures to minimize incidental take, and, if needed, the imposition of permit terms or conditions to implement these measures.   Id. at 12; SBZ037398. This planning and coordination process itself is not affected in any way by newly listed species or newly designated critical habitat.   Instead, the Biological Opinion establishes a dispute resolution mechanism that would apply if the SMCRA regulatory authority and FWS cannot reach agreement on appropriate permit-specific protective measures.   Id. at 13; SBZ037399.   NPCA has failed to

explain how or why the processes established in the 1996 Biological Opinion are not reasonably

adequate to accommodate the listing of new species and/or the designation of critical habitat.   For

these reasons, OSM has reasonably not reinitiated ESA consultation under 50 C.F.R. § 402.16(d).

      **2.**      **There Is No New Information On The Adverse Impacts Of Mining On Listed Species and Habitat, Or Modification Of The Action To Compel Reinitiation Of Formal Consultation On The 1996 BiOp**.

The FWS regulations at 50 C.F.R. § 402.16(b) or (c) both require reinitiation when

circumstances have changed in a manner not contemplated by the biological opinion, i.e., new

information that was not considered in the biological opinion is revealed or the action considered

in the biological opinion is modified in such a manner that causes effects that were not

contemplated.   This is not the case here.   The only piece of "new information" cited by NPCA

that allegedly "reveals effects of the action that may affect listed species or critical habitat in a

manner or to an extent not previously considered" is the 2005 Mountaintop Mining/Valley Fills in

Appalachia Final Programmatic Environmental Impact Statement ("MTM/VF FEIS"),

SBZ030644.   See ECF No. 48-1 at 39.   NPCA asserts that this document shows that "hundreds

of miles of streams in central Appalachia have been directly impacted or destroyed as a result of

surface mining operations conducted and approved under SMCRA."   Id.   However, the cited

document concluded that "there would be no effects on [threatened and endangered] species as a

result of the preferred alternative."[12]   MTM/VF FEIS at 53; SBZ030699.   More importantly, the

---

[12]   Of note, FWS was a cooperating agency in the MTM/VF FEIS; thus, FWS must have been fully aware of the "new information" allegedly contained therein.   Yet, FWS has never requested OSM re-initiate consultation on this, or any other ground.   OSM's not seeking re-initiation is further supported by the fact that FWS itself has not suggested such re-initiation.   See, e.g., FWS Handbook, at 2-10, available at http://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf (last visited Aug. 29, 2013) ("When consultation needs to be reinitiated but the action agency neither agrees nor responds, the [FWS] should send a letter clearly outlining the change of circumstances supporting the need for reinitiation.   The letter notifies the agency of its responsibilities under the Act, and presents a clear case for why the [FWS has] determined that one or more of the four general conditions for reinitiating consultation have been triggered (50 C.F.R. § 402.16).").

1996 Biological Opinion expressly recognized the many potential direct and indirect effects of

coal mining on listed species, noting that the effect "depends on the nature of the affected plant,

animal, or critical habitat, the type of mining and its intensity, reclamation techniques and timing,

the seral history of the site, and postmining land use."   1996 Biological Opinion at 6; SBZ037392.

NPCA has not alleged, let alone demonstrated, that the effects of coal mining have changed since

1996 in ways not contemplated in the 1996 Biological Opinion.   As with NPCA's allegations

concerning the listing of new species and designation of critical habitat, NPCA fails to explain

how the planning, coordination, and dispute resolution processes established in the 1996

Biological Opinion have been called into question by any specific finding of the 2005 MTM/VF

FEIS.

Finally, OSM's promulgation of the 2008 SBZ Rule should not be deemed to constitute a

modification of the action, as both NPCA and Federal Defendants have requested vacatur of that

rule in light of the admitted ESA violation.   NPCA has neither alleged nor shown that the

SMCRA regulatory program has changed since 1996, except regarding the SBZ Rule for which

Federal Defendants already confess error.   Thus, OSM has reasonably not reinitiated ESA

consultation on the conduct of SMCRA programs regulating surface coal mining and reclamation

operations under 50 C.F.R. § 402.16(b) or (c).

**B.** **The Court Should Grant Summary Judgment In Favor Of Federal Defendants As To NPCA's Count VII Claims Against EPA.**

Plaintiff has also moved for summary judgment as to its Count VII claims that EPA

allegedly failed to consult with FWS under Section 7(a)(2) of the ESA when it provided its written

concurrence to OSM, see SBZ000079-81; EPA AR001, with respect to regulations promulgated

under Section 501 of SMCRA.   See ECF No. 6 at ¶¶ 84 - 89 (Amended Complaint).   Section 501

provides that the Secretary of the Interior shall not promulgate and publish SMCRA regulations

until the Secretary has:

> (B) obtained the written concurrence of the Administrator of the Environmental
> Protection Agency with respect to those regulations promulgated under this section
> which relate to air or water quality standards promulgated under the authority of the
> Federal Water Pollution Control Act [commonly referred to as Clean Water Act
> ("CWA")], as amended [33 U.S.C. § 1251 et seq.]; and the Clean Air Act ["CAA"],
> as amended [42 U.S.C. § 7401 et seq.] . . . .

30 U.S.C. § 1251(a)(B).

As a threshold matter, Federal Defendants note that NPCA makes only passing references

to this claim in its summary judgment memorandum.  See ECF No. 48-1 at 4, 13, 41.   NPCA

fails to demonstrate any legal violation on the part of EPA.   Under the circumstances, NPCA's

arguments as to Count VII should be deemed waived.   Moreover, it is entirely unnecessary for the

Court to reach the merits of Plaintiff's Count VII claims concerning the EPA's alleged duty to

consult with FWS considering that Federal Defendants have already confessed that OSM had its

own duty to consult with FWS when it promulgated the 2008 SBZ Rule.   If the Court grants the

remand and vacatur of the 2008 SBZ Rule, as requested by both Plaintiff and Federal Defendants,

it would serve no purpose to reach the issue of whether EPA had its own, independent obligation to

consult with FWS.   In any event, the Court lacks jurisdiction to review the merits of EPA's

decision whether to provide its concurrence to OSM.

## 1.      EPA's Concurrence Is Not Final Agency Action.

EPA's concurrence does not constitute a final agency action for purposes of judicial review

under the APA and the ESA.   The APA, 5 U.S.C. § 704, makes judicial review available for two

categories of agency actions:   "[a]gency action made reviewable by statute" and "final agency

action for which there is no other adequate remedy in a court."   Id.   While only the second

category contains an explicit reference to finality, the D.C. Circuit has concluded that the finality requirements explicated in the APA apply equally to cases--as here, under the citizen-suit provision of the ESA--where judicial review is sought under another statute.   Ticor Title Ins. Co. v. FTC, 814 F.2d 731, 746 n.2 (D.C. Cir. 1987); Carter/Mondale Presidential Comm. v. Fed. Election Comm'n, 711 F.2d 279, 285 n.9 (D.C. Cir. 1983).[13]   The APA's requirements, including the requirement for final agency action, thus apply to NPCA's ESA challenge here.   Nat'l Ass'n of Home Builders v. Norton, 298 F. Supp. 2d 68, 79 n. 4 (D.D.C. 2003), aff'd 415 F.3d 8 (D.C. Cir. 2005).

The Supreme Court set forth the criteria for determining whether an agency action is final in Bennett, 520 U.S. 154.   At that time, the Court explained that, as a general matter, two conditions must be satisfied for agency action to be "final."   First, the action "must mark the 'consummation' of the agency's decisionmaking process," and not be "of a merely tentative or interlocutory nature."   520 U.S. at 177-78.   Second, the action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"   Id. (citation omitted).   See also Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 483 (2004) ("to be final, agency action must mark the consummation of the agency's decisionmaking process, and must either determine rights or obligations or occasion legal consequences") (internal quotation marks and citation omitted) (quoting Bennett).

EPA's concurrence is not a final action for purposes of the first part of the Bennett test, because such concurrence does not mark the end of the relevant decisionmaking process, OSM's

---

[13]  The Carter/Mondale court reasoned that when Congress enacted the judicial review provisions of the APA, it intended to codify existing law on judicial review of agency actions.   Id.   The existing law at the time included a court-imposed finality requirement as a prerequisite for judicial review.   Id.   Accordingly, the court noted that the judicial review provision of the statute at issue in that case, the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031 - 42, would be subject to a finality requirement even if it did not otherwise refer to the review procedures of the APA.

issuance of final regulations under SMCRA.   See Franklin v. Massachusetts, 505 U.S. 788,

797–98 (1992) (holding that the Secretary of Commerce's report to the President did not create

legal consequences); Dalton v. Specter, 511 U.S. 462, 465 (1994) (holding the Secretary of

Defense's recommendations and the Defense Base Closure and Realignment Commission's report

for the President did not create legal consequences).   EPA's concurrence is a condition of OSM's

publication of a final rule relating to air or water quality pursuant to SMCRA.   However, EPA's

concurrence does not act as a mandate on OSM to finalize its proposed rule; in fact, EPA's

concurrence does not *require* OSM to take any action whatsoever.   OSM can still choose to

take—even after EPA's concurrence—whatever action it wants on its proposed rule, including not

issuing the rule at all.[14]

 EPA's concurrence also fails to satisfy the second part of the Bennett test because it does

not create new obligations on those being potentially regulated under OSM's proposed rule; only

the promulgation of OSM's final rule can impose such obligations.   Additionally, any legal

obligation for OSM's potential regulations to comply with the CWA pursuant to SMCRA, 30

U.S.C. § 1261(a)(B), does not derive from EPA's concurrence, but from the existence of the CWA

itself.   E.g., Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs, 543 F.3d 586, 594 (9th Cir.

2008) ("[The applicant]'s legal obligations arise directly and solely from the CWA, and not from

the Corps' issuance of an approved jurisdictional determination.").   Moreover, EPA's

concurrence does not insulate OSM's regulations from legal challenge as inconsistent with the

CWA.   Morris v. Gressette, 432 U.S. 491, 506–07 (1977) (Attorney General's failure to object to

a discriminatory state law does not mean the law is insulated from traditional constitutional

---

[14]  Even assuming for the sake of argument that the concurrence constitutes the consummation of EPA's
decisionmaking process for purposes of the first prong of the Bennett test, it still fails to meet Bennett's second prong
as discussed below.

challenge.).   In short, because EPA's concurrence fails to meet either prong of the <u>Bennett</u> test, it

is not a final agency action under the APA and is not subject to judicial review.

2.     <u>EPA's Concurrence Is Committed To Agency Discretion.</u>

Even if EPA's concurrence could somehow be construed as a final agency action under

<u>Bennett</u>, it would still be unreviewable because it is an action committed to EPA's discretion.   An

agency action is deemed to be committed to agency discretion by law where a "statute is drawn so

that a court would have no meaningful standard against which to judge the agency's exercise of

discretion" and where "no judicially manageable standards are available for judging how and

when an agency should exercise its discretion."   <u>Heckler v. Chaney</u>, 470 U.S. 821, 830 (1985).

Here, SMCRA Section 501 requires OSM to "obtain[] the written concurrence of the

Administrator of the EPA *with respect* to those regulations . . . which relate to air or water quality

standards[.]"   30 U.S.C. § 1251(a)(B) (emphasis added).   Based on this provision, there are no

factors that limit EPA's discretion in any fashion.   The substance of EPA's required concurrence

is not described in any detail as to the timing of such concurrence, <u>see id.</u> (requiring EPA's

concurrence *before* OSM's regulations can be promulgated).   The "with respect" clause of

Section 501 of SMCRA does not require EPA's concurrence to be based substantively upon EPA's

own CAA and CWA regulations; instead, the "with respect" clause designates only those OSM

regulations that EPA must concur with before their promulgation.   <u>See id.</u>   This provision is

analogous to the CAA provision construed in <u>Sierra Club v. Jackson</u>, 648 F.3d 848, 856 (D.C. Cir.

2011).   There, the D.C. Circuit held that even though the CAA stated the Administrator "*shall*

'take such measures' . . . *as necessary* to prevent construction or modification of a major emitting

facility," there was sufficient agency discretion left to EPA to exempt EPA's actions from judicial

review due to the qualifying "as necessary."   <u>Id.</u>   Because the statutory provision at issue here

28

delegates an equal or even greater degree of discretion to EPA regarding its concurrence with

OSM's SMCRA regulations, the Court should follow Jackson and hold that the concurrence is

unreviewable.

### 3.        It Is Legally Unnecessary For EPA To Consult With FWS.

Even assuming for sake of argument that EPA's concurrence is a reviewable, final agency

action under the APA and the ESA, Plaintiff has failed to demonstrate that consultation *by EPA* (as

opposed to OSM) is necessary as a matter of law.     Not every action taken by a federal agency

triggers a duty to consult under ESA Section 7(a)(2).    Consultation is required only when an

agency *authorizes, funds, or carries out* an affirmative, discretionary action that "may affect"

listed species or critical habitat. 16 U.S.C. § 1536(a)(2) (emphasis added); 50 C.F.R. § 402.14(a);

Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1011 (9th Cir. 2012) (en banc).   EPA's

concurrence does not authorize, fund, or carry out any action.   It is merely an interlocutory step in

the OSM's process for issuing final regulations under SMCRA.   EPA's concurrence has no

independent legal effect.   Rather, the action authorized, funded, or carried out in this context is

OSM's issuance of final SMCRA regulations.   Thus, on its face, ESA Section 7 consultation

requirements are not triggered by EPA's concurrence letter.

Moreover, if "a particular action will have no effect on an endangered or threatened

species, the consultation requirements are not triggered."   Pac. Rivers Council v. Thomas, 30 F.3d

1050, 1054 n.8 (9th Cir. 1994); Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d

1443, 1447-48 (9th Cir. 1996).   Here, as a matter of law, EPA's concurrence in OSM's SMCRA

regulation has no effect on threatened or endangered species because the concurrence does not

authorize the application of the SMCRA regulation in any particular situation.   Again, as

described above, EPA's concurrence is merely a condition of OSM's decision whether to publish

SMCRA regulations.   EPA's concurrence, standing alone, does not result in any effect on threatened or endangered species.   Any such effect is necessarily caused by actions taken following OSM's publication of its final regulations.   As a matter of causation, EPA is not legally responsible for any effects on threatened or endangered species that may occur after OSM publishes its regulations following EPA's concurrence.   <u>Dep't of Transp. v. Pub. Citizen</u>, 541 U.S. 752, 773 n.7 (2004) (holding that a "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations); <u>cf Nat'l Ass'n of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, 668 (2007) (discussing <u>Public Citizen</u>). Therefore, it is unnecessary as a matter of law for EPA to consult with FWS when it renders its concurrence under SMCRA.

## **CONCLUSION**

For the foregoing reasons, and for the reasons set forth in Federal Defendants' opening memorandum, ECF No. 43-1, Federal Defendants respectfully request the Court to: (1) grant summary judgment in favor of Plaintiff as to the pertinent portions of Count II of the Amended Complaint, ECF No. 6 at ¶¶ 56-62; (2) grant summary judgment in favor of Federal Defendants as to Counts III, IV, V, and VII of the Amended Complaint, ECF No. 6 at ¶¶ 69-78 84-89; and (3) dismiss any remaining claims as moot or otherwise subject to the primary jurisdiction of OSM and FWS.   As remedy for the admitted ESA violation, Federal Defendants respectfully request the Court to vacate the 2008 SBZ Rule, reinstate the regulations in effect prior to the adoption of that rule, and remand this matter to OSM for further rulemaking proceedings, as proposed in the Pizarchik Declaration, ECF No. 43-4.

Respectfully submitted,

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division

/s/ Brian H. Lynk
Brian H. Lynk, D.C. Bar No. 459525
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C.   20026-3986
(202) 514-6187 (telephone)
(202) 514-8865 (facsimile)
brian.lynk@usdoj.gov

/s/ Ruth Ann Storey
Ruth Ann Storey
United States Department of Justice
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0493 (telephone)
(202) 514-8865 (facsimile)
ruth.ann.storey@usdoj.gov


DATED: August 30, 2013        By:     /s/ Mark Arthur Brown
                                      Mark Arthur Brown, D.C. Bar No. 470050
                                      United States Department of Justice
                                      Wildlife and Marine Resources Section
                                      P.O. Box 7611
                                      Washington, D.C. 20044-7611
                                      (202) 305-0204 (telephone)
                                      (202) 305-0275 (facsimile)
                                      mark.brown@usdoj.gov

                                      Attorneys for the United States

OF COUNSEL:

Emily D. Morris
Thomas Bovard
Division of Mineral Resources
Office of the Solicitor
U.S. Department of the Interior

Michael G. Lee
Office of General Counsel
U.S. Environmental Protection Agency